# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

Case No. 4:24-cv-342

PATRICK HORSMAN,

      Plaintiff,

v.

BRETT JEFFERSON,
RYAN ANDREWS, and
ANDREWS LAW FIRM, P.A.,

      Defendants.

_____/

## **COMPLAINT**

Plaintiff Patrick Horsman files this Complaint against Defendants Brett Jefferson, Ryan Andrews, and Andrews Law Firm, P.A. ("Andrews Law").

## **INTRODUCTION**

1.    Defendant Brett Jefferson is an abusive bully who was previously ordered to pay compensatory and punitive damages for libel after defaming another victim through false and derogatory statements published online. Despite a punitive damages award of six times the compensatory damages, this consequence was insufficient to deter Jefferson from repeating the same misconduct.

2.    As he had done before, Defendant Jefferson attempted to conceal his identity while making defamatory statements, this time using an encrypted Protonmail email address in connection with defaming Plaintiff and others. With the

assistance of his complicit attorney, Ryan Andrews, Jefferson orchestrated the destruction of Plaintiff's reputation and livelihood by publishing multiple false articles containing disparaging content through the use of fake personas—pseudonym bots—falsely posing as journalists.

3.    As in his previous reputation-destroying actions, Jefferson ensured that his defamatory content was amplified online with keywords and backlinks, making it prominently appear in Google search results for Plaintiff's name.

4.    The damage to Plaintiff's reputation and business was catastrophic, as being labeled a "fraudster" or "scam artist" is a scarlet letter in the investment management industry where Plaintiff operates.

5.    Jefferson is a serial defamer and a malicious destroyer of reputations, a rare recidivist undeterred by a prior libel judgment and the imposition of punitive damages.

6.    Plaintiff brings this action to recover at least $30 million in compensatory damages from Defendants, jointly and severally, and an additional $150 million in punitive damages from Brett Jefferson.

## **PARTIES**

7.    Plaintiff Horsman is a natural person and a citizen of Puerto Rico.

8.    Defendant Jefferson is a natural person and a citizen of Florida.

9.    Defendant Andrews is a natural person and a citizen of Florida.

10. Defendant Andrews Law is a Florida corporation with a principal place of business at 822 N. Monroe Street, Tallahassee, FL 32303, and is therefore a citizen of Florida.

## JURISDICTION AND VENUE

11. There is complete diversity between the parties under 28 U.S.C. § 1332. Plaintiff is a citizen of Puerto Rico and Defendants are citizens of Florida.

12. The amount in controversy requirement of 28 U.S.C. § 1332 is satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

13. Defendant Jefferson is subject to personal jurisdiction in this state because he is a resident of Florida, he is a citizen of Florida, and he has engaged in substantial and continuous activity within Florida. He committed wrongful acts in Florida and the defamatory statements that he placed online were accessible in Florida and were accessed in Florida.

14. Defendant Andrews is subject to personal jurisdiction in this state because he is a resident and citizen of Florida, has engaged in substantial and continuous activity within the state, committed wrongful acts in Florida by actively participating in the publication of defamatory statements about Plaintiff, and substantially assisted in publishing these statements on the Internet, where these statements were accessible and accessed in Florida.

15.    Citizens of Florida accessed, read, and understood the defamatory statements while residing in Florida.

16.    Defendant Andrews Law is Andrews' employer, and all actions described herein which were taken by Andrews are imputed to Andrews Law through vicarious liability as all actions taken by Andrews were taken within the scope of his employment at Andrews Law and all actions taken by Andrews in this action were condoned, encouraged, and intended by Andrews Law.

17.    Venue is proper in this Court.

## FACTS COMMON TO ALL ALLEGATIONS

18.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

I.    JEFFERSON'S MOTIVE FOR DEFAMING PLAINTIFF

19.    Jefferson defamed Plaintiff in connection with his demand that Plaintiff pay him money to offset his investment loss after realizing he had no legal recourse against the start-up company in which he had invested.

20.    In May 2019, Defendant Jefferson, through an entity named BRJ Holdings III, LLC ("BRJ"), loaned $2,500,000 to an Arizona start-up farming company named Integrated CBD LLC ("Integrated CBD") pursuant to a written agreement. Plaintiff was one of Integrated CBD's principals.

21.    By November 2019, the market for the company's crop had crashed due to market forces, leading Corbin Capital, Integrated CBD's senior lender, to call its loan, forcing the liquidation of Integrated CBD.

22.    Integrated CBD's fate was not unique, as most businesses within the CBD start-up community experienced similar failures during that period.

23.    As a result of the senior lender's invocation of its liquidation preference, all equity and convertible note investors, including all investors in BRJ's class, lost their investments in the forced liquidation.

24.    Like BRJ, which lost its $2,500,000 investment, Plaintiff also lost the entirety of his $1,300,000 investment in Integrated CBD.

25.    Jefferson had personally negotiated and signed an inter-creditor agreement with Integrated CBD and the senior lender, knowing that the "stand-still" requirement precluded BRJ from taking any action against Integrated CBD unless and until the senior lender's debt was repaid in full.

26.    The senior lender's debt was not repaid in full, and Jefferson knew that his entity BRJ therefore not only had no recourse against Integrated CBD but was also precluded from taking any legal action against Integrated CBD.

27.    Jefferson is an investor with 25 years of experience in the structured finance market and the option arbitrage industry. He serves as the Co-Chief Investment Officer and Founder of Hildene Capital Management, an asset

management firm overseeing $15 billion in assets, where he directs all of the firm's investment decisions and strategies.

28.    However, Jefferson's investment in Integrated CBD through BRJ was "off the books" and separate from his hedge fund activities. Concurrently, Corbin Capital, an $8 billion private credit fund, invested $30 million in Integrated CBD and conducted extensive due diligence, including multiple visits to the team and the farm.

29.    In May 2019, when BRJ invested in Integrated CBD, both parties were represented by sophisticated counsel, and a multitude of comprehensive risk disclosures were exchanged and acknowledged in the written agreements signed by both sides.

30.    Knowing that BRJ was bound by the "stand-still" clause in the inter-creditor agreement he negotiated and signed with Corbin Capital, Jefferson became increasingly hostile, abusive, and unprofessional in his communications with Plaintiff.

31.    After meeting with Plaintiff in May 2019, Jefferson had introduced and recommended an investment in Integrated CBD to three individuals—two of his company's employees and another person. These three additional investments, totaling $1,250,000, were in the same class as BRJ's investment, and those investors also lost their money in the liquidation of Integrated CBD.

6

32.    In his hostile communications with Plaintiff in 2020, Jefferson openly copied the three individuals he had referred to Plaintiff, indicating that he was also communicating on their behalf.

33.    In September 2019, Jefferson had testified that he has a "character flaw" related to his anger, admitting to incidents where he referred to the principal of an unrelated solar company as a "piece of [expletive]," expressed a desire to hire someone to break the executive's knees, and even admitted under oath that he threatened to kill him.[1]

34.    During the liquidation of Integrated CBD, Jefferson referenced unnamed sources in his communications with Plaintiff while making inaccurate accusations against him.

35.    Throughout these hostile communications, Jefferson asserted that he and the copied individuals were interested in "rectifying this situation," which

---

[1] Jefferson sent the solar company executive the following late-night email:

> Since you are such a horrible role model for your kids (sic) I would be happy to speak with them and let them know what a loser you are but more importantly I could explain to them how to become responsible, successful and respected. As we all know those are traits you will never have. Please let me know if you want me to speak to your kids.

Jefferson further told the executive, an MBA graduate from Harvard Business School, that he was going to ensure he ended up "working at a Whataburger." Jefferson even celebrated upon learning that the executive's wife had filed for divorce—news that came shortly after Jefferson's own wife had done the same.

involved Jefferson's demand that Plaintiff pay money to Jefferson and his colleagues despite the lack of any legal obligation for Plaintiff to pay money to Jefferson or his colleagues. In his efforts to coerce Plaintiff into making this payment, Jefferson resorted to threats, warning Plaintiff that Jefferson would contact investors involved in "all" of Plaintiff's "deals" as well as "regulators" if a resolution was not reached.

36.    In response to Jefferson's hostile communications, Plaintiff corrected the inaccurate accusations, provided substantive answers to the outstanding questions, and submitted all requested documents.

37.    After Plaintiff addressed all of Jefferson's questions, Jefferson blithely proclaimed that there were enough "red flags" to file a suit, referencing his past litigation against "a very talented fraudster" who, as a result, would "have a really difficult time ever finding respectable employment." However, Jefferson indicated he was willing to have "one last discussion."

38.    In an August 2020 phone call between Plaintiff and Jefferson, Jefferson stated, "I don't know what you did, but I know I'll find something!"

39.    Jefferson then brought Defendant Andrews into the conversation, stating that Andrews would reach out to determine whether the matter could be resolved without litigation.

40.    On August 11, 2020, Jefferson told Plaintiff that if they did not reach a resolution involving Plaintiff's payment, "[t]he question for you is what happens to you."

41.    On August 19, 2020, Jefferson sent Plaintiff the following email:

I am completely fed up with your bullshit. Everything you do has an excuse to why (sic) it wrong. But the simple (sic) the fact is you are a crook. Plain and simple a crook…

In addition, I will (sic) contacting CNBC to sell you "Patrick the scam artist" to American Greed so they can also alert everyone. Please note that I will also be contacting major media contacts I have to make sure that know about your antics. Finally, I know you think you are well protected because you showed up with some "super lawyer" but after everything I have learned it won't be hard to get you put away. Ryan [Defendant Ryan Andrews] has been speaking with some "whistleblowers" former employees, **and to put into plain English, you are fucked. Patrick Fuck You we are going to war!!**

(Emphasis added).

## II.    PRIOR JUDGMENT AGAINST JEFFERSON FOR LIBEL, INCLUDING ORDER TO PAY PUNITIVE DAMAGES

42.    Jefferson's admitted "character flaw" surfaced again when he told a Connecticut small business owner that he was going to "destroy you, your business, your life, your reputation."

43.    Jefferson purchased a 7,207-square-foot residence in Connecticut and hired a husband-and-wife small business, SBD Kitchens, LLC ("SBD"), to renovate portions of the home under written agreements. However, Jefferson failed to pay the remaining invoice.

44.    SBD initiated arbitration for the unpaid balance, damages, and an injunction related to a defamatory website that Jefferson directed a Hildene employee to create, which referred to SBD as a "SCAM."

45.    The arbitrator ruled in favor of SBD on the defamation claim, awarding $25,000 in compensatory damages and $166,038 in punitive damages against Jefferson.

46.    The arbitrator stated:

When coupled with the content and tone of internal e-mails between and among [Brett Jefferson, Russell, Walker] and others, the conclusion is inescapable that publication of the website was motivated in large measure by a desire to embarrass [the plaintiff] and tarnish its reputation in the eyes of those who visited the website. It is also evident that efforts were made by [Brett] Jefferson and his agents to optimize the website so that it appears as a prominent search result when the term 'SBD' is the subject of a 'Google' or related search inquiry." The arbitrator also found, based on testimony of an advertising consultant, "that the existence of the website made it impractical and imprudent for [the plaintiff] to launch an advertising campaign.

*SBD Kitchens LLC v. Jefferson, 157*, Conn. App. 731, 739-40 (Conn. App. Ct. 2015) (affirming judgment against Jefferson on appeal).

47.    In affirming the arbitration award, the Connecticut district court noted that Jefferson "exercised no due diligence nor investigated the veracity of many of the defamatory statements in the website. Brett Jefferson stated to Karas that he was going to destroy the plaintiff's business and reputation, as well as the lives and

reputation of Karas and Blank. Brett Jefferson insisted on using the term 'SCAM,' a term that his agent, Russell, equated to 'BS.'" *Id*. at 746-77.[2]

48.    In 2015, the Connecticut appellate court upheld the arbitrator's finding of actual malice on Jefferson's part, ruling:

> When the website was about to go live, Brett Jefferson asked Russell to e-mail a link to Blank under an anonymous name. **Brett Jefferson posted a fake comment on the website, under a fake name, as part of a plan to get other people involved and join in the insults of Blank.** He also e-mailed Karas as follows: "What I want you to know is that regardless of the outcome of the contract dispute the website ... which I have created will never be taken down ... and will have numerous back up sites in foreign jurisdictions...." After temporarily taking down the website, the defendants republished it, including the false statements attributed to Howard, despite the fact that two months prior she had advised Brett Jefferson that she had never made those statements. We agree that this and other evidence in the record supports a finding of actual malice.

*Id*. at 477 (emphasis added).

49.    Again revealing his character flaw, Jefferson directed his attorney to offer payment solely of the $25,000 compensatory damages award, but with the condition that the payment be made "in coins, to be delivered in fifty-five-gallon containers." The email from Jefferson's attorney stated that "the coins would be dumped from the containers upon delivery unless the plaintiff paid the defendants

---

[2] In this regard, among the e-mails that the arbitrator referred to in his decision for tone and content, was one from Russell to the webhost: "How hard is it to change that by the way? He [Jefferson] wants to incorporate Scam or some BS. *He cares far less now about discretion.* Do you see the crap I deal with?" (Emphasis added in original.) *Id*. at 477, n. 12.

$5000 per container [and] failure to accept the coins would result in them deeming the plaintiff to have abandoned the award." SBD's attorney objected and moved for sanctions against Jefferson and his counsel. *Id*.

50.   Jefferson is a rare litigant who, despite being previously adjudicated liable for defamation and ordered to pay punitive damages, was undeterred and engaged in the same type of reputation-destroying defamation for which he had been previously punished.

III.   INVOLVEMENT AND COMPLICITY OF CO-DEFENDANT RYAN ANDREWS IN JEFFERSON'S DEFAMATION SCHEME

51.   At all relevant times, Andrews was an authorized agent of Jefferson.

52.   At all relevant times, Andrews served as counsel for Jefferson.

53.   At all relevant times, Andrews served as counsel for the USA Herald and its operator.

54.   Prior to 2017, Andrews had been employed full-time by the USA Herald's operator for three years, as the USA Herald's operator hired Andrews directly out of law school as an employee.

55.   Dating back to 2017, and at all times relevant in this action, Andrews simultaneously represented both Jefferson and the USA Herald's operator and Andrews served as the liaison, conduit, and facilitator between Jefferson and the USA Herald's operator pursuant to Jefferson's publication of defamatory materials.

56.    For each act of defamation, concealed as a purported news story by a pseudonym bot, Jefferson would pay the USA Herald's operator to assist in Jefferson's publication of defamatory materials, and that payment flowed through Andrews and Andrews Law.

57.    Dating back to 2017, and at all times relevant in this action, Andrews used the Andrews Law firm bank account to shuffle money from Jefferson's bank account to the USA Herald operator's companies' bank accounts.

58.    For each occasion on which Jefferson would publish defamatory content online through pseudonym bots—including the occasions discussed herein relative to Plaintiff—Andrews, Jefferson, and the USA Herald's operator would agree on a price, generally in the range of $15,000 per transaction. Jefferson would then make the payment to Andrews, through the Andrews Law bank account, and Andrews would then send the money to the USA Herald operator's designated account.

59.    These furtive actions regarding the transfer of money were taken to maintain "plausible deniability," as agreed by Jefferson, Andrews, and the USA Herald's operator.

60.    For all occasions in which Jefferson published content in connection with the USA Herald, either Jefferson or Andrews would send the USA Herald

operator a Word document containing the very content that Jefferson and Andrews intended to publish.

61.    For every defamatory publication that Jefferson published in connection with the USA Herald, including those referenced herein regarding Plaintiff, Andrews either drafted the entirety of the content at Jefferson's direction or played a significant and vital role in drafting and editing the defamatory content.

62.    On or about August 27, 2022, Andrews drafted, edited, and revised a Word version of a defamatory article dated August 27, 2022 about Plaintiff and Andrews, on his own behalf and on Jefferson's behalf, published it online as distributed by the USA Herald (the "August 27, 2022 Defamatory Remcoda Article").

63.    Using his Andrews Law email address, Andrews then sent the August 27, 2022 Defamatory Remcoda Article content to the USA Herald's operator to distribute online.

64.    Among other things, using his sophistication as an attorney to obtain a copy of the Second Amended Complaint in *Remcoda, LLC v. Ridge Hill Trading Ltd.*, No. 1:21-cv-00979 (S.D.N.Y. filed Feb. 3, 2021) (the "Remcoda Lawsuit"), Andrews altered the allegations in ¶ 75 by removing the phrase "upon information and belief" and instead adding the phrase "and his business partner Patrick

Horsman's company Unicorn Health" and "Horsman's company" when no reference to Horsman or Unicorn Health existed in the actual pleading.

65.    Andrews disseminated the August 27, 2022 Defamatory Remcoda Article with those allegations altered per above and he provided the allegations in altered form to the USA Herald's operator with malice and with the intention of harming Plaintiff.

66.    Andrews undertook these actions, with malice and with the intent to maximize the harm to Plaintiff, on his own behalf and on Jefferson's behalf.

67.    As of August 27, 2022, when Andrews and Jefferson defamed Horsman, Andrews was counsel of record, admitted pro hac vice, in then-pending litigation on behalf of Jefferson and BRJ and against Horsman. *Lev, et al. v. Horsman, et al.*, CV2020-012256 and *Horsman v. Jefferson, et al.*, CV2021-006036, Maricopa Superior Court, Arizona.

68.    Andrews provided significant assistance to Jefferson and the USA Herald's operator by drafting and revising the August 27, 2022 Defamatory Remcoda Article through written changes, verbal discussions, and voice note message exchanges that automatically delete themselves two minutes after being heard.

69.    Even after Plaintiff's counsel sent a cease and desist letter to the USA Herald's operator, and this letter was provided to Andrews, Andrews revised the

August 27, 2022 Defamatory Remcoda Article in a manner which retained the defamatory content.

70.    On May 29, 2023, Andrews played a significant role in drafting a defamatory article date May 29, 2023 about Plaintiff and Andrews, on his own behalf and on Jefferson's behalf, published it online as distributed by the USA Herald (the "May 29, 2023 Defamatory LGBCoin Article").

71.    On or before May 29, 2023, Andrews drafted, edited, and revised a Word version of the May 29, 2023 Defamatory LGBCoin Article about Plaintiff and published it on his behalf, and on Jefferson's behalf, online as distributed by the USA Herald.

72.    Using his Andrews Law email address, Andrews sent the May 29, 2023 Defamatory LGBCoin Article content to the USA Herald's operator to distribute online.

73.    Among other things, using his sophistication as an attorney to obtain a copy of the Second Amended Complaint in *De Ford v. Koutoulas, et al* No. 6:22-cv-00652 (M.D. Fla. Filed Apr. 1, 2022) (the "LGBCoin Lawsuit"), Andrews drafted defamatory content in the May 29, 2023 Defamatory LGBCoin Article which he knew to be false.

74.    Jefferson instructed and engaged Andrews and his law firm, Andrews Law, to draft, edit, and publish the defamatory material about Plaintiff in the August

27, 2022 Defamatory Remcoda Article and the May 29, 2023 Defamatory LGBCoin Article.

75.    Andrews was acting within the scope of his employment as Jefferson's agent when he provided substantial assistance and actively participated in drafting, editing, revising, and publishing the defamatory articles about Plaintiff.

76.    Andrews was fully aware and acted at all times with the intent that the damage caused by the August 27, 2022 Defamatory Remcoda Article and the May 29, 2023 Defamatory LGBCoin Article would be maximized through search engine optimization tactics, including the creation of links and backlinks, to ensure that the articles ranked as high as possible in Google searches of Plaintiff's name.

77.    The USA Herald and its operator acted as authorized agents of Jefferson and Andrews in disseminating the defamatory material that Defendants published.

78.    Jefferson and Andrews directed the operator of the USA Herald to amplify the harm done to Plaintiff's reputation through backlinks and other search engine optimization in distributing the defamatory content.

79.    The USA Herald's operator acted within the scope and purpose of his employment, as dictated by Jefferson and Andrews, when he disseminated and distributed the defamatory articles published by Defendants.

80.     At relevant times pursuant to the allegations herein, Andrews used his ryan@andrewslaw.com email address as part of his full-time employment at Andrews Law.

81.     At all relevant times, as alleged herein, Andrews was employed by Andrews Law. All actions taken by Andrews, as described herein, occurred within the context and scope of his employment with Andrews Law. Accordingly, Andrews Law is vicariously liable for all actions taken by Andrews as set forth herein.

IV.    JEFFERSON'S USE OF PSEUDONYM BOTS TO DEFAME PLAINTIFF

1.    The August 27, 2022 Defamatory Remcoda Article

82.     On August 27, 2022, Jefferson collaborated with Andrews to publish a defamatory smear piece about Plaintiff, which was disseminated online through the USA Herald. The article, falsely attributed to a person named "Catherine Davis," is the August 27, 2022 Defamatory Remcoda Article.

83.     However, "Catherine Davis" is not a real person, as this name is a pseudonym bot under which Jefferson and Andrews published their false and defamatory statements about Plaintiff online.

84.     The photograph associated with the fictitious profile "Catherine Davis" is as follows:

Home  ›  Authors  ›  Posts by Catherine Davis

# Catherine Davis



**225 POSTS**

Catherine Davis is a contributor to the USA Herald. She covers politics and reports on issues of the times.

85.    "Catherine Davis" is a pseudonymous bot that Jefferson and Andrews used as a false persona to defame Plaintiff and other victims.

86.    Defendants also employed the fake persona "Jeff Watterson"—a name closely resembling Brett Jefferson's—to defame Plaintiff.

87.    The depiction of "Jeff Watterson" from his USA Herald profile is as follows:

Home  ›  Authors  ›  Posts by Jeff Watterson

# Jeff Watterson



**101 POSTS**

https://usaherald.com

Jeff Watterson is a journalist that focuses on politics, investigative journalism, and technology news. When Jeff is not writing, which is his hobby, he enjoys fishing and hunting.



88.    The photograph of Jeff Watterson from his LinkedIn profile picture is as follows:



89.    "Jeff Watterson" is not a real person.

90.    At all times, Defendants knew that "Catherine Davis" and "Jeff Watterson" were not real people. Defendants maliciously and intentionally defamed Plaintiff by presenting defamatory statements through these false personas—pseudonymous bots—adding an additional layer of inherent and pernicious falsity to Defendants' defamatory content.

91.    The August 27, 2022 Defamatory Remcoda Article, published by Defendants under the pseudonym "Catherine Davis," falsely asserted that Plaintiff was purportedly involved in a fraudulent scheme that was the subject of litigation captioned *Remcoda, LLC v. Ridge Hill Trading Ltd.*, No. 1:21-cv-00979 (S.D.N.Y. filed Feb. 3, 2021) (the "Remcoda Lawsuit").

92.    The title of the August 27, 2022 Defamatory Remcoda Article was "Patrick Horsman and partner Russel [sic] Gross [sic] involvement in $3.7M alleged fraud." This headline is defamatory per se because Plaintiff was not involved in any $3.7M alleged fraud. Moreover, Gross was also not involved in any fraud.

93.    The August 27, 2022 Defamatory Remcoda Article featured a large photograph of Plaintiff, misappropriated and published without his consent, directly under the headline referencing "involvement in $3.7M alleged fraud."

94.    The first sentence of the August 27, 2022 Defamatory Remcoda Article states that a "lawsuit between Remcoda, LLC, and defendants…. Russel [sic] Gross, and the *involvement of his partner*, *Patrick Horsman*, is *ever evolving*." (Emphasis added).

95.    However, Plaintiff has never been named as a party in the Remcoda Lawsuit, nor was he mentioned anywhere in the April 25, 2022 operative Second Amended Complaint.

96.    The April 25, 2022 operative Second Amended Complaint also contains no reference to "Unicorn Health LLC," which, according to the August 27, 2022 Defamatory Remcoda Article, is "owned by Gross's business partner Patrick Horsman."

97.    Furthermore, the August 27, 2022 Defamatory Remcoda Article falsely suggests that the Remcoda Lawsuit was "ever evolving," particularly as it relates to Plaintiff. This is false. The April 25, 2022 operative Second Amended Complaint was filed four months before the August 27, 2022 Defamatory Remcoda Article. Nothing was "ever evolving," and no pleading in the case contains any reference whatsoever to Plaintiff. The express and implied implication of Plaintiff's purported

involvement in the $3.7M fraud or the Remcoda Lawsuit itself is false and defamatory per se.

98.    The August 27, 2022 Defamatory Remcoda Article asserts that "Russel [sic] Gross, and his business partner Patrick Horsman's company Unicorn Health, were allegedly working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. Russel [sic] Gross and Horsman's company allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld."

99.    These statements in the August 27, 2022 Defamatory Remcoda Article are not only false but are also altered and differ from ¶ 75 of the Second Amended Complaint, where this information would have been sourced.

100.   Paragraph 75 of the Second Amended Complaint states: "Gross, upon information and belief, was working with Defendants from the start when he introduced Plaintiff to Ridge Hill as part of Defendants' scheme. Gross, upon information and belief, received payment of his fee from Plaintiff's funds that Defendants have wrongfully withheld."

101.   The August 27, 2022 Defamatory Remcoda Article offers no explanation for why the actual allegations in the Second Amended Complaint were altered to further implicate, disparage, and impugn Plaintiff, despite the absence of any reference to Plaintiff or Plaintiff's company, "Unicorn Health," (in which

Plaintiff held a minority interest as a passive investor), in the Second Amended Complaint.

102.   The following table summarizes the falsity of this aspect of the information in the August 27, 2022 Defamatory Remcoda Article:

| Second Amended Complaint at ¶ 75 | False Report in the Defamatory Article |
|---|---|
| Gross, ***upon information and belief,*** was working with Defendants from the start when he introduced Plaintiff to Ridge Hill as part of Defendants' scheme. Gross, ***upon information and belief,*** received payment of his fee from Plaintiff's funds that Defendants have wrongfully withheld. (Emphasis added). | Russel Gross, ***and his business partner Patrick Horsman's company Unicorn Health***, were allegedly working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. Russel [sic] Gross ***and Horsman's company*** allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld. (Emphasis added). |

103.   The August 27, 2022 Defamatory Remcoda Article contains a material alteration by deleting the phrase "upon information and belief," which appears twice in ¶ 75 of the Second Amended Complaint.

104.   Instead, the August 27, 2022 Defamatory Remcoda Article substitutes the phrase "and his business partner Patrick Horsman's company Unicorn Health," and "and Horsman's company" in place of the actual allegations set forth in the phrase "upon information and belief."

105.   Jefferson and Andrews intentionally altered the text of the allegations made in the Second Amended Complaint, removing the phrase "upon information and belief," which denotes the absence of direct evidentiary support.

106.   Allegations made "upon information and belief" should be handled with care and should at least be identified as such if the allegations reflect that status.

107.   However, in the August 27, 2022 Defamatory Remcoda Article, Jefferson and Andrews deliberately removed the phrase "upon information and belief" twice and instead inserted unsourced and inaccurate language, completely extrinsic to the Second Amended Complaint, to falsely implicate, disparage, and impugn Plaintiff.

108.   The August 27, 2022 Defamatory Remcoda Article also includes a statement in the headline next to Plaintiff's photograph, claiming that the Remcoda Lawsuit involving the $3.7M fraud is "ever evolving." This, too, is false. The filing of the Second Amended Complaint on April 25, 2022—four months prior to the August 27, 2022 Defamatory Remcoda Article—was not identified as an "ever evolving" aspect of the case, nor was any aspect of the case identified as such.

109.   The "ever evolving" language is false, as is the headline. Given that four months had passed since the complaint was amended on April 25, 2022, the only new developments would have been the June 30, 2022 motion to dismiss, and

July 21, 2022, memo of law in support of the motion to dismiss, if the phrase "ever evolving" were to be applied.

110.   In fact, the July 21, 2022 memo of law in support of the motion to dismiss filed by Gross clearly states, "[t]his case has almost nothing to do with Mr. Gross," arguing that Remcoda failed to allege any viable legal claim against him.

111.   Moreover, Plaintiff's name is nowhere mentioned in either motion to dismiss because Plaintiff is not a party in the case and is not involved in the Remcoda Lawsuit.

112.   Nonetheless, the title of the August 27, 2022 Defamatory Remcoda Article, the large photograph of Plaintiff under the title, and the first sentence falsely and affirmatively assert Plaintiff's "involvement" in "$3.7M alleged fraud."

113.   Just under the photograph of Plaintiff, the August 27, 2022 Defamatory Remcoda Article states that the lawsuit is "ever evolving." The false implication of the term "ever evolving," which would apply to any legal case that does not remain static, reasonably indicates the presence of a new development implicating Plaintiff. But there is none.

114.   The Second Amended Complaint filed four months before the August 27, 2022 Defamatory Remcoda Article contains scaled-back claims against Gross, which were then subject to a motion to dismiss filed a month before the August 27, 2022 Defamatory Remcoda Article.

115.   The statements in the August 27, 2022 Defamatory Remcoda Article are known by Defendants to be false and are false by implication because the article contains no factual explanation of Plaintiff's purported "involvement" as Plaintiff was not involved according to any allegation in the Second Amended Complaint.

116.   On September 1, 2022, Plaintiff's counsel emailed a cease and desist letter to the USA Herald regarding the falsity of the August 27, 2022 Defamatory Remcoda Article, which Defendants published with the assistance of the USA Herald.

117.   Defendants collaborated among themselves after receiving the September 1, 2022 cease and desist letter concerning the August 27, 2022 Defamatory Remcoda Article.

118.   On September 1, 2022, about an hour later, the USA Herald's operator forwarded the cease and desist email and letter from Plaintiff's counsel to Defendant Andrews, stating, "Ryan [Andrews] – see attached. Pls call me."

119.   On September 2, 2022, the USA Herald's operator sent an email entitled "C&D [cease and desist] Received" to Defendant Jefferson at his secret joeyrocks99@protonmail.com address with Plaintiff's counsel's cease and desist letter as an attachment.

120.  On September 2, 2022, the USA Herald's operator forwarded subsequent correspondence with Plaintiff's counsel to Defendant Andrews, stating, "FYI – send me the first complaint. Should be very interesting."

121.  On September 6, 2022, Defendant Andrews and Defendant Jefferson directed the USA Herald's operator to magnify and amplify the defamatory content about Plaintiff in the August 27, 2022 Defamatory Remcoda Article.

122.  On Defendants' behalf, the USA Herald's operator asked a company named Valuewalk to "do a write-up on this article and source us as the original author with an anchor text link to "Patrick Horsman" with this link: https://usaherald.com/russell-gross-of-unicorn-health-owned-by-patrick-horsman-sued-for-alleged-3-7m-fraud/."

2.  The May 29, 2023 Defamatory LGBCoin Article

123.  On May 27, 2023, Defendant Jefferson sent the operator of the USA Herald an email from his joeyrocks99@protonmail.com address entitled "Patrick" which contained a 104 page July 19, 2022 Second Amended Complaint the LGBCoin Lawsuit.

124.  In the Second Amended Complaint attached to Defendant Jefferson's email, Plaintiff was neither named as a party nor alleged to have engaged in any improper conduct. Plaintiff was only briefly mentioned as a co-founder of two

defendant entities and a registered executive of a third company, with no other references to Plaintiff throughout the 300-paragraph pleading.

125.   On May 29, 2023, the Defendants published the May 29, 2023 Defamatory LGBCoin Article titled "Patrick Horsman & Business Partner Thomas McLaughlin Wrapped up in LGBCoin Class Action Lawsuit."

https://usaherald.com/patrick-horsman-business-partner-thomas-mclaughlin wrapped-up-in-lgbcoin-class-action-lawsuit/ (visited August 27, 2024).

https://web.archive.org/web/20230926013630/https://usaherald.com/patrick-horsman-business-partner-thomas-mclaughlin-wrapped-up-in-lgbcoin-class-action-lawsuit/ (visited August 27, 2024).

126.   The May 29, 2023 Defamatory LGBCoin Article refers to a "104 page class-action lawsuit."

127.   The "104 page class-action lawsuit" is the 104 page Second Amended Complaint dated July 19, 2022.

128.   The May 29, 2023 Defamatory LGBCoin Article contains false information, as Plaintiff is not a party to the case according to the Second Amended Complaint.

129.   The first sentence of the May 29, 2023 Defamatory LGBCoin Article falsely states:

> Thomas McLaughlin, co-founder of LGBCoin and business partners with **Patrick Horsman at Coral Defi (Coral Capital Management, LLC), is accused of fraud along with unjust enrichment in a 104 page class-action lawsuit** filed on behalf of investors that lost money in an alleged cryptocurrency scam.

(Emphasis added).

130.  The statement is false because Plaintiff was not "accused of fraud" or unjust enrichment in the 104-page class-action lawsuit.

131.  Moreover, Plaintiff did not engage in any fraud and was not involved in the litigation, as Plaintiff was not a party to the 104-page pleading.

132.  The second sentence of the May 29, 2023 Defamatory LGBCoin Article falsely states:

> The class action lawsuit alleges that Coral Defi, Coral Capital LLC, Coral Capital Management LLC, **all owned by Patrick Horsman (he is listed at the Managing Member/Co-Founder**), defrauded investors in the LGBCoin Cryptocurrency Pump & Dump scheme and attempted to hide their role through a complex web of transactions.

(Emphasis added).

133.  The 104-page pleading contains only three references to Plaintiff, in ¶¶ 32-34: (1) Coral Capital was co-founded by [Plaintiff], Thomas McLaughlin, and/or David Namdar, (2) Coral Capital Management LLC… [Plaintiff] is listed as the registered executive of Coral Capital Management LLC on its SEC corporate filings, and (3) Coral DeFi was founded by [Plaintiff], Thomas McLaughlin, and David Namdar.

134.  The allegations in the Second Amended Complaint do not indicate that Coral Defi, Coral Capital LLC, and Coral Capital Management LLC are "all owned

by Patrick Horsman (he is listed as the Managing Member/Co-Founder)," making the statement in the May 29, 2023 Defamatory LGBCoin Article false.

135. The May 29, 2023 Defamatory LGBCoin Article further states that "Coral Defi, Coral Capital LLC, Coral Capital Management LLC, all owned by Patrick Horsman (he is listed as the Managing Member/Co-Founder), **defrauded investors**…" (Emphasis added).

136. The statements above are false, as the 104-page complaint contains no fraud claims against Plaintiff or any of the "Coral Defendants," as the only claim asserted against the Coral Defendants was unjust enrichment and Plaintiff was not even a party per that pleading.

137. On June 7, 2023, Defendants directed the USA Herald's operator to aggravate and amplify the defamatory content about Plaintiff which Defendants had published in the May 29, 2023 Defamatory LGBCoin Article by ordering a press release.

138. On behalf of Defendants, therefore, the USA Herald's operator ordered a press release that references this article: https://usaherald.com/patrick-horsman-business-partner-thomas-mclaughlin wrapped-up-in-lgbcoin-class-action-lawsuit/

139. Defendants published a press release with the following specifications: "Need 'Patrick Horsman Coral' in the title of the story and in the first paragraph

along with at least 2-3 other times in the press release. Feel free to bill me on Paypal or Upwork, whatever is easiest for you."

140. Beginning in June 2023, multiple forms of The May 29, 2023 Defamatory LGBCoin Article sprung up online pursuant to Defendants' purchase of search engine optimization, syndications, back linking, and reciprocal cross-linking. One such example is found at https://menafn.com/1106513149/Patrick-Horsman-Of-Coral-Capital-Slapped-With-Class-Action-Lawsuit (visited August 27, 2024).

141. In this article, attributed to one "rich williams," which is a pseudonym bot controlled by Defendants posing as a journalist, the defamatory content reads as follows: "**patrick horsman**, managing partner and co-founder of coral capital, an alternative investment platform focused on digital assets and decentralized finance applications, **has been accused of fraud and unjust enrichment** in a class-action lawsuit filed by zigler law group. the **104-page class-action lawsuit**, filed on behalf of investors who lost money in an alleged Cryptocurrency scam, alleges that horman [sic] and his business partner defrauded investors in the 'lgbcoin crypto pump-and-dump scheme' and attempted to hide their role through a complex web of transactions." (Emphasis added).

142. This article contains numerous blatantly false statements.

143. Defendants also reached out to other avenues for distribution, such as Valuewalk, to promote the May 29, 2023 Defamatory LGBCoin Article and to

request that the May 29, 2023 Defamatory LGBCoin Article be reproduced and disseminated in multiple forms.

144. Defendants' conduct in defaming Plaintiff matches Defendant Jefferson's conduct in the SBD Kitchens matter, in which Jefferson emailed the victim of his defamation as follows: "What I want you to know is that regardless of the outcome of the contract dispute the website ... which I have created will never be taken down ... and will have numerous back up sites in foreign jurisdictions...."

145. On May 30, 2023, Defendants directed the operator of the USA Herald to pretend to be a journalist named "Jeff Watterman" on their behalf—despite the fact that no such journalist named Jeff Watterman exists—for the purpose of emailing the plaintiffs' attorney in the LGBCoin Lawsuit, Aaron Zigler, the following:

> Our publication has previously covered a number of scams that Patrick Horsman, the Managing Member of Coral DeFi, has been involved in.  We published an article yesterday on the case and would appreciate if you would give us updates on the case so we can keep it in the news cycle:
> https://usaherald.com/patrick-horsman-business-partner-thomas-mclaughlin-wrapped-up-in-lgbcoin-class-action-lawsuit/
>
> You may want to consider amending your complaint to add Patrick Horsman individually since he is the one that is operating the Coral companies but largely stays behind the scenes.

The "May 30, 2023 Defamatory Email."

146.   The May 30, 2023 Defamatory Email falsely claims that "[o]ur publication has previously covered a number of scams that Patrick Horsman, the Managing Member of Coral DeFi, has been involved in."

147.   Plaintiff has not been involved in any scams, let alone "a number of scams."

148.   The so-called "coverage" by the publication is itself a scam, as the articles published under pseudonyms on Defendants' behalf are defamatory hit pieces, not legitimate journalism.

149.   By advising Zigler to "consider amending your complaint to add Patrick Horsman individually," Defendants implicitly acknowledged that as of May 30, 2023, they considered the Second Amended Complaint—where Plaintiff was not named as a party—to be the operative pleading.

150.   As of May 30, 2023, Defendants were fully aware that their statements alleging that Plaintiff was accused of fraud in the Second Amended Complaint were false.

V.    JEFFERSON'S CONCURRENT USE OF PSEUDONYM BOTS TO DEFAME OTHER VICTIMS, DEMONSTRATING JEFFERSON'S OPPORTUNITY, INTENT, KNOWLEDGE, IDENTITY, AND ABSENCE OF MISTAKE

151.   Defendant Jefferson has repeatedly demanded payment from individuals, threatening to destroy their reputations if they fail to comply.

152.  For    example,    on    May    30,    2023,    using    his joeyrocks99@protonmail.com email address, Defendant Jefferson sent the operator of the USA Herald a pleading from a Florida case involving Plaintiff. In response, the  operator  of  the  USA  Herald  emailed  Defendant  Jefferson  at  his joeyrocks99@protonmail.com email address as follows:

> Under the first 15k I will do another article on the LGBCoin case, pushing to get the lawyer to add Horsman [Plaintiff] individually and I will work to shift social media to pointing Horsman [Plaintiff] as the "guy behind the iron curtain."  FYI I have already gotten crypto media outlets to pick up the story, check it: https://cryptosaurus.tech/patrick-horsman-and-business-partner-thomas-mclaughlin-wrapped-up-in-lgbcoin-class-action-lawsuit/
>
> I'll do the Bachow v Horsman article for another $15k, it's a 74 page complaint and needs a lot of research.  We'll write 2 articles on it.   It will take 3-4 days to get the first article one, need to fully research.  Will tie it into the other 2 articles.  Deal?

153.  Since 2017, Defendant Jefferson has used the encrypted email address joeyrocks99@protonmail.com to carry out his malicious destruction of the precious and valuable reputations of those who do not acquiesce to his bullying.

154.  Since 2017, Defendant Jefferson has been using pseudonym bots to defame his targets.

155.  Engaging in misconduct so alarming that his investors would cease doing business with him if they knew his true nature, Defendant Jefferson funnels clandestine payments through his complicit attorney, Andrews, to the operator of the USA Herald for the purpose of defaming his adversaries.

156.   Defendant Jefferson anonymously publishes defamatory hit pieces filled with false information, through the use of fake profiles and pseudonyms, while deceitfully presenting these publications as acts of legitimate journalism.

157.   Jefferson directed the operator of the USA Herald to engage in further harassment on his behalf, such as creating a cartoon depicting Plaintiff in a prison jumpsuit, despite Plaintiff's lack of involvement in any criminal matter. Additionally, through funds funneled via Defendant Andrews and Andrews Law, Jefferson pays the operator of the USA Herald approximately $15,000 for each defamatory hit piece, including those targeting Plaintiff.

158.   Jefferson directed the operator of the USA Herald to place another one of his adversaries on an autodialer, which would cause his phone to ring incessantly throughout the night, and to anonymously sign the adversary up for pornography websites linked to his work email address.

159.   In 2017, Jefferson began paying the operator of the USA Herald money to distribute defamatory articles published by Jefferson under the false names of pseudonym bots.

160.   Jefferson's targets included adversaries in pending litigation, such as the Harvard Business School graduate whose career, knees, and life, Jefferson sought to destroy.

161.    Jefferson employed his nefarious tactics both on and off the grid. At Hildene, Jefferson specialized in securities known as TruPS, which are collateralized debt obligations issued by small banks. Often, when a bank asked for a forbearance due to hardship, Jefferson took a hardline approach, pressuring them to pay.

162.    Jefferson recounted one such story: "Hey, we own your trust preferreds, and we'd like to know more about what's going on here. And [the CEO] said no and I don't have to tell you, and I said fine..."

163.    To retaliate against this bank which failed to pay the trust preferred, Jefferson called upon a source to write a hit piece about the bank's CEO, falsely accusing him of having "stolen the money out of the bank."

164.    Jefferson is quoted as saying, "If you're going to live, you're going to pay me."

165.    More recently, Jefferson directed a malicious crusade against two insurance brokers at Mass Mutual.

166.    Having purchased a whole life insurance policy in his late 50s, Jefferson became enraged by the carrier's routine request for additional collateral due to increased interest rates. Instead of complying with the policy, Jefferson sought to ruin the lives of his insurance brokers.

167.    Jefferson relishes destroying the lives of those who he perceives as economically weaker than himself.

168.   On March 27, 2023, at Jefferson's direction, Defendant Andrews filed

an administrative complaint in New York and Florida against the two Mass Mutual

brokers.

169.   On April 2, 2023, under the guise of "getting their side of the story,"

Jefferson followed up as Jeff Watterson aka Jeff Waterman (who had apparently

forgotten the spelling of his alias) of the USA Herald stated on behalf of Jefferson:

> Hello my name is Jeff Waterman (*sic*) and I am the editor of USA
> Herald. A few weeks ago a colleague of mine, [LG] reached to inquire
> about Premium Finance Life Insurance Policies that have been issued
> by you for Mass Mutual. It has come to my attention that a very detailed
> and thorough complaint has been filed with the Florida Department of
> Financial Services (DFS). I was hope (*sic*) to discuss this matter with
> you. Can you please let me know some times that would work and
> either Leah or myself will contact you.

170.   On July 11, 2023, Jefferson published a hit piece article under the

pseudonym bot "Jackie Allen," titled "Brian Grodin, Hugo Tomasio, Michael Book:

Allegations of Misrepresentation and Fraud or Buyer's Remorse," in which

Jefferson reiterated the allegations made by Defendant Andrews in the civil remedy

notices.

https://usaherald.com/brian-grodin-hugo-tomasio-michael-book-allegations-of-

misrepresentation-and-fraud-or-buyers-remorse/ (visited August 27, 2024).

171.   On August 18, 2023, Jefferson used the pseudonym bot "Jeff

Watterson" to send an email to Michael Book of Lenox Advisors, stating, "Hello,

The USA Herald is doing a follow-up story on https://usaherald.com/brian-grodin-

hugo-tomasio-michael-book-allegations-of-misrepresentation-and-fraud-or-buyers-remorse/. Would you please provide your side of the story?"

172.    On August 18, 2023, Jefferson told the operator of the USA Herald that it was "time to turn up the heat" on these brokers and Jefferson directed the USA Herald's operator to email the general counsel for Mass Mutual to disparage the brokers who were lucky enough to have conducted business with Jefferson.

173.    Jefferson instructed the communications to Mass Mutual to include the question: "Does Mass Mutual train their representatives to perform acts of deceit?"

174.    On September 3, 2023, Defendant Andrews showed his active participation in Defendant Jefferson's defamatory schemes by telling the operator of the USA Herald, "Dude DON'T PUBLISH YET" regarding the article titled "Fraud Allegations Mass Mutual, Brian Grodin, Hugo Tomasio, and Michael Book named." Jefferson and Andrews subsequently published the article on September 13, 2023, titled "Fraud Allegations: Mass Mutual, Brian Grodin, Hugo Tomasio, and Michael Book named."

175.    On September 5, 2023, Jefferson emailed the operator of the USA Herald from his joeyrocks99@protonmail.com email address as follows:

> So if you could write a brief add on story regarding Grodin, Book, Tomisio and O'Connor. Basically an add on to the other story stating that complaints have been brought Grodin, Book and Toisio and Mass Mutual has denied any affiliation with Grodin and Book. But Grodin and Book are registered reps for Mass Mutual and their licenses are listed there. In addition, it has come to our attention that Mass Mutual

reviews all email correspondence for Grodin and Book. Mass Mutual denies any involvement in the allegations against Book and Grodin but any policy that would need to be underwritten especially a very large Premium Finance Policy would need to be vetted by the underwriter. Michael O'connor, General Counsel for Mass Mutual has refused to comment on this matter and Mass Mutual is being investigated for aggressive underwriting in premium finance policies. Key words, Mass Mutual, Grodin, Book Michael O'Connor. Photos for the three. Please show to Ryan [Defendant Ryan Andrews].

176.   On October 9, 2023, Defendant Andrews filed a lawsuit on Defendant Jefferson's behalf against the two Mass Mutual brokers in the Gadsden Circuit Court in Florida because the brokers allegedly "failed to predict the rapid [sic] interest rates in 2022, and as a result, alleged caused [Jefferson] to pledge additional collateral." *Jefferson v. Grodin, et al*., case no. 2023-CA-000771 (the "Mass Mutual Lawsuit").

177.   Defendant Andrews described the case as follows: "[t]his is a case of shameless greed by two insurance agents and brokers… who, conspiring together, were willing to say and do anything—including defrauding [Jefferson], misrepresenting and omitting material facts to [Jefferson] and misleading [Jefferson]…"

178.   In the Mass Mutual Lawsuit, Jefferson confirmed on October 9, 2023, and again on April 25, 2024, that he "was at all relevant times a resident of the State of Florida." Compl., ¶ 7; Am. Compl., ¶ 7.

179.   Defendants carried out their defamatory actions against Plaintiff while concurrently defaming others using the same methods and channels.

VI.    SCOPE AND NATURE OF DAMAGES THAT PLAINTIFF SUSTAINED

180.    Jefferson succeeded in his stated objective of destroying the reputation that Plaintiff had spent his entire career building.

181.    By mid-2024, Plaintiff identified at least 45 websites that either directly hosted the defamatory content published by Defendants or featured syndications and reprints of the defamatory material.

182.    As a result of Defendants' defamation, Plaintiff sustained millions of dollars in damages pursuant to the following categories of damages.

183.    Plaintiff was forced out of multiple businesses, resulting in the loss of his equity.

184.    Plaintiff's clients redeemed their investments.

185.    Plaintiff's business partners refused to conduct or continue business with him.

186.    In 2024, Plaintiff's hedge fund was in the process of being acquired by another hedge fund. Plaintiff was explicitly informed that he could not continue to be involved in the merged fund due to the online allegations published about him, forcing him to forgo any salary or equity in the combined business.

187.    Plaintiff joined a new, high-profile hedge fund launched in 2024 and successfully raised $100 million for the new fund from one of his investor relationships. Despite fully disclosing all litigation to the fund's founder, when one

of the two principals at the hedge fund discovered the extent of the online articles and allegations, which are traced back to Defendants, Plaintiff was told he could no longer attend meetings with the principals. His email at the fund was shut off, and the principals stopped returning his phone calls.

188.    Other business ventures refused to engage with entities involving Plaintiff.

189.    Plaintiff was unable to raise outside capital.

190.    Investors declined projects associated with Plaintiff's name.

191.    Financial institutions required Plaintiff to close his accounts.

192.    Financial institutions refused to allow new accounts to be opened in the name of corporations associated with Plaintiff.

193.    A bank canceled Plaintiff's loan refinance.

194.    A bank closed Plaintiff's unsecured credit line.

195.    A bank refused to open accounts for a company associated with Plaintiff.

196.    Banks refused to issue loans to Plaintiff.

197.    Plaintiff stopped receiving investment opportunities from sources that had previously provided a steady stream of opportunities.

198.    Financial institutions refused to open trading accounts for Plaintiff's businesses.

199.    A bank refused to open any new accounts and canceled two credit cards frequently used by Plaintiff.

200.    A bank closed all of Plaintiff's personal accounts.

201.    A bank refused to issue a loan.

202.    A trading institution required the unwinding of Plaintiff's company's positions and refused to issue credit to a company associated with Plaintiff.

203.    Plaintiff was asked to resign from his country club, which was important for his business relationships and personal friendships.

204.    Another country club, with opportunities for business development, denied Plaintiff membership despite the submission of supporting letters from seven members.

205.    Due to being publicly labeled as involved in the commission of "fraud," investment opportunities that were once plentiful for Plaintiff dried up.

206.    Plaintiff's income drastically decreased, and his future prospects evaporated as a direct result of Defendants' defamation.

## COUNT ONE – DEFAMATION (LIBEL) PER SE

### The August 27, 2022 Defamatory Remcoda Article
### against all Defendants, Jointly and Severally

207.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-206 of the Complaint as if fully set forth herein.

208.   Defendants published false statements regarding Plaintiff on August 27, 2022, in the August 27, 2022 Defamatory Remcoda Article, as set forth herein.

209.   The statements regarding Plaintiff in the August 27, 2022 Defamatory Remcoda Article were false, as discussed herein.

210.   Defendants acted at least negligently regarding the falsity of the statements in the August 27, 2022 Defamatory Remcoda Article.

211.   As a result of Defendants' defamatory actions, Plaintiff sustained actual damages.

212.   As a result of Defendants' defamatory actions, Plaintiff sustained actual damages.

213.   The statements in the August 27, 2022 Defamatory Remcoda Article were defamatory, as discussed herein.

214.   The statements in the August 27, 2022 Defamatory Remcoda Article constitute libel per se, as they accuse Plaintiff of conduct incompatible with the exercise of his profession as a professional businessman and accuse him of acts of moral turpitude, specifically, that Plaintiff was purportedly involved in a fraudulent scheme which was the subject of the Remcoda Lawsuit.

215.   On August 27, 2022, just before the public dissemination of the August 27, 2022 Defamatory Remcoda Article, Defendant Andrews, acting individually and on behalf of Defendant Jefferson as Jefferson's agent and attorney, actively

participated in the drafting and substantially assisted in the publication of defamatory material about Plaintiff, knowing and intending that the USA Herald's operator would then disseminate this material through its online publication while masquerading it as a news article.

216.   As a result of Andrews' active participation and substantial assistance in creating a defamatory article about Plaintiff, the USA Herald disseminated the August 27, 2022 Defamatory Remcoda Article on its website.

217.   Defendants' statements were false, malicious, willful, wanton, grossly negligent, reckless, defamatory per se, made with knowledge of their falsity, and without any good motives.

218.   As a direct and proximate result of the false, malicious, and defamatory statements, Plaintiff sustained significant damage to his reputation and business interests.

219.   Plaintiff also sustained damages in the form of mental anguish, depression, loss of sleep, loss of self-esteem, loss of motivation, irritability, uncertainty about the future of his career, feelings of diminished respect by his peers, feelings of professional incompetence, embarrassment, humiliation, an inability to feel pleasure, loss of enjoyment of life, and severe anxiety.

220.   Defendants published the defamatory statements intentionally and maliciously, with a willful, wanton, corrupt, callous, and reckless disregard for

Plaintiff's rights and the truth, and with a willful, wanton, corrupt, and malicious desire to injure Plaintiff's reputation.

221.   Andrews, individually and as Jefferson's agent, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Andrews intentionally pursued his course of conduct, resulting in damage to Plaintiff.

222.   Andrews Law, as Andrews' employer, is vicariously liable for Andrews' conduct that occurred within the scope of his employment at Andrews Law.

223.   Andrews Law, as Andrews' principal, either actively and knowingly participated in its agent Andrews' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to his conduct.

224.   Jefferson, individually and as Andrews' and USA Herald's principal, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Jefferson intentionally pursued his course of conduct, resulting in damage to Plaintiff.

225.   Jefferson, as Andrews' and USA Herald's principal, either actively and knowingly participated in his agents' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to their conduct.

226.   Jefferson is vicariously liable for the conduct of his agents, Andrews and the USA Herald.

## COUNT TWO – DEFAMATION (LIBEL) PER SE

### The May 29, 2023 Defamatory LGBCoin Article
### against all Defendants, Jointly and Severally

227.   Plaintiff incorporates by reference all the allegations in Paragraphs 1-206 of the Complaint as if fully set forth herein.

228.   Defendants published false statements regarding Plaintiff on May 29, 2023, in the May 29, 2023 Defamatory LGBCoin Article, as set forth herein.

229.   The statements regarding Plaintiff in the May 29, 2023 Defamatory LGBCoin Article were false, as discussed herein.

230.   Defendants acted at least negligently regarding the falsity of the statements in the May 29, 2023 Defamatory LGBCoin Article.

231.   As a result of Defendants' defamatory actions, Plaintiff sustained actual damages.

232.   As a result of Defendants' defamatory actions, Plaintiff sustained presumed damages.

233.   The statements in the May 29, 2023 Defamatory LGBCoin Article were defamatory, as discussed herein.

234.   The statements in the May 29, 2023 Defamatory LGBCoin Article constitute libel per se, as they accuse Plaintiff of conduct incompatible with the exercise of his profession as a professional businessman and accuse him of acts of moral turpitude, specifically, that Plaintiff was purportedly involved in a fraudulent scheme which was the subject of the LGBCoin Article.

235.   On May 29, 2023, just before the public dissemination of the May 29, 2023 Defamatory LGBCoin Article, Defendant Andrews, acting individually and on behalf of Defendant Jefferson as Jefferson's agent and attorney, substantially assisted in and actively participated in the drafting and publication of defamatory material about Plaintiff, knowing and intending that the USA Herald's operator would then disseminate this material through its online publication while masquerading it as a news article.

236.   As a result of Andrews' active participation and substantial assistance in the creation of a defamatory article about Plaintiff, the USA Herald disseminated the May 29, 2023 Defamatory LGBCoin Article about Plaintiff on its website.

237.   Defendants' statements were false, malicious, willful, wanton, grossly negligent, reckless, defamatory per se, made with knowledge of their falsity, and without any good motives.

238.   As a direct and proximate result of the false, malicious, and defamatory statements, Plaintiff sustained significant damage to his reputation and business interests.

239.   Plaintiff also sustained damages in the form of mental anguish, depression, loss of sleep, loss of self-esteem, loss of motivation, irritability, uncertainty about the future of his career, feelings of diminished respect by his peers, feelings of professional incompetence, embarrassment, humiliation, an inability to feel pleasure, loss of enjoyment of life, and severe anxiety.

240.   Defendants published the defamatory statements intentionally and maliciously, with a willful, wanton, corrupt, callous, and reckless disregard for Plaintiff's rights and the truth, and with a willful, wanton, corrupt, and malicious desire to injure Plaintiff's reputation.

241.   Andrews, individually and as Jefferson's agent, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Andrews intentionally pursued his course of conduct, resulting in damage to Plaintiff.

242.   Andrews Law, as Andrews' employer, is vicariously liable for Andrews' conduct that occurred within the scope of his employment at Andrews Law.

243.    Andrews Law, as Andrews' principal, either actively and knowingly participated in its agent Andrews' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to his conduct.

244.    Jefferson, individually and as Andrews' and USA Herald's principal, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Jefferson intentionally pursued his course of conduct, resulting in damage to Plaintiff.

245.    Jefferson, as Andrews' and USA Herald's principal, either actively and knowingly participated in his agents' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to their conduct.

246.    Jefferson is vicariously liable for the conduct of his agents Andrews and the USA Herald.

**COUNT THREE**

**DEFAMATION (LIBEL) BY IMPLICATION**

**The August 27, 2022 Defamatory Remcoda Article
against all Defendants, Jointly and Severally**

247.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-206 of the Complaint as if fully set forth herein.

248.    Defendants published false statements regarding Plaintiff on August 27, 2022, in the August 27, 2022 Defamatory Remcoda Article, as set forth herein.

249.    The statements regarding Plaintiff in the August 27, 2022 Defamatory Remcoda Article were false, as discussed herein.

250.    Defendants acted at least negligently regarding the falsity of the statements in the August 27, 2022 Defamatory Remcoda Article.

251.    As a result of Defendants' defamatory actions, Plaintiff sustained actual damages.

252.    As a result of Defendants' defamatory actions, Plaintiff sustained presumed damages.

253.    The statements in the August 27, 2022 Defamatory Remcoda Article were defamatory, as discussed herein.

254.    On August 27, 2022, just before the public dissemination of the August 27, 2022 Defamatory Remcoda Article, Defendant Andrews, acting individually and on behalf of Defendant Jefferson as Jefferson's agent and attorney, substantially assisted in and actively participated in the drafting and publication of defamatory material about Plaintiff, knowing and intending that the USA Herald's operator would then disseminate this material through its online publication while masquerading it as a news article.

255.   As a result of Andrews' active participation and substantial assistance in the creation of a defamatory article about Plaintiff, the USA Herald disseminated the August 27, 2022 Defamatory Remcoda Article about Plaintiff on its website.

256.   To the extent that the August 27, 2022 Defamatory Remcoda Article contains true facts, the operator of the USA Herald, on behalf of Jefferson and with the substantial assistance of Andrews, juxtaposed those facts in a way that implied a defamatory connection between them. Specifically, the article carries the defamatory implication that Plaintiff was involved in a fraudulent scheme related to the Remcoda Lawsuit.

257.   The August 27, 2022 Defamatory Remcoda Article even featured a large photograph of Plaintiff, misappropriated and published without his consent, directly under a headline referencing "involvement in $3.7M alleged fraud." The placement of the large picture above the article falsely implies that Plaintiff was involved in the "$3.7M alleged fraud." This implication is both false and defamatory, as Plaintiff's name was not mentioned once in the complaint in the Remcoda Lawsuit. Moreover, Plaintiff had nothing to do with the Remcoda Lawsuit.

258.   Additionally, the August 27, 2022 Defamatory Article created a defamatory implication that Plaintiff was a party to the Remcoda Lawsuit and involved in the "$3.7M alleged fraud" related to the Remcoda Lawsuit by omitting the critical fact that Plaintiff was not named in the Remcoda Lawsuit at all.

259.   Defendants' statements were false, malicious, willful, wanton, grossly negligent, reckless, made with knowledge of their falsity, and without any good motives.

260.   As a direct and proximate result of the false, malicious, and defamatory statements, Plaintiff sustained significant damage to his reputation and business interests.

261.   Plaintiff also sustained damages in the form of mental anguish, depression, loss of sleep, loss of self-esteem, loss of motivation, irritability, uncertainty about the future of his career, feelings of diminished respect by his peers, feelings of professional incompetence, embarrassment, humiliation, an inability to feel pleasure, loss of enjoyment of life, and severe anxiety.

262.   Defendants published the defamatory statements intentionally and maliciously, with a willful, wanton, corrupt, callous, and reckless disregard for Plaintiff's rights and the truth, and with a willful, wanton, corrupt, and malicious desire to injure Plaintiff's reputation.

263.   Andrews, individually and as Jefferson's agent, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Andrews intentionally pursued his course of conduct, resulting in damage to Plaintiff.

264. Andrews Law, as Andrews' employer, is vicariously liable for Andrews' conduct that occurred during the scope of Andrews' employment at Andrews Law.

265. Andrews Law, as Andrews' principal, either actively and knowingly participated in its agent Andrews' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to his conduct.

266. Jefferson, individually and as Andrews' and USA Herald's principal, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Jefferson intentionally pursued his course of conduct, resulting in damage to Plaintiff.

267. Jefferson, as Andrews' and USA Herald's principal, either actively and knowingly participated in his agents' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to their conduct.

268. Jefferson is vicariously liable for the conduct of his agents Andrews and the USA Herald.

## COUNT FOUR

## DEFAMATION (LIBEL) BY IMPLICATION

### The May 29, 2023 Defamatory LGBCoin Article
### against all Defendants, Jointly and Severally

269.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-206 of the Complaint as if fully set forth herein.

270.    Defendants published false information regarding Plaintiff on May 29, 2023, in the May 29, 2023 Defamatory LGBCoin Article, as set forth herein.

271.    The information regarding Plaintiff in the May 29, 2023 Defamatory LGBCoin Article was false, as discussed herein.

272.    Defendants acted at least negligently regarding the falsity of the information in the May 29, 2023 Defamatory LGBCoin Article

273.    As a result of Defendants' defamatory actions, Plaintiff sustained actual damages.

274.    The statements in the May 29, 2023 Defamatory LGBCoin Article were defamatory, as discussed herein.

275.    On May 29, 2023, just before the public dissemination of the May 29, 2023 Defamatory LGBCoin Article, Defendant Andrews, acting individually and on behalf of Defendant Jefferson as Jefferson's agent and attorney, substantially assisted in and actively participated in the drafting and publication of defamatory material about Plaintiff, knowing and intending that the USA Herald's operator

would then disseminate this material through its online publication while masquerading it as a news article.

276.   As a result of Andrews' active participation and substantial assistance in the creation of a defamatory article about Plaintiff, the USA Herald disseminated the May 29, 2023 Defamatory LGBCoin Article about Plaintiff.

277.   To the extent that the May 29, 2023 Defamatory LGBCoin Article contains true facts, the operator of the USA Herald, on behalf of Jefferson and with the substantial assistance of Andrews, juxtaposed those facts in a way that implied a defamatory connection between them. Specifically, the article carries the defamatory implication that Plaintiff was involved in a fraudulent scheme related to the LGBCoin Lawsuit.

278.   The first sentence of the May 29, 2023 Defamatory LGBCoin Article falsely states:

> Thomas McLaughlin, co-founder of LGBCoin and business partner with Patrick Horsman at Coral Defi (Coral Capital Management, LLC), **is accused of fraud along with unjust enrichment** in a 104-page class-action lawsuit filed on behalf of investors who lost money in an alleged cryptocurrency scam. (Emphasis added).

279.   The implication of the statement above is that Plaintiff is "accused of fraud" in a 104-page class-action lawsuit.

280.    This statement is false, as Plaintiff was neither accused of fraud in the LGBCoin Lawsuit nor involved in the litigation pursuant to the 104-page pleading; Plaintiff was not a party to that pleading.

281.    The May 29, 2023 Defamatory LGBCoin Article also created defamatory implications by suggesting that Plaintiff was accused of fraud in the Second Amended Complaint in the LGBCoin Lawsuit and was involved in litigation in the LGBCoin Lawsuit. This implication was created by omitting the fact that Plaintiff was not named in the Second Amended Complaint from which Defendants drew their information. Defendants knew that Plaintiff was not a party to the Second Amended Complaint in the LGBCoin Lawsuit but still assisted in the publication of the May 29, 2023 Defamatory LGBCoin Article, falsely stating that Plaintiff was involved in the LGBCoin Lawsuit.

282.    Defendants' statements were false, malicious, willful, wanton, grossly negligent, reckless, made with knowledge of their falsity, and without any good motives.

283.    As a direct and proximate result of the false, malicious, and defamatory statements, Plaintiff sustained significant damage to his reputation and business interests.

284.    Plaintiff also sustained damages in the form of mental anguish, depression, loss of sleep, loss of self-esteem, loss of motivation, irritability,

uncertainty about the future of his career, feelings of diminished respect by his peers, feelings of professional incompetence, embarrassment, humiliation, an inability to feel pleasure, loss of enjoyment of life, and severe anxiety.

285.   Defendants published the defamatory statements intentionally and maliciously, with a willful, wanton, corrupt, callous, and reckless disregard for Plaintiff's rights and the truth, and with a willful, wanton, corrupt, and malicious desire to injure Plaintiff's reputation.

286.   Andrews, individually and as Jefferson's agent, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Andrews intentionally pursued his course of conduct, resulting in damage to Plaintiff.

287.   Andrews Law, as Andrews' employer, is vicariously liable for Andrews' conduct that occurred during the scope of Andrews' employment at Andrews Law.

288.   Andrews Law, as Andrews' principal, either actively and knowingly participated in its agent Andrews' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to his conduct.

289.   Jefferson, individually and as Andrews' and USA Herald's principal, engaged in intentional conduct, knowing that his participation in the publication of the defamatory statements was wrongful and that there was a high probability his actions would cause injury or damage to Plaintiff. Despite this knowledge, Jefferson intentionally pursued his course of conduct, resulting in damage to Plaintiff.

290.   Jefferson, as Andrews' and USA Herald's principal, either actively and knowingly participated in his agents' conduct regarding the publication of the defamatory statements about Plaintiff or knowingly condoned, ratified, or consented to their conduct.

291.   Jefferson is vicariously liable for the conduct of his agents Andrews and the USA Herald.

### **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against Defendants, jointly and severally, as follows:

A.    Compensatory damages in the amount of at least $30 million, payable jointly and severally by all Defendants;

B.    Punitive damages in the amount of $150 million, payable by Defendant Jefferson;

C.    Prejudgment interest;

D.    Costs of collection; and,

E.    Such other and further relief as this Court deems just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:    */s/ Kenneth E. Chase*
       Kenneth E. Chase
       Florida Bar No. 017661
       kchase@chaselaw.com
       Chase Law & Associates, P.A.
       2700 North Military Trail, Suite 150
       Boca Raton, FL 33431
       Telephone: (305) 402-9800

       *Attorneys for*
       *Plaintiff Patrick Horsman*

# EXHIBIT A

## Patrick Horsman and partner Russel Gross involvement in $3.7M alleged fraud

By **Catherine Davis** - August 27, 2022



A lawsuit between plaintiff Remcoda, LLC, and defendants Ridge Hill Trading (PTY) LTD, Ataraxia Capital Partners PTY LTD, Russel Gross, and the involvement of his partner, Patrick Horsman, is ever evolving.

Remcoda agreed to Gross's terms and provided proof of funds as requested. Satisfied that Remcoda could afford to enter into the transaction and that he would receive his fee, Gross introduced Remcoda to Gunawardhana and Fletcher according to the lawsuit. Gross advised Remcoda that Gunawardhana and Fletcher were agents of Ridge Hill, one of his purported "proprietary manufacturing supply relationships" that would be able to immediately provide Remcoda with nitrile examination gloves.

### Signup for the USA Herald exclusive Newsletter

First Name

First Name

Email Address:

Email Address

Sign up

Prior to Remcoda's transaction with Ridge Hill, however, Remcoda allegedly contracted with Unicorn Health LLC ("Unicorn"), owned by Gross's business partner Patrick Horsman, to act as a broker and introduce Remcoda to potential PPE suppliers. The contract between Remcoda and Unicorn, titled "Procurement Agreement," which was signed by Gross on behalf of Unicorn, expressly described Unicorn's role as being limited to "introduc[ing] the Purchaser [Remcoda] directly to [Unicorn's] supply relationships."

Further allegations detailed in the lawsuit reveal that on July 16th, 2020, Ridge Hill provided a commercial invoice to Remcoda reflecting their order of 629,100 boxes of blue gloves and 722,980 of black gloves for a total purchase price of $9,261,748, which Remcoda would pay in two 50% installments pursuant to the terms of the agreement. On July 20th, Remcoda wired the 50% deposit in the amount of $4,630,874 to Ridge Hill and, pursuant to the agreement, Ridge Hill was required to have the gloves ready for delivery to Remcoda by July 31st.

On July 23rd, in furtherance of the defendant's alleged scheme, Gunawardhana sent Remcoda photographs of boxes of gloves allegedly allocated for Remcoda's order. According to the lawsuit, on July 27th, Gunawardhana again falsely advised Remcoda that "[w]e have got all the stock allocated to us today" and that the goods have already passed an inspection.

Ridge Hill, however, refused to provide proof of such inspection, vaguely claiming that another inspection would be performed. At the same time, on July 27th, Gunawardhana attempted to unilaterally change the terms of the agreement by demanding that Remcoda immediately wire to Ridge Hill the balance of the purchase price (another $4,630,874) without their receipt and acceptance of an inspection report, according to the lawsuit. Remcoda refused and demanded that Ridge Hill perform as outlined in their agreement.

To assuage Remcoda's growing concerns, and further conceal their scheme, according to the lawsuit, on July 28th, Gross provided Remcoda with information allegedly vouching for the bona fides of Ridge Hill, including advising Remcoda that Ridge Hill along with Ataraxia were part of a "family group" based in Australia. Gross represented that two individuals, Sharad Sri and Asanth Sebastian, are owners and partners of Ridge Hill and Ataraxia, and together they manage the personal protective equipment supply chain and offer customers contract, legal, funding and financial support for personal protective equipment.

Gross is alleged to have touted his work with Gunawardhana, Fletcher, Ridge Hill and Ataraxia in offering connections, financial scale, quality control and experience that "most in the PPE market do not." Unknown to Remcoda at the time, Remcoda alleged the only information that Gross relayed that was true was that Ridge Hill and Ataraxia are one in the same.

Also on July 28th, Gunawardhana is alleged to have sent Remcoda a fraudulent email from Vaidyanathan falsely claiming that "government intervention" in Vietnam was delaying Remcoda's order, but assuring that the De Raj Entities' "connections at the most senior level in VGloves and the relevant government ministries" would provide a "big advantage" and the gloves would be ready for

Despite repeatedly advising Remcoda that Ridge Hill had sourced and secured full stock of all of the gloves that they had ordered, Ridge Hill failed to deliver the gloves by July 31st, as required by the agreement. Instead, with knowledge that Remcoda had time sensitive commitments to supply the gloves to its customers and to repay its lender, the defendants were alleged to have pressed forward with their fraudulent scheme to prevent Remcoda from defaulting Ridge Hill and taking steps to obtain a refund of the deposit by continuing to misrepresent that delivery of gloves was imminent.

In furtherance of this scheme, on July 31st – two days after the supposedly scheduled inspection – the lawsuit alleges Gunawardhana now claimed that Ridge Hill could not obtain any black gloves to deliver to Remcoda, despite Gross, Gunawardhana and Fletcher's representations as Ridge Hill's agents that all stock was secured, and offered to provide additional blue gloves as replacements.

By August 25th, Remcoda had still not received an inspection report, the gloves had not been delivered, and Ridge Hill had entirely failed to perform. Accordingly, by letter to Ridge Hill, copying the De Raj Entities, dated August 25th, 2020, Remcoda terminated the agreement and demanded repayment of the $4,630,874 that they had paid.

The defendants were alleged to have already converted and misused Remcoda's deposit for their own personal benefit, and had no intention of fully refunding the deposit. Instead, according to the lawsuit, to maintain their scheme and forestall Remcoda from taking action, the defendants attempted to shift Remcoda's attention to the De Raj Entities and Nateshan to create further delay, wear Remcoda down, and allegedly retain as much of the deposit as possible.

Russel Gross, and his business partner Patrick Horsman's company Unicorn Health, were allegedly working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. Russel Gross and Horsman's company allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld.



**Catherine Davis**

Catherine Davis is a contributor to the USA Herald. She covers politics and reports on issues of the times.

ALSO ON **USAHERALD-COM**

| Billionaire Investor Cathie Wood Says … | Coinbase user loses $11.6 Million of … | Hillsborough County Police Make 100+ … | Bitc<br>$22, |
|---|---|---|---|
| 9 months ago • 1 comment | 10 months ago • 1 comment | 7 days ago | 2 mor |
| The price of Bitcoin — the largest cryptocurrency by | A Coinbase user has lost $11.6 million worth of Bitcoin | Human trafficking, notably sex trafficking, continues to | Bitcoi<br>$22.0 |

# EXHIBIT B

Case 4:24-cv-00342-AW-MAF   Document 1   Filed 08/27/24   Page 66 of 78

# Russell Gross of Unicorn Health, owned by Patrick Horsman, sued for alleged 3.7M fraud

By **Catherine Davis** - August 27, 2022



Russell Gross of Unicorn Health (owned by Patrick Horsman) sued for alleged 3.7m fraud - USA Herald

A lawsuit brought by plaintiff Remcoda, LLC, and defendants Ridge Hill Trading (PTY) LTD, Ataraxia Capital Partners PTY LTD, Russel Gross of Unicorn Health (owned by Patrick Horsman), alleges $3.7M in fraud.

As a quick summary, according to allegations in the lawsuit, Remcoda agreed to provide nitrile examination gloves for use as personal protective equipment to two of the country's largest food distribution companies during the summer of 2020, while the Covid-19 Pandemic was still in full swing. Gross ultimately offered to introduce Remcoda to his relationships in exchange for a 5% fee of the total purchase price.

Remcoda agreed to Gross's terms and provided proof of funds as requested. Satisfied that Remcoda could afford to enter into the transaction and that he would receive his fee, Gross introduced Remcoda to Gunawardhana and Fletcher according to the lawsuit. Gross advised Remcoda that Gunawardhana and Fletcher were agents of Ridge Hill, one of his purported "proprietary manufacturing supply relationships" that would be able to immediately provide Remcoda with nitrile examination gloves.

## Signup for the USA Herald exclusive Newsletter

First Name

First Name

Email Address:

Email Address

Sign up

Prior to Remcoda's transaction with Ridge Hill, however, Remcoda allegedly contracted with Unicorn Health LLC ("Unicorn"), owned by Gross's business partner Patrick Horsman, to act as a broker and introduce Remcoda to potential PPE suppliers. The contract between Remcoda and Unicorn, titled "Procurement Agreement," which was signed by Gross on behalf of Unicorn, expressly described Unicorn's role as being limited to "introduc[ing] the Purchaser [Remcoda] directly to [Unicorn's] supply relationships."

Further allegations detailed in the lawsuit reveal that on July 16th, 2020, Ridge Hill provided a commercial invoice to Remcoda reflecting their order of 629,100 boxes of blue gloves and 722,980 of black gloves for a total purchase price of $9,261,748, which Remcoda would pay in two 50% installments pursuant to the terms of the agreement. On July 20th, Remcoda wired the 50% deposit in the amount of $4,630,874 to Ridge Hill and, pursuant to the agreement, Ridge Hill was required to have the gloves ready for delivery to Remcoda by July 31st.

On July 23rd, in furtherance of the defendant's alleged scheme, Gunawardhana sent Remcoda photographs of boxes of gloves allegedly allocated for Remcoda's order. According to the lawsuit, on July 27th, Gunawardhana again falsely advised Remcoda that "[w]e have got all the stock allocated to us today" and that the goods have already passed an inspection.

Ridge Hill, however, refused to provide proof of such inspection, vaguely claiming that another inspection would be performed. At the same time, on July 27th, Gunawardhana attempted to unilaterally change the terms of the agreement by demanding that Remcoda immediately wire to Ridge Hill the balance of the purchase price (another $4,630,874) without their receipt and acceptance of an inspection report, according to the lawsuit. Remcoda refused and demanded that Ridge Hill perform as outlined in their agreement.

To assuage Remcoda's growing concerns, and further conceal their scheme, according to the lawsuit, on July 28th, Gross provided Remcoda with information allegedly vouching for the bona fides of Ridge Hill, including advising Remcoda that Ridge Hill along with Ataraxia were part of a "family group" based in Australia. Gross represented that two individuals, Sharad Sri and Asanth Sebastian, are owners and partners of Ridge Hill and Ataraxia, and together they manage the personal protective equipment supply chain and offer customers contract, legal, funding and financial support for personal protective equipment.

Gross is alleged to have touted his work with Gunawardhana, Fletcher, Ridge Hill and Ataraxia in offering connections, financial scale, quality control and experience that "most in the PPE market do not." Unknown to Remcoda at the time, Remcoda alleged the only information that Gross relayed that was true was that Ridge Hill and Ataraxia are one in the same.

Also on July 28th, Gunawardhana is alleged to have sent Remcoda a fraudulent email from Vaidyanathan falsely claiming that "government intervention" in Vietnam was delaying Remcoda's order, but assuring that the De Raj Entities' "connections at the most senior level in VGloves and the relevant government ministries" would provide a "big advantage" and the gloves would be ready for delivery shortly. In forwarding the fraudulent email to Remcoda, Gunawardhana falsely assured them that an inspection of the gloves had been scheduled for July 30th, and the goods would be shipped on August 8th.

9/6/22, 1:31 PM
Case 4:24-cv-00342-AW-MAF Document 1 Filed 08/27/24 Page 69 of 78
Russel Gross of Unicorn Health Owned by Patrick Horsman, Sued for alleged 3-7m fraud | USA Herald

Despite repeatedly advising Remcoda that Ridge Hill had sourced and secured full stock of all of the gloves that they had ordered, Ridge Hill failed to deliver the gloves by July 31st, as required by the agreement. Instead, with knowledge that Remcoda had time sensitive commitments to supply the gloves to its customers and to repay its lender, the defendants were alleged to have pressed forward with their fraudulent scheme to prevent Remcoda from defaulting Ridge Hill and taking steps to obtain a refund of the deposit by continuing to misrepresent that delivery of gloves was imminent.

In furtherance of this scheme, on July 31st – two days after the supposedly scheduled inspection – the lawsuit alleges Gunawardhana now claimed that Ridge Hill could not obtain any black gloves to deliver to Remcoda, despite Gross, Gunawardhana and Fletcher's representations as Ridge Hill's agents that all stock was secured, and offered to provide additional blue gloves as replacements.

By August 25th, Remcoda had still not received an inspection report, the gloves had not been delivered, and Ridge Hill had entirely failed to perform. Accordingly, by letter to Ridge Hill, copying the De Raj Entities, dated August 25th, 2020, Remcoda terminated the agreement and demanded repayment of the $4,630,874 that they had paid.

The defendants were alleged to have already converted and misused Remcoda's deposit for their own personal benefit, and had no intention of fully refunding the deposit. Instead, according to the lawsuit, to maintain their scheme and forestall Remcoda from taking action, the defendants attempted to shift Remcoda's attention to the De Raj Entities and Nateshan to create further delay, wear Remcoda down, and allegedly retain as much of the deposit as possible.

Russel Gross of Unicorn Health, which is owned by Patrick Horsman, is alleged to have been working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. The USA Herald is researching whether it was Russel Gross and/or Horsman's company that allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld.



| 1 | 2 | > |

---

**Catherine Davis**

Catherine Davis is a contributor to the USA Herald. She covers politics and reports on issues of the times.

---

ALSO ON **USAHERALD-COM**

Florida Restaurant Owner Bans Biden ...

a year ago • 1 comment

The deaths of 13 American Marines, coupled with the ...

Elon Musk's Neuralink Could Implant The ...

9 months ago • 1 comment

Elon Musk has announced that Neuralink — his brain-

New Ad Sexual

12 days ag

The story discrimin

9/6/22, 1:31 PM
Case 4:24-cv-00342-AW-MAF Document 1 Filed 08/27/24 Page 71 of 78
Russell Gross of Unicorn Health Owned by Patrick Horsman, Sued for alleged 3.7m fraud | USA Herald

# EXHIBIT C





Home » Technology

# Patrick Horsman Of Coral Capital Slapped With Class Action Lawsuit

By Rich Williams

Published on Jun 28, 2023, 12:27 pm



**National (June 26, 2023) –** Patrick Horsman, Managing Partner and Co-Founder of Coral Capital, an alternative investment platform focused on digital assets and decentralized finance applications, has been accused of fraud and unjust enrichment in a class-action lawsuit filed by Zigler Law Group.

The 104 page class-action lawsuit, filed on behalf of investors who lost money in an alleged cryptocurrency scam, alleges that Horman and his business partner defrauded investors in the "LGBCoin crypto pump-and-dump scheme" and attempted to hide their role through a complex web of transactions.

While investing in alternative assets can be risky, there are opportunities to invest in innovative technologies that can change the world. One such example is the small-cap company at the forefront of AI-driven drug discovery, which has already discovered new treatments for multiple myeloma and liver cancer in record time. With high-profile investors like Bill Gates and Steve Cohen, this company could be worth considering for those looking to invest in cutting-edge medical research. Visit **Behind the Markets** This paragraph is AI-generated advertising.

Pump-and-dump schemes involve fraudsters who typically spread false or misleading information to create a buying frenzy that will pump up the price of a stock and then dump shares of the stock by selling their own shares at the inflated price.

According to the lawsuit, the LGBCoin is a cryptocurrency co-created by Horsman and his business partners that is a blockchain-based digital asset known as "ERC-20 tokens," created using the Ethereum blockchain. The LGBCoin was primarily traded against Ether, the native currency of the Ethereum blockchain network onUniswap, Binance, Coinbase, and other decentralized exchanges that allow anyone to list a token.

The complaint alleges that Letsgobrandon.com Foundation, LGBCoin, Ltd, Koutoulas, and Horsman of Coral Capital sought to capitalize on the publicity surrounding the "Let's Go Brandon" chant and conspired to violate provisions of the Securities Act and its Florida State law analog by selling the unregistered LGBCoins.

In addition, the complaint alleges that Horsman (and his business partners) solicited sales of LGBCoins by making false and misleading statements concerning NASCAR's approval of the LGBCoin sponsorship of Brandon Brown, the digital asset's growth prospects, and financial benefits for LGBCoin investors, as well as using celebrity promoters to lure in unsuspecting investors so that Horsman and other insiders

could sell the unregistered LGBCoin securities in violation of federal and state securities laws.

The action was filed in the U.S. District Court for the Middle District of Florida and captioned De Ford et. al. v. Koutoulas et al., Case No. 6:22-cv-652, asserts claims under § 12(a)(1) of the Securities Act of 1933 (the "Securities Act") and under §517.07 of the Florida Securities and Investment Protection Act for the sale of unregistered securities, as well as other Florida State law claims (including conspiracy, unjust enrichment, negligent misrepresentation, and promissory estoppel), on behalf of investors who purchased the LGBCoin unregistered securities, which were sold as LGBCoins on various cryptocurrency exchanges from November 2, 2021 through March 15, 2022. On January 5, 2022, NASCAR announced it would not approve LGBCoin's sponsorship of NASCAR driver Brandon Brown. In the wake of this news, the price of LGBCoin fell to Class Period lows.

Though this isn't the first time that Horman has been accused of fraud, this is by far his most high-profile accusation to date. According to Horsman's personal LinkedIn profile, the self-proclaimed "serial entrepreneur and investor" is still a Managing Partner at Coral Capital in San Juan, Puerto Rico.

Do you know which under-the-radar stocks the top hedge funds and institutional investors are investing in right now? Click here to find out.

## Who Is Patrick Horman?

Horsman was born in St. John, Nebraska and grew up in Halifax, Nova Scotia. He and his family moved to Scottsdale, Arizona when he was fifteen. Horsman attended Desert Mountain High School in Scottsdale where he played on the Basketball, Golf, Track and Cross-Country teams. He graduated from Desert Mountain in 1998.

After high school, Patrick attended the University of Arizona, where he graduated Magna Cum Laude in 2002 with a triple major in finance, accounting and entrepreneurship.

After graduation, Horsman co-founded Blue Sands Securities with his business partner, Michael Cooney. The company was created to serve as a placement agent for alternative investment funds, raising over $15 billion from institutional investors.

The company was the first business he launched after college, as well as Horsman's first encounter with accusations of fraud.

Allegations were made against Horsman while at Blue Sands Securities alleging negligent misrepresentation, breach of implied covenant of good faith, unjust enrichment and fraud. He was permitted to resign from the organization, though he faced disciplinary actions.

In March of 2017, Horsman consented to sanctions and to the entry of findings that he purchased shares in eleven initial public offerings (IPOs) in three personal brokerage accounts held at three FINRA member firms.

The findings stated that FINRA rules prohibit a person associated with a member from purchasing a new issue in any account in which such person associated with a member has a beneficial interest. The findings also stated that Horsman orally disclosed four outside brokerage accounts to his member firm, but he failed to promptly notify the firm of the accounts in writing. Horman was fined and suspended accordingly.

Horssman received attention again in 2020 when a lawsuit alleged that he had lied about the prospects of the investment of his cannabidiol company, Integrated CBD. Further, the lawsuit claimed that Horman used an emergency pandemic-relief loan (Paycheck Protection Program) to buy a private jet and fund other lavish expenses, despite having laid off the company's staff.

Integrated AG, the Horman-founded parent company of Integrated CBD, filed for Chapter 11 bankruptcy protection on January 20, 2021, and disclosed over $20 million in outstanding debt, the Phoenix Business Journal reported.

The full list of companies that Horman is publicly affiliated include:

- Coral Capital
- Horsman Holdings
- Octopus Investments
- Merion Investment Management
- The Arizona Coyotes (NHL hockey team)
- Innovation Shares
- Integrated AG

- Blue Sand Securities
- Cashmere Capital
- Verified Organic
- Safe Shepherd
- Bay Front Development
- Integrated CBD

---

**Media Contact**

Rich Williams

T: 702-613-0824

E: Rich@Protonmail.com

(Free Video) The 2 Secrets To Finding Small-Cap, Hidden Gem Stock Opportunities To Dramatically Grow Your Portfolio Going Into Q4 .

‹ The Biden Administration Is Evaluating A Wider Chip Ban On China
› U.S. Public Pension Funds Could Be $21 Billion Richer Right Now

## Related Articles

**Is Bitcoin's Lack Of Volatility A Blessing Or A Curse For Investors?**

**Crypto Stocks Are Hot Right Now, But Should You Invest?**

**Ethereum-Based BTCX Token Raises $1.5M to Build the World's First Bitcoin Xin Blockchain**

**Introducing TON Space – Self-Custody Wallet in Telegram, Available to Developers Now**

# Never Miss A Story!

Subscribe to ValueWalk Newsletter. We respect your privacy.

Your email address

Subscribe

We won't send you spam. Unsubscribe at any time.