UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DISTRICT

|  |  |  |
|---|---|---|
| | § | |
| PATRICK HORSMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24-cv-00342-AW-MAF |
| | § | |
| BRETT JEFFERSON, | § | |
| RYAN ANDREWS, and | § | |
| ANDREWS LAW FIRM, P.A., | § | |
| | § | |
| Defendants. | § | |

---

## DEFENDANT BRETT JEFFERSON'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF LAW

Defendant Brett Jefferson, by and through his undersigned counsel, and pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure, hereby moves to dismiss Plaintiff Patrick Horsman's Complaint [ECF No. 1], and in support thereof states as follows:

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

Plaintiff, who resides in Puerto Rico, brings this case against Defendant Brett Jefferson, a resident of North Carolina, alleging that two articles published online and having no nexus to Florida defamed him. Plaintiff chose Florida as the forum because his defamation claims would be timed-barred in both Puerto Rico and North

Carolina. But Mr. Jefferson is not subject to personal jurisdiction in Florida, and venue is not proper here.

The Court should dismiss the Complaint for three independent reasons.

*First*, this Court lacks personal jurisdiction over Mr. Jefferson. There is no general personal jurisdiction because Mr. Jefferson is a resident of North Carolina and not "at home" in Florida; neither is Plaintiff, who is domiciled in Puerto Rico. Nor is there specific personal jurisdiction because Plaintiff does not allege that Mr. Jefferson committed a tort at all, let alone that the commission of a tort caused an injury within Florida. All the alleged defamatory statements, which merely recounted allegations in two public lawsuits that involve Plaintiff or his business dealings, were substantially true.

*Second*, this district is not the proper venue for resolving Plaintiff's claims. As courts in the Eleventh Circuit and elsewhere recognize, venue for an internet defamation case is generally proper in the district where the plaintiff resides and the defamatory material is published. Because Plaintiff resides in Puerto Rico and has not alleged that the online articles had any nexus to Florida, the District of Puerto Rico is the only potentially proper venue. That dooms Plaintiff's claims because, when a case is transferred to cure a lack of personal jurisdiction or improper venue under 28 U.S.C. § 1406(a), the transferee court applies its own statute of limitations. As such, Plaintiff's claims would be time-barred because Puerto Rico has a one-year

statute of limitations for defamation claims and both articles were published more than one year ago. Transfer would be futile and dismissal is appropriate under Rule 12(b)(3) and 28 U.S.C. § 1406(a).

*Third*, *and in the alternative*, Plaintiff fails to plausibly state a claim for defamation against Mr. Jefferson based on the accurate recitation of legal allegations set forth in the two articles. Dismissal is therefore proper under Rule 12(b)(6).

For these reasons, the Complaint should be dismissed pursuant to Rules 12(b)(2) and 12(b)(3) or alternatively, pursuant to Rule 12(b)(6).

## BACKGROUND

Plaintiff and Mr. Jefferson are currently parties in a consolidated lawsuit pending in the Superior Court of Arizona entitled *Lev et al. v. Horsman et al.*, CV2020-12256 (Consol.) (Super. Ct. Ariz.). In that lawsuit, Plaintiff has asserted a defamation claim against Mr. Jefferson arising out of the Miami Herald's publication of a story about its filing. Plaintiff here asserts defamation claims against Defendants arising out of two articles published on the website of non-party USA Herald relating to allegations made in certain other lawsuits.

### A.    The Parties

Plaintiff is a resident of Puerto Rico. Compl. ¶ 7. Although Plaintiff alleges that Mr. Jefferson is a resident of Florida, Mr. Jefferson is a current resident of North Carolina. Declaration of Brett Jefferson ("Jefferson Decl.") ¶ 2; *see* ECF No. 14

(affidavit of service identifying Mr. Jefferson's "residence or usual place of abode" in North Carolina and stating "[r]esidency was confirmed"). Ryan Andrews is a resident of Florida and his law firm, Andrews Law, P.A., is based in Florida. Compl. ¶¶ 9-10. Plaintiff does not plead the residency of non-party USA Herald through which the alleged defamatory statements were published, nor name the USA Herald or its operator as defendants in this action despite alleging that they were ultimately responsible for publishing the purported defamatory statements.

## B.    The Remcoda Article

Plaintiff alleges that he was defamed by an August 27, 2022 article (the "Remcoda Article") that discussed certain allegations in *Remcoda, LLC v. Ridge Hill, et al.*, Case No. 1:21-cv-00979 (S.D.N.Y.). Compl. ¶ 62 & Ex. A. Plaintiff alleges that the following statements in the Remcoda Article were defamatory:

- "Patrick Horsman and partner Russel [sic] Gross [sic] involvement in $3.7M alleged fraud." *Id.* ¶ 92 (alterations in original).

- "[L]awsuit between Remcoda, LLC, and defendants . . . . Russel [sic] Gross, and the *involvement of his partner, Patrick Horsman, is ever evolving*." *Id.* ¶ 94 (alterations and emphasis in original).

- "Russel [sic] Gross, and his business partner Patrick Horsman's company Unicorn Health, were allegedly working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. Russel [sic] Gross and Horsman's company allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld." *Id.* ¶ 98 (alterations in original).

Plaintiff claims these statements were defamatory because they were inconsistent

with the operative pleading in *Remcoda* at that time—the Second Amended Complaint. *Id.* ¶ 95-115. The Remcoda Article does not, however, attribute the statements to any specific pleading or submission and merely states that they were alleged in *Remcoda*. Compl. Ex. A.

All these statements appeared in documents filed in *Remcoda* before the Remcoda Article was published. As Plaintiff recognizes, the Second Amended Complaint filed on April 25, 2022 alleges a scheme in which the defendants, including Russell Gross, were alleged to have fraudulently persuaded persons to invest substantial sums of money in a plan to purchase personal protective equipment ("PPE") during the COVID-19 pandemic. *See* Compl. ¶ 100. In his motion to dismiss the prior operative complaint filed on November 10, 2021, Mr. Gross identified Unicorn Health LLC ("Unicorn") as his company and explained that Unicorn acted as a broker for the sale of PPE underlying the scheme. Ex. 1 at 1 ("In early June 2020, Plaintiff was introduced to Defendant Gross, whose company Unicorn Health LLC ('Unicorn') has manufacturing and supply relationships for PPE, including nitrile.").[1] In his motion to dismiss the Second Amended Complaint filed on July 21,

---

[1] The Court can take judicial notice of officially filed documents and consider them in connection with a motion to dismiss without converting it into a motion for summary judgment. *Stahl v. U.S. Dept. of Agriculture*, 327 F.3d 697, 700 (11th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss.") The Court can also consider the documents

2022, Mr. Gross again explained that the *Remcoda* lawsuit concerns a failed transaction in which Unicorn, and Mr. Gross as its agent, operated as the PPE broker between the plaintiff and Mr. Gross' co-defendants. Ex. 2 at 1. And in support of this motion, Mr. Gross' counsel submitted a declaration in which he referred to Plaintiff as "Unicorn partner Patrick Horseman [sic]" and attached an email that Plaintiff received from an agent of one of Mr. Gross' co-defendants. Ex. 3 ¶ 19(i).

## C.   The LGBCoin Article

Plaintiff likewise alleges that he was defamed by a May 29, 2023 article (the "LGBCoin Article") that discussed certain allegations in *De Ford v. Koutoulas, et al.*, No. 6:22-cv-00652 (M.D. Fla.). Compl. ¶ 70.[2] Plaintiff alleges the following statements in the LGBCoin Article were defamatory:

- "Thomas McLaughlin, co-founder of LGBCoin and business partners **with Patrick Horsman at Coral Defi (Coral Capital Management, LLC), is accused of fraud along with unjust enrichment in a 104 page class-action lawsuit** filed on behalf of investors that lost money in an alleged cryptocurrency scam." *Id.* ¶ 129 (emphasis in original).

- "The class action lawsuit alleges that Coral Defi, Coral Capital LLC, Coral Capital Management LLC, **all owned by Patrick Horsman (he is listed at the Managing Member/Co-Founder)**, defrauded investors in the LGBCoin Cryptocurrency Pump & Dump scheme and attempted to hide their role through a complex web of transactions." *Id.* ¶ 132

---

because they are central to Plaintiff's claims and their authenticity is beyond challenge. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

[2] Plaintiff did not attach the LGBCoin Article to his complaint and instead supplied an archival link. The article located at that link is attached as Exhibit 4.

(emphasis in original).

Plaintiff alleges that these statements were defamatory because they were inconsistent with the Second Amended Complaint in *De Ford*. *Id.* ¶¶ 130-131, 133-136. Yet, the Second Amended Complaint names Coral DeFi, Coral Capital LLC, and Coral Capital Management LLC as defendants, identifies Plaintiff and Thomas McLaughlin as founders of Coral DeFi and Coral Capital LLC, identifies Plaintiff as the registered executive of Coral Capital Management LLC, and alleges that Mr. McLaughlin and the Coral entities were involved in a fraudulent scheme to "pump and dump" cryptocurrency. Ex. 5 ¶ 32-34, 57, 132-157, 177-178, 266-267.

Moreover, the Third Amended Complaint filed on April 14, 2023 contains even more information relating to Plaintiff. Ex. 6. It names Plaintiff as a defendant and alleges that Plaintiff is the managing partner and co-founder of Coral DeFi, that Coral DeFi is "Horsman's firm," and that Plaintiff engaged with others, including Mr. McLaughlin, in the fraudulent "pump and dump" scheme described in the Second Amended Complaint. *See, e.g.*, *id.* ¶¶ 31-34, 41-42, 97, 103-104, 110, 129, 252, 400-402, 409.[3]

---

[3] In its March 30, 2023 order, the court granted a motion to dismiss for lack of personal jurisdiction filed by Mr. McLauglin and the Coral entitles. *De Ford v. Koutoulas*, 2023 WL 2709816, at *8-10 (M.D. Fla. Mar. 30, 2023). As a result, the plaintiffs noted in the Third Amended Complaint that they were "evaluating bringing claims against the Coral corporate entities and Thomas McLaughlin within the District of Puerto Rico." Ex. 6 ¶ 77 n.8.

Plaintiff alleges that Mr. Jefferson directed Mr. Andrews and his law firm to prepare both Articles for publication on the USA Herald's website. Compl. ¶ 74.

## ARGUMENT

### I.     The Complaint Should Be Dismissed Because the Court Lacks Personal Jurisdiction over Mr. Jefferson

The Court "has personal jurisdiction over non-Floridians to the same extent a Florida court would, subject to federal due process requirements." *Nature Coast Dev. Grp. v. U.S. Specialty Ins.*, 2022 WL 11589413, at *2 (N.D. Fla. Sept. 2, 2022) (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008)). "That means [the Court] must dismiss the claims against them if the complaint does not allege a proper basis for jurisdiction under Florida's long-arm statute." *Id.*

A nonresident defendant may be subject to personal jurisdiction under Florida's long-arm statute in two scenarios:

(1)    A defendant may be "subject to 'general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida," and

(2)    A defendant may be "subject to 'specific personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida'—for conduct specifically enumerated" by statute.

*Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (quoting *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203-04 (11th Cir. 2015)); Fla. Stat. § 48.193. Florida's long-arm statute "must be strictly construed, and any

doubts about applicability of the statute resolved in favor of the defendant and against a conclusion that personal jurisdiction exists." *Island Wifi Ltd., LLC v. AT&T Mobility Nat'l Accts. LLC*, 2021 WL 210536, at *1 (S.D. Fla. Jan. 19, 2021) (quoting *Gadea v. Star Cruises, Ltd.*, 949 So. 2d 1143, 1150 (Fla. 3d DCA 2007)).

In either case, the Court may not exercise jurisdiction over a defendant unless doing so would "comport[] with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Hinkle v. Cont'l Motors, Inc.*, 268 F. Supp. 3d 1312, 1319 (M.D. Fla. 2017), *aff'd sub nom. Hinkle v. Cirrus Design Corp.*, 775 F. App'x 545 (11th Cir. 2019). The "Due Process" question is a separate inquiry that "imposes a more restrictive requirement" than Florida's long-arm statute. *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 859-60 (11th Cir. 2013) (quoting *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1207 (Fla. 2010)).

Plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction" over a nonresident defendant. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "When a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Id.* (quoting *Madara v. Hall*, 916 F.2d 1510,

9

1514 (11th Cir. 1990)).

### A. The Court Lacks General Personal Jurisdiction Over Mr. Jefferson

The Court lacks general personal jurisdiction over Mr. Jefferson because he is not a resident of Florida and Plaintiff alleges no other substantial and not isolated activities by Mr. Jefferson within this state to render him "at home."

The general jurisdiction prong of Florida's long-arm statute provides jurisdiction over any claims against "[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). The "substantial and not isolated activity" requirement is "the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Fourteenth Amendment" of the United States Constitution. *Meier ex rel. Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1269 n.6 (11th Cir. 2002). Florida courts therefore examine whether the defendant's activities in the forum state are so continuous and systematic as to render the defendant "at home" in the state. *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1134 (Fla. 3d DCA 2018) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014)). An individual is typically "at home" in the state where they are domiciled. *Daimler*, 571 U.S. at 139.

Mr. Jefferson is not "at home" in Florida. As an initial matter, Mr. Jefferson

is not a resident of Florida; Mr. Jefferson is a resident of North Carolina. Jefferson Decl. ¶ 2. Indeed, Plaintiff's affidavit of service for the Summons reflects that Plaintiff left the Summons with Mr. Jefferson's spouse at his "residence or usual place of abode" in North Carolina. ECF No. 14. The affidavit further states: "Vehicle parked in the driveway displaying NC tag . . . Residency was confirmed." *Id.* Because Mr. Jefferson is not a resident of Florida, he cannot be subject to general personal jurisdiction under Florida's long-arm statute on this basis. *Novak v. Weichselbaum*, 2021 WL 3036369, at *4 (M.D. Fla. Apr. 26, 2021) ("Defendants are not residents of Florida and are, therefore, not domiciled in Florida. This alone warrants a finding that the Court does not have general jurisdiction over Defendants.").

Nor does Plaintiff allege that Mr. Jefferson has engaged in "substantial and not isolated activity" within Florida to otherwise subject him to general jurisdiction notwithstanding that he is nonresident. "It is clear . . . that a very high threshold must be met in order for general jurisdiction to be exercised over a nonresident defendant in Florida." *Pathman v. Grey Flannel Actions, Inc.*, 741 F. Supp. 2d 1318, 1323 (S.D. Fla. Oct. 1, 2010) (citing *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408 (1984)). Indeed, it is only the "exceptional case" where an individual's contacts with a forum might be so extensive to support general jurisdiction where they are domiciled elsewhere. *Daimler*, 571 U.S. at 139 n.19; *see also Reich v.*

11

*Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (noting that "the Second Circuit has yet to find such a case.").

This is not the exceptional case. The only contacts that Plaintiff alleges with Florida are (1) Mr. Jefferson's purported participation in the publication of defamatory statements on the USA Herald's website that were accessible and accessed in Florida; and (2) Mr. Jefferson's filing of an unrelated administrative complaint with the Florida Department of Financial Services and the associated lawsuit in Florida's Second Judicial Circuit. Compl. ¶¶ 13, 15; 168, 176. These allegations are insufficient to plead that this is the exceptional case in which general jurisdiction can be exercised over a nonresident individual.

*First*, the mere publishing of information on a website in Florida is not "substantial and not isolated activity." *Gazelles FL, Inc. v. Cupp*, 2018 WL 7364591, at \*6 (M.D. Fla. Sept. 26, 2018) ("[T]he Amended Complaint does not explain how the website establishes continuous and systematic business contact with Florida."); *Shipping & Transit, LLC v. WOV, LLC*, 2016 WL 5338078, at \*3 (S.D. Fla. Sept. 23, 2016) ("A defendant's website alone does not establish general jurisdiction when it is not specifically directed at the forum state, 'but instead is available to all customers throughout the country who have access to the Internet . . . . [T]he ability of [forum] residents to access the defendants' websites . . . does not by itself show any persistent course of conduct by the defendants in the [forum].'" (alterations in

12

original)). And Plaintiff does not otherwise allege that the USA Herald's website was directed at Florida residents or that Mr. Jefferson intended to target Florida residents with the alleged defamatory statements. Plaintiff's naked assertion that the website was accessible and accessed in Florida is insufficient to constitute "substantial and not isolated activity" under the long-arm statute. *Schefren v. Carpenter*, 2014 WL 12026079, at *3 (S.D. Fla. Aug. 20, 2014) ("An entity is not subject to general personal jurisdiction in Florida merely because it maintains an interactive website that is accessible in Florida. And because Plaintiffs do not identify any special quality or characteristic of the website from which it could be inferred that it was targeted towards Florida, Plaintiffs fail to allege general personal jurisdiction under Fla Stat. § 48.193(2)." (citation omitted)).

*Second*, the commencement of an administrative proceeding or a lawsuit in Florida is not "substantial and not isolated activity." *See, e.g.*, *Lee v. Branch Banking & Tr. Co.*, 2018 WL 5633995, at *3 (S.D. Fla. Oct. 31, 2018) ("[F]iling lawsuits in Florida's courts is not 'exceptional' or unique and does not 'closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.'" (quoting *Waite*, 901 F.3d at 1317-18)); *Elkins v. Abbvie, Inc.*, 2021 WL 2823444, at *4 n.2 (M.D. Fla. Mar. 11, 2021) (finding more extensive contacts than those alleged by Plaintiff, including "fil[ing] lawsuits to enforce contract agreements in Florida," insufficient to establish general jurisdiction

over nonresident). Mr. Jefferson's filing of an unrelated administrative complaint and associated lawsuit is equally insufficient to allege "substantial and not isolated activity" under the long-arm statute.[4]

Accordingly, Mr. Jefferson is not "at home" in Florida and Plaintiff has not otherwise alleged sufficient facts to adequately plead that Mr. Jefferson engaged in "substantial and not isolated activity" to be subject to general jurisdiction in Florida as a nonresident individual.

## B. The Court Lacks Specific Personal Jurisdiction Over Mr. Jefferson

The Court also lacks specific personal jurisdiction over Mr. Jefferson under Florida's long-arm statute because: (1) Plaintiff fails to state a defamation claim against Mr. Jefferson, and (2) Plaintiff fails to allege that the purported defamatory statements caused injury in Florida.

### 1. The Court Lacks Specific Personal Jurisdiction Over Mr. Jefferson Because Plaintiff Fails to State a Cause of Action for Defamation

Plaintiff relies on Florida's "tortious act" provision, Fla. Stat. §

---

[4] Mr. Jefferson has owned real property in Florida since 2018 where he has spent limited time in 2024. Jefferson Decl. ¶¶ 3-5. These contacts are also insufficient to constitute "substantial and not isolated" activity within Florida. *Skorupski v. Dale C. Rossman, Inc.*, 2008 WL 4724680, at *5 n.48 (M.D. Fla. Oct. 20, 2008) ("By itself, ownership of property is insufficient to subject a nonresident defendant to the jurisdiction of the courts of this state, unless the cause of action arose out of such ownership.") (citing *Nichols v. Paulucci*, 652 So. 2d 389, 393 n.5 (Fla. 5th DCA 1995)).

48.193(1)(a)2, to allege specific jurisdiction over Mr. Jefferson based on the defamation claims. Compl. ¶ 13 (alleging jurisdiction because Mr. Jefferson "committed wrongful acts in Florida."). "In Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action.'" *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citations omitted); *Nature Coast Dev. Grp.*, 2022 WL 11589413, at *2 ("Although jurisdictional and merits analyses are distinct, assessing jurisdiction under Florida's long-arm statute requires determining whether the complaint actually alleges a claim to invoke jurisdiction." (citations omitted)). "Thus, the long-arm statute is satisfied only if the complaint states a plausible claim [for relief]." *Nature Coast Dev. Grp.*, 2022 WL 11589413, at *2.

Plaintiff brings claims for (1) defamation *per se* based on the statements in the Remcoda and LGBCoin Articles (Counts One and Two); and (2) defamation by implication based on the same statements in the Remcoda and LGBCoin Articles (Counts Three and Four). For a claim to be plausible, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A claim is not plausible if the complaint alleges conduct "'merely consistent with' a defendant's

liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). And a court need not take a plaintiff's allegations as true if they are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Plaintiff has failed to state a plausible defamation claim under Florida law to subject Mr. Jefferson to specific jurisdiction.

### a. Plaintiff Fails to Plead a Cause of Action for Defamation *Per Se*

Plaintiff's claims for defamation *per se* fail under Florida law. "To state a claim for defamation *per se*, a plaintiff must plausibly allege that the defendant (1) published, (2) to a third party, (3) a false statement about the plaintiff, (4) that rises to the level of defamation *per se.*" *Clowdus v. Am. Airlines, Inc.*, 2022 WL 18458134, at *3 (S.D. Fla. Oct. 12, 2022), *aff'd*, 2023 WL 5011731 (11th Cir. Aug. 7, 2023) (citing *Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1155 (S.D. Fla. 2018), *aff'd,* 973 F.3d 1304 (11th Cir. 2020)). "A statement can support a claim of defamation, or defamation *per se*, only if the statement is false." *Id.* (citing *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) and *Cape Publ'n Inc. v. Reakes*, 840 So. 2d 277, 279-80 (Fla. 5th DCA 2003)). Falsity, however, exists only if "the publication is substantially and materially false, not just if it is technically false." *Id.* (citing *Turner v. Wells*, 198 F. Supp. 3d 1365, 1365 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254 (11th Cir. 2018)). Whether a statement is false is a question of law for the court. *Turner*, 879 F.3d at 1262-63. Plaintiff's claims fail

because there are no false statements in the Remcoda and LGBCoin Articles that would support a defamation *per se* claim.

The Remcoda Article merely recites allegations that were made in *Remcoda*. Plaintiff claims that three of these statements are false because they do not appear in the Second Amended Complaint in *Remcoda*:

- "Patrick Horsman and partner Russel [sic] Gross [sic] involvement in $3.7M alleged fraud." Compl. ¶ 92 (alterations in original).

- "[L]awsuit between Remcoda, LLC, and defendants . . . . Russel [sic] Gross, and the *involvement of his partner, Patrick Horsman, is ever evolving*." *Id.* ¶ 94 (alterations and emphasis in original).

- "Russel [sic] Gross, and his business partner Patrick Horsman's company Unicorn Health, were allegedly working with the defendants from the start when they introduced Remcoda to Ridge Hill as part of their overall alleged scheme. Russel [sic] Gross and Horsman's company allegedly received payment of their fee from Remcoda's funds that the defendants wrongfully withheld." *Id.* ¶ 98 (alterations in original).

These statements, however, accurately recite allegations made in filings in *Remcoda* before the Remcoda Article was published. For example, Mr. Gross explained that Unicorn was his company, identified Plaintiff as a "Unicorn partner," submitted evidence reflecting Plaintiff's dealings with the co-defendants, and described his own role as agent for Unicorn in brokering sales of PPE between the plaintiff and the co-defendants. Ex. 1 at 1; Ex. 2 at 1; Ex. 3 ¶ 19(i). Moreover, by the time the Remcoda Article was published, the case was on its third complaint, the court had dismissed some claims and sustained others, and multiple motions to dismiss were

still pending, so the statement that the lawsuit was "ever evolving" was accurate.

That these allegations do not all appear in the Second Amended Complaint is beside

the point because the Remcoda Article does not specifically refer to the Second

Amended Complaint or any other filing in *Remcoda*. Compl. Ex. A. Accordingly,

Plaintiff cannot state a plausible claim of defamation *per se* based on the statements

in the Remcoda Article.

The LGBCoin Article recites allegations that were made in *De Ford*. Plaintiff

claims two such statements are false because they were not contained in the Second

Amended Complaint in *De Ford*:

- "Thomas McLaughlin, co-founder of LGBCoin and business partners **with Patrick Horsman at Coral Defi (Coral Capital Management, LLC), is accused of fraud along with unjust enrichment in a 104 page class-action lawsuit** filed on behalf of investors that lost money in an alleged cryptocurrency scam." Compl. ¶ 129 (emphasis in original).

- "The class action lawsuit alleges that Coral Defi, Coral Capital LLC, Coral Capital Management LLC, **all owned by Patrick Horsman (he is listed at the Managing Member/Co-Founder)**, defrauded investors in the LGBCoin Cryptocurrency Pump & Dump scheme and attempted to hide their role through a complex web of transactions." *Id.* ¶ 132 (emphasis in original).

Yet the Second Amended Complaint names the Coral entities as defendants,

identifies Plaintiff as a founder of these entities (or in the case of Coral Capital

Management LLC, as a registered executive) along with Mr. McLaughlin, and

alleges that Mr. McLaughlin and the Coral entities were involved in a fraudulent

scheme to "pump and dump" cryptocurrency. Ex. 5 ¶¶ 32-34, 57, 132-157, 177-178, 266-267. And the Third Amended Complaint filed on April 14, 2023—over a month before the LGBCoin Article—names Plaintiff as a defendant and alleges that he is the managing partner and co-founder of Coral DeFi, that Coral DeFi is "Horsman's firm," and that Plaintiff engaged with others, including Mr. McLaughlin, in this fraudulent scheme. Ex. 6 ¶¶ 31-34, 41-42, 97, 103-104, 110, 129, 252, 400-402, 409. While the LGBCoin Article incorrectly attributes these statements to the Second Amended Complaint, and not the Third Amended Complaint, that only means that this attribution is "technically false"; it does not mean that the statements themselves are "substantially and materially false" because they are entirely consistent with allegations asserted in *De Ford* before the LGBCoin Article was published. *Clowdus*, 2022 WL 18458134, at * 3. Plaintiff therefore also cannot state a plausible claim of defamation *per se* based on the statements in the LGBCoin Article.

> **b.    Plaintiff Fails to Plead a Cause of Action for Defamation by Implication**

Plaintiff's claims for defamation by implication also fail under Florida law. To plead a cause of action for defamation by implication, a plaintiff must allege that literally true statements "are juxtaposed in such a way as to imply a false and defamatory connection between them" or "omit facts in such a way as to create a false and defamatory implication, or 'gist.'" *Utterback v. Morris*, 2024 WL 3809368, at *3 (N.D. Fla. July 24, 2024), *report and recommendation adopted,* 2024 WL

3799423 (N.D. Fla. Aug. 12, 2024). "Florida law entrusts courts with determining whether the defendant's published words are reasonably susceptible to the implication alleged by the plaintiff." *Id.* (citations omitted). It therefore "falls to courts in the first instance to determine whether the reasonable implications derived from a defendant's statements are as the plaintiff alleges." *Id.* (citations omitted). The purported implications that Plaintiff alleges can be derived from the Remcoda and LGBCoin Articles do not meet this requirement.

Plaintiff claims that the Remcoda Article juxtaposes facts in a manner that falsely implies that Plaintiff was involved in the PPE scheme at issue in *Remcoda*. Compl. ¶¶ 256-257. There is no false implication, however, because Mr. Gross has been sued for perpetrating this scheme and he alleged in his prior court filings that he operated as an agent of Unicorn in brokering PPE sales, identified Plaintiff as a "Unicorn partner," and submitted documents evidencing Plaintiff's involvement. Ex. 3 ¶ 19(i). Moreover, the Remcoda Article qualifies its summary of *Remcoda* by stating that Mr. Gross and Plaintiff were involved in an "*alleged* fraud" and Mr. Gross and their company Unicorn "were *allegedly* working with defendants from the start" and "*allegedly* received payment of their fee from Remcoda's funds that the defendants wrongfully withheld." Compl. Ex. A (emphasis added); *see Utterback*, 2024 WL 3809368, at *5 ("Defendant indicated that the money laundered by Plaintiff 'allegedly' had some drug connection. This is an important qualification.

It indicates to a reasonable person that Defendant is unsure about this fact, and that anyone should take Defendant's statements with the understanding that they may not be accurate.").

Plaintiff also claims that the Remcoda Article falsely implies he was a party in *Remcoda* by omitting that he was not named as a party there. Compl. ¶ 258. This claim fails because the Remcoda Article includes factual statements that show that Plaintiff was not, in fact, named as a party. *Id.* Ex. A ("A lawsuit between *plaintiff* Remcoda, LLC, *and defendants* Ridge Hill Trading (PTY) LTD, Ataraxia Capital Partners PTY LTD, Russel Gross, *and the involvement of his partner, Patrick Horsman*, is ever evolving." (emphasis added)). Moreover, a statement or implication "does not have to be perfectly accurate" to bar a claim of defamation by implication; only the 'gist' or the 'sting'" of the implication must be true." *Utterback*, 2024 WL 3809368, at *5. The "gist" of the implication here is that *Remcoda* concerns allegations of fraud involving Plaintiff's business partner and Plaintiff's company. Plaintiff does not deny—and filings in *Remcoda* show—that this implication is true.

Plaintiff claims that the LGBCoin Article juxtaposes facts in a manner that falsely implies that he was involved in the fraudulent scheme at issue in *De Ford*. Compl. ¶¶ 277-281. There is no false implication here either because Plaintiff was in fact named as a defendant in Third Amended Complaint filed in *De Ford* detailing

Plaintiff's alleged involvement in this scheme. Ex. 6. Moreover, like the Remcoda Article, the LGBCoin Article merely states that Plaintiff's business partner Mr. McLaughlin and their corporate entities were "accused of fraud along with unjust enrichment . . . in an *alleged* cryptocurrency scam" in a class-action lawsuit that "*alleges* that Coral Defi, Coral Capital LLC, Coral Capital Management LLC, all owned by Patrick Horsman . . . defrauded investors," Ex. 4 (emphasis added), which is entirely consistent with the allegations made in *De Ford*. Exs. 5-6. That the LGBCoin Article references the Second Amended Complaint, rather than the Third Amended Complaint, does not change the outcome because the "gist" of the implication is the same: these individuals and entities are all alleged to be involved in the fraudulent scheme at issue in *De Ford*.

Plaintiff has therefore failed to state a plausible claim for defamation *per se* or defamation by implication to permit the exercise of specific jurisdiction over Mr. Jefferson.

> **2.    The Court Lacks Specific Personal Jurisdiction Over Mr. Jefferson Because Plaintiff Fails to Allege that Mr. Jefferson Caused Injury in Florida**

For Plaintiff to establish specific jurisdiction, he not only must state a plausible cause of action against Mr. Jefferson, but he must also plead that Mr. Jefferson's alleged conduct "cause[d] an injury within Florida." *Louis Vuitton*, 736 F.3d at 1353. Because the statements at issue were not defamatory, they did not

cause any injury at all that would permit the exercise of specific jurisdiction over Mr. Jefferson under the long-arm statute. *Turner*, 198 F. Supp. at 1364 ("Under Florida law, defamation is generally defined as 'the unprivileged publication of false statements which naturally and proximately result in injury to another'" and requires showing that "the falsity of the statement caused injury to the plaintiff.") (citations omitted)).

Moreover, Plaintiff has not alleged that the statements caused injury to him in Florida. Plaintiff lives in Puerto Rico, not Florida. Compl. ¶ 7. And he proffers only conclusory allegations that the Articles were accessible and accessed in Florida, which is insufficient to show an injury in Florida. *Catalyst Pharms., Inc. v. Fullerton*, 748 F. App'x 944, 947 (11th Cir. 2018) ("A party asserting jurisdiction in Florida over a nonresident defendant for a defamation claim must make a prima facie showing that that the purported defamatory statements were not merely accessible to, but also 'accessed by a third party in Florida.'" (citation omitted) (emphasis in original)); *McCall v. Zotos*, 2023 WL 3946827, at *5 (11th Cir. June 12, 2023) (affirming dismissal for lack of jurisdiction where the allegedly tortious internet post was "accessible in" but did not "target" Florida). And he does not otherwise plead that any of his alleged injuries have any connection to Florida. *See* Compl. ¶¶ 180-206. Plaintiff's allegations therefore fall short of establishing that the

alleged conduct caused an injury in Florida to support the exercise of specific

personal jurisdiction over Mr. Jefferson.

For these reasons, the Court should decline to exercise personal jurisdiction

over Mr. Jefferson and dismiss Plaintiff's case pursuant to Rule 12(b)(2). In doing

so, the Court need "not address federal due process dimension of personal

jurisdiction." *Nature Coast Dev. Grp.*, 2022 WL 11589413, at *3 (citing *Stonepeak

Partners, LP v. Tall Tower Cap., LLC*, 231 So. 3d 548, 558 (Fla. 2d DCA 2017)).

## II.  The Complaint Should Be Dismissed Pursuant to Rule 12(b)(3) for Improper Venue

Federal courts are empowered to dismiss a case under Rule 12(b)(3) where

the case is filed in an improper venue. Under the general venue statute, venue is

proper in:

> (1)  a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2)  a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3)  if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)-(3). None of these venue requirements are met here.

*First*, this case falls outside Section 1391(b)(1) because Defendants are not all

residents of Florida. Mr. Jefferson is a resident of North Carolina, while the other

Defendants are residents of Florida. *Compare* Jefferson Decl. ¶ 2 (Mr. Jefferson is a resident of North Carolina), *with* Compl. ¶¶ 14-15 (Defendant Ryan Andrews and Andrews Law Firm, P.A. are residents of Florida). In fact, there is no venue that would be proper under Section 1391(b)(1) because Defendants do not all reside in the same state.

*Second*, this case falls outside Section 1391(b)(2) because Plaintiff fails to allege that a substantial part of the events giving rise to the claims took place here. For defamation claims, "courts generally hold that venue under [Section 1391(b)(2)] is proper in the district where the injured party resides and the defamatory statements were published." *Cap. Corp. Merch. Banking v. Corp. Colocation, Inc.*, 2008 WL 4058014, at *3 (M.D. Fla. Aug. 27, 2008) (collecting cases). Plaintiff does not reside in this district; he resides in Puerto Rico. Compl. ¶ 7. He does not allege that he suffered any economic or reputational harm in this district rather than in Puerto Rico. And he does not allege that the purported defamatory statements were published in this district—indeed, Plaintiff does not allege any facts about where the publication occurred because he does not identify the location of the USA Herald. To the contrary, Plaintiff alleges only that the Articles were published on the USA Herald's website and therefore were accessible in Florida and accessed by Florida residents. *Id.* ¶¶ 13, 15. These conclusory allegations, which apply equally to nearly all websites, are insufficient to show that venue is proper in this district. Instead, based

on the allegations in the Complaint, the only district in which venue would be proper under Section 1391(b)(2) is the District of Puerto Rico where Plaintiff resides.

*Third*, this case falls outside Section 1391(b)(3) because there are judicial districts in which this case could have been brought. In particular, because venue is proper in online defamation cases in the district where the injured party resides, Plaintiff could have tried to bring this case in the District of Puerto Rico. *McDowell v. Ham*, 2011 WL 2560342, at *2 (N.D. Fla. May 23, 2011) ("Section 1392(b)(3) does not apply because that provision is only applicable when there is no district in which the action may otherwise be brought."), *report and recommendation adopted*, 2011 WL 2560328 (N.D. Fla. June 28, 2011).[5]

For these reasons, venue is improper in this district under Section 1391(b) and the only district in which venue would be proper, based on the allegations in the Complaint and the documents properly before the Court, is the District of Puerto Rico.

\*    \*    \*

Because the Court lacks personal jurisdiction over Mr. Jefferson and venue is otherwise not proper here, the Court should dismiss the Complaint because transferring the case to a different district would be futile. Under 28 U.S.C. §

---

[5] Even if Section 1391(b)(3) were available to Plaintiff, it does not provide for venue in this district because, as explained above, the Court lacks personal jurisdiction over Mr. Jefferson.

1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Section 1406(a) operates "where a suit is filed in federal court in a district in which venue or personal jurisdiction is improper." *Manley v. Engram*, 755 F.2d 1463, 1467 (11th Cir. 1985). When a case is transferred under Section 1406(a), the transferee court must apply the law of the forum in which it sits, including the applicable statute of limitations. *Id.*; *James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs., Inc.*, 315 F. App'x 885, 888 (11th Cir. 2009) ("When the transferor court lack[s] personal jurisdiction over the defendant, the transferee court must apply the law of the state in which it sits."); *see also Eggleton v. Plasser & Theurer Exp. Von Bahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 588 (8th Cir. 2007) (recognizing that under § 1406(a) no circuit court has applied "the law of the transferor forum to rescue a case with jurisdictional defects in the original court from a statute of limitations bar in the transferee forum.").

The rationale for this rule is "quite simple":

A transfer under § 1406(a) is based not on the inconvenience of the transferor forum but on the impropriety of that forum. If the state law of the forum in which the action was originally commenced is applied following a § 1406(a) transfer, the plaintiff could benefit from having brought the action in an impermissible forum.

*Manley*, 755 F.2d at 1467 (citation omitted).

If there were a transfer here, the transferee court would need to apply the law of the forum in which it sits to Plaintiff's claims. As explained above, the only potential transferee court in which venue is proper is the District of Puerto Rico. Puerto Rico has a one-year statute of limitations for defamation claims running from the date of publication. *Miller v. Tyler Louthan*, 2024 WL 1230255, at *7 (D.P.R. Mar. 22, 2024) ("Defamation claims are subject to the one-year statute of limitations set for tort actions under Article 1802 of the Puerto Rico Civil Code. . . . [T]he Supreme Court of Puerto Rico has determined that 'a cause of action for defamation accrues immediately upon the occurrence of the tortious act.'" (quoting *Cacho-González v. Santarrosa*, 203 D.P.R. 215, 225 (P.R. 2019)). Plaintiff's claims would be time-barred under Puerto Rico law because both the Remcoda Article and the LGBCoin Article were published more than one year before Plaintiff filed this lawsuit. The Remcoda Article was published on August 27, 2022, and the LGBCoin Article was published on May 29, 2023. Compl. ¶¶ 62, 70. Plaintiff did not commence this lawsuit until August 27, 2024—two years after the Remcoda Article was published and more than one year after the LGBCoin Article was published. As such, transfer would be futile and therefore not in the interest of justice because Plaintiff's claims would be time-barred under the applicable forum law of the only potential transferee court. *See, e.g.*, *Daniel v. Langley*, 2014 WL 6978874, at *2 (N.D. Fla. Dec. 9, 2014) (holding that this district was an improper venue and

dismissing because the statute of limitations in the proper venue ran before plaintiff filed action).[6]

## III. The Complaint Should Be Dismissed Pursuant to Rule 12(b)(6) Because Plaintiff Fails to State a Defamation Claim Against Mr. Jefferson

Alternatively, Plaintiff's claims should be dismissed under Rule 12(b)(6) for failure to state a claim for the reasons set forth in Section I.B.1, above, which we incorporate by reference here. *See Nature Coast Dev. Grp., LLC*, 2022 WL 11589413, at *3 (dismissing claims against certain defendants for lack of personal jurisdiction and the same claims against others on the merits).

## CONCLUSION

For these reasons, the Complaint should be dismissed pursuant to Rules 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue. Alternatively, the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

---

[6] To the extent that Plaintiff argues that a different venue would be proper, such as North Carolina, where Mr. Jefferson resides, or Arizona, where the parties have a pending lawsuit, the outcome would be the same. *Oldham v. Univ. of N. Carolina*, 2023 WL 3984031, at *17 (M.D.N.C. June 13, 2023) ("Under North Carolina law, defamation claims for libel and slander carry a one-year statute of limitations."); *Benedict v. Google LLC*, 2024 WL 3427161, at *4 (D. Ariz. July 16, 2024) ("Under Arizona law, the statute of limitations for a defamation claim is one year after the defamation action accrues.").

**CERTIFICATE OF COMPLIANCE OF LOCAL RULE 7.1(F)**

I HEREBY CERTIFY that, in accordance with Local Rule 7.1(F) of the United States District Court for the Northern District of Florida, the foregoing motion to dismiss and supporting memorandum of law contains 7,169 words.

**CERTIFICATE OF ATTORNEY CONFERENCE - NOT REQUIRED**

I HEREBY CERTIFY that, pursuant to Local Rule 7.1(D), no attorney conference is required because this motion would determine the outcome of a case or claim.

Dated: October 16, 2024                    Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
101 East College Avenue
Post Office Drawer 1838
Tallahassee, FL  32301
Phone 850-222-6891
Fax 850-521-1379

*/s/ David C. Ashburn*
**DAVID C. ASHBURN, ESQ.**
Fla. Bar No. 0708046
ashburnd@gtlaw.com
jessica.turner@gtlaw.com

and

**WOLLMUTH MAHER & DEUTSCH LLP**

David H. Wollmuth (*pro hac vice* forthcoming)
Joshua M. Slocum (*pro hac vice* forthcoming)

Maxwell G. Dillan (*pro hac vice*
forthcoming)
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
dwollmuth@wmd-law.com
jslocum@wmd-law.com
mdillan@wmd-law.com

***Attorneys for Defendant Brett
Jefferson***

# EXHIBIT 1

Bijan Amini
AMINI LLC
131 West 35th Street
12th Floor
New York, New York 10001
(212) 490-4700
bamini@aminillc.com

*Attorneys for Defendant Russell Gross*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
REMCODA, LLC,                                            :

                     Plaintiff,                      :        **Case No. 1:21-cv-00979**

           -against-                              :

RIDGE HILL TRADING (PTY) LTD, ATARAXIA   :
CAPITAL PARTNERS PTY LTD, DE RAJ GROUP AG,
PETRICHOR CAPITAL SDN BHD, PETRICHOR      :
CAPITAL TRADING LIMITED, VAIDYANATHAN
MULANDRAM NATESHAN, GAYATHRI             :
VAIDYANATHAN, MENUSHA GUNAWARDHANA,
VINCENT FLETCHER, and RUSSELL GROSS,      :

                 Defendants.                    :
-------------------------------------------------------------------X


**DEFENDANT RUSSELL GROSS' MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT FACTUAL ALLEGATIONS ..................................................................... 4

    Plaintiff's Relationship with Gross and the Alleged Misrepresentations ................... 4

    Plaintiff's Unsupported Allegations Against Gross .................................................... 5

    Plaintiff's Causes of Action Against Gross ............................................................... 7

ARGUMENT .................................................................................................................. 7

    1.    Legal Standard ............................................................................................... 7

    2.    The Procurement Agreement Contradicts Plaintiff's Allegation that Gross Is an

        Employee and/or Agent of Defendant Ridge Hill ........................................... 9

    3.    Plaintiff's Claim for Fraud in the Inducement Should Be Dismissed ........... 12

    4.    Plaintiff's Aiding and Abetting Claim Should Be Dismissed ....................... 18

    5.    Plaintiff's Quasi-Contractual Claims Against Gross Are Precluded by Its

        Agreement with Ridge Hill and Should Be Dismissed ................................. 19

CONCLUSION .............................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
   957 F. Supp. 1308 (S.D.N.Y. 1997).................................................................. 20

*Affiliated FM Ins. Co. v. Jou Jou Designs, Inc.*,
   1997 WL 473382 (S.D.N.Y. Aug. 19, 1997) .................................................. 14

*Altman v. J.C. Christensen & Assoc's, Inc.*,
   786 F.3d 191 (2d Cir. 2015)............................................................................ 7

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir.1983).............................................................................. 18

*Ashcroft v. Iqbal*,
   556 U.S. 662, (2009) ...................................................................................... 7

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)............................................................................. 8

*Bates Advert. USA, Inc. v. McGregor*,
   282 F. Supp. 2d 209 (S.D.N.Y. 2003)........................................................... 17

*Bazak Int'l. Corp. v. Tarrant Apparel Grp.*,
   347 F. Supp. 2d 1 (S.D.N.Y. 2004)............................................................... 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................7-8

*Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., Inc.*,
   2013 WL 1385210 (S.D.N.Y. Mar. 18, 2013) .............................................. 19

*Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................... 9

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005)........................................................................... 9

*. Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*,
   419 F. Supp. 2d 419 (S.D.N.Y. 2005)....................................................... 12, 13

*Caro Cap., LLC v. Koch*,
   2021 WL 1595843 (S.D.N.Y. Apr. 23, 2021) .............................................. 14

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .................................................................................. 9

*Cohen v. Acorn Int'l Ltd.*,
    944 F. Supp. 204 (S.D.N.Y. 1996) ............................................................. 10 n. 3, 11

*Coppelson v. Serhant*,
    2021 WL 148088 (S.D.N.Y. Jan. 15, 2021) ........................................................... 14

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ................................................................... 16

*Friedman v. Ariz. World Nurseries*,
    730 F. Supp. 521 (S.D.N.Y.1990) ......................................................................... 16

*Gen. Bank v. Mark II Imports, Inc.*,
    293 A.D.2d 328 (N.Y. 2002) ................................................................................ 17

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
    8 F. Supp. 3d 467 .................................................................................................. 22

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    17 F. Supp. 275 (S.D.N.Y. 1998) .......................................................................... 21

*GS Equities, Ltd. v. Blair Ryan Co.*,
    2011 WL 3278909 (S.D.N.Y. July 26, 2011) .................................................. 15 n. 5

*High Tides, LLC v. DeMichele*,
    88 A.D.3d 954 (N.Y. 2011) .................................................................................. 13

*In re Lyondell Chem. Co.*,
    505 B.R. 409 (S.D.N.Y. 2014) ....................................................................... 9-10, 11

*In re MPM Silicones, L.L.C.*,
    596 B.R. 416 (S.D.N.Y. 2019) ............................................................................... 7

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
    2018 WL 1610416 (S.D.N.Y. Mar. 30, 2018) ...................................................... 20

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
    450 F. Supp. 3d 358 (S.D.N.Y. 2020) .............................................................. 15 n. 5

*JP Morgan Chase Bank v. Winnick*,
    406 F.Supp.2d 247 (S.D.N.Y.2005) ..................................................................... 18

*King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*,
    2009 WL 5033960 (S.D.N.Y. Dec. 23, 2009)......................................................... 20 n. 6

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) ......................................................................... 9

*Kolbeck v. LIT America, Inc.*,
    939 F. Supp. 240 (S.D.N.Y.1996) ......................................................... 18

*Kriegel v. Donelli*,
    2014 WL 2936000 (S.D.N.Y. June 30, 2014)...................................... 12, 15, 15 n. 5

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) ......................................................................... 18

*L. Debenture v. Maverick Tube Corp.*,
    2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008) ....................................... 20

*L. Offs. of Oliver Zhou v. Citibank N.A.*,
    2016 WL 2889060 (S.D.N.Y. May 17, 2016).......................................... 18

*Lee Chu v. Ling Sun Chu*,
    234 N.Y.S.2d 849 (1st Dep't 1962) ...................................................... 14

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006).......................................................................... 18

*Levy v. Young Adult Inst., Inc.*,
    103 F. Supp. 3d 426 (S.D.N.Y. 2015)...................................................... 22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................ 15-16

*Manela v. Gottlieb*,
    784 F.Supp. 84 (S.D.N.Y.1992) ......................................................... 13

*May v. Sony Music Ent.*,
    399 F. Supp. 3d 169 (S.D.N.Y. 2019)............................................... 9, 11

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    43 F. Supp. 3d 309 (S.D.N.Y. 2014)............................................. 19, 20 n. 6

*Mina Inv. Holdings Ltd. v. Lefkowitz*,
    16 F. Supp. 2d 355 (S.D.N.Y. 1998) .................................................... 20

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Worley*,
    257 A.D.2d 228 (1st Dep't 1999).......................................................... 12

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ........................................................................ 14

*Payday Advance Plus, Inc. v. Findwhat.com, Inc.*,
  478 F. Supp. 2d 496 (S.D.N.Y. 2007) ......................................................... 20

*PetEdge, Inc. v. Garg*,
  234 F. Supp. 3d 477 (S.D.N.Y. 2017) ......................................................... 18

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
  420 F. Supp. 3d 123 (S.D.N.Y. 2019) ......................................................... 11

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
  460 F. Supp. 3d 481 (S.D.N.Y. 2020) ......................................................... 15

*President Container Grp. II, LLC v. Systec Corp.*,
  467 F. Supp. 3d 158 (S.D.N.Y. 2020) ......................................................... 18

*Quintanilla v. WW Int'l, Inc.*,
  2021 WL 2077935 (S.D.N.Y. May 24, 2021) ........................................ 20 n. 6

*Rensselaer Polytechnic Inst, v. Varian, Inc.*,
  340 F. App'x 747 (2d Cir. 2009) ............................................................. 19-20

*Rich v. Maidstone Financial, Inc.*,
  2001 WL 286757 (S.D.N.Y. March 23, 2001) ......................................... 8, 13

*Riker v. Premier Cap.*, LLC,
  2016 WL 5334980 (S.D.N.Y. Sept. 22, 2016) ........................................ 11, 16

*River Birch Capital, LLC. v. Jack Cooper Holdings Corp.*,
  2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ............................................... 18

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .......................................................................... 8

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ............................................................................ 8

*Saltz v. First Frontier, LP*,
  782 F. Supp. 2d 61 (S.D.N.Y. 2010) ....................................................... 13, 16

*State St. Glob. Advisors Tr. Co. v. Visbal*,
  431 F. Supp. 3d 322 (S.D.N.Y. 2020) ..................................................... 15 n. 5

*Stephenson v. PricewaterhouseCoopers, LLP*,
    482 F. App'x 618 (2d Cir. 2012) .......................................................................... 16

*Universal Antiques, Inc. v. Vareika*,
    826 F. Supp. 2d 595 (S.D.N.Y. 2011) ................................................................... 12

*W.B. David & Co., Inc. v. DWA Commu'n, Inc.*,
    2004 WL 369147 (S.D.N.Y. Feb. 26, 2004). .................................................. 15 n. 5

*Welch v. TD Ameritrade Holding Corp.*,
    2009 WL 2356131 (S.D.N.Y. July 27, 2009) ........................................................ 22

*Wexler v. Allegion (UK) Ltd.*,
    2018 WL 1626346 (S.D.N.Y. Mar. 30, 2018) ................................................. 15, 16

*Wolet Cap. Corp. v. Walmart Inc.*,
    2021 WL 242297 (S.D.N.Y. Jan. 25, 2021) ..................................................... 11-12

## **Rules**

Fed. R. Civ. P. 8 ........................................................................................................... 8

Fed. R. Civ. P. 9(b) ....................................................................................................... 8

Fed. R. Civ. P. 12(c) ..................................................................................................... 1

## **Other Authorities**

22A N.Y. Jur. 2d Contracts § 515 ............................................................................. 22

Defendant Russell Gross ("Gross") respectfully submits this Memorandum of Law in Support of his motion to dismiss the claims of Plaintiff Remcoda, LLC ("Plaintiff" or "Remcoda") pursuant to Fed. R. Civ. P. 12(c), as follows.

## PRELIMINARY STATEMENT

In 2020, as the COVID-19 pandemic ravaged the United States and the rest of the world, Plaintiff, who touts itself as the largest glove importer in the United States with over $200 million in revenue, sought to capitalize on the ever-increasing demand for personal protective equipment ("PPE"). To that end, Plaintiff sourced and purchased PPE worldwide for its clients in the United States. In early June 2020, Plaintiff was introduced to Defendant Gross, whose company Unicorn Health LLC ("Unicorn") has manufacturing and supply relationships for PPE, including nitrile examination gloves that Plaintiff had agreed to provide to its clients.

On behalf of Unicorn, Gross offered to introduce Plaintiff to manufacturers and suppliers of the nitrile gloves it needed, in exchange for a fee of 5% of the total purchase price for any transaction that Plaintiff successfully completed, to be paid by Plaintiff to Unicorn. Plaintiff agreed, and on June 8, 2020, Plaintiff and Unicorn memorialized their agreement by entering into a Procurement Agreement (the "Procurement Agreement") that provided that Unicorn would act as Plaintiff's "Procurement Agent" and "introduce the Purchaser directly to their proprietary supply relationships."[1] *See* Declaration of Russell Gross, dated November 10, 2021 ("Gross Decl."), submitted herewith, Ex. A at 1.

---

[1] Although Plaintiff did not attach the Procurement Agreement to its Amended Complaint, it repeatedly references its language and its terms, thereby incorporating it into the Amended Complaint. Because the Procurement Agreement, and its terms and effects, govern the parties' relationship and are part of the Amended Complaint, the Court should consider the Procurement Agreement when deciding this Motion. *See infra* at pp. 8-12.

After Plaintiff entered into the Procurement Agreement with Unicorn, Gross introduced Plaintiff to Defendant Ridge Hill Trading (PTY) LTD ("Ridge Hill"), and on July 16, 2020, Plaintiff and Ridge Hill entered into an agreement whereby Ridge Hill was to supply Plaintiff with over 1.3 million boxes of gloves (the "Agreement"). Pursuant to the Agreement, Plaintiff made an initial deposit of 50% of the purchase price by wire transfer to Ridge Hill. Unbeknownst to Plaintiff and Gross, Ridge Hill entered into a separate contract with Petrichor UK, who was supposed to arrange for manufacture and shipping of the gloves from a factory in Vietnam.

Over the course of the next several months, it became apparent to Plaintiff that Ridge Hill would not be able to deliver the nitrile gloves on the expected timeline. Plaintiff demanded the return of its deposit to Ridge Hill, but by that time, Ridge Hill had apparently transferred the deposit to Petrichor UK, who claims to have paid the deposit to the Vietnamese factory. As a result, Plaintiff received back only a partial payment totaling $2.2 million. On its scorched-earth mission to recover the remaining deposit, Plaintiff then sued not only Ridge Hill – the only party to the Agreement with Plaintiff and the recipient of Plaintiff's funds – but also several other entities and individuals, including Gross.

Whether Ridge Hill breached its contract with Plaintiff is for those parties to litigate between themselves. It is clear, however, that Plaintiff has no valid claims against Gross, who is not a party to the Agreement and who, at all times, as an officer of Unicorn, acted as Plaintiff's Procurement Agent pursuant to Plaintiff's Procurement Agreement with Unicorn. Because Ridge Hill never delivered the nitrile gloves to Plaintiff, Unicorn (and Gross) never became entitled to, and were never paid, the 5% procurement fee, and in fact incurred costs in connection with trying to facilitate Ridge Hill's procurement of the gloves. After months of Unicorn's futile attempts to help Plaintiff complete the transaction, to add insult to injury, Plaintiff named Gross *in his*

*individual capacity* as a party in its Amended Complaint after Ridge Hill moved to dismiss the original complaint. Notably, the original complaint had not mentioned Gross once despite Plaintiff's awareness of his role in the transaction, and the Amended Complaint does not allege any facts that Plaintiff discovered since the filing of the original complaint. Plaintiff's attempt to drag Gross into its breach-of-contract dispute with Ridge Hill is clear for what it is: a bad-faith, shotgun approach to recover Plaintiff's funds at all costs, without regard for accuracy of its allegations.

In any event, Plaintiff's factual allegations do not support its claims against Gross. Plaintiff's fraud in the inducement claim fails as a matter of law because Gross is not a party to the Agreement, and both fraud-based claims should be dismissed for the independent reason that Plaintiff fails to state a claim against Gross. Specifically, the Amended Complaint does not sufficiently allege that Gross "made a false representation as to a material fact" that induced Plaintiff to enter into the Agreement, nor does it contain any non-conclusory allegations that Gross intended to defraud Plaintiff. The fraud in the inducement claim fails for the additional reason that the integration clause in the Agreement bars Plaintiff from claiming any reliance on Gross's representations relating to Ridge Hill and its capabilities as a PPE supplier. Finally, any alleged post-contract misrepresentations are entirely nonactionable because they occurred *after* Plaintiff signed the Agreement.

Plaintiff's quasi-contractual claims are likewise inadequately pleaded because Plaintiff does not – and cannot – support its conclusory allegation that Gross received ***any*** compensation from Defendants, let alone a portion of the deposit that Plaintiff paid to Ridge Hill. In fact, that allegation is expressly contradicted by the terms of the Procurement Agreement between Plaintiff and Unicorn, pursuant to which Gross (through Unicorn) was to be compensated by Plaintiff as its

Procurement Agent. The same claims are also barred by Plaintiff's agreement with Ridge Hill that governs the same subject matter.

Because Plaintiff's claims against Gross are legally and factually meritless, the Court should dismiss with prejudice all claims against Gross.

## RELEVANT FACTUAL ALLEGATIONS

Plaintiff's Relationship with Gross and the Alleged Misrepresentations

Plaintiff is a New York limited liability company with a principal place of business in New York. Amended Complaint, dated June 30, 2021 (ECF No. 56)[2] ("Complaint"), ¶ 5. Defendant Gross is an individual who also resides in New York. *Id.* ¶ 17. Both Plaintiff and Gross were in the business of sourcing and procuring PPE. *Id.* ¶¶ 20-21.

In June 2020, Gross represented to Plaintiff that he had manufacturing and supply relationships in the PPE industry and offered to introduce Plaintiff to his relationships, in exchange for a fee equal to 5% of the total purchase price for any transaction entered into by Plaintiff. *Id.* ¶¶ 21-22. Plaintiff agreed. *Id.* ¶ 23. Performing under their agreement, Gross introduced Plaintiff to Defendant Ridge Hill, who would be able to provide Plaintiff with nitrile examination gloves (*id.* ¶¶ 23-24), and Plaintiff began negotiating the purchase of the gloves with Ridge Hill for delivery by July 31, 2020 (*id.* ¶¶ 25-26). Gross facilitated the negotiations between the parties, including confirming Ridge Hill's ability to "immediately" provide the gloves and assisting Ridge Hill with exploring options to finance the transaction for Plaintiff. *Id.* ¶¶ 27-30. Ultimately, Ridge Hill was unable to finance the transaction and required Plaintiff to make a 50% deposit payment on the gloves, and Gross relayed this information to Plaintiff. *Id.* ¶¶ 31-32. On July 16, 2020,

---

[2]  Plaintiff amended its original complaint to include Gross as a defendant, despite never mentioning him once the original complaint (ECF No. 1), following Ridge Hill's efforts to dismiss the action on 12(b)(5) and 12(b)(6) grounds. *See* ECF Nos. 52, 55.

following over a month of negotiations, Plaintiff entered into the Agreement, pursuant to which Ridge Hill agreed to deliver the gloves in specific colors and sizes by July 31, 2020. *Id.* ¶¶ 39-40.

Following Plaintiff's July 16, 2020, agreement with Ridge Hill and July 20, 2020, payment of the first installment payment to Ridge Hill, Gross provided to Plaintiff additional information about Ridge Hill's owners and partners, its relationship to Defendant Ataraxia, and general expertise as a PPE supplier. *Id.* ¶¶ 39, 43-44, 48. The Complaint does not allege that Gross made any other misrepresentations. For example, unlike against Ridge Hill, the Complaint does not allege that Gross misrepresented Ridge Hill's current stock or provided an inaccurate estimated delivery date for the gloves. *Id.* ¶¶ 31, 34-35.

Plaintiff alleges that Gross knew about the falsity of Ridge Hill's representations to Plaintiff about its stock and safekeeping of its deposit payment. *See, e.g.*, *id.* ¶¶ 34-36. Yet, it does not explain why those statements were false at the time Ridge Hill made them, nor how Gross knew that they were false. This is a crucial omission because, at the time they were made, the representations were consistent with the agreement between Plaintiff and Ridge Hill, which provided that the goods would be ready for shipment on July 30, 2020 (ECF No. 83-2, Ex. B at 3), slightly over two weeks after the date of the contract.

Ridge Hill ultimately was unable to provide the gloves on the agreed-upon date and had still not provided them approximately one month later, at which time Plaintiff terminated the Agreement. Compl. ¶¶ 49-72.

Plaintiff's Unsupported Allegations Against Gross

Plaintiff makes several allegations "upon information and belief," but it fails to provide ***any*** factual support for those allegations. First, Plaintiff baselessly alleges that Gross is "an employee and/or agent of Ridge Hill" (*id.* ¶ 17) and "was working with the Defendants from the

5

start when he introduced Plaintiff to Ridge Hill as part of Defendants' scheme." *Id.* ¶ 71. But Plaintiff does not set forth any basis to support such an inference, and it does not even attempt to reconcile it with the allegations that: (i) Plaintiff hired Gross to "introduce" Plaintiff to its supplier relationships, which included Ridge Hill; (ii) Gross "facilitate[d] communications between" Plaintiff and Ridge Hill; and (iii) Gross helped Ridge Hill look for financing for its transaction with Plaintiff. *Id.* ¶¶ 21-32. It also does not address how the allegation fits with the Procurement Agreement between Plaintiff and Gross's company Unicorn, which acted as Plaintiff's "Procurement Agent" for PPE. Gross Decl., Ex. A at 3.

Notably, Plaintiff is silent on when or how Gross allegedly received the funds that Plaintiff transferred to Ridge Hill. Plaintiff alleges that "Gross, upon information and belief, received payment of his fee from Plaintiff's funds that Defendants have wrongfully withheld," (Compl. ¶ 71) but it does not allege any agreement by other Defendants to pay Gross, nor does it say when or how he was paid – because he was not. Perhaps more importantly, Plaintiff does not explain *why* those defendants would have paid Gross the 5% fee that Unicorn was entitled to receive from *Plaintiff* under the Procurement Agreement, nor why Gross would receive 5% of the $4.6 million Plaintiff paid to Ridge Hill when the Complaint also alleges that Plaintiff received $2.2 million back. *See id*. ¶¶ 64-69. Plaintiff does not allege that Gross or Unicorn received any other benefit.

Finally, the Complaint makes a litany of allegations about Defendants as a group (*see id*. ¶¶ 37, 50, 53, 59, 60, 65, 70, 74-79, 101, 105), not once mentioning Gross by name or specifying whether or how he was involved in the alleged misconduct. *See, e.g.*, *id*. ¶ 60 ("On August 4, 2020, Fletcher sent Plaintiff another fraudulent email from Vaidyanathan that appeared to forward an email from SGS Vietnam Ltd, a third-party inspection company, scheduling an inspection for August 7, 2020. Defendants immediately tried to use this phony email to extract additional

unwarranted funds from Plaintiff when, on August 4, 2020, Gunawardhana attempted to condition delivery of the gloves on Plaintiff making an additional payment, contrary to the Agreement's terms. . . .").

Plaintiff's Causes of Action Against Gross

Plaintiff asserts a cause of action for fraudulent inducement against all Defendants, alleging that Gross, among others, "fraudulently induced Plaintiff to enter into the Agreement" (*i.e.*, the agreement between Plaintiff and Ridge Hill). *Id.* ¶ 74. Plaintiff further alleges, in the alternative, that Gross aided and abetted Ridge Hill and its agents' alleged fraud by "knowingly providing false information to induce Plaintiff to enter into the Agreement and transfer funds to Ridge Hill in order to allow Mr. Gross to receive payment for his purported fee." *Id.* ¶ 85. The Complaint also asserts the quasi-contractual causes of action of (i) money had and received and (ii) unjust enrichment against all Defendants, including Gross, but only in the event that "the Court does not find that a contract existed between Plaintiff and any of the Defendants." *Id.* ¶¶ 100-107.

## **ARGUMENT**

Plaintiff asserts the following causes of action against Gross: (1) fraudulent inducement, (2) aiding and abetting fraud, (3) money had and received, and (4) unjust enrichment. All those claims should be dismissed with prejudice, for the reasons stated below.

### 1. **Legal Standard**

"[A] motion pursuant to 12(c) is analyzed under the same standard as a motion pursuant to 12(b)(6)." *In re MPM Silicones, L.L.C.*, 596 B.R. 416, 428 (S.D.N.Y. 2019) (citing *Altman v. J.C. Christensen & Assoc's, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015)).

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678-79.

While the rules of federal pleading generally require a "short and plain statement," *see* Fed. R. Civ. P. 8, fraud claims have heightened pleading requirements. *See* Fed. R. Civ. P. 9(b) (requiring parties to "state with particularity the circumstances constituting fraud or mistake."). To meet Rule 9(b)'s pleading standard, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Moreover, where fraud is alleged against multiple defendants, a plaintiff must "set forth separately the acts complained of as to each defendant." *Rich v. Maidstone Fin., Inc.*, No. 98-CV-2569, 2001 WL 286757, at *6 (S.D.N.Y. March 23, 2001).

2.  **The Procurement Agreement Contradicts Plaintiff's Allegation that Gross Is an Employee and/or Agent of Defendant Ridge Hill**

As an initial matter, the Procurement Agreement is properly before the Court on this Motion because the Procurement Agreement governs the relationship between the parties, and Plaintiff relied on and quoted its terms and effect in the Complaint.

In this Circuit, on a 12(b)(6) or 12(c) motion, a "court may . . . consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit." *May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 179 (S.D.N.Y. 2019) (citing *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (when a "plaintiff has relied on the terms and effect of a document in drafting the complaint, and that document is thus integral to the complaint, we may consider its contents even if it is not formally incorporated by reference."). "[I]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *May*, 399 F. Supp. 3d at 179 (internal citations omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) ("Insofar as the complaint relies on the terms of Cablevision's customer agreement, therefore, we need not accept its description of those terms, but may look to the agreement itself."); *Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (dismissing fraudulent inducement claims and rejecting plaintiff's characterization of transactions as inconsistent with the documents on which the complaint was based).

Courts in this District routinely consider engagement letters that govern the parties' relationship, even when omitted by the plaintiff, as pertinent to deciding a motion to dismiss. For

example, in *In re Lyondell Chemical Co.*, 505 B.R. 409, 418 (S.D.N.Y. 2014), the court affirmed

the bankruptcy court's consideration of the parties' engagement letter to identify the nature of the

relationship between the parties. The Court reasoned that, by alleging defendants' role as the lead

arrangers and bookrunners, "the complaint incorporated [the engagement letter] by reference,"

even though the complaint had not expressly mentioned it. *Id*.[3]

Here, the Procurement Agreement between Plaintiff and Gross's company, Unicorn,

governs their relationship and expressly contradicts Plaintiff's allegations that Gross was an

"employee and/or agent of Ridge Hill." Compl. ¶ 17.

The Complaint describes the agreement between Plaintiff and Gross:

On June 8, 2020, Gross offered to introduce Plaintiff to his purported proprietary
manufacturing and supply relationships to allow Plaintiff to procure the gloves it
needed in a short time frame in exchange for a fee equal to 5% of the total purchase
price for any transaction into which Plaintiff entered. . . . Plaintiff agreed to Gross's
terms.

*Id*. ¶¶ 21-22.

The next day, on June 9, 2021, Plaintiff and Gross, on behalf of Unicorn, signed the

Procurement Agreement, "entered into as of June 8th 2020," that mirrors these allegations:

WHEREAS Procurement Agent [Unicorn] has proprietary manufacturing and
supply relationships for personal protective equipment . . . Purchaser [Remcoda]
and Procurement Agent agree as follows:

1. In order to procure Medical Supplies in short supply within very tight time frames
the Procurement Agent shall introduce the Purchaser directly to their proprietary
supply relationships.

*** * ***

---

[3]       Similarly, in *Cohen v. Acorn International Ltd.*, 944 F. Supp. 204, 206-07 (S.D.N.Y. 1996),
the court considered the engagement letter between the parties to be "integral" to plaintiff's claim
because the complaint stated that defendant was plaintiff's financial advisor. The court found that
the engagement letter contradicted the complaint's characterization of the relationship (specifically
whether, like in the present matter, the agreement was made with an individual or an entity), and
dismissed plaintiff's misrepresentation claims. *Id*.

5. In connection with the services provided by Procurement Agent hereunder, Procurement Agent shall be entitled to receive a payment equal to five percent (5%) of the purchase price for each transaction consummated with a COVERED SUPPLIER, (the "Procurement Fee").

Just as in *Lyondell Chemical Co*., 505 B.R. at 418, "the complaint incorporated [the Procurement Agreement] by reference," and the Court may look to the Procurement Agreement "to identify the nature of the relationship" between Plaintiff and Gross and ignore Plaintiff's self-interested mischaracterization because "the document, not the allegations, control." *May*, 399 F. Supp. 3d at 179; *see Cohen*, 944 F. Supp. at 206-07.

Tellingly, Plaintiff does not disclose its factual basis for alleging that Gross was an "employee and/or agent" of Ridge Hill. "If it were shown that the facts were peculiarly within the possession and control of the opposing party, then it is true that [a plaintiff] could plead facts 'upon information and belief.' But even then, the plaintiff still bears the burden of alleging facts upon which her or his belief is founded." *Riker v. Premier Cap*., *LLC*, No. 15-CV-8293, 2016 WL 5334980, at *6 (S.D.N.Y. Sept. 22, 2016) (internal quotations and citation omitted); *see also Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am*., 420 F. Supp. 3d 123, 142 (S.D.N.Y. 2019). Here, Plaintiff cannot plead "upon information and belief" that Gross is an employee and/or agent when it not only offers no factual support, but its own allegations as well as the terms of the Procurement Agreement contradict that conclusion, and Plaintiff has not attempted to explain the apparent contradiction.

That Plaintiff chose to conceal the document from the Court does not prevent the Court from relying on it and only demonstrates Plaintiff's bad faith in bringing this action against Gross, ***its own procurement agent*** with no relationship – let alone one as employee and/or agent – to Defendant Ridge Hill. *See Wolet Cap. Corp. v. Walmart Inc*., No. 18-CV-12380 (LJL), 2021 WL 242297, at *12 (S.D.N.Y. Jan. 25, 2021) ("Plaintiff has eschewed to even quote language from

11

[the written communications between the parties] in an apparent effort to prevent the Court from examining them for their factual content and to determine whether they would state a claim or not. Particularly when the documents are in possession of Plaintiff and integral to the complaint, Plaintiff's conduct is precisely the type of conduct *Twombly* and *Iqbal* condemns.").

### 3. <u>Plaintiff's Claim for Fraud in the Inducement Should Be Dismissed</u>

Under New York law, the elements of a claim for fraudulent inducement are: (1) defendant knowingly made a misrepresentation of a material fact; (2) with the intent to deceive another party and induce that party to act on it; (3) plaintiff reasonably relied upon the representation; and (4) as a result of such reliance plaintiff suffered damage. *Kriegel v. Donelli*, No. 11-CV-9160 (ER), 2014 WL 2936000, at *10 (S.D.N.Y. June 30, 2014) (Ramos, J.) (citing *Universal Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 607 (S.D.N.Y. 2011). "Fraudulent inducement involves a misrepresentation of present fact, not of future intent, collateral to a contract and used to induce the defrauded party to sign the contract." *Id*. (internal quotations omitted).

Plaintiff's fraud claims do not set forth these elements, nor do they meet the heightened Rule 9(b) pleading requirements for fraud claims.

<u>First</u>, under New York law, a nonparty to the agreement at issue cannot be subject to a fraudulent inducement claim. *C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc*., 419 F. Supp. 2d 419, 431 (S.D.N.Y. 2005) (dismissing fraudulent inducement claim against individual defendants who were not parties to the agreement allegedly fraudulently induced, despite their statuses as directors of the corporate defendant who was a party) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Worley*, 257 A.D.2d 228, 233 (1st Dep't 1999)) ("Fraud by a third party is not effective to vitiate contractual obligations."). Gross is not a party to the Agreement, nor is he even mentioned therein. And even if the Court were to accept Plaintiff's disingenuous allegation that

Gross were an "employee and/or agent" of Ridge Hill, expressly contradicted by the Procurement Agreement (*see supra* pp. 9-12), Gross cannot be considered more of a party to the Agreement than the defendant corporate directors in *C3 Media* were. 419 F. Supp. 2d at 431.

Second, Plaintiff's fraud claim should be dismissed because it alleges fraudulent misconduct by all Defendants, without setting forth separately the acts complained of as to each defendant. *Rich*, 2001 WL 286757, at *6; *see also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 74 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012) (quoting *Manela v. Gottlieb*, 784 F. Supp. 84, 87-88 (S.D.N.Y.1992) (dismissing complaint where "many of the allegations are made against multiple defendants lumped together and fail to distinguish among them"). Plaintiff's "group" fraud allegations, therefore, fail as a matter of law.

Third, Plaintiff fails to plead any elements of the fraud, let alone with the particularity required under Rule 9(b). Specifically, the Complaint does not sufficiently allege that Gross "made a false representation as to a material fact" that induced it to enter into the Agreement, nor does it contain any non-conclusory allegations that Gross intended to defraud Plaintiff.

The alleged misrepresentation at issue[4] is that Ridge Hill was a PPE supplier who "could immediately provide" gloves to Plaintiff. Compl. ¶¶ 21, 23, 29, 48. But that representation is not actionable because Plaintiff fails to adequately plead that it was false and was known by Gross to be false when he made it. *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 959 (N.Y. 2011) (dismissing fraud claims because no facts were alleged to permit inference that the defendants, who included the company's CEO and members of the board of directors, "would have any

---

[4]     The alleged misrepresentations made by Gross differ materially from those of the Ridge Hill Defendants. Gross did not make representations about Ridge Hill's current stock or an estimated delivery date for the gloves, as alleged against Ridge Hill. *See* Compl. ¶¶ 31, 34, 35; ECF No. 93 at 20.

knowledge that these reports and communications [by the company] were somehow false or misleading"). Nor can Plaintiff work backwards from Ridge Hill's alleged ultimate failure to provide the gloves to a "strong inference" (or any inference) that Gross's earlier statements about Ridge Hill's ability to provide the gloves were false when made, much less knowingly false. Plaintiff readily acknowledges that it made commitments to provide over a million gloves to companies "[a]s the COVID-19 pandemic raged in the Summer of 2020," but ignores the well-known reality that the pandemic brought on sudden and astronomical demand for PPE and also created general supply chain havoc. This was especially true for nitrile gloves, which were in extremely short supply after the United States Customs and Border Protection banned all imports from Top Glove, one of the largest glove manufacturers in the world with 26% of total global market share, in July 2020.

Even absent such extraordinary circumstances, courts have long rejected "fraud by hindsight" claims where no evidence that a statement was false is offered other than the fact that its predicted result did not come to pass. *See Coppelson v. Serhant*, No. 19-CV-8481 (LJL), 2021 WL 148088, at *8 (S.D.N.Y. Jan. 15, 2021) (dismissing fraudulent inducement claim based on "fraud in hindsight") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("We have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' ")); *Affiliated FM Ins. Co. v. Jou Jou Designs, Inc.*, No. 90-CV-8262 (MJL), 1997 WL 473382 (S.D.N.Y. Aug. 19, 1997) (dismissing fraudulent inducement claim where plaintiff's basis for claim defendant never intended to provide insurance coverage was that defendant did not provide insurance coverage); *Caro Cap., LLC v. Koch*, No. 20-CV-6153 (LJL), 2021 WL 1595843, at *12 (S.D.N.Y. Apr. 23, 2021), on reconsideration, No. 20-CV-6153 (LJL), 2021 WL 2075481 (S.D.N.Y. May 24, 2021) ("[W]here the only evidence of the breaching party's intention was the breach itself, '[t]here [is]

14

absolutely no proof to sustain a finding, nor is there any evidence from which we may draw an inference, that at the time the promises were made there was no intention to perform.'") (quoting *Lee Chu v. Ling Sun Chu*, 234 N.Y.S.2d 849, 850 (1st Dep't 1962)).

The representation is further superseded by Plaintiff's agreement with Ridge Hill, which states that:

> "FOB STOCK READY BY 31 JULY. WE NOTE THIS IS SUBJECT TO FUNDS BEING TRANSFERRED AND REALISED. PLEASE NOTE WHILST STOCK IS READILY AVAILBLE [sic] THERE ARE DELAYS CAUSED BY SGS AND OTHER VERIFYING BODIES DUE TO THE CURRENT PANDEMIC."

(Uppercase in original). ECF 83-2, Ex. B at 3. Once the contract was signed, Plaintiff was necessarily relying on Ridge Hill's more specific (and more recent) representation, not Gross's earlier general representations on the same subject. *Kriegel*, 2014 WL 2936000, at *14 (internal quotations omitted) (dismissing fraudulent inducement claim because purported fraudulent representations were "the exact representations made [in the contract]").[5]

Plaintiff also fails to allege facts "that give rise to a strong inference of fraudulent intent." *Wexler v. Allegion (UK) Ltd*., No. 16-CV-2252 (ER), 2018 WL 1626346, at *6 (S.D.N.Y. Mar. 30, 2018) (Ramos, J.) (dismissing fraudulent inducement claim on those grounds) (citing *Loreley Fin.*

---

[5]     "New York law does not recognize claims that are essentially contract claims masquerading as claims of fraud." *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 355 (S.D.N.Y. 2020) (quoting *W.B. David & Co., Inc. v. DWA Commu'n, Inc*., 02-CV-8479 (BSJ), 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004). "Breaching a contract does not constitute fraud unless some legal duty to the plaintiff that is independent of the contract is violated. Any such independent duty must spring from circumstances extraneous to, and not constituting, elements of the contract itself." *Kriegel,* 2014 WL 2936000, at *13 (quoting *GS Equities, Ltd. v. Blair Ryan Co*., No. 08-CV-1581 (CM), 2011 WL 3278909, at *6 (S.D.N.Y. July 26, 2011)) ("[A]llegations that contractual warranties and representations were fraudulent do not magically transform a contract dispute into a fraud action."); *See also Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) (Ramos, J.) ("[E]ven where a fraud claim is sufficiently pled, under New York law, no fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract.") (internal quotations omitted).

*(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015)); *see also Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012) (same); *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (same). To qualify as "strong," an inference of fraud "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of the other explanations." *Wexler*, 2018 WL 1626346 at *6 (internal citations omitted). A plaintiff may establish the requisite "strong inference of fraud" by alleging facts that "show that defendants had both motive and opportunity to commit fraud," meaning that the defendant "benefited in some concrete and personal way from the purported fraud." *Id*. (citing *Saltz*, 782 F. Supp. 2d at 72).

Here, Plaintiff's conclusory allegation that other Defendants paid Gross's commission due to him ***from Plaintiff*** under the Procurement Agreement (Compl. ¶¶ 22, 37, 71) is not only unsupported by any alleged facts, but it also belied by the terms of the Procurement Agreement between Plaintiff and Gross. *See Riker*, 2016 WL 5334980, at *6 (allegations in fraud claim relying on "information and belief" must allege facts upon which belief is founded). Even assuming, for the sake of the argument, that Gross was entitled to or received any compensation from other Defendants – and he did not – such compensation does not constitute sufficient "motive." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 253 (S.D.N.Y. 2012) ("It would defy common sense to hold that the motive element would be satisfied merely by alleging the receipt of normal compensation for professional services rendered.") (quoting *Friedman v. Ariz. World Nurseries*, 730 F. Supp. 521, 532 (S.D.N.Y.1990), *aff'd* 927 F.2d 594 (2d Cir.1991)).

Fourth, the Agreement's integration clause bars Plaintiff from claiming any reliance on Gross's representations relating to Ridge Hill and its capabilities as a PPE supplier when it entered into the Agreement. The Agreement expressly disclaims reliance on such representations:

This offer constitutes the entire understanding and agreement between the parties hereto *and their affiliates* with respect to its subject matter and supersede all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). This offer may be amended only by written agreement, signed by the parties to be bound by the amendment.

Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this letter.

ECF 083-2, Ex. B at 4 (emphasis added).

As Plaintiff's Procurement Agent (*see supra* pp. 10-11), Gross is a transaction "affiliate" covered by the merger clause, and Plaintiff is barred, as a matter of law, from claiming reliance on Gross's representations made outside of the Agreement. *See, e.g., Bates Advert. USA, Inc. v. McGregor*, 282 F. Supp. 2d 209, 221 (S.D.N.Y. 2003) (holding that the fraudulent inducement claim failed as a matter of law in that "any binding representation made by [the defendant] before the Purchase Agreement is either incorporated into the Agreement or superseded by the Agreement, not collateral or extraneous to the Agreement, and cannot serve as the basis for a fraud claim."); *Gen. Bank v. Mark II Imports, Inc.*, 293 A.D.2d 328, 328-29 (N.Y. 2002) ("The corporate defendant is likewise foreclosed from asserting the claim of fraudulent inducement by the alleged promise by the Loan Agreement's provision that [t]his Agreement, together with any Related Documents, constitutes the entire *understanding* and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment") (emphasis in original).

Finally, any alleged post-contract misrepresentations (Compl. ¶¶ 39-44) are entirely nonactionable. Because the representations occurred *after* Plaintiff signed the Agreement and transferred the $4.6 million to Ridge Hill, Plaintiff cannot claim that it relied on Gross's subsequent

representations to induce it to contract with Ridge Hill. *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017) ("pre-contractual conduct [. . .] is the only conduct that is relevant to the fraudulent inducement claim"). Moreover, "claims about [. . .] experience and expertise are routinely found to be nothing more than ambiguous puffery." *President Container Grp. II, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 166 (S.D.N.Y. 2020) (citing *River Birch Capital, LLC. v. Jack Cooper Holdings Corp.*, No. 17-CV-9193, 2019 WL 1099943 at *5 (S.D.N.Y. Mar. 8, 2019). The allegation that Gross "touted" Ridge Hill as PPE providers with the expertise that "most in the PPE market do not" (Compl. ¶ 48) is nothing more than such puffery.

### 4. Plaintiff's Aiding and Abetting Claim Should Be Dismissed

To state a claim for aiding and abetting under New York law, Plaintiff must allege "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (citing *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y.2005)). "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." *Id*. (citing *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996). "A failure to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage." *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (citations omitted); *see also L. Offs. of Oliver Zhou v. Citibank N.A.*, No. 15-CV-5266 (ER), 2016 WL 2889060, at *8 (S.D.N.Y. May 17, 2016) (Ramos, J.). Aiding and abetting fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Lerner*, 459 F.3d at 292-93 (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92-93 (2d Cir.1983)).

Plaintiff makes the conclusory allegation, in the alternative, that Gross "knowingly participated in the fraud and provided substantial assistance by knowingly providing false information to induce Plaintiff to enter into the Agreement and transfer funds to Ridge Hill in order to allow Gross to receive payment for his purported fee." Compl. ¶ 86. This conclusory assertion is nonactionable for the same reasons set forth above: it fails to allege knowledge of falsity, reliance, and intent to defraud. *See supra* pp. 13-18. Because Plaintiff has failed to sufficiently allege any of the elements for aiding and abetting fraud, that claim should be dismissed as to Defendant Gross. Plaintiff's conclusory assertion has the same fatal flaws (no reliance by Plaintiff and insufficient allegations of scienter and/or knowledge of falsity) already set forth above.

### 5. Plaintiff's Quasi-Contractual Claims Against Gross Are Precluded by Its Agreement with Ridge Hill and Should Be Dismissed

The Complaint asserts quasi-contractual claims against all Defendants, including Gross, for money had and received and for unjust enrichment. Both of those claims should be dismissed as to Gross because (i) they are precluded by the existence of the Agreement, which relates to the same subject matter, and (ii) the Complaint fails to adequately allege that Gross received any payment from Plaintiff's deposit to Ridge Hill or was otherwise unjustly enriched.

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014); *Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., Inc*., No. 11-CV-4509 RJS, 2013 WL 1385210, *3 (S.D.N.Y. Mar. 18, 2013) ("A valid and enforceable contract precludes quasi-contractual recovery in New York. Accordingly, Plaintiffs' unjust enrichment and money had and received claims are barred because there is an enforceable contract governing these claims.") (citing *Rensselaer Polytechnic Inst, v. Varian, Inc*., 340 F. App'x 747, 749 (2d Cir.

2009)); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1333-34 (S.D.N.Y. 1997) ("Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists.").[6]

Significantly, the existence of a valid and enforceable contract relating to the same subject matter precludes an unjust enrichment claim regardless of "whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998); *In re Stillwater Asset Backed Offshore Fund Ltd.*, No. 16-CV-08883 (ER), 2018 WL 1610416, *13 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 777 F. App'x 16 (2d Cir. 2019) ("[R]ecent decisions in New York state courts and this District have found that the existence of a valid and binding contract governing the subject matter at issue in a particular case precludes a claim for unjust enrichment even against a non-signatory to that agreement.") (citing *L. Debenture v. Maverick Tube Corp.*, No. 06-CV-14320(RJS), 2008 WL 4615896, *12 (S.D.N.Y. Oct. 15, 2008), *aff'd*, 595 F.3d 458 (2d Cir. 2010)); *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 504-05 (S.D.N.Y. 2007) ("[The Complaint] does not allege that [the defendant not a party to the contract with plaintiff] received any money other than a portion of the payments [plaintiff] made pursuant to its contract with [the defendant

---

[6]     "A plaintiff can plead unjust enrichment as an alternative claim to breach of contract, but only if there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue." *MF Glob.*, 43 F. Supp. 3d at 317. *See also Quintanilla v. WW Int'l, Inc.*, No. 20-CV-6261 (PAE), 2021 WL 2077935, at *14 (S.D.N.Y. May 24, 2021) ("Although such claims 'may be plead in the alternative where the plaintiff challenges the validity of the contract; [they] may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract.'") (quoting *King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, No. 09-CV-3980 (DLC), 2009 WL 5033960 (S.D.N.Y. Dec. 23, 2009), *aff'd*, 396 F. App'x 736 (2d Cir. 2010)).

who was a party to the contract] . . . [T]hese payments fall within the purview of the contract and hence there is no basis for an unjust enrichment claim against [nonparty defendant].").

The Complaint alleges that "Defendants received $4,630,874 belonging to Plaintiff and Defendants have benefitted from receipt of Plaintiff's money," and that "Defendants have been unjustly enriched at Plaintiff's expense." Compl. ¶¶ 101, 105. The Complaint, however, also admits that Plaintiff and Ridge Hill entered into a "valid and binding" Agreement (*id.* ¶ 90) and that Plaintiff paid the $4,630,874 deposit pursuant to that Agreement (*id.* ¶ 40 ("The Agreement provided that . . . Plaintiff [would make] a 50% deposit payment to Ridge Hill."); ¶ 43 ("Plaintiff would pay [the total purchase price of $9,261,748] in two 50% installments pursuant to the terms of the Agreement."); ¶ 44 ("On July 20, 2020, Plaintiff wired the 50% deposit in the amount of $4,630,874 to Ridge Hill and, pursuant to the Agreement, Ridge Hill was required to have the gloves ready for delivery to Plaintiff by July 31, 2020.")). Because Plaintiff paid a deposit to Ridge Hill pursuant to its valid and enforceable Agreement with Ridge Hill, if Plaintiff believes that Ridge Hill breached that Agreement by failing to deliver the gloves, then Plaintiff may assert (as it has) a breach-of-contract claim against Ridge Hill. The law is clear, however, that Plaintiff may not assert quasi-contractual claims against Gross based on the same subject matter as its valid and enforceable contract with Ridge Hill. *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998) ("The law is clear that the payments made pursuant to the express terms of a contract cannot be recovered via unjust enrichment theory.").

Indeed, the Complaint itself admits that it brings its quasi-contractual claims against Gross only "[I]n the alternative that the Court does not find that a contract existed between Plaintiff and any of the Defendants." Compl. ¶¶ 102, 106. Because Plaintiff acknowledges that its agreement

with Ridge Hill is valid and binding, as do all the Defendants (*see* ECF No. 77 at 27-29, ECF No. 83 at 24-27), Plaintiff does not even attempt to separately allege these claims.

Plaintiff's quasi-contractual claims are also deficient for failure to adequately allege that Gross benefited at Plaintiff's expense. *Bazak Int'l. Corp. v. Tarrant Apparel Grp*., 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) ("A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff.") (quoting 22A N.Y. Jur. 2d Contracts § 515).

Here, Plaintiff's claims – premised entirely on allegations of fraud – are subject to Rule 9(b)'s heightened pleading requirement. *Levy v. Young Adult Inst., Inc*., 103 F. Supp. 3d 426, 443 (S.D.N.Y. 2015) ("Courts have found non-fraud claims to sound in fraud where the underlying conduct alleged has been fraud or closely linked with fraudulent behavior, such as claims for which fraud is a necessary element or claims that the other party has attempted to induce action through misrepresentations or material omissions."); *see also Goldemberg v. Johnson & Johnson Consumer Companies, Inc*., 8 F. Supp. 3d 467, 483 (applying Rule 9(b) "where the alleged unjust enrichment is premised on fraudulent acts."). But even under the low threshold of Rule 12(b)(6), "only assertion and speculation as to the benefit that was taken from [Plaintiff] by the defendants" is insufficient to establish a claim for unjust enrichment. *Welch v. TD Ameritrade Holding Corp*., No. 07-CV-6904 (RJS), 2009 WL 2356131, at *52 (S.D.N.Y. July 27, 2009).

As discussed *supra* at p. 6, Plaintiff provides no support for its unfounded allegation that other Defendants paid Gross's commission from the deposit it paid to Ridge Hill (Compl. ¶¶ 22, 37, 71), and its claims are belied by the express terms of the Procurement Agreement, which make clear that Gross was to be compensated by Plaintiff as its Procurement Agent. Moreover, because Plaintiff admits that it paid the $4,630,874 deposit to Ridge Hill – and not to Defendants as a group

(*id.* ¶ 44) – it has contradicted its lumped-together allegations that Defendants as a group received and benefited from Plaintiff's money (*id*. ¶ 101).

Because the Agreement between Plaintiff and Ridge Hill precludes Plaintiff's quasi-contractual claims, and because Plaintiff has failed to plead non-conclusory allegations that Gross received or retained any portion of Plaintiff's deposit, Plaintiff's claims against Gross for money had and received and for unjust enrichment should be dismissed.

## **CONCLUSION**

For all the foregoing reasons, Defendant Gross respectfully requests that the Court dismiss the Complaint as against him with prejudice.

Dated: New York, New York
        November 10, 2021

<div style="margin-left:40%">

AMINI LLC


By    */s/ Bijan Amini*
         Bijan Amini
131 West 35th Street, 12th Floor
New York, NY  10001
(212) 490-4700
bamini@aminillc.com

*Attorneys for Defendant Russell Gross*

</div>

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

REMCODA, LLC,

                Plaintiff,

      v.

RIDGE HILL TRADING (PTY) LTD, ATARAXIA
CAPITAL PARTNERS PTY LTD, and RUSSELL
GROSS,

                Defendants.

Civil Case No.: 1:21-cv-00979

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**RUSSELL GROSS'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Robert J. Anello
Christopher B. Harwood

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Ave.
New York, NY 10017
(212) 856-9600

*Attorneys for Defendant Russell Gross*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

    I.     Remcoda Misrepresents Its Citizenship to Invoke this Court's Diversity Jurisdiction ........................................................................................... 4

    II.    Remcoda's First Amended Complaint Alleged a Narrative with Respect to Mr. Gross that Discovery Could Not Sustain ................................................. 6

         A.    Remcoda Knows that Mr. Gross's Role was Limited to Acting as a Broker on Behalf of Unicorn, and that Neither Mr. Gross Nor Unicorn Would Receive any Benefit Absent a Successful PPE Transaction ........................7

         B.    Remcoda Knows that After Mr. Gross, Acting as a Broker on Behalf of Unicorn, Introduced It to Ridge Hill, Remcoda Relied on Its Own Due Diligence in Deciding to Proceed with the Transaction ............................. 8

         C.    Remcoda Knows that Mr. Gross Did Not Perform Any Function Outside His Broker Role on Behalf of Unicorn ....................................................... 9

    III.    Remcoda Amends Its Complaint to Acknowledge Mr. Gross's Limited Role and Its Lack of Reliance on Any Purported Statements by Mr. Gross............................. 10

    IV.    Remcoda Improperly Tries to Have It Both Ways with the SAC: It Acknowledges Mr. Gross's Limited Role and Its Own Lack of Reliance While Keeping Conclusory Allegations to Try to Maintain Its Claims Against Him....................................... 11

    V.    In Previously Sustaining Remcoda's Claims Against Mr. Gross, the Court Relied on Inferences that No Longer Are Sustainable ....................................................... 12

LEGAL STANDARD ............................................................................................. 13

ARGUMENT .......................................................................................................... 14

    I.     Remcoda's Claims Against Mr. Gross Should be Dismissed Because Diversity Jurisdiction Does Not Exist Between Remcoda and Mr. Gross ........................... 14

II.   Remcoda's Claims Against Mr. Gross Also Should Be Dismissed Because the SAC Does Not Support an Inference that Mr. Gross Made Knowing Misrepresentations, or that Remcoda Relied on Mr. Gross's Alleged Representations ...................... 15

    A.   Remcoda's Claims Fail Because the SAC Does Not Support an Inference that Mr. Gross Knew His Alleged Statements to Remcoda Were False... 15

    B.   The Fraudulent Inducement Claim Should Be Dismissed Because the Procurement Agreement Eliminates Any Inference of Fraudulent Intent  17

    C.   The Fraudulent Inducement Claim Also Fails Because Remcoda Did Not Rely on Mr. Gross's Alleged Misstatements ........................................... 19

III.   The Economic Loss Doctrine Bars the Claims Against Mr. Gross Because the Claims Are Premised on Breaches of Contractual Representations, and Neither Involves an Injury that is Not Remediable by Contract Damages ....................... 21

IV.   The Fraudulent Inducement Claim Must Be Dismissed as Duplicative of the Contract Claim Against Ridge Hill ...................................................................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*5 E. 59th Realty Holding Co., LLC v. Leahey,*
2020 WL 4936915 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 24, 2020) ................................. 25

*251 West 30th Owner LLC v. Justin Tower, LLC,*
2018 WL 5448618 (N.Y. Sup. Ct. Oct. 29, 2018) ................................... 24

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ...................................... 18

*ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.,*
2021 WL 1177532 (S.D.N.Y. Mar. 29, 2021) ....................................... 25

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n,*
328 F. Supp. 3d 141 (S.D.N.Y. 2018) ...................................... 22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................... 13

*Auerbach v. Amir,*
2008 WL 479361 (E.D.N.Y. Feb. 19, 2008) .......................................... 24

*Basso v. N.Y. Univ.,*
2020 WL 7027589 (S.D.N.Y. Nov. 30, 2020) ................................... 22, 23, 24

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.,*
98 F.3d 13 (2d Cir. 1996) ....................................... 24, 25

*Carmania Corp., N.V. v. Hambrecht Terrell Int'l,*
705 F. Supp. 936 (S.D.N.Y. 1989) ...................................... 22

*Carter v. HealthPort Techs, LLC,*
822 F.3d 47 (2d Cir. 2016) ....................................... 15

*Cruz v. Marchetto,*
2012 WL 4513484 (S.D.N.Y. Oct. 1, 2012) .......................................... 14

*Duckett v. Williams,*
86 F. Supp. 3d 268 (S.D.N.Y. 2015) ..................................... 20, 21

*East River S.S. Corp. v. Transamerica Delaval Inc.,*
476 U.S. 858 (1986) ........................................... 22

*Grosz v. Museum of Mod. Art,*
    772 F. Supp. 2d 473 (S.D.N.Y. 2010) ........................................................................ 7, 14

*In re MF Glob. Holdings Ltd. Inv. Litig.,*
    998 F. Supp. 2d 157 (S.D.N.Y. 2014) .......................................................................... 23

*In re Take-Two Secs. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................................... 14, 19

*In re WorldCom Inc.,*
    382 F. Supp. 2d 549 (S.D.N.Y. 2005) .......................................................................... 16

*JP Morgan Chase Bank v. Winnick,*
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) .......................................................................... 16

*Kalimantano GmbH v. Motion in Time, Inc.,*
    939 F. Supp. 2d 392 (S.D.N.Y. 2013) ..................................................................... 23, 24

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,*
    478 F. App'x 679 (2d Cir. 2012) .................................................................................. 20

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006) ......................................................................................... 14

*Manhattan Motorcars v. Automobili Lamborghini, S.p.A.,*
    244 F.R.D. 204, 220 (S.D.N.Y. 2007) ..................................................................... 22, 23

*Maron v. Legal Aid Soc'y,*
    2022 WL 1910247 (S.D.N.Y. June 2, 2022) ................................................................ 14

*MBIA Ins. Corp. v. Credit Suisse Secs. LLC,*
    165 A.D.3d 108 (1st Dep't 2018) ................................................................................. 25

*PetEdge, Inc. v. Garg,*
    234 F. Supp. 3d 477 (S.D.N.Y. 2017) .......................................................................... 18

*Prickett v. N.Y. Life Ins. Co.,*
    896 F. Supp. 2d 236 (S.D.N.Y. 2012) .......................................................................... 20

*Ravic, Inc. v. Cinram, Inc.,*
    907 F. Supp. 102 (S.D.N.Y. 1995) ............................................................................... 14

*Robertson v. Martindale,*
    2022 WL 1556999 (S.D.N.Y. May 16, 2022) .............................................................. 15

*SBI Invs. LLC, 2014-1 v. Eventure Interactive, Inc.*,
  2018 WL 2417847 (S.D.N.Y. May 28, 2018) ........................................................................ 20

*Sillam v. Labaton Sucharow LLP*,
  2022 WL 1036635 (S.D.N.Y. Apr. 5, 2022) ................................................................... 16, 17

*Tradeshift, Inc. v. Smucker Servs. Co.*,
  2021 WL 4463109 (S.D.N.Y. Sept. 29, 2021) ...................................................................... 17

*Triad Int'l Corp. v. Cameron Indus., Inc.*,
  122 A.D.3d 531 (1st Dep't 2014) ........................................................................................ 25

*Wild Bunch, S.A. v. Vendian Ent., LLC*,
  2018 WL 1365690 (Feb. 25, 2018) ...................................................................................... 16

*The World Egg Bank, Inc. v. Nesco Invs., LLC*,
  492 P.3d 320 (Ariz. Ct. App. 2021) .................................................................................... 19

*Wynn v. AC Rochester*,
  273 F. 3d 153 (2d Cir. 2001) ............................................................................................... 16

<u>Rules</u>

Federal Rule of Civil Procedure 12(b)(1) ...................................................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 1

Defendant Russell Gross respectfully submits this memorandum of law in support of his motion to dismiss with prejudice the claims against him in plaintiff Remcoda, LLC's ("Remcoda") Second Amended Complaint ("SAC"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

This case has almost nothing to do with Mr. Gross. It concerns a failed transaction pursuant to which Remcoda contracted to buy personal protective equipment ("PPE") from defendant Ridge Hill Trading (PTY) LTD ("Ridge Hill"). Prior to entering the contract with Ridge Hill, Remcoda contracted with non-party Unicorn Health LLC ("Unicorn"), a PPE broker, to introduce potential suppliers of PPE. Pursuant to their contract (the "Procurement Agreement"), the sole consideration that Unicorn would receive for connecting Remcoda with a potential PPE supplier was "five percent (5%) of the purchase price for each transaction consummated with [such] supplier." Mr. Gross was Unicorn's agent for purposes of the Procurement Agreement, and as such, he performed an exclusively brokerage function (*i.e.*, on behalf of Unicorn, he facilitated communications between Remcoda and potential PPE suppliers). Per the terms of the Procurement Agreement, Mr. Gross would receive no possible benefit unless he facilitated a "consummated" transaction (*i.e.*, a transaction pursuant to which Remcoda received the subject PPE).

Acting on behalf of Unicorn, Mr. Gross introduced Remcoda to Ridge Hill. Thereafter, Remcoda entered its failed contract with Ridge Hill. Mr. Gross's involvement in the failed transaction was so peripheral that Remcoda's initial Complaint did not even name him as a defendant. Remcoda added Mr. Gross to its First Amended Complaint (the "FAC") only after it realized that it could not collect from most of the other parties it had sued.

Adding Mr. Gross, however, created a dispositive jurisdictional problem: it destroyed diversity because both Mr. Gross and Remcoda's sole member, Marc Garson, were New York

citizens.  Remcoda added him anyway, and when this Court issued an Order to Show Cause on January 4, 2022, requiring Remcoda to explain why this case should not be dismissed for lack of diversity jurisdiction, Remcoda lied.  It represented to this Court on February 8, 2022, that "on the dates that Plaintiff filed the initial Complaint [February 3, 2021] and the Amended Complaint [June 30, 2021], Plaintiff had one member, who was a citizen of Florida."  Remcoda repeated that representation when—in resisting Mr. Gross's efforts to obtain discovery relevant to Mr. Garson's citizenship—it stated in a June 29, 2022 email, "As we have advised, . . . Mr. Garson is, and since the commencement of the action has been, a resident of Florida.  Indeed, at all relevant times, the only residence that Mr. Garson has had is in Florida."  Those representations are flatly contrary to a representation that Remcoda made in another case in this district on March 1, 2021.  In response to an order requiring it to explain why diversity existed in that other case (where the defendant was a Florida citizen), Remcoda represented to Judge Schofield that it "is a New York limited liability company with one member, Mark Garson [*sic.*], who is a *resident and citizen of New York*."

When Remcoda made the latter representation as to Mr. Garson's New York citizenship to Judge Schofield in March 2021, it presumably was telling the truth.  In any event, Remcoda has lied to a court about Mr. Garson's citizenship in order to obtain jurisdiction, either to this Court or Judge Schofield.

Remcoda's gamesmanship is not limited to jurisdiction.  In the FAC, Remcoda made allegations that it knew discovery could not sustain, including that (i) Mr. Gross supposedly made knowingly false statements to Remcoda about Ridge Hill's ability to deliver the PPE, and (ii) Remcoda supposedly relied on Mr. Gross's statements in deciding to proceed with the transaction.  As Remcoda knew it would, discovery has confirmed that, in connection with the failed transaction, Mr. Gross did no more than facilitate communications between Remcoda and

2

Ridge Hill by passing the information he received from one to the other. Discovery also has confirmed that, in deciding to proceed with the transaction, Ridge Hill relied on its own due diligence, including its direct communications with Ridge Hill—not any purported statements from Mr. Gross. Accordingly, Remcoda—having been discovered—had no choice but to amend its pleading to acknowledge Mr. Gross's limited role and its lack of reliance on his alleged statements.

Nevertheless, through the SAC, Remcoda (as it has done with its diversity jurisdiction representations to two different judges in this district) improperly tries to have it both ways: while acknowledging Mr. Gross's limited role and its lack of reliance on his alleged statements, Remcoda still seeks to pursue claims against him for fraudulent inducement and aiding and abetting. Remcoda also still seeks to invoke this Court's diversity jurisdiction based on its discredited assertion of Florida citizenship.

Based on the SAC's new allegations, the discovery on which the allegations are based (which properly is considered on this motion to dismiss), and Remcoda's judicial representation as to its New York citizenship, Remcoda's claims against Mr. Gross should be dismissed for the following, independent reasons: (i) the Court lacks diversity jurisdiction as to Mr. Gross, (ii) the SAC's allegations, alongside the documents on which they are based, cannot support an inference that Mr. Gross knew his statements to Remcoda were false; (iii) Remcoda has acknowledged that it did not rely on Mr. Gross's alleged statements; (iv) the economic loss doctrine bars Remcoda's claims because they are premised on breaches of contractual representations and both allege injuries that can be remedied by contractual damages; and (v) the fraudulent inducement claim is duplicative of Remcoda's remaining breach of contract claim against Ridge Hill, because both are premised on the same alleged misstatements and seek the same exact damages. Accordingly, the

3

Court should grant Mr. Gross's motion and dismiss with prejudice the remaining claims against him.

## BACKGROUND

### I.  Remcoda Misrepresents Its Citizenship to Invoke this Court's Diversity Jurisdiction

On January 4, 2022, this Court issued an Order to Show Cause requiring Remcoda to explain why this case should not be dismissed for lack of subject matter jurisdiction based on Remcoda being "a New York limited liability corporation" and Mr. Gross being a New York resident. Dkt. 117 at 1. In response, Remcoda misrepresented its citizenship in an improper attempt to avoid dismissal, assuring this Court in a February 8, 2022 letter that "on the dates that Plaintiff filed *the initial Complaint and the Amended Complaint*, Plaintiff had one member, who was a *citizen of Florida*." Dkt. 127 at 1 (emphasis added).

Remcoda knew that representation was untrue. Remcoda filed its initial Complaint on February 3, 2021 and the FAC on June 30, 2021. Dkts. 1, 56. Between those two dates, Remcoda's citizenship was called into question in another case in this district, *Remcoda, LLC v. SR3D Intl Holdings Corp.*, No. 1:21-cv-00756-LGS (S.D.N.Y. 2021) ("*SR3D*"), in which, as in this case, Remcoda sued one of its suppliers allegedly for failing to deliver PPE.[1] In the *SR3D* case, on February 24, 2021, Judge Schofield issued an order requiring Remcoda to justify its invocation of the court's diversity jurisdiction. Anello Decl. Ex. A. Unlike in this case, diversity jurisdiction in that case did not pose a problem, because, as Remcoda would represent to Judge Schofield, its sole member, Mr. Garson, was a New York citizen. *See id.* Ex. B.

---

[1] Remcoda is well-versed in such suits, having filed four cases in this district since January 2021 for the same alleged conduct. *See, e.g.*, *Remcoda, LLC v. Sumner*, 1:22-cv-00770-PAE (S.D.N.Y. Jan. 28, 2022), Dkt. No. 1; *Remcoda, LLC v. Chan*, No. 1:21-cv-02606-LJL (S.D.N.Y. 2021 Mar. 25, 2021), Dkt. No. 1; *Remcoda, LLC v. SR3D Intl Holdings Corp.*, No. 1:21-cv-00756-LGS (S.D.N.Y. Jan. 27, 2021), Dkt. No. 1.

Specifically, in a letter dated March 1, 2021, Remcoda represented to Judge Schofield that it "is a New York limited liability company with one member, Mark Garson [*sic.*], who is a resident and citizen of New York." *Id.* Based on that representation of New York citizenship, Judge Schofield permitted Remcoda to move for a default judgment, *id.* Ex. C, and ultimately granted Remcoda the default judgment, *id.* Ex. D.

Remcoda thereafter made the flatly contrary representation to this Court on February 8, 2022, that "on the dates that Plaintiff filed the initial Complaint *[February 3, 2021]* and the Amended Complaint *[June 30, 2021]*, Plaintiff had one member, who was *a citizen of Florida*." Dkt. 127 at 1 (emphasis added). Remcoda doubled down on that representation when—in resisting Mr. Gross's efforts to obtain discovery relevant to Mr. Garson's citizenship—it stated (through counsel) on June 29, 2022, "As we have advised, . . . Mr. Garson *is, and since the commencement of the action has been, a resident of Florida*. Indeed, at all relevant times, the *only* residence that Mr. Garson has had is *in Florida*." Anello Decl. Ex. E at 1 (first emphasis added). Those representations cannot be reconciled with its representation to Judge Schofield on *March 1, 2021* that it has "one member, Mark Garson [*sic.*], who *is a resident and citizen of New York*," Anello Decl. Ex. B (emphasis added). Nor can Remcoda's representation of Florida citizenship be reconciled with the fact that, in connection with the failed PPE transaction at issue in this case, Mr. Garson provided Ridge Hill with a New York driver's license. *Id.* Ex. F. Remcoda's representation of Florida citizenship also is inconsistent with Mr. Garson's public LinkedIn profile, which identifies him as located in New York. *Id.* ¶ 10 & Ex. H.

To date, Remcoda has resisted Mr. Gross's attempts for discovery into Mr. Garson's alleged Florida citizenship. Indeed, in response to Mr. Gross's requests, it has produced only (i) two leases for a Florida apartment in Mr. Garson's name, covering the period October 2020

through April 2022, (ii) a settlement statement listing Mr. Garson as the purchaser of that apartment in April 2022, and (iii) a tax-related document sent to Mr. Garson at that Florida apartment in 2022. *Id.* ¶ 12 & Exs. J, K, L, and M. The documents plainly are insufficient to establish Mr. Garson's Florida citizenship in February and June 2021—particularly in the face of Remcoda's judicial admission as to Mr. Garson's New York citizenship in March 2021—but may reflect that Mr. Garson claimed Florida residence for tax purposes (in order to receive a favorable tax rate) during a time when he, in fact, was a citizen of New York.

## II.    Remcoda's First Amended Complaint Alleged a Narrative with Respect to Mr. Gross that Discovery Could Not Sustain

Even if Remcoda had not misrepresented its citizenship, Mr. Gross still would not belong in this case. This case has little to do with him. It concerns a failed transaction pursuant to which Remcoda contracted to buy PPE from Ridge Hill. SAC ¶¶ 1-4. Remcoda's initial Complaint did not even name Mr. Gross as a defendant. Dkt. 1 ¶¶ 60-93. Remcoda only named Mr. Gross in the FAC after it became clear it faced collection issues with respect to the parties it had named initially.

Contrary to the allegations in its FAC, however, and as discovery now has confirmed, Mr. Gross had an extremely limited role in the underlying transaction. He acted on behalf of a broker of PPE, Unicorn, and his role was limited to connecting a potential purchaser of PPE (Remcoda) with a potential supplier of PPE (Ridge Hill) and facilitating communications between them. Moreover, Mr. Gross received no money directly or indirectly in connection with the transaction, and the broker for which he acted, Unicorn, was to be compensated (by Remcoda) only if the subject PPE in fact was provided. Remcoda also conducted its own due diligence of Ridge Hill and Ridge Hill's purported alter ego, Ataraxia Capital Partners PTY LTD ("Ataraxia"), before moving forward with the transaction, and it relied on its own due diligence—not any supposed statements from Mr. Gross—in deciding to proceed with the transaction.

6

The foregoing facts are all confirmed by the documents that Remcoda expressly references in its pleadings or on which it necessarily relied in drafting the pleadings. Such documents include the parties' contracts, as well as the emails and text messages they exchanged. The Court properly may consider such documents in deciding this motion to dismiss. *See, e.g.*, *Grosz v. Museum of Mod. Art*, 772 F. Supp. 2d 473, 477 (S.D.N.Y. 2010).

Mr. Gross's limited brokerage role, the parties' compensation arrangement, and Remcoda's lack of reliance on Mr. Gross's purported statements are incompatible with the inaccurate and now known to be unsustainable allegations in Remcoda's FAC—on which the Court relied in sustaining Remcoda's claims against Mr. Gross—namely, that (i) Mr. Gross supposedly made statements he "knew [to be] false," FAC ¶¶ 36, 50, (ii) Mr. Gross purportedly received a fee under circumstances that gave him a motive to defraud Remcoda, *e.g.*, *id.* ¶ 37, and (iii) Remcoda supposedly relied on representations from Mr. Gross, *e.g.*, *id.* ¶¶ 39, 72.

**A.  Remcoda Knows that Mr. Gross's Role was Limited to Acting as a Broker on Behalf of Unicorn, and that Neither Mr. Gross Nor Unicorn Would Receive any Benefit Absent a Successful PPE Transaction**

Remcoda knows that its contract with Unicorn, titled "Procurement Agreement" and dated June 9, 2020, establishes that (i) Mr. Gross acted on behalf of Unicorn, (ii) Unicorn was a broker of PPE and, in acting on its behalf, Mr. Gross's role was limited to connecting Remcoda with potential suppliers of PPE, and (iii) neither Unicorn nor Mr. Gross would receive any benefit from a PPE transaction unless Ridge Hill received the subject PPE.[2] Indeed, the Procurement Agreement, which is signed by Mr. Gross on behalf of Unicorn, expressly describes Unicorn's role as being limited to "introduc[ing] the Purchaser [Remcoda] directly to [Unicorn's] proprietary

---

[2] The Procurement Agreement is referenced in the SAC and thus properly is considered in resolving this motion to dismiss. *See* SAC ¶¶ 21-22.

supply relationships." Anello Decl. Ex. N at 1. Moreover, the Procurement Agreement provides that the sole consideration for such brokerage services would be that Unicorn would "be entitled to receive a payment equal to five percent (5%) of the purchase price for each transaction *consummated* with a" covered supplier. *Id.* (emphasis added).

The plain text of the Procurement Agreement thus eliminates any inference that Mr. Gross had a motive to cause Remcoda to pay money to Ridge Hill for PPE that it would never receive. Absent receipt (*i.e.*, absent consummation of the transaction), neither Mr. Gross nor anyone else would have had any reason to believe that the 5% fee would be paid.

> **B.  Remcoda Knows that After Mr. Gross, Acting as a Broker on Behalf of Unicorn, Introduced It to Ridge Hill, Remcoda Relied on Its Own Due Diligence in Deciding to Proceed with the Transaction**

Consistent with Mr. Gross's limited role, Remcoda knows that after Mr. Gross introduced Remcoda to Ridge Hill on June 9, 2020, Remcoda conducted its own due diligence of Ridge Hill and relied on that due diligence in deciding to proceed with the transaction.

Indeed, after that introduction, the communications between the parties demonstrate that (i) Remcoda repeatedly communicated directly with Ridge Hill, and (ii) in those communications, the Ridge Hill representatives confirmed Ridge Hill's ability to provide the subject PPE.[3]  For instance, in one email exchange, dated June 9, 2020, a Ridge Hill representative described Ridge Hill's connections to a factory in Vietnam and its relationship with "one of the largest and most prominent companies and asset managers" in the region to provide "reassurance that [Ridge Hill] will be able to del[i]ver as per schedule." Anello Decl. Ex. R at 1. In another email exchange, also dated June 9, 2020, a Ridge Hill representative stated that "we will get back to you with a

---

[3] Remcoda expressly referenced the parties' relevant emails and text messages in the SAC and/or necessarily relied on them in drafting the SAC, and thus the documents properly are considered. *See, e.g.*, SAC ¶¶ 22-24, 27-28, 29, 52, 75.

critical path and assurance we can deliver," Anello Decl. Ex. S at 1, which the Ridge Hill representative later did, *id.* Ex. R at 1. Throughout, Ridge Hill sent Remcoda dozens of detailed messages touting its ability to procure PPE. For example, it promised Remcoda that "we can do . . . [20] million gloves," *id.* Ex. T; boasted █████████████████████████████ " *id.* Ex. U; and assured Remcoda that "stock is all there," and "all ok with the stock," *id.* Ex. V at 2.

### C. Remcoda Knows that Mr. Gross Did Not Perform Any Function Outside His Broker Role on Behalf of Unicorn

Remcoda also knows that Mr. Gross's role was limited to introducing Remcoda to Ridge Hill and thereafter facilitating the exchange of information between the two. Indeed, the communications between the parties reflect that, on the same day Remcoda and Unicorn executed the Procurement Agreement, Mr. Gross took steps to facilitate communications between Remcoda and Ridge Hill. For example, in a June 9, 2020 email to a Ridge Hill representative, Mr. Gross promised to "connect everyone over email and whatsapp," *id.* Ex. W at 1, which he did promptly, *id.* Ex. X (June 9, 2020 Whatsapp message thread started by Mr. Gross); *see id.* Ex. Y (email exchange initiated by Mr. Gross).

Moreover, once Mr. Gross had connected the parties on common communication threads, the discovery confirms that the only other functions he performed were to (i) try to schedule calls between the parties, *see id.* Ex. Z (Mr. Gross requesting Remcoda's availability for a call); *id.* Ex. AA at 1 (same); (ii) try to prompt the parties to respond to one another's inquiries, *id.* at 5 (Mr. Gross asking Remcoda to respond to Ridge Hill); and (iii) pass information between the parties, *compare id.* Ex. BB *with id.* Ex. CC (emails showing that in making statements to Remcoda, Mr. Gross merely was passing on information he previously had received from Ridge Hill); *see also id.* Ex. AA at 1, 4-5, 8 (Mr. Gross passing on to Remcoda information he previously had received from Ridge Hill regarding Ridge Hill's ability to procure "[n]itrile black" gloves).

### III. Remcoda Amends Its Complaint to Acknowledge Mr. Gross's Limited Role and Its Lack of Reliance on Any Purported Statements by Mr. Gross

Now faced with that discovery, Remcoda had no choice but to amend its pleading to acknowledge Mr. Gross's limited role. For example, whereas the FAC alleged that Mr. Gross supposedly made knowing misrepresentations about Ridge Hill's experience and ability to deliver PPE, FAC ¶¶ 23, 25, 36-37, the SAC acknowledges that Mr. Gross received the information at issue directly from Ridge Hill and then promptly passed it on to Remcoda. *See* SAC ¶ 30 (alleging that after a Ridge Hill employee emailed Mr. Gross information about Ridge Hill's ties with Ataraxia and ability to "offer the connections . . . that most in the PPE market do not," *id.* ¶ 29, Mr. Gross immediately "conveyed this information to [Remcoda]"); *compare id.* ¶¶ 52 with *id.* 29 (making clear that the additional alleged misstatements by Mr. Gross consisted entirely of information that he had received directly from Ridge Hill before passing it on to Remcoda).

Similarly, whereas the FAC alleged that Mr. Gross supposedly was "working with the" other defendants "from the start" as part of a common "scheme" to defraud Remcoda, FAC ¶ 71, the SAC now concedes that Mr. Gross simply "conveyed" information he had received from Ridge Hill to Remcoda, SAC ¶ 30. The SAC also admits that Mr. Gross's role otherwise consisted of "facilitat[ing] communications" between Remcoda, Ridge Hill, and Ataraxia by including them on common messaging threads, *id.* ¶ 27.

The SAC also now admits that after receiving the pass-through information from Mr. Gross, Remcoda relied on its own due diligence, including direct communications with Ridge Hill, in entering the Purchase Agreement. *E.g.*, SAC ¶¶ 23, 30. For example, Remcoda describes numerous direct reassurances from Ridge Hill, including that it "was supported by Ataraxia's financial strength" and "other resources," *id.* ¶¶ 26, 31, could "promptly supply gloves," *id.* ¶ 23, "ha[d] secured" the PPE, and would "ensure your money is secure," *id.* ¶¶ 23, 30, 37-38. Remcoda

10

concedes that those statements—as well as its due diligence on Ataraxia[4]—"eased [its] concerns" and led it to proceed with the transaction.  *Id.*

## IV.    Remcoda Improperly Tries to Have It Both Ways with the SAC:  It Acknowledges Mr. Gross's Limited Role and Its Own Lack of Reliance While Keeping Conclusory Allegations to Try to Maintain Its Claims Against Him

Much like it has done with its purported citizenship for diversity purposes, through the SAC, Remcoda improperly tries to have it both ways:  it amended its pleading to acknowledge Mr. Gross's limited role and its lack of reliance on his alleged statements, but it still includes false or misleading allegations directed at Mr. Gross (which are refuted or put into proper context by the discovery it has received), in an improper attempt to sustain its claims against him.

For example, the SAC misleadingly asserts that Mr. Gross (i) stated that Ridge Hill "would be able to immediately provide [Remcoda] with nitrile examination gloves," SAC ¶ 22; *see id.* ¶¶ 28, 40-43, and (ii) "provided [Remcoda] with information purportedly vouching for the bona fides of Ridge Hill," *id.* ¶ 52, without clarifying that the information underlying each of those alleged statements originated with Ridge Hill.  In each case, Mr. Gross passed along information he had received directly from Ridge Hill.  *See* Anello Decl. Ex. P at 8; Ex. AA at 4-5, 8; Ex. BB; Ex. CC.

The SAC also still alleges—without any factual support—that Mr. Gross (i) "knew that his statements regarding Ridge Hill "were false," SAC ¶ 40, and (ii) was "working . . . from the start . . . as part of Defendants' scheme," *id.* ¶ 75; *see id.* ¶¶ 49, 52, 54.  The documents produced in discovery confirm that Mr. Gross had no knowledge that Ridge Hill could not provide the PPE,

---

[4] The due diligence included researching "Ataraxia's website," after which Remcoda admits it was "impressed" with what it learned about Ataraxia's "history, its offices around the world," and its "110 full-time employees[] and institutional investors, including person funds, family offices, and state banks."  *Id.* ¶ 30.  Remcoda acknowledges its research left it "reassured that Ridge Hill, Ataraxia, and their affiliates would deliver the required gloves on time and in full."  *Id.*

and that he was not part of any purported scheme. Instead, Mr. Gross introduced the parties to one another and facilitated communications between them. *See, e.g.*, Anello Decl. Exs. Y, X, W at 1.

In addition, the SAC also continues to allege in conclusory fashion that Remcoda entered the Purchase Agreement "[i]n . . . reliance on" Mr. Gross's supposed "false statements," *id.* ¶ 43; *see also id.* ¶¶ 24, 42, 82, notwithstanding the discovery showing that Remcoda relied on representations it received directly from Ridge Hill. *See, e.g.*, Anello Decl. Exs. R, S. Finally, although the SAC continues falsely to allege that Mr. Gross (i) "intended to enrich [himself] at [Remcoda's] expense" by "receiving his 5% fee," SAC ¶ 41, and (ii) "received payment" of the 5% fee, *id.* ¶ 75, the SAC does so without any factual allegations in support and by ignoring the separate Procurement Agreement to the contrary. In a transparent and improper effort to avoid the allegations' incompatibility with the plain text of the Procurement Agreement—and wholesale lack of support following discovery—Remcoda now alleges Mr. Gross's supposed "recei[pt]" of the 5% fee only on "upon information and belief." *Id.* ¶ 75.

## V. In Previously Sustaining Remcoda's Claims Against Mr. Gross, the Court Relied on Inferences that No Longer Are Sustainable

In previously sustaining Remcoda's claims against Mr. Gross for fraudulent inducement and aiding and abetting (in connection with the now-superseded FAC), the Court found plausible two inferences that no longer are sustainable: that Mr. Gross made knowingly false representations to Remcoda and "engaged in a common fraudulent scheme." Dkt. 131 at 27. Neither inference can be maintained in the face of discovery confirming Mr. Gross's limited role: introducing the parties and passing information between them. *See supra* Parts II-IV.

Moreover, the Court's prior decision was premised largely on its finding that Remcoda's "allegations regarding [Mr. Gross's supposed] fee [we]re sufficient to establish motive and opportunity to defraud, leading to an inference of fraudulent intent." Dkt. 131 at 27. Remcoda's

12

allegations, however, have been discredited by the Procurement Agreement—which expressly provides that the fee would be paid to Unicorn, not Mr. Gross, and only if the transaction was "consummated" (*i.e.*, the gloves were delivered to Remcoda). Anello Ex. N at 1. The Procurement Agreement, together with the utter lack of any well-pled facts supporting Mr. Gross's receipt of a fee, renders untenable the inference of fraudulent intent on which the Court previously relied. *Id.*

## LEGAL STANDARD

In addition to failing for lack of diversity jurisdiction, Remcoda's claims against Mr. Gross cannot "survive [the instant] motion to dismiss," because, as to each, the SAC lacks well-pled factual allegations sufficient "to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Although the Court must accept the SAC's well-pled facts as true, it should not accept its conclusory statements or legal conclusions. *Cruz v. Marchetto*, 2012 WL 4513484, at *5 (S.D.N.Y. Oct. 1, 2012).

Nor should the Court accept allegations (or draw inference based on allegations) that are "contradicted by documents properly considered on [the] motion to dismiss." *In re Take-Two Secs. Litig.*, 551 F. Supp. 2d 247, 262 (S.D.N.Y. 2008). Such documents include the parties' communications and contracts referenced herein, because "the plaintiff either possessed[] or knew about and relied upon [those documents] in bringing the suit." *Grosz*, 772 F. Supp. 2d at 477; *see Maron v. Legal Aid Soc'y*, 2022 WL 1910247, at 2 n.2 (S.D.N.Y. June 2, 2022).

Additionally, where, as here, a plaintiff alleges a claim sounding in fraud, it must (i) state with particularity the circumstances constituting fraud, *Mills v. Polar Molecular Corp.¸* 12 F.3d 1170, 1175 (2d Cir. 1993), and (ii) "allege facts that give rise to a strong inference of fraudulent intent," *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Based on the allegations of

13

the SAC and the documents properly considered on this motion to dismiss, Remcoda has failed to carry its burden in both respects.

## ARGUMENT

## I.    Remcoda's Claims Against Mr. Gross Should be Dismissed Because Diversity Jurisdiction Does Not Exist Between Remcoda and Mr. Gross

Remcoda's fraudulent inducement and aiding and abetting claims against Mr. Gross should be dismissed for lack of diversity jurisdiction based on Remcoda's judicial admission before Judge Schofield in March 2021 that its "one member, Mark Garson [*sic.*], . . . is a resident and citizen of New York." Anello Decl. Ex. B.  "It is well settled that diversity jurisdiction does not exist where plaintiff is a citizen of a state of which any defendant is also a citizen." *Ravic, Inc. v. Cinram, Inc.*, 907 F. Supp. 102, 103 (S.D.N.Y. 1995).  A limited liability company like Remcoda is a citizen of the state of its members. *Carter v. HealthPort Techs, LLC*, 822 F.3d 47, 60 (2d Cir. 2016).

In a blatant misrepresentation of its citizenship in response to an Order to Show Cause from this Court, Remcoda represented to this Court on February 8, 2022, that "on the dates that Plaintiff filed the initial Complaint [February 3, 2021] and the Amended Complaint [June 30, 2021], Plaintiff had one member, who was a citizen of Florida."  Dkt. 127 at 1.  It doubled down on that misrepresentation when—in resisting Mr. Gross's efforts to obtain discovery relevant to Mr. Garson's citizenship—it stated in its June 29, 2022, email that "Mr. Garson is, and since the commencement of the action has been, a resident of Florida" and "at all relevant times, the *only* residence that Mr. Garson has had is in Florida."    Anello Decl. Ex. E at 1.  Those representations cannot be squared with Remcoda's representation to Judge Schofield on March 1, 2021 in the

14

*SR3D* case, that it "is a New York limited liability company with one member, Mark Garson [*sic.*], who is a resident and citizen of *New York*." Anello Decl. Ex. B (emphasis added).

When Remcoda made the latter representation as to Mr. Garson's New York citizenship to Judge Schofield—which allowed it to avoid dismissal of the *SR3D* case for lack of diversity jurisdiction, *id.* Ex. C, and to obtain a default judgment against the defendant in that case, *id.* Ex. D—it presumably was telling the truth. Among other things, the representation is consistent with the fact that (i) in connection with the failed PPE transaction at issue in this case, Mr. Garson provided Mr. Gross with a New York driver's license, *id.* Ex. F, (ii) Mr. Garson's LinkedIn profile identifies his location as New York, *id.* Ex. H, (iii) Remcoda has resisted Mr. Garson's efforts to obtain discovery relevant to Mr. Garson's citizenship, *id.* Ex. E at 1, 15-17, and (iv) the few jurisdictional documents Remcoda has produced are woefully inadequate to establish Mr. Garson's Florida citizenship (and at most are suggestive of potential tax fraud), *id.* Exs. J, K, L, M.

Based on Remcoda's judicial admission before Judge Schofield in March 2021 that, like Mr. Gross, its "one member, Mark Garson, . . . is a resident and citizen of New York," Remcoda's claims against Mr. Gross should be dismissed for lack of diversity jurisdiction. *See, e.g.*, *Robertson v. Martindale*, 2022 WL 1556999, at *2 (S.D.N.Y. May 16, 2022).

## II.    Remcoda's Claims Against Mr. Gross Also Should Be Dismissed Because the SAC Does Not Support an Inference that Mr. Gross Made Knowing Misrepresentations, or that Remcoda Relied on Mr. Gross's Alleged Representations

### A.    Remcoda's Claims Fail Because the SAC Does Not Support an Inference that Mr. Gross Knew His Alleged Statements to Remcoda Were False

Aside from their jurisdictional defects, Remcoda's fraudulent inducement and aiding and abetting claims against Mr. Gross also fail because they require Remcoda to allege facts sufficient to support an inference that Mr. Gross knew that his alleged statements to Remcoda were false. The SAC's allegations, when considered together with the parties' underlying communications,

cannot support such an inference.

To sustain its claim for fraudulent inducement, Remcoda must allege facts sufficient to support an inference that Mr. Gross made "a misrepresentation" that he "knew to be false." *Wild Bunch, S.A. v. Vendian Ent., LLC*, 2018 WL 1365690, at *3 n.1 (Feb. 26, 2018) (quoting *Wynn v. AC Rochester*, 273 F. 3d 153, 156 (2d Cir. 2001)). Aiding and abetting similarly requires factual allegations sufficient to support an inference that Mr. Gross had "actual knowledge of the [alleged] fraud." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005). *See also Sillam v. Labaton Sucharow LLP*, 2022 WL 1036635, at *9 (S.D.N.Y. Apr. 5, 2022) (dismissing claim where allegations failed to support inference of actual knowledge); *In re WorldCom Inc.*, 382 F. Supp. 2d 549, 560-61 (S.D.N.Y. 2005) (same).

The SAC does not support such an inference. The SAC asserts only that Mr. Gross supposedly "had actual knowledge" that his pass-through statements were false, *id.* ¶ 80, and purportedly "knowingly participated" in a scheme to defraud Remcoda, *id.* ¶ 87. Such conclusory assertions are insufficient to avoid dismissal. Moreover, the SAC's well-pled factual allegations— and the underlying emails and text messages on which they are based (which properly are considered on this motion)—show the opposite: that from the beginning, Mr. Gross performed only a brokerage function (on behalf of Unicorn), doing nothing more than introducing Remcoda to Ridge Hill and then facilitating communications between the two.

The SAC alleges, for instance, that after a Ridge Hill representative emailed Mr. Gross detailed information on Ridge Hill and Ataraxia, stating that both companies were part of "a Family group" that was "able to 'offer the connections, financial scale, controls and experience that most in the PPE market do not,'" *id.* ¶ 29, Mr. Gross promptly "conveyed this information to [Remcoda] in a telephone call," *id.* ¶ 30. Similarly, the SAC alleges that Mr. Gross later "provided

Remcoda with information purportedly vouching for the bona fides of Ridge Hill." *Id.* ¶ 52. The email underlying that allegation, however, confirms that Mr. Gross obtained the referenced information directly from Ridge Hill and then conveyed it to Remcoda. *Compare* Anello Decl. Ex. BB *with id.* Ex. CC.

Put simply, Mr. Gross's purported "representations" amount to nothing more than information that he received from Ridge Hill and then promptly passed on to Remcoda. Based on Mr. Gross's actual conduct, no plausible inference can be drawn that he had "actual knowledge" that the information he received and passed along was false. *Sillam*, 2022 WL 1036635, at *9. That is fatal to both remaining claims. *See Tradeshift, Inc. v. Smucker Servs. Co.*, 2021 WL 4463109, at *8 (S.D.N.Y. Sept. 29, 2021) (dismissing fraudulent inducement claim where plaintiff "has not sufficiently alleged knowledge of falsity" by defendant); *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 186-87 (S.D.N.Y. 2009) (dismissing aiding and abetting claim where plaintiff failed to allege knowledge of the underlying fraud).

## B. The Fraudulent Inducement Claim Should Be Dismissed Because the Procurement Agreement Eliminates Any Inference of Fraudulent Intent

Remcoda's fraudulent inducement claim fails for the additional reason that (i) the claim requires Remcoda to plead fraudulent intent on the part of Mr. Gross, and (ii) the Procurement Agreement eliminates any inference of such intent. *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017). To plead fraudulent intent, Remcoda must allege facts sufficient to show that Mr. Gross "had both motive and opportunity to commit fraud."[5] *Id.* at 491. Remcoda has failed to carry its burden.

---

[5] Fraudulent intent also can be established by well-pled factual allegations "that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *PetEdge, Inc.*, 234 F. Supp. 3d at 492, but no such allegations exist here.

17

Although Remcoda continues to rely on its allegations that Mr. Gross (i) "intended to enrich [himself] at [Remcoda's] expense" by "receiving his 5% fee," SAC ¶ 41, and (ii) "received payment" of the 5% fee, *id.* ¶ 75, to try to show motive and opportunity, the Procurement Agreement—on which the SAC expressly relies, SAC ¶¶ 21, 22, 41, 75, and thus properly is considered on this motion to dismiss—eliminates any such inference.  By its express terms, the Procurement Agreement provides that Unicorn (not Mr. Gross) would receive a 5% fee *only after Remcoda actually received the PPE*.  Anello Decl. Ex. N at 1.  Specifically, the Procurement Agreement states that Unicorn "shall be entitled to receive a payment equal to five percent (5%) of the purchase price for each transaction *consummated* with" Remcoda.  *Id.* at 1 (emphasis added).  Under Arizona law (which governs the Procurement Agreement), a "consummated" transaction is one that has been fully performed.  *The World Egg Bank, Inc. v. Nesco Invs., LLC*, 492 P.3d 320, 324 (Ariz. Ct. App. 2021) (holding that, where statute provided that rights were triggered by a "consummated" sale, such "rights are triggered by the occurrence of the sale—not by the entry of a contract for sale").  Similarly, Black's Law Dictionary defines a "consummated" transaction as one that has been "br[ought] to completion."  Black's Law Dictionary (11th ed. 2019).  The plain text of the Procurement Agreement thus precludes any inference that Mr. Gross had a motive to trick Remcoda into signing the Purchase Agreement.  To the contrary, it shows he had a motive to ensure that Remcoda received the PPE.

The Court's prior order—which found that Remcoda's "on information and belief" allegation that Mr. Gross supposedly received the 5% fee suggested motive and opportunity to defraud—does not compel a different result.  Dkt. 131 at 27.  That ruling was based solely on the FAC's (now discredited) allegations of Mr. Gross's supposed fee, rather than the terms of the Procurement Agreement itself, *see id.* at 26-27 (citing FAC ¶¶ 23, 37), as well as the (also

18

discredited) suggestion that Mr. Gross was something other than a mere conduit of information between Remcoda and Ridge Hill.  To the extent the FAC's allegations alone supported an inference of motive and opportunity, such an inference no longer is tenable given the Procurement Agreement's actual terms and the parties' actual communications.  *In re Take-Two Secs. Litig.*, 551 F. Supp. 2d at 262 (court need not accept inference "contradicted by documents properly considered on [a] motion to dismiss").  Moreover, Remcoda has represented that it has produced all documents in its possession relevant to its 5% allegation, Anello Decl. ¶ 17, and consistent with the terms of the Procurement Agreement, no document in its production supports the "on information and belief" allegation.  Remcoda's wholesale failure to support the allegation further confirms its lack of merit.

Even absent the Procurement Agreement, the SAC's allegations of the 5% fee would be insufficient to support an inference of fraud, given the absence of any other support for such an inference.  Courts have long held that "the motive to earn fees" alone "is not a sufficient motive to commit fraud."  *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012); *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012).

## C.     The Fraudulent Inducement Claim Also Fails Because Remcoda Did Not Rely on Mr. Gross's Alleged Misstatements

Remcoda's fraudulent inducement claim fails for yet another reason:  Remcoda has admitted that it did not rely on Mr. Gross's alleged statements.  *See, e.g.*, *SBI Invs. LLC, 2014-1 v. Eventure Interactive, Inc.*, 2018 WL 2417847, at *4 (S.D.N.Y. May 28, 2018) (dismissing fraudulent inducement claim where plaintiff insufficiently alleged reliance); *Duckett v. Williams*, 86 F. Supp. 3d 268, 274 (S.D.N.Y. 2015) (similar).  As Remcoda's numerous pending lawsuits in this district confirm, Remcoda is a sophisticated and experienced buyer in this space that routinely

enters contracts to purchase PPE from overseas entities, and thus unsurprisingly relies on its own due diligence before engaging in such transactions. *See supra* p. 4 n.1.

Accordingly, rather than supporting an inference of reliance on Mr. Gross's alleged statements, the SAC confirms through its newly added allegations that, in entering the Purchase Agreement, Remcoda relied on statements from Ridge Hill. "Through a series of emails and text message[s]," Remcoda now acknowledges that Ridge Hill directly "represented to [Remcoda] that [Ridge Hill] would be able to promptly supply gloves that met [Remcoda's] specifications," that Ridge Hill and Ataraxia "had 'direct access' to factories such that Remcoda was guaranteed delivery," and that Ridge Hill could use its "network [of] investors, manufacturers, shipping, [and] raw materials people with offices in several countries" to provide the PPE. SAC ¶ 23. Remcoda also now avers that Ridge Hill "confirmed to [Remcoda] that Ridge Hill and Ataraxia were one in the same and that Ataraxia would use its financial and other resources to support the transaction," *id.* ¶ 26, which Remcoda admits was so "significant . . . to [its] decision to contract with Ridge Hill" that it conveyed the information to its lender, *id.* ¶ 32. Remcoda adds that the representations from Ridge Hill, as well as "the collective reputation of the 'Ridge Hill/Ataraxia' group," "eased [its] concerns" and prompted it to move forward with the transaction, *see id.* ¶¶ 23-24, 38.

The SAC also acknowledges that Remcoda, an experienced and sophisticated buyer of PPE, entered the Purchase Agreement only after performing its own due diligence on Ridge Hill and Ataraxia. That included viewing "Ataraxia's website," through which Remcoda learned about Ataraxia's "history, its offices around the world," and its "110 full-time employees[] and institutional investors." *Id.* ¶ 30. Remcoda admits that its own research left it "impressed" and

20

"reassured that Ridge Hill, Ataraxia, and their affiliates would deliver the required gloves on time and in full." *Id.*

Remcoda thus admits that relied on its own due diligence and information that it received directly from Ridge Hill in entering the Purchase Agreement, not the duplicative, pass-through information it alleges to have received from Mr. Gross. Remcoda's conclusory allegations to the contrary, *see, e.g.*, *id.* ¶¶ 42, 43, 82, thus cannot support a reasonable inference of reliance. *Williams*, 86 F. Supp. 3d at 274 (conclusory allegations are "woefully inadequate to establish . . . reli[ance]"). The fraudulent inducement claim fails for this reason alone.

**III.    The Economic Loss Doctrine Bars the Claims Against Mr. Gross Because the Claims Are Premised on Breaches of Contractual Representations, and Neither Involves an Injury that is Not Remediable by Contract Damages**

New York's economic loss doctrine bars both claims against Mr. Gross because the claims sound in tort but are premised on breaches of contractual representations, and because neither involves an injury that cannot be remedied by contract damages.

Under the economic loss doctrine, a plaintiff may not bring a tort claim seeking economic damages arising purely from performance of a contract. *See, e.g.*, *Basso v. N.Y. Univ.*, 2020 WL 7027589, at *12-13 (S.D.N.Y. Nov. 30, 2020); *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 157-58 (S.D.N.Y. 2018). The rule exists out of a recognition that tort and contract claims have different purposes and remedies, and should not be applied interchangeably. *See Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989). The economic loss doctrine disentangles contract and tort law and keeps "contract law 'from drowning in a sea of tort,'" with a straightforward rule: when, as here, "the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." *Id.* (quoting *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 866 (1986)). As a result, tort claims should be dismissed under the economic loss doctrine when, as here, the plaintiff's complaint lacks factual

21

allegations supporting an inference of "(1) the existence of an extra-contractual duty, and (2) independent damages flowing from that duty." *Basso*, 2020 WL 7027589, at *12; *see Manhattan Motorcars v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007).

*Basso* illustrates the economic loss doctrine and why it is fatal to Remcoda's tort claims. *Basso* involved students who claimed that a university's study-abroad program fell short of its promised educational experience. 2020 WL 7027589, at *1. The court found that the economic loss doctrine barred the students' tort claims for negligent misrepresentation and fraud for two independent reasons. *Id.* at *12. *First*, both claims involved misrepresentations relating exclusively to promises that the university had made in a contract with the students. *Id.* As a result, the students had pled "no extra-contractual duty." *Id. Second*, because both claims involved "only economic harm . . . remediable in contract," the students had not alleged "any independent injury that is not otherwise remediable in contract." *Id.* at *13.

As in *Basso*, Remcoda has failed to allege the breach of an extra-contractual duty. Both tort claims against Mr. Gross are based on supposed misrepresentations that arise entirely from the terms of the Purchase Agreement. *See* SAC ¶¶ 22, 24, 29, 52 (allegedly "vouching" for Ridge Hill and promising Ridge Hill would provide PPE). Because each purported misrepresentation concerns Ridge Hill's ability to deliver the PPE pursuant to the Purchase Agreement, Remcoda's tort claims against Mr. Gross necessarily are "premised on . . . contractual representations" and are not "extra-contractual." *Basso*, 2020 WL 7027589, at *12. Remcoda's failure to allege an "extra-contractual duty" is fatal to its tort claims. Moreover, the SAC seeks *the exact same damages* for its tort claims against Mr. Gross as it does for its contract claim against Ridge Hill. SAC ¶¶ 84, 88, 96. The tort claims thus do not involve an "independent injury" that is not "remediable [by]

contract" damages. *Manhattan Motorcars, Inc.*, 244 F.R.D. at 220. For this reason alone, the tort claims fail under the economic loss doctrine. *Basso*, 2020 WL 7027589, at *1.

That Mr. Gross was not a party to the Purchase Agreement does not alter the result. The defendant invoking the economic loss doctrine need not be a party to the relevant contract. Rather, all that is required is that (as here) the tort claims (i) are premised on breaches of representations under the contract or (ii) seek damages that are remediable under the contract. *See, e.g.*, *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 414-15, 416-17 (S.D.N.Y. 2013) (economic loss doctrine barred tort claims against certain defendants who were not parties to the relevant contracts); *In re MF Glob. Holdings Ltd. Inv. Litig*, 998 F. Supp. 2d 157, 185 (S.D.N.Y. 2014) (even where plaintiffs had no grounds to bring contract claim against defendants, economic loss doctrine barred tort claim because "[l]egal claims for breaches of those duties sound in contract, not tort").

Nor can Remcoda argue that the economic loss doctrine does not apply to its fraud claims. Courts in this District repeatedly (and recently) have applied the doctrine to bar fraud claims. Indeed, *Basso* itself dismissed such a claim "based on the economic loss doctrine" in 2020. *Id.* at *13; *see, e.g.*, *Kalimantano*, 939 F. Supp. 2d at 416-17 (dismissing fraudulent misrepresentation claim). Applying the doctrine to fraud claims makes sense. When, as here, a fraud claim arises purely from a contractual duty and seeks the same damages as the contract claim, the claim is nothing more than an action "for the benefit of the[] bargain," *Manhattan Motorcars*, 244 F.R.F. at 220 (S.D.N.Y. 2007), which is "precisely the sort[] of claim[] the economic-loss doctrine seeks to prevent," *251 West 30th Owner LLC v. Justin Tower, LLC*, 2018 WL 5448618, at *5 (N.Y. Sup. Ct. Oct. 29, 2018).

23

## IV.     The Fraudulent Inducement Claim Must Be Dismissed as Duplicative of the Contract Claim Against Ridge Hill

Remcoda's fraudulent inducement claim against Mr. Gross also must be dismissed as duplicative of its contract claim against Ridge Hill.  "[N]o fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract."  *Auerbach v. Amir*, 2008 WL 479361, at *5 (E.D.N.Y. Feb. 19, 2008) (internal quotation marks and citations omitted).  Thus, "where fraud claims are brought alongside contract claims, the fraud claims may only proceed where plaintiff can '(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentations collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'"  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

The Court already has dismissed Remcoda's fraudulent inducement claim against Ridge Hill as duplicative of its contract claim against Ridge Hill.  Dkt. 131 at 21-22.  Remcoda now tries an end run around that ruling by pursuing an identical fraudulent inducement claim against Mr. Gross.  That effort fails for two independent reasons.  *First*, like Remcoda's now-dismissed fraud claim against Ridge Hill, the fraudulent inducement claim against Mr. Gross arises entirely from alleged misrepresentations about Ridge Hill's ability to perform under the Purchase Agreement between Ridge Hill and Remcoda.  *See, e.g.*, SAC ¶¶ 28-30 (allegedly confirming Ridge Hill could provide black nitrile gloves).  Those allegations are no different from the allegations underlying the breach of contract claim against Ridge Hill.  *See* SAC ¶¶ 43-44, 47-48.  Indeed, both sets of allegations bear directly "on the provision of PPE," Dkt. 131 at 21, and thus cannot be "collateral or extraneous to" the Purchase Agreement's terms, *Bridgestone*, 98 F.3d at 20.

*Second*, the SAC's fraudulent inducement claim against Mr. Gross seeks the exact same damages as its contract claim against Ridge Hill.  *See* SAC ¶¶ 84, 96.  The fraudulent inducement

claim fails as duplicative on that basis alone: "It has long been the rule that parties may not assert fraud claims seeking damages that are duplicative of those recoverable on a cause of action for breach of contract." *MBIA Ins. Corp. v. Credit Suisse Secs. LLC*, 165 A.D.3d 108, 114 (1st Dep't 2018); *see, e.g.*, *ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, 2021 WL 1177532, at *22 (S.D.N.Y. Mar. 29, 2021); *Triad Int'l Corp.*, 122 A.D.3d at 531-32 (same).

That Mr. Gross was not a party to the Purchase Agreement is irrelevant, because (i) Remcoda has alleged (and this Court previously found) that Mr. Gross was an agent of Ridge Hill for purposes of the Purchase Agreement, *see* SAC ¶ 9; Dkt. 131 at 26; and (ii) the party seeking dismissal need not be a party to the relevant contract, *see, e.g.*, *Triad Int'l Corp.*, 122 A.D.3d at 531-32 (dismissing fraud claim against company president who was not a party to the relevant contract as duplicative of contract claim against company); *5 E. 59th Realty Holding Co., LLC v. Leahey*, 2020 WL 4936915, at *8 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 24, 2020) (dismissing fraud claims against certain defendants who were non-parties to the relevant contract as duplicative of contract claim against another defendant).

## CONCLUSION

Because subject matter jurisdiction does not exist as to Mr. Gross, the Court should dismiss him from this suit with prejudice. Additionally, the Court should dismiss with prejudice the claims against Mr. Gross because (i) the SAC fails to support an inference that Mr. Gross's alleged statements were knowingly false or that Remcoda relied on them, (ii) the claims are barred by New York's economic loss doctrine, and (iii) the fraudulent inducement claim is duplicative of the contract claim against Ridge Hill.

Dated:  New York, New York
        June 30, 2022

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C

By:  /s/  Robert J. Anello
          Robert J. Anello
          Christopher B. Harwood

       MORVILLO ABRAMOWITZ GRAND
       IASON & ANELLO P.C.
       565 Fifth Avenue
       New York, New York 10017
       (212) 856-9600

       *Attorneys for Defendant Russell Gross*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2022, I caused the foregoing Memorandum of Law in Support of Defendant Russell Gross's Motion to Dismiss the Second Amended Complaint to be served upon counsel of record via ECF.


<u>/s/ Robert J. Anello</u>
Robert J. Anello

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

REMCODA, LLC,

                    Plaintiff,

          v.

RIDGE HILL TRADING (PTY) LTD, ATARAXIA
CAPITAL PARTNERS PTY LTD, and RUSSELL
GROSS,

                    Defendants.

---

Civil Case No.: 1:21-cv-00979

**DECLARATION OF ROBERT J. ANELLO IN SUPPORT OF DEFENDANT**
**RUSSELL GROSS'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

I, ROBERT J. ANELLO, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury,

the following to be true and correct:

1.          I am a principal of the firm Morvillo Abramowitz Grand Iason & Anello P.C., counsel

for Defendant Russell Gross in the above-captioned action.  I submit this Declaration, along with the

accompanying Memorandum of Law in support of Defendant Russell Gross's Motion to Dismiss the

Second Amended Complaint.  I make this declaration based on my review of, and information

provided to me about, the filings and records produced in this action.

**I.     Remcoda Misrepresents Its Citizenship to Invoke this Court's Diversity Jurisdiction**

2.          Remcoda filed the initial Complaint in this action on February 3, 2021, Dkt. 1, and

filed its First Amended Complaint (the "FAC"), in which it first named Mr. Gross as a defendant, on

June 30, 2021, Dkt. 56.  Remcoda invoked subject matter jurisdiction based on diversity of

citizenship.  *Id.* ¶ 18.

1

3. On January 4, 2022, the Court issued an Order to Show Cause requiring Remcoda to explain why this case should not be dismissed for lack of subject matter jurisdiction based on Plaintiff being "a New York limited liability corporation" and Mr. Gross being a New York resident. Dkt. 117.

4. In response, in a February 8, 2022 letter, Remcoda represented to this Court that "on the dates that Plaintiff filed the *initial Complaint [February 3, 2021] and the Amended Complaint [June 30, 2021]*, Plaintiff had one member, who was a *citizen of Florida*." Dkt. 127 at 1 (emphasis added).

5. Between February 3, 2021 and June 30, 2021, however, Remcoda made a contrary representation in another case in this district, *Remcoda, LLC v. SR3D Intl Holdings Corp.*, No. 1:21-cv-00756-LGS (S.D.N.Y. 2021) ("*SR3D*"). In the *SR3D* case, on February 24, 2021, Judge Lorna G. Schofield issued an Order requiring Remcoda to "explain the factual basis for [diversity] jurisdiction," including "the citizenship of each of the entity's members." Attached as Exhibit A is a true and correct copy of Judge Schofield's February 24, 2021 Order in the *SR3D* case.

6. Remcoda responded to Judge Schofield's February 24, 2021 Order in a letter dated March 1, 2021, in which, directly contrary to what it had represented to this Court, it represented that Remcoda "is a New York limited liability company with one member, Mark Garson [*sic.*], who is a resident and citizen of New York." Attached as Exhibit B is a true and correct copy of Remcoda's March 1, 2021 letter.

7. Based on Remcoda's representation of New York citizenship, on March 2, 2021, Judge Schofield endorsed Remcoda's March 1, 2021 letter with an Order permitting Remcoda to move for default judgment against the defendant in that action. Thereafter, by Order dated April 22, 2021, Judge Schofield granted Remcoda a default judgment. Attached as Exhibit C is a true and

correct copy of Remcoda's March 1, 2021 letter with Judge Schofield's endorsed Order, and attached as Exhibit D is a true and correct copy of Judge Schofield's April 22, 2021 default judgment Order.

8.    After representing to Judge Schofield on March 1, 2021 that Remcoda has "one member, Mark Garson [*sic.*], who is a resident and citizen of New York," Ex. B, Remcoda made the contrary representation to this Court on February 8, 2022, that "on the dates that Plaintiff filed the initial Complaint [February 3, 2021] and the Amended Complaint [June 30, 2021], Plaintiff had one member, who was a citizen of Florida," Dkt. 127 at 1.

9.    Remcoda then repeated that contrary representation when—in response to Mr. Gross's efforts to obtain discovery relevant to Mr. Garson's citizenship, which Remcoda stubbornly has resisted providing—Remcoda's counsel wrote in a June 29, 2022 email to Mr. Gross's counsel, "As we have advised and as the documents confirm, Mr. Garson is, *and since the commencement of the action has been*, a resident of Florida.  Indeed, at all relevant times, the *only* residence that Mr. Garson has had is *in Florida*."  (Second emphasis added.)  Attached as Exhibit E is a true and correct copy of the email chain containing Remcoda's counsel's June 29, 2022 email.

10.    Consistent with Remcoda's representation of Mr. Garson's New York citizenship— and inconsistent with its claim that, "at all relevant times, the *only* residence that Mr. Garson has had is in Florida"—in connection with the failed PPE transaction at issue in this case, Mr. Garson provided Ridge Hill with a New York driver's license, and Mr. Garson's public LinkedIn profile identifies his location as New York:

> i.    Specifically, in a WhatsApp messaging exchange between Marc Garson and Remy Garson (of Remcoda), Vincent Fletcher (of Ridge Hill), Menusha Gunawardhana (of Ridge Hill), Sharad Sri (of Ridge Hill), and Mr. Gross, covering the period September 28, 2020 to September 29, 2020, Mr. Sri asked

Mr. Garson for "a[n] ID," and in response, Mr. Garson sent a photograph of a New York Driver License, bearing the name "Marc Garson" and listing his address ████████████████████ New York, NY 10128. Attached as Exhibit F is a true and correct copy of the referenced WhatsApp messaging exchange. Exhibit F is excerpted from a full WhatsApp message thread, covering the period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

      ii.    Attached as Exhibit H is a true and correct copy of Mr. Garson's LinkedIn profile, downloaded on June 29, 2022, which identifies Mr. Garson's location as "New York, New York."

11.      Not surprisingly, to date, Remcoda has resisted Mr. Gross's attempts for discovery into Mr. Garson's alleged Florida citizenship. *See* Ex. I at 13. Indeed, in response to Mr. Gross's requests, it has produced only (i) two leases for a Florida apartment in Mr. Garson's name, covering the period October 2020 through April 2022, (ii) a settlement statement listing Mr. Garson as the purchaser of that apartment in April 2022, and (iii) a tax-related document sent to Mr. Garson at that Florida apartment in April 2022. True and correct copies of the referenced leases, settlement statement, and tax-related document (together with the transmittal letter for the same) are attached hereto as Exhibits J, K, L, and M.

## II.   Remcoda's First Amended Complaint Alleged a Narrative with Respect to Mr. Gross that the Operative Documents Incorporated by Reference into Remcoda's Pleadings Could Not Sustain

12.      As Remcoda's operative Complaint, the Second Amended Complaint ("SAC") makes clear, this case has little to do with Mr. Gross. It concerns a failed transaction pursuant to which Remcoda was to purchase PPE from defendant Ridge Hill Trading (PTY) LTD ("Ridge Hill"). *See*

SAC, Dkt. 140 ¶¶ 1-4. As discovery, including recently produced documents, now has confirmed, Mr. Gross had an extremely limited role in the underlying transaction.

A. **Mr. Gross's Role was Limited to Acting as a Broker on Behalf of Unicorn, and Neither Mr. Gross Nor Unicorn Would Receive any Benefit Absent a Successful PPE Transaction**

13.     Prior to Remcoda's underlying transaction with Ridge Hill, on June 9, 2020, Remcoda contracted with non-party Unicorn Health LLC ("Unicorn") to act as a broker and introduce Remcoda to potential PPE suppliers. A true and correct copy of the June 9, 2020 contract between Remcoda and Unicorn, titled "Procurement Agreement," is attached as Exhibit N.

14.     The Procurement Agreement, which is referenced in the SAC, *see* SAC ¶¶ 21-22, and signed by Mr. Gross on behalf of Unicorn, expressly describes Unicorn's role as being limited to "introduc[ing] the Purchaser [Remcoda] directly to [Unicorn's] supply relationships." Ex. N at 1.

15.     The Procurement Agreement further provides that the sole consideration for such brokerage services would be that Unicorn would "be entitled to receive a payment equal to five percent (5%) of the purchase price for each transaction *consummated* with a covered supplier." *Id.* (emphasis added).

16.     Accordingly, absent Remcoda's receipt of the PPE (*i.e.*, the consummation of the transaction), neither Unicorn nor Mr. Gross nor anyone else would have had any reason to believe that the 5% fee would be paid.

17.     Moreover, Remcoda has represented that it has produced "the responsive documents of which it is aware" relevant to its allegation, made only "on information and belief," that Mr. Gross "received payment of [the 5%] fee." Ex. E at 15-17; *see* SAC ¶ 75. Consistent with

the terms of the Procurement Agreement, no document in any party's production, or indeed elsewhere, supports the "on information and belief" allegation.

**B. After Mr. Gross Introduced It to Ridge Hill, Remcoda Relied on Its Own Due Diligence in Deciding to Proceed with the Transaction**

18. Acting on behalf of Unicorn, Mr. Gross introduced Remcoda to Ridge Hill on June 9, 2020. SAC ¶ 22. Thereafter, Remcoda entered into an agreement with Ridge Hill to purchase PPE on July 16, 2020. *Id.* ¶ 43.

19. Shortly before Mr. Gross introduced Remcoda to Ridge Hill on June 9, 2020, Ridge Hill had represented to Unicorn that it could provide the subject PPE. For example:

      i. Attached as Exhibit O is a true and correct copy of a May 20, 2020 email from Vincent Fletcher to Unicorn partner Patrick Horseman, copying Russell Gross, in which Mr. Fletcher conveyed information about Ridge Hill's "business," its "two plants in Sri Lanka and Vietnam," and the plants' "certificates for nitrile gloves." Ex. O at 1.

      ii. Attached as Exhibit P is a true and correct copy of a set of slides attached to the above-referenced May 20, 2020 email, which reflect that Ridge Hill offers "[g]loves] – nitrile and latex" as part of its "PPE product range." Ex. P at 8.

      iii. Attached as Exhibit Q is a true and correct copy of another document attached to the above-referenced May 20, 2020 email, titled "EU Type-Examination Certificate," which states that a factory in Sri Lanka—which Vincent Fletcher characterized in the May 20, 2020 email as a partner of Ridge Hill—produced "Nitrile" gloves meeting "relevant standards/technical specifications." Ex. O at 1.

20.     Between when Mr. Gross introduced Remcoda to Ridge Hill on June 9, 2020, and when Remcoda entered into an agreement with Ridge Hill to purchase PPE on July 16, 2020, Remcoda communicated directly and repeatedly with Ridge Hill about the prospective deal to purchase PPE before agreeing to proceed.

21.     For example, attached as Exhibit R is a true and correct copy of an email chain ending with an email from Menusha Gunawardhana to Remy Garson on June 9, 2020, in which Gunawardhana describes Ridge Hill's connections to a factory in Vietnam and its relationship with "one of the largest and most prominent companies and asset managers" in the region to "give [Remcoda] some sort of reassurance that we will be able to deliver as per schedule." Ex. R at 1.

22.     Subsequent to June 9, 2020, Remcoda communicated directly with Ridge Hill on numerous other occasions and sought and received representations from Ridge Hill about its ability to deliver the subject PPE.  For example:

i.      Attached as Exhibit S is a true and correct copy of an email exchange ending with an email from Vincent Fletcher to Remy Garson on June 9, 2020, in which Mr. Fletcher states that Ridge Hill "really want[s] [Remcoda] to feel comfortable and secure with us," and that "we will get back to you with a critical path and assurance we can deliver," Ex. S at 1.

ii.     Attached as Exhibit T is a true and correct copy of a June 15, 2020 WhatsApp messaging exchange between Marc Garson, Remy Garson, Vincent Fletcher and Menusha Gunawardhana, in which Gunawardhana represents to Remcoda that "we can do . . . [20] million gloves." *Id.*  Exhibit T is excerpted from a full WhatsApp message thread, covering the period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

       iii.    Attached as Exhibit U is a true and correct copy of a June 30, 2020 WhatsApp

messaging exchange between Marc Garson, Remy Garson, Vincent Fletcher,

Menusha Gunawardhana, and Mr. Gross, ███████████████████████

████████████████████████████████████ Exhibit U is excerpted

from a full WhatsApp message thread, covering the period June 9, 2020 to

October 13, 2020, which is attached as Exhibit G.

       iv.    Attached as Exhibit V is a true and correct copy of a July 14, 2020 WhatsApp

messaging exchange between Marc Garson, Remy Garson, Vincent Fletcher,

Menusha Gunawardhana, and Russell Gross, in which Gunawardhana assures

Remcoda that "stock is all there," and "all ok with the stock."  *Id.* at 1-2.

Exhibit V is excerpted from a full WhatsApp message thread, covering the

period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

23.    Remcoda expressly referenced the parties' relevant emails and text messages in the

SAC and/or necessarily relied on them in drafting the SAC.  *See, e.g.*, SAC ¶¶ 22-24, 27-28, 29,

52, 75.

### C. Mr. Gross Did Not Perform Any Function Outside His Broker Role on behalf of Unicorn

24.    Consistent with the terms of the Procurement Agreement, Ex. N at 1, Mr. Gross's

role (on behalf of Unicorn) was limited to introducing Remcoda to Ridge Hill and thereafter

facilitating the exchange of information between the two.

25.    Communications involving Mr. Gross—expressly referenced in, or integral to, the

SAC—reflect Mr. Gross's limited role.  For example:

       i.    Attached as Exhibit W is a true and correct copy of a June 9, 2020 email

exchange ending with an email from Menusha Gunawardhana to Mr. Gross in

8

which Mr. promises to "connect everyone over email and whatsapp."  Ex. W at 1.

    ii.    Thereafter, Mr. Gross added each party's representatives on common WhatsApp and email threads.  Attached as Exhibit X is a true and correct copy of a June 9, 2020, WhatsApp messaging exchange between Mr. Gross, Marc Garson, Vincent Fletcher, and Gunawardhana, pursuant to which Mr. Gross "[c]onnect[s] everybody on Whatsapp."  Ex. X at 1.  Exhibit X is excerpted from a full WhatsApp message thread, covering the period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

    iii.    Attached as Exhibit Y is a true and correct copy of a June 9, 2020 email exchange ending with an email from Remy Garson to Mr. Gross, in which Remy Garson thanks Mr. Gross for connecting the parties and then addresses language regarding "next steps" and "delivery dates" to Menusha Gunawardhana of Ridge Hill.  Ex. Y at 1.

26.    After Mr. Gross connected Remcoda with Ridge Hill, the communications between the parties demonstrate that, consistent with Unicorn's brokerage function, Mr. Gross facilitated the exchange of information between the parties by trying to schedule calls between the parties, prompting the parties to respond to one another's proposals or questions, and passing information between the parties.  For example:

    i.    Attached as Exhibit Z is a true and correct copy of a June 18, 2020 WhatsApp messaging exchange between Russell Gross, Remy Garson, and Vincent Fletcher, ██████████████████████████████████████ ████████████  Ex. Z at 1.  Exhibit Z is excerpted from a full WhatsApp

message thread, covering the period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

ii.  Attached as Exhibit AA is a true and correct copy of a WhatsApp messaging exchange, covering the period June 18, 2020 to June 30, 2020, between Marc Garson, Remy Garson, Vincent Fletcher, Menusha Gunawardhana, and Mr. Gross, ███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ Exhibit AA is excerpted from a full WhatsApp message thread, covering the period June 9, 2020 to October 13, 2020, which is attached as Exhibit G.

iii. Attached as Exhibit BB is a true and correct copy of a June 30, 2020 email from Menusha Gunawardhana to Jackson Barber (a non-party and unrelated potential client of Ridge Hill), copying Vincent Fletcher and Mr. Gross, in which Gunawardhana emailed Mr. Gross detailed information on Ridge Hill and Ataraxia, stating that both companies were part of "a Family group" that was "able to 'offer the connections, financial scale, controls and experience that most in the PPE market do not,'" and that Ataraxia employees "manage the supply chain and offer customers 'contract, legal, funding, and financial support." Ex. BB at 1.

       iv.      Attached as Exhibit CC is a true and correct copy of July 29, 2020 email from

Mr. Gross to Remy Garson, in which Mr. Gross restated to Mr. Garson the

same information that Ridge Hill had provided to Mr. Gross in the above-

referenced June 30, 2020 email, *see* Ex. BB.


Dated: New York, New York
       June 30, 2020

                            /s/  Robert J. Anello
                            ROBERT J. ANELLO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2022, I caused the foregoing Declaration in Support of Defendant Russell Gross's Motion to Dismiss the Second Amended Complaint, along with all exhibits attached thereto, to be served upon counsel of record via ECF.


<u>/s/ Robert J. Anello</u>
Robert J. Anello

# EXHIBIT 4

The Wayback Machine - https://web.archive.org/web/20230926013630/https://usaherald.com/patrick-horsman-...

# Patrick Horsman & Business Partner Thomas McLaughlin Wrapped up in LGBCoin Class Action Lawsuit

By **Catherine Davis** - May 29, 2023



*7/9/2023 Update: Thomas McLaughlin and the Coral Defendants were dismissed from this lawsuit. Since running this article, Patrick Horsman added as a co-defendant.

Order on Motions to Dismiss

Thomas McLaughlin, co-founder of LGBCoin and business partners with Patrick Horsman at Coral Defi (Coral Capital Management, LLC), is accused of fraud along with unjust enrichment in a 104 page class-action lawsuit filed on behalf of investors that lost money in an alleged cryptocurrency scam.

## Signup for the USA Herald exclusive Newsletter

First Name

First Name

Email Address:

Email Address

Sign up

The class action lawsuit alleges that Coral Defi, Coral Capital LLC, Coral Capital Management LLC, all owned by Patrick Horsman (he is listed at the Managing Member/Co-Founder), defrauded investors in the LGBCoin Cryptocurrency Pump & Dump scheme and attempted to hide their role through a complex web of transactions.

"*Concurrently, the complex web of transactions among the wallets described above strongly suggests that this was purposefully designed to obscure the true owners of significant portions of LGBCoin Float and provide Carter, Koutoulas, Michalopoulos (along with McLaughlin and the Coral entities) plausible deniability to investors when those owners sold. There are dozens of additional wallet addresses that have received LGBCoins from the Carter Wallets, the Hub Wallet, McLaughlin's Wallets, Mascioli's Wallets, and the Coral Wallets.*"

# Case Background

1 2 3 4 5 >

### Catherine Davis

Catherine Davis is a contributor to the USA Herald. She covers politics and reports on issues of the times.

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| ERIC DE FORD, SANDRA BADER, Individually and on Behalf of All Others Similarly Situated, | Case No. 6:22-cv-652-PGB-DCI |
| Plaintiffs, | CLASS ACTION |
| v. | |
| JAMES KOUTOULAS, JEFFREY CARTER, ERIK NORDEN, ALEXANDER HOPE MASCIOLI, ARIS GEORGE MICHALOPOULOS, THOMAS McLAUGHLIN, CORAL CAPITAL LLC, CORAL CAPITAL MANAGEMENT LLC, CORAL DEFI LP, BRANDON BROWN, BRANDONBILT MOTORSPORTS, LLC, and NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, bring this action against LGBCoin d/b/a LGBCoin.io (the "Company"), James Koutoulas, Jeffrey Carter, Erik Norden, Aris George Michalopoulos (the "Executive Defendants") Thomas McLaughlin, Coral Capital LLC, Coral Capital Management LLC, Coral DeFi LP (the "Coral Defendants"), Alexander Hope Mascioli, Brandon Brown, Brandonbilt Motorsports, LLC, National Association for Stock Car Auto Racing, LLC (the "Racing Defendants") (collectively, with the Company, Executive Defendants, and Coral Defendants, the "Defendants"). The following allegations

are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

**<u>NATURE OF THE CASE</u>**

1.      On October 2, 2021, an NBC reporter incorrectly described attendees at the NASCAR Sparks 300 race at Talladega Superspeedway who were expressing their distaste for President Biden as chanting "Let's go Brandon!" in support of the race's eventual winner Brandon Brown.

2.      From there, the phrase "Let's Go Brandon!" and its shorthand "LGB!" has become a nearly universally known euphemistic slogan for those seeking to express their displeasure with the current Administration. The phrase's popularity gave rise to its appearance on t-shirts, trucker hats, coffee mugs, wrist bands, and bumper stickers, among other things.

3.      Alexander H. Mascioli, an automobile enthusiast and self-proclaimed Cryptocurrency investments expert, who is also a convicted forger that consented to a $100,000 SEC fine for securities fraud, saw another opportunity: creating a "Let's go Brandon!" cryptocurrency (a digital commodity whose value rises with its demand) ("LGBCoin") and associating it with high-profile conservative influencers and NASCAR.

4.      Mascioli recruited James Koutoulas, CEO of the hedge fund Typhon Capital Management and a Republican influencer, and Brandon Brown's racing

team, BrandonBilt Motorsports ("BMS"), to promote the coin. This two-front marketing campaign began in earnest immediately.

5. On November 2, 2021, LGBCoin became available for purchase. Three days later, Mascioli, Koutoulas and BMS owner Jerry Brown met with NASCAR executives at the NASCAR Xfinity Series Champion Race in Phoenix, Arizona, discussing their partnership.

6. Koutoulas spent the next two months promoting LGBCoin to the public using race car imagery and inside access to Brandon Brown and to additional conservative influencers by, among other things, providing them purported insider information, gifting them LGBCoins and benefiting from their further promotion of the coin.

7. Koutoulas's Instagram and Twitter accounts are littered with pictures of himself with Brandon Brown and wearing the LGBCoin's logo alongside prominent Republican public figures such as former President Donald J. Trump, Donald J. Trump, Jr., Peter Thiel, Texas Governor Greg Abbott, Arizona Senate candidate Blake Masters, and City of Miami Mayor Francis Suarez.

8. All the while, Koutoulas and the other promoters continued to tease an upcoming announcement of a NASCAR partnership.



9.     On December 30, 2021, LGBCoin and BMS announced that LGBCoin was Brandon Brown's full season primary partner for the 2022 NASCAR Xfinity Series season (the "Sponsorship").

10.     On January 1, 2022, LGBCoin reached a price of $0.000001734, a market value of more than $570 million, which represented a 510% increase from its initial price of $0.00000034, just two months earlier.

11.     On January 4, 2022, NASCAR announced that it would not allow LGBCoin to sponsor Brandon Brown.  In fact, a NASCAR official claimed that NASCAR executives told LGBCoin and BMS on November 5, 2021, that it would not allow any variation of "Let's go Brandon!" on a race car.  Koutoulas claims NASCAR executives said that they would approve a sponsorship if it used the abbreviated coin name, LGBCoin.io.

12.     Insiders sold and the value of LGBCoin fell to zero.



13.     Plaintiffs bring this action on behalf of all investors who purchased virtual currency in the form of Let's Go Brandon meme tokens ("LGBCoin") between November 2, 2021, and March 15, 2022 (the "Relevant Period"), and were damaged thereby.

## PARTIES

### *Plaintiffs*

14.     Plaintiff Eric De Ford ("De Ford") is a resident and citizen of Missouri. During the class period, De Ford purchased LGBCoins in several transactions dating December 31, 2021, January 1, 2022, January 11, 2022, January 26, 2022, and January 28, 2022, via the U.S.-based cryptocurrency exchanges Coinbase and Uniswap.  De Ford suffered investment losses as a result of Defendants' conduct.

15.     Plaintiff Sandra Bader ("Bader") is a resident and citizen of Idaho. During the relevant period, and specifically on January 1, 2022, Bader purchased LGBCoins via the U.S.-based cryptocurrency exchanges Coinbase and Uniswap. Bader suffered investment losses as a result of Defendants' conduct.

***Defendants***

16.     Defendant Alexander Hope Mascioli ("Mascioli") is a resident and citizen of New York, living in Brooklyn, New York.  Mascioli is the co-founder/creator of the Company, served as a consultant and spokesman for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public and at one point, was an LGBCoin holder.

17.     Mascioli has quite the checkered past.  Not only was Mascioli convicted of forgery and criminal impersonation in Connecticut in 2002, but he also has an investment history that is consistent with stock price manipulation.

18.     In September 2011, Mascioli and his purported hedge fund, North Street Capital, LP agreed to purchase Spyker Cars for $43.5 million and 2.38 million shares of SAAB for $70 million.  Although the deals were widely reported, they never closed, with SAAB Chairman and CEO Victor Muller quoted as saying "North Street Capital was not real," "they pretended to make a deal, but in fact they could not at all that.  They could not provide credible evidence of assets."

19.     In May 2012, Mascioli and North Street Capital again made an offer to purchase a publicly traded company, that was widely reported, for which

Mascioli was without the ability to consummate the transaction. On May 9, 2012, Mascioli sent Winnebago ("WGO") an unsolicited offer letter to acquire all of Winnebago's common stock for $11 per share, or approximately $321 million. The $11 per share represented a $2.11 (or 23.7) premium to WGO's closing price on May 8, 2012.

20.     On May 17, 2012, Mascioli sent a copy of that offer letter to Bloomberg which reported the offer. Winnebago Industries stock, which closed at $8.51 on May 17, 2012, the day before news of the latest offer broke, reached a high of $10 per share on May 18, 2012. In pre-market trading on May 18, 2012, almost 700,000 WGO shares were traded. By contrast, in the four trading days prior to May 18, 2012, WGO had little to no volume in pre-market trading.

21.     In March 2014, the SEC filed a securities fraud complaint against Mascioli and North Street Capital for their actions in connection with the Winnebago offer. *Securities and Exchange Commission v. Alexander H.G. Mascioli*, No. 3:14-cv-325 (D. Conn. Mar. 12, 2014). Mascioli and North Street Capitol agreed to a consent judgment accessing a civil penalty of $100,000 and permanently enjoining Mascioli from acting as an officer or director of any issuer of securities. *Securities and Exchange Commission v. Alexander H.G. Mascioli*, No. 3:14-cv-325, ECF No. 9 (D. Conn. Mar. 20, 2014).

22.     In 2017, Mascioli shifted his attention to cryptocurrencies, as head of institutional services for Bequant, a crypto prime broker, overseeing the trading, execution, margin financing and lending for institutional players in crypto. In

2020, Mascioli co-founded Trade the Chain, an alerts-based dashboard of crypto markets. Mascioli now markets himself as a crypto fund and institutional digital assets educator, speaker and entrepreneur. At some point prior to December 30, 2021, Mascioli became co-owner of BrandonBilt Motorsports ("BMS").

23. Defendant James Koutoulas ("Koutoulas") is a resident and citizen of Florida, living in Miami Beach, Florida. Koutoulas is the co-founder/creator of the Company, served as a consultant, developer, and spokesman for the Company, is an LGBCoin holder, and exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

24. Koutoulas's primary occupation is the CEO of Typhon Capital Management, a commodity trading advisory firm that he founded in 2008. Koutoulas is also a lawyer, who graduated from Northwestern Law School in 2006, admitted to practice in Illinois in November 2006 and New York in April 2021. But he generally is non-practicing. His law firm's registered address with the Illinois Attorney Registration and Disciplinary Committee and the New York State court system is the same as his former law professor and current counsel Sam Tenenbaum's.

25. But in October 2011, when MF Global filed for bankruptcy, Koutoulas learned that nearly all of the funds Typhon was managing ($55 million of Typhon Capital Management's $70 million under management) had been dragged into the bankruptcy proceedings. Koutoulas loudly threw himself into the proceedings by

filing an emergency motion arguing for MF Global customers' (Typhon Capital's investors) funds to be unfrozen. Although his motion was denied, his picture appeared on the cover of *The New York Times* business section the next day and he became the figurehead for the MF Global customers whose funds were frozen. He and another broker organized fundraising calls with affected customers and hired a securities lawyer to represent their interests in the bankruptcy.[1] He also reached out to Sam Tenenbaum for help. The bankruptcy court eventually released the customers' funds and Koutoulas touted a $6.7 billion victory, *pro bono*. Koutoulas parlayed that notoriety into a spot on the National Futures Association's Board of Directors.

26.     Most recently, however, Koutoulas is more likely to be found in less idealistic pursuits. He now frequently promotes his association with notable conservative public figures such as Peter Thiel and Donald Trump, Jr. In his most recent court experience, he served as one of the plaintiffs' counsel in a securities fraud class action concerning the issuance and promotion of a cryptocurrency, EOS Tokens, which plaintiffs pointedly alleged was "an unregulated security" that violated several provisions of the Securities Act of 1933 and the Exchange Act of 1934. *Williams v. Block.one*, No. 20-cv-2809 (S.D.N.Y.). Koutoulas bragged that the *Williams* case concerned a multi-billion-dollar fraud and that he served one

---

[1]     Ameet Sachdev, *Hedge-fund manager an impassioned advocate for commodities customers*, CHICAGO TRIBUNE, Mar. 18, 2013, https://www.chicagotribune.com/business/ct-xpm-2013-03-18-ct-biz-0318-executive-profile-koutoulas-20130318-story.html.

defendant during the defendant's presidential campaign rally. The case settled prior to a ruling on the motion to dismiss for $27.5 million and awaits a ruling on final approval of the settlement. Koutoulas claims an $800 an hour billing rate.

27.     Defendant Jeffrey R. Carter ("Carter") is a resident and citizen of Florida, living in Miami Beach, Florida. Carter is the co-founder/creator of the Company, served as a consultant, developer, and spokesman for the Company, is an LGBCoin holder, and exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

28.     Carter is the managing partner of West Loop Ventures, a venture capital fund. Carter also serves as a board member of Koutoulas's Typhon Capital Management.

29.     Defendant Erik Norden ("Norden") is a resident and citizen of Florida, living in Boca Raton, Florida. Norden is the co-founder/creator of the Company, served as a consultant, developer, and spokesman for the Company, is an LGBCoin holder, and exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

30.     Defendant Aris George Michalopoulos ("Michalopoulos") is a resident and citizen of Florida, living in Miami Beach, Florida. Michalopoulos is the founder and CEO of Empeopled, a social networking website that has been inactive since 2017, and the chief investment officer of Leonidas Funds at Koutoulas's Typhon Capital Management.

31.     Defendant Thomas McLaughlin, Jr. ("McLaughlin") is a resident and citizen of Puerto Rico, living in San Juan, Puerto Rico.  McLaughlin is the co-founder/creator of the Company, served as a consultant, developer, and spokesman for the Company, is an LGBCoin holder, and exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.  McLaughlin is also the co-founder and Chief Investment Officer of Coral DeFi, a crypto investment fund and subsidiary of Coral Capital Partners.

32.     Coral Capital LLC, is a Puerto Rico Limited Liability Corporation with its principal place of business located at 954 Ponce de Leon Avenue, Suite 601, San Juan, PR 00907.  Coral Capital LLC operates as a venture capital fund that focuses on cryptocurrency and other related ventures for investors seeking equity stakes in small- to medium-sized enterprises.  Coral Capital was co-founded by Patrick Horsman, Thomas McLaughlin and/or David Namdar.

33.     Coral Capital Management LLC is a Delaware Limited Liability Corporation and an affiliate and/or subsidiary of Coral Capital LLC, with its principal place of business located 2067 Calle Espana #4, San Juan, PR 00913. Patrick Horsman is listed as the registered executive of Coral Capital Management LLC on its SEC corporate filings.

34.     Coral DeFi LP is a Delaware Limited Partnership and an affiliate and/or subsidiary of Coral Capital LLC, with its principal place of business located 2067 Calle Espana #4, San Juan, PR 00913.  Coral DeFi LP operates as an

11

"Alternative Investment Platform" and digital asset manager. Coral DeFi was founded by Patrick Horsman, Thomas McLaughlin and David Namdar, and is specifically focused on decentralized financial applications and investment opportunities.

35. Coral Capital LLC, Coral Capital Management LLC, and Coral DeFi are collectively referred to as the "Coral entities."

36. Defendant Brandon Brown ("Brown") is a resident and citizen of Virginia living in Stafford County, Virginia. Brandon Brown is an LGBCoin holder and acted as a promotor for the Company and LGBCoin.

37. Defendant Brandonbilt Motorsports, LLC ("BMS") is a Virginia Limited Liability Corporation with its principal place of business in Mooresville, North Carolina, that operates a professional stock car racing team with Brown. BMS is managed by Jerry Brown and David Clark, both citizens of Virginia. BMS acted as a promotor for the Company and LGBCoin.

38. Defendant National Association for Stock Car Auto Racing, LLC ("NASCAR") is a Florida corporation with its principal place of business in Daytona Beach, Florida, where it controls, oversees, promotes, and markets the NASCAR brand and sanctioned stock car racing events and series and throughout the United States, Canada, Mexico, and Europe.

## JURISDICTION AND VENUE

39. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332. Plaintiffs bring this civil action seeking to represent a class of

more than 100 plaintiffs pursuant to Fed. R. Civ. P. 23. Plaintiff De Ford is a citizen of the State of Missouri. Plaintiff Bader is a citizen of the State of Idaho. None of the Defendants are citizens of Missouri or Idaho. Plaintiffs seek an award exceeding $5,000,000, exclusive of interest and costs, on behalf of themselves and the putative class.

40.     The Court has general jurisdiction over Defendants Koutoulas, Carter, Michalopoulos, Norden, and NASCAR as they are all residents of the State of Florida and are thus "at home" in the forum.

41.     The Court has specific jurisdiction over the remaining defendants as they have conducted business in Florida, committed tortious acts in Florida and have engaged in substantial activity in Florida. *See* Fla. Stat. Ann. §48.193. Florida's long-arm statute provides for personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281-82 (11th Cir. 2009) (citing *Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 734-36 (Fla. 3d DCA 2006) (finding personal jurisdiction existed in Florida where conspiracy was made in Ohio but acts in furtherance of the conspiracy were done in and directed toward Florida)); *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994) ("if [plaintiff] has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the

conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute"); *see also Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 584-85 (Fla. 2000) (finding personal jurisdiction in Florida over a participant in a nationwide price-fixing conspiracy in which some co-conspirators, but not the defendant at issue, made sales into Florida).

42.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because Defendants live and/or conduct business in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## **FACTUAL ALLEGATIONS**

43.     Cryptocurrency, or crypto, is a form of currency that exists digitally or virtually and uses cryptography to secure transactions. Cryptocurrencies use a decentralized system to record transactions and issue new units. The first cryptocurrency was Bitcoin, which was founded in 2009. As of March 2022, there are 18,465 cryptocurrencies in existence.[2] Some of the largest include: Ethereum, XRP, Dogecoin, and Shiba Inu.

44.     Anyone can create a new cryptocurrency. An internet search will provide you step-by-step instructions with video for creating a new cryptocurrency in less than an hour. Once created, the new cryptocurrency can be traded on cryptocurrency exchanges. Exchanges can be centralized such as Coinbase,

---

[2]     Josh Howarth, *How Many Cryptocurrencies are There in 2022?* Jul. 19, 2022, https://explodingtopics.com/blog/number-of-cryptocurrencies (last visited Jul. 19, 2022).

Crypto.com, Gemini, BitMart and others, or decentralized (Dex) such as Uniswap, Pancake Swap, and others.

45.    Cryptocurrency is stored in crypto wallets, which are physical devices or online software used to store the private keys to the owner's cryptocurrencies securely.  Wallets have unique identifiers called Wallet IDs.  There is no limit on the number of wallets a person can control.

46.    Transactions of cryptocurrencies are recorded in a blockchain which serves as a distributed public ledger.  The amount of cryptocurrency transacted, the sender's wallet address, the recipient's wallet address and the date and time of the transfer for every transfer of cryptocurrency between digital wallets can be publicly viewed on the blockchain by using any number of websites like www.blockchain.com/explorer or www.etherscan.io.

47.    The owner of a particular wallet is not publicly available from the blockchain.  However, since users usually have to reveal their identity in order to receive services or goods, many times the owner of a wallet can be deduced from a wallet's transactions or matching wallet data with other identifiable data points such as a user's IP address.

**LGBCoin.io Background**

48.    The LGBCoin is a cryptocurrency created by a group of entrepreneurs and cryptocurrency developers, including, but not limited to, the Executive Defendants.  In particular, LGBCoins are blockchain-based digital assets known as "ERC-20 tokens" that are created using the Ethereum blockchain.  After an ERC-

20 token is created, it can be traded, spent, or otherwise transacted with. LGBCoin were primarily traded against Ether, the native currency of the Ethereum blockchain network on Binance, Coinbase, Uniswap, and other decentralized exchanges that allow anyone to list a token.

49.　The Company promoted LGBCoin to be a collectable "inspiring positivity and patriotism" and "grounded in a strong belief in the American dream and the principles of freedom."[3]　According to the Company, LGBCoin are not "inherently political" but rather, a way to "digitally voice their support for America and the American dream."[4]

50.　LGBCoin's name alludes to the political phrase "Let's Go Brandon" that arose after Brandon Brown's NASCAR Xfinity Series win at the Talladega Speedway on October 2, 2021 (the "Talladega NASCAR Race").　The phrase stemmed from a misunderstanding that occurred during Brown's post-win interview with NBC Sports reporter, Kelli Stavast, but later caught on as a euphemistic expression of displeasure with President Biden.

51.　On October 28, 2021, all 330 trillion LGBCoin were minted as part of the creator smart contract.[5]　It is best practice for tokens to be sold as part of time-locked smart contracts with controls to prevent fraud.　And although the Executive

---

[3]　　https://LGBCoin.io/ (last visited Mar. 9, 2022).

[4]　　https://LGBCoin.io/about/ (last visited Mar. 9, 2022).

[5]　　*See*　https://www.instagram.com/tv/CXtuLKsDVQL/?utm_medium=copy_link;　THE DAVID J. HARRIS JR. SHOW, Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932 439, 15:59-16:01.

defendants were experienced in crypto, they did not implement these fraud prevention controls. At the same time, the Executive Defendants took steps to conceal their identities from the public.

52. The 330 trillion LGBCoin were dispersed to three wallet addresses owned and/or controlled by Jeffrey Carter as follows:

- Wallet Address 0x37364ca1fd526ed06c6e0a36b8d471919b0e273f ("Carter Wallet 1 0x373") received 165 trillion LGBCoins.

- Wallet Address 0xc9150014a3cab1ff3ffcb031b5bc2570b07d4a53 ("Carter Wallet 2") received 33 trillion LGBCoins.

- Wallet Address 0x619e91cf4bbd4a78f8207192d6fb5c347bee1a1d ("Carter Wallet 3" 0x619) received 132 trillion LGBCoins.

53. Carter Wallet 1 then transferred 100 billion LGBCoins to a fourth wallet owned and/or controlled by Carter: Wallet Address 0xed33bf53db33 49db27f9bf54d29460ad10567206 ("Carter Wallet 4").[6] Carter Wallet 4 was the first wallet address to receive LGBCoin from Carter Wallet 1. The four Carter Wallets collectively serve as the de facto deployer wallets of LGBCoin. Notably, none of the Carter Wallets are contract-based wallets. Best practices in cryptocurrency launches include a mechanism in the code of the smart contract itself to "lock" for a certain period of time the portion of the Float given to the developers and other insiders pre-launch. This mechanism is designed to prevent

---

[6] *See* TCP # 614, James Koutoulas & Jeffery Carter Interview, https://rumble.com/embed/ vm65gr/?pub=4 (last visited Jul. 19, 2022).

insiders from immediately dumping huge amounts of tokens (acquired at little to no cost pre-launch) onto the market once trading volume from retail investors increases. The Carter Wallets, instead, are regular cryptocurrency wallets that have no limitations on selling at any point.

54. On October 29, 2021, Carter Wallet 4 received three "gas fee"[7] transfers from separate wallet addresses.

55. One of those wallets can be positively identified as belonging to Michalopoulos: Wallet Address 0xcD39Fd52d7998D30A77903FF31229B4cDbc 7805B. The wallet owns the domain name "empeopled.eth" – Michalopoulos' social networking business is called "empeopled." Michalopoulos' wallet sent $1,325.22 in gas fees to Carter Wallet 1 on October 29, 2021 to facilitate the public trading of LGBCoins at launch.

56. On November 1, 2021, Koutoulas's wallet, Wallet Address 0x2986534b03b87d358224daee9e1585c32b7725db (the "Koutoulas Wallet"),[8]

---

[7]    "Gas Fees" are fees charged by the Ethereum network to process a transaction to compensate for the computing energy required to process and validate transactions. Gas Fees are paid in ether, the base currency of the network.

[8]    Further demonstrating that this wallet is under Koutoulas' ownership and control is its February 23, 2022 transaction sending 500 billion LGBCoins to a newly created wallet. This new wallet only holds these 500 billion LGBCoins and it appears to be the same one Koutoulas set aside for, and gave to, former President Trump (discussed further below). Additionally, during an interview with the Daily Beast, Koutoulas recounted a story about how he had personally attempted to stabilize the price of the LGBCoin during a sell-off period by purchasing roughly $70,000 worth of LGBCoin while he was in the bathroom at Peter Thiel's home. The following transaction on the Ethereum blockchain shows the Koutoulas Wallet making a purchase for similar amount around the same timeframe: https://etherscan.io/tx/0x661d7df5433f2 5cbc98a883b1fa5ef0f6a038fe16f9aa2bfca307d3136c0fde5.

received 1 trillion tokens from Carter Wallet 1. At this time, Koutoulas was dubbed the "representative" of the Company and the LGB Token.

57. That same day, LGBCoin insiders set up an additional wallet to act as a pass-through wallet (with the following lists as the Wallet Address: 0x40ecf54ad6339e0b346a48f4907661bde67dd4d0 (the "Hub Wallet")), enabling them to obscure the transfer and sale of LGBCoins. To begin, Koutoulas provided $4,292.06 in gas fees to the Hub Wallet. Shortly thereafter, two additional wallet addresses, one owned by Thomas McLaughlin and the other by his firm Coral Defi, sent gas fees to the Hub Wallet.[9] Koutoulas via Typhon is business associates with McLaughlin and Coral Defi. Around two and a half hours later, Carter Wallet 1 made the first of transfer of several trillion LGBCoins to the Hub Wallet. Within an hour, the Hub Wallet sold 1 trillion LGBCoins, seemingly to confirm that the Hub Wallet could reliably receive, transfer, and/or sell LGBCoins prior to launch.

58. On November 2, 2021, the Executive Defendants launched LGBCoin for the first time in a bona fide public offering with a transaction volume of $100 million and an opening price of $0.000000034.

---

[9]     Wallet Address 0x9725bdd039fcfe6dee3de5398c3ba06113390aec provides $40,000 in USDC for initial gas fees to the Hub Wallet. Wallet 0x97 owns the domain name "CoralDefi." It is owned by Coral Defi. (the "Coral Wallet"). *See* https://etherscan.io/tx/0xdc0328b07ae4754 2a185311ee4ae36da4e49ae305b595e50b6ccfe25ef5ac86 Wallet Address 0xaa130e5a43cadbe2 eaa4e58ede61e39874e3ead7 provides $10,000 in USDC for gas fees to the Hub Wallet. Wallet 0xaa owns the domains of thomasmclaughlin.eth, tmcg.eth, and tmclaughlin.eth, and owns the same penguin NFT as Thomas McLaughlin displays as his twitter avatar. It is owned by Thomas McLaughlin.    *See* https://etherscan.io/tx/0x702bd76e51bd858277367c237b9312932db4a1d4 cc7e2863d611c967e5768763; https://opensea.io/fhsunvds ("McLaughlin Main Wallet").

59.     At the time of public launch, and throughout the Relevant Period, LGBCoin were not sold pursuant to a "whitepaper."   Best practice in cryptocurrencies include creation and release of a whitepaper (similar to a prospectus) that provides investors technical information about its concept, and a roadmap for how it plans to grow and succeed.

60.     In the absence of a whitepaper, the Company posted "The Story of the LGB Coin" on the Company website at https://LGBCoin.io/, explaining that the LGBCoin was launched as a way to "honor" patriotic Americans that promote American values.   The Company then highlighted Koutoulas personally and praised his work in the MF Global bankruptcy proceeding.

> To honor [Koutoulas] and his righteous fight for the people, he was gifted 1 trillion LGBCoin from Jeffery Carter.  Why?  Because [Koutoulas] is the best representation of what we consider to be *America's coin*.  What [Koutoulas] did encapsulates the idea of the Let's Go Brandon movement.  Fighting back against the establishment, their mismanagement, and the financial fleecing of the American people.
>
> *Fighting for your freedom, our freedom.  For America.*
>
> Let's Go Brandon![10]

61.     The Executive Defendants launched and promoted LGBCoin with the following logo (the "Company Logo"), which they featured prominently on the Company's Website, social media accounts, and promotions:

---

[10]     *See The Story of the LGB Coin*, https://LGBCoin.io/ (last visited March 21, 2022).



62.     To entice potential investors, the Company repeatedly boasted about LGBCoin connections to Brown and NASCAR following Brown's victory at the Talladega NASCAR Race, proclaiming in the "Our Sponsorship of Brandon Brown" section on the Company website that:

> Brandon is a talented and passionate racecar driver, focused on perfecting his craft to take his skills to the highest level. . . . This country needs more positive and good-natured people like Brandon and that's just one of the many reasons why we support him.

> NASCAR is an expensive sport, and when you're competing against well-funded racing teams, you need every financial advantage. Brandon's personal story is one that we can all be proud of — an American story of success and perseverance, building a race team with his dad from scratch to compete at some of the highest levels of the sport.

> Brandon is truly America's Driver.

> LGBCoin is proud to support Brandon, providing financial resources to help him stay competitive and that empower him to do what he loves: drive.

> We don't expect Brandon to lead a political movement, and neither should you. But we want him to have the support to continue to live his American dream and to make us all proud.

> If we do our job right, when you think of us, and you hear, "Let's Go Brandon!" you'll think and feel, "Let's Go America!," just as Brandon would have it.[11]

---

[11]     *See About Us*, https://LGBCoin.io/about/ (last visited Feb. 23, 2022).

63.    To further promote LGBCoin as "America's Coin" to investors, the Company also bragged that it donated more than "$500,000 of LGBCoin tokens" to various conservative causes, including Turning Point USA.[12]

64.    In plain terms, the Company presents the LGBCoin to investors as something positive and generally altruistic to invest in.  But the reality is that behind the tongue-in-cheek rhetoric, the Company's entire business model relies on using constant marketing and promotional activities associated with the "Let's Go Brandon" phrase, often from "trusted" celebrities and political pundits, to increase demand of LGBCoin by convincing potential retail investors that its price would appreciate.

### The Pump – Executive, and Racing Defendants Shill LGBCoin
*Executive Defendants use Racing Defendants to Promote LGBCoin*

65.    The Company and the Executive Defendants repeatedly relied upon and marketed their relationships with both Brandon Brown and NASCAR to promote the LGBCoin launch in November 2021 and the subsequent rise in value in December 2021.

66.    For example, on November 6, 2021, the Company used its Twitter account, handle @LGBCoin_io (the "Company Twitter account"), to associate itself with NASCAR, Brandon Brown and BMS by repeatedly tweeting and retweeting to its thousands of followers about Brandon Brown and his appearance

---

[12]    *See id.*

22

in the NASCAR Xfinity Series Champion Race in Phoenix, Arizona (the "Phoenix NASCAR Race"), including the following pictures and video:



\*        \*        \*

\*        \*        \*



67.     The Company also posted[13] the same Brandon Brown and Phoenix NASCAR Race photos and videos to thousands of followers on the Company's Instagram account @LGBCoin.io.[14]

68.     Mascioli also posted a picture of Koutoulas (wearing an LGBCoin promotional shirt) on the racetrack with Brown standing together for the national anthem at the Phoenix NASCAR Race.[15]

---

[13]     *See* November 6, 2021, Company Instagram Post https://www.instagram.com/p/CV9Xg5Zru2F/ (last visited Feb. 25, 2022); November 6, 2021, Company Instagram Post, https://www.instagram.com/p/CV9L5cRDEAf/ (last visited Feb. 25, 2022); November 6, 2021 Company Instagram Post, https://www.instagram.com/p/CV9FZkXvb6L/ (last visited Feb. 25, 2022); November 6, 2021 Company Instagram Post, https://www.instagram.com/p/CV8712SPW8l/ (last visited Feb. 25, 2022).

[14]     On or about March 4, 2022, the Company changed its Instagram account handle from @LGBCoin.io to the new @LetsGo handle. *See* Official $LETSGO, https://www.instagram.com/letsgo/ (last visited Jul. 19, 2022).

[15]     https://www.instagram.com/p/CV9VzQODXBl/?utm_medium=copy_link (last visited Jul. 19, 2022).

69.     Likewise, that same day, Koutoulas — whom the Company touted as its "best representation" of LGBCoin — repeatedly tweeted about LGBCoin, Brandon Brown, and NASCAR from his personal Twitter account @jameskoutoulas (the "Koutoulas Twitter account"), which the Company then retweeted on the Company Twitter account:



              *        *        *



70.     After the Phoenix Xfinity Race, the Company made clear in a November 11, 2021 tweet of its intent to hire professional promoters to increase the popularity and value of LGBCoin as well as implementing safeguards that would prevent insiders from draining the LGBCoin's liquidity and claimed that several national sponsorships and national partnerships were forthcoming:



71. The enlarged, emphasized, and complete Company statement is

as follows:

> Hi everyone want to give a few project updates – we have about 60 people working on it already on our 10th day in existence, including some serious crypto OGs. **We are working on implementing a smart contract vesting and locking mechanism to reduce peoples' concerns regarding the genesis wallets**. We are also working on decentralizing those tokens and you'll see some movements of the genesis tokens in preparing them for the smart wallet locks **and a major national sponsorship deal. Also, we have several major national media partnerships in the works as well as 10 influencers engaged**. Again, please remember this project is a digital collectible and a digital way to express your support for the Let's Go Brandon movement, so please spend only what your budget allows (for some that's a t shirt, for others maybe it's a plane that says LGB on the tail), **but do rest assured there's a ton of experienced, honest, and talented people working around the clock to make this the best damn collectible out there** with goals of showing America how much we love her.[16]

---

[16]  *See* Company Twitter Account, https://twitter.com/LGBCoin_io/status/1458925209369 595913/photo/1 (last visited Feb. 23, 2022).

[Emphasis added.]

72.    The Company then continued to promote to the public that it was working to promote LGBCoin and that a NASCAR sponsorship was imminent through posts it made on the Company's Twitter account on November 10, 2021, November 21, 2021, November 23, 2021, December 2, 2021, and December 3, 2021:

    a.    November 10, 2021:



b.   November 21, 2021:



c.   November 23, 2021:



d.     December 2, 2021, and December 3, 2021:



73.     The Company posted the same November 23, 2021, and December 2, 2021, posts on the Company's Instagram account.

74.     On December 23, 2021, Mascioli posted a picture of Brown's racecar with only a prime coating of gray paint with the following caption: "Pumped for the 2022 NASCAR Xfinity season.  What will be the new paint scheme for the season on the @brandonbrown_68 #68 @BMSRaceTeam car?   You'll know soon enough."[17]

75.     On December 29, 2021, BMS tweeted from its company Twitter account @BMSRaceTeam (the "BMS Twitter account") that a big announcement was imminent:

---

[17]     https://twitter.com/AlexMascioli/status/1474045240650706946?s=20&t=fTiSYO-0zUnx UBGDfqWT5w (last visited Jul. 19, 2022).

30



76.    Brandon Brown posted a similar message about "big news" to his 33k+ followers on his Twitter account @brandonbrown_68 (the "Brown Twitter account"):



77.    This big announcement was to what the Company had been eluding for weeks — that the Company signed on as Brandon Brown's full season primary partner for the 2022 NASCAR Xfinity Series season (the "Sponsorship"). BMS, Brandon Brown, and the Company announced this Sponsorship across its social

31

media platforms and through a December 30, 2021, press release issued by BMS.
The BMS Twitter account, Brown Twitter account, and Company Twitter account
each posted a video with Brandon Brown, his BMS racing team, and his Number
68 Chevrolet Camaro (also referred to herein as "Brandon Brown's racecar")
showing the red-white-and-blue paint scheme with the Company name and
Company Logo:







78.    Koutoulas also posted a picture on his personal Twitter account of Brandon Brown standing next to his racecar with the Company logo prominently displayed on the hood:



79.    Koutoulas told *USA Today* that he and the Company had "put together proposed car designs a month or so ago before any of this happened

because we thought (Brown) was obviously the best guy to naturally do a national sponsorship with.  So we had it ready to go[.]"[18]

80.     In the 24 hours leading up to BMS's, Brandon Brown's, and the Company's Sponsorship announcement and the 24 hours following, the value of a single LGBCoin increased 64% from $0.00000098 on December 29, 2021, to $0.000001646 the morning of December 31, 2021.[19]

81.     NASCAR was well aware of the Company's efforts to promote and associate Brandon Brown and the LGBCoins with NASCAR.  NASCAR executives met with Brown, BMS owner Jerry Brown, Koutoulas, and others on November 5, 2021, to discuss the possibility of a sponsorship with the Company.[20]

82.     While NASCAR claimed it rejected the idea at this November 2021 meeting after the fact, NASCAR did absolutely nothing to distance itself from a prospective sponsorship with Brandon Brown and LGBCoins and the publicity connecting NASCAR to LGBCoin.

83.     For example, two days after the Talladega Race and leading up to the championship weekend at Phoenix Raceway, NASCAR president Steve Phelps

---

[18]     Josh Peter, *NASCAR driver Brandon Brown's new paint scheme that references vulgar anti-Biden meme in limbo*, USA TODAY, Dec. 31, 2021, https://www.usatoday.com/story/sports/nascar/2021/12/31/nascar-driver-brandon-browns-new-anti-biden-paint-scheme-limbo/9059843 002/.

[19]     Daniel Villareal, *'Let's Go Brandon' Coin Rallies as NASCAR Grapples With Insult to President Joe Biden*, NEWSWEEK, Dec. 31, 2021, https://www.newsweek.com/lets-go-brandon-coin-rallies-nascar-grapples-insult-president-joe-biden-1664789.

[20]     *See* Liz Clark, *NASCAR Rejects Sponsorship Deal Based on 'Let's Go Brandon' Chant*, THE WASHINGTON POST, Jan. 4, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/.

commented on the Let's Go Brandon chant and its political connotations.  Notably, the issue that most displeased Phelps was that some of the Let's Go Brandon apparel being sold featured NASCAR's trademarked color bars and added that NASCAR would be pursuing legal action against those who are profiting off of the phrase using said bars: "We will pursue whoever (is using logos) and get that stuff. That's not OK.  It's not OK that you're using our trademarks illegally."[21]  While NASCAR was willing to pursue legal action against those merchants who did not cut NASCAR in on the merchandise sales for Let's Go Brandon apparel, NASCAR has not pursued any legal action (copyright, trademark infringement, or otherwise) against the Company, Executive Defendants, Brown, or BMS.

84.    Moreover, NASCAR approved the Company and TradetheChain.com to be Brandon Brown's sponsors for the upcoming Daytona 500 race no later than December 26, 2021.

85.    The following email exchange between Mac MacLeod at Fast Lane Media Inc. and NASCAR Racing Operations Senior Manager Dale Howell shows that the Company's sponsorship request: specifically referenced the Company name, LGBCoin.io, at least ***six times*** in the request, prominently featured the Company logo across the proposed graphics on Brandon Brown's racecar, and

---

[21]    Asher Fair, *NASCAR is going after some let's go Brandon' users*, FANSIDED – MINUTE MEDIA, Nov. 14, 2021, https://beyondtheflag.com/2021/11/14/nascar-going-lets-go-brandon-users/.

included the Company name on the right side, left side, rear, and top of Brandon

Brown's racecar:







From: **Howell, Dale**
Date: Sun, Dec 26, 2021 at 8:48 AM
Subject: Re: Brandonbilt Motorsports Paint
Scheme Submission - Daytona
To: Mac MacLeod
<mac.macleod@fastlanemediainc.com>

Good morning Mac,

The sponsors are approved however please clean
up the markings around the number especially
the white stars touching the white number.

2022 we are really going to hone in on keeping
the numbers clean per the rule book nothing
within 2" should be touching the numbers we
understand some step and repeats, however in
this case white and white makes it blob.

My rule of thumb is step back from the computer
screen and see how it looks. In the shop or up
close it looks fine but think about the tower or
safety vehicles seeing it go 170mph

Dale Howell
NASCAR Racing Operations

### Koutoulas' Individual Efforts and Executive Defendants' Use of Conservative Figures to Promote LGBCoin

86. In addition to promoting the Company's relationship to Brandon Brown, BMS, and NASCAR, Koutoulas used his Instagram and Twitter accounts to promote LGBCoin and/or post pictures of himself wearing the LGBCoin logo alongside prominent Republican public figures such as former President Donald J. Trump, Donald J. Trump, Jr., Peter Thiel, Texas Governor Greg Abbott, Arizona Senate candidate Blake Masters, and City of Miami Mayor Francis Suarez.

87. Throughout December 2021, Koutoulas also promoted LGBCoin at several prominent cryptocurrency and conservative events, including at Puerto

Rico Blockchain Week, Turning Point USA's AmericaFest in Phoenix, Arizona, a dinner party at Mar-a-Lago, and former President Donald J. Trump's Christmas party in Naples, Florida.

88.     Koutoulas, along with Norden, also promoted LGBCoin on several conservative podcasts, including UnBossed Reporting with Brendon Leslie at Florida's Conservative Voice on or about December 29, 2021,[22] and the Patriot Talk Show with Brendon Leslie at Florida's Conservative Voice on or about December 28, 2021.[23]    Norden boasted during the UnBossed Reporting podcast that LGBCoins "went from $0 to $330 million."

89.     Koutoulas also promoted LGBCoin through interviews on The David J. Harris Jr. Show podcast, which was recorded on or about December 13, 2021, and aired on or about December 22, 2021,[24] and Roundtable, which aired on or about December 14, 2021.[25]    Koutoulas boasted during his Roundtable interview that "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap already without even being on a centralized exchange, [with] only

---

[22]     Brendon Leslie, *We're hanging out the Let's Go Brandon Coin guys discussing conservative news in Florida*, UNBOSSED REPORTING, Dec. 29, 2021, https://twitter.com/i/broadcasts/1eaKbNyjrOjKX.

[23]     Brendon Leslie, *We're Live at Seed to Table with our guests the major HODLers of Let's Go Brandon Coin!* PATRIOT TALK SHOW, Dec. 28, 2021, https://twitter.com/BrendonLeslie/status/1475980992749846529.

[24]     *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439.

[25]     Roundtable Crypto, *Let's Go Brandon Meme Coin Gains Traction In Conservative Circles*, ROUNDTABLE CRYPTO, Dec. 14, 2021, https://roundtablecrypto.io/political/lets-go-brandon-new-coin.

5,000 holders."[26] Koutoulas similarly proclaimed on David J. Harris Jr.'s podcast that "the coin is already about $350 million in market cap."[27]

90.    In addition to his repeated posts and statements encouraging the public as a means of supporting the conservative movement, Koutoulas, a public figure himself, along with the other Executive Defendants, actively recruited and retained conservative influencers to serve as the promotors following the launch of the LGBCoin in November 2021.

91.    Upon information and belief, these influencers received LGBCoins and/or other forms of consideration as part or all of their compensation for promoting the Company.

92.    On November 24, 2021, conservative personality Candace Owens posted the following solicitation for the Company on her Twitter account @Real CandaceO, which has over three million followers:

---

[26]    *See id.*

[27]    *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 15:51.



93.    Owens' promotional post generated a lot of media attention, and Newsweek noted that the value of LGBCoin rose more than 37% in value in the days leading up to her tweet.[28]

94.    Even more importantly, the trading volume of LGBCoin spiked over 425% the day after Owens' announcement that she was "ALL IN" on LGBCoin, according to historical price data from Coinmarketcap.com.[29]

95.    On or about December 6, 2021, at a Republican political event at Mar-a-Lago, Koutoulas promoted LGBCoin by wearing an LGB button throughout the event and appearing alongside political figures like Congressman Madison

---

[28]    https://twitter.com/RealCandaceO/status/1463702086684749826?s=20&t=7goouVgxJsnBbE95q8jYxQ; Ewan Palmer, *Lets Go Brandon' Crypto Coins Are Being Pushed by Conservative Figures*, NEWSWEEK, Nov. 25, 2021, https://www.newsweek.com/lets-go-brandon-crypto-coin-launch-conservatives-1653334.

[29]    https://coinmarketcap.com/currencies/lets-go-brandon/historical-data/ (last visited Jul. 19, 2022).

Cawthorn.[30]   A picture shared by Koutoulas's official Instagram account shows
Koutoulas (right) with Cawthorn (left) during the event:



96.    The Company also used Cawthorn to promote the LGBCoin at the
Mar-a-Lago event and investors following the event through social media.   In
particular, the Company promoted a picture of Cawthorn alongside two women
with the caption "@LGBCoin.io babes":[31]

---

[30]     Koutoulas, James [@jameskoutoulas]. (Dec. 4, 2021). *About last night. . .* [Photograph].
Instagram. https://www.instagram.com/p/CXFqJI6LQOf/?utm_medium=copy_link.

[31]     An image of this promotion was captured and posted on Twitter, *see* https://twitter.com/
patriottakes/status/1467924649501765639?s=20&t=M4G9G6ezbWKdZ79SYUm2EA.



97.     Similarly, the Company posted a picture of Cawthorn having an "LGB Meeting" with other attendees at the Mar-a-Lago event to its social media platforms in an effort to mislead investors into thinking that the LGBCoin was being backed by powerful political interests:[32]

---

[32]     https://twitter.com/patriottakes/status/1467937685130170375?s=20&t=M4G9G6ezb WKdZ79SYUm2EA  (last visited Jul. 19, 2022).



98.     As one commentator following the Mar-a-Lago event noted on December 6, 2021, during this event, "people . . . were posting online that LGB coin was doing well and others were falling."[33]

99.     Koutoulas, on behalf of the "LGB Foundation" also publicly gifted conversative activist Charlie Kirk $100,000 worth of LGBCoin to further promote LGBCoin during the Mar-a-Lago event.[34]

---

[33]     https://twitter.com/patriottakes/status/1467943522074513417?s=20&t=M4G9G6ezb WK dZ79SYUm2EA (last visited Jul. 19, 2022).

[34]     https://twitter.com/patriottakes/status/1467945291567575041?s=20&t=M4G9G6ezb WK dZ79SYUm2EA (last visited Jul. 19, 2022).

100. After the Mar-a-Lago event, Koutoulas gave an interview with conservative public speaker and author, David J. Harris, Jr. on December 14, 2021. During the podcast interview with Koutoulas, Harris made the following statement:

> And if it does, uh, take off like I think it's going to, then maybe it will grow and make a nice little bonus for you. ***But, uh, I know you have some other things in the works that we cannot get into. Some very exciting things that should make national headlines, without a doubt, uh, and some very interesting people that are also aligning with this that I know my audience will absolutely love.*** But. . . uh . . .I know we can't get into that yet, so [Koutoulas], I'd love to have you back on in the very near future. And again, friends, if you're going to get some coin, I'd say get some as soon as you can 'cause once some of this stuff breaks, it's just, ***it's gonna increase, it's what they do***. . . .
>
> Friends, get over to, uh, L—LGB . . . LGBCoin.io, LGBCoin.io. Read the story. Read more about [Koutoulas], what he's done, uh, you can verify everything that I've said that we've shared. Do your own research. But I'm telling you, I'm only bringing you the stuff that I believe in and that I think will be a powerful blessing for those people who are watching or listening. So share this with as many people as possible . . . .
>
> ***I have some of this coin.*** I know Candace Owens has promoted this coin. ***There's going to be some other very big names, very soon.*** They're going to be talking about it and uh, this is your chance to get in early. . . . ***Please share this with as many people as you can — 10, 25 friends, 50 friends.*** Share it, let's get the word out, we need to — we need to bless [Koutoulas].[35]

[Emphasis added.]

---

[35] *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple. com/us/podcast/the-david-j-harris-jr-show/id1485932439, 29:58-30:39, 31:53-32:58.

101.   On December 19, 2021, the Company's Twitter account posted a link to a *New York Times* article "Brandon Just Wants to Drive His Racecar," which came out on the same day.  Mascioli posted this article as well the following day.[36]

102.   On December 20, 2021, *Newsweek* magazine published an article written by Brown entitled "My name is Brandon," wherein Brown indicated that he was not a political person despite being thrust into the political spotlight due to the "Let's Go Brandon" chant.[37]  Brown stated that he had "no interest in leading some political fight," but rather, would focus on "problems we face together as Americans."  Brown elaborated on this point:

> I understand that millions of people are struggling right now and are frustrated.  Struggling to get by and struggling to build a solid life for themselves and their families, and wondering why their government only seems to make it worse.
>
> \*       \*       \*
>
> Listen, I buy more gas than most.  I don't like that $4 per gallon has become the norm.  I know the cost of everything is rising and I know first-hand that making ends meet can be a struggle for middle-class folks like me.
>
> \*       \*       \*
>
> I will use what free time I have to highlight the struggle we all feel and share, as Americans.

---

[36]    https://twitter.com/AlexMascioli/status/1472886572123103237?s=20&t=fTiSYO-0zUn xUBGDfqWT5w (last visited Jul. 19, 2022).

[37]    Brandon Brown, *My Name Is Brandon | Opinion*, NEWSWEEK.COM, Dec. 20, 2021, https://www.newsweek.com/my-name-brandon-opinion-1660525.

103.    The Company's Twitter account, Mascioli, and Koutoulas reposted the Brandon Brown *Newsweek* article that same day.[38]

104.    Also on December 20, 2021, Koutoulas gave a speech at an event sponsored by non-profit organization Turning Point USA, called AmericaFest 2021 ("Amfest 2021").[39]  Amfest 2021 featured many notable conservative politicians and speakers, and Koutoulas used his proximity to these public figures to make it seem like these figures tacitly approved and/or endorsed LGBCoin in particular (as opposed to the "Let's Go Brandon" phrase or associated political movement).

105.    As Harris' promotional efforts were taking place between December 12, 2021 and December 20, 2021, the trading volume correspondingly rose approximately 534%.

106.    Harris continued to promote LGBCoin and a big forthcoming announcement with the following Instagram post on or about December 22, 2021, which both the Company and Congressman Madison Cawthorn shared from their social media accounts:

---

[38]    https://twitter.com/jameskoutoulas/status/1472941662229852163?s=20&t=srLDhETM gLmDMxICvQ3zNA; https://twitter.com/AlexMascioli (last visited Jul. 19, 2022).

[39]    https://www.instagram.com/tv/CXtuLKsDVQL/?utm_medium=copy_link (last visited Jul. 19, 2022).



107.   On December 23, 2021, Harris posted the following endorsement video[40] for the Company and LGBCoin on his Instagram account @davidjharrisjr, which has over 1.5 million followers:



_____

[40]     The video is footage from Harris' podcast interview with Koutoulas, which was recorded on or about December 13, 2021, and aired on or about December 22, 2021.

108.   In his December 23rd Instagram post, Harris, wearing a Let's Go Brandon t-shirt, plainly endorses the coin to his followers and proclaims that the LGBCoin is "going to be huge!!!"

109.   Trading volume for LGBCoin rose over 31% the day of Harris' promotions, going from $2,653,477 on December 22, 2021 to $3,478,490 on December 23, 2021.[41]

110.   Harris continues to support the Company and LGBCoin by posting numerous photos and videos on his Instagram account wearing Let's Go Brandon apparel and even sells Let's Go Brandon apparel on the David J. Harris Jr. official online store.[42]

111.   Similarly, Austen Fletcher a/k/a Fleccas, host of the conservative podcast show "Fleccas Talks," is an LGBCoin holder and acted as an avid promotor for the Company and LGBCoin on numerous social media platforms, including but not limited to, his podcast show Fleccas Talks; his YouTube channel Fleccas Talks; his Twitter account @fleccas; and his Instagram account @fleccas.

112.   Fletcher's combined social media following from YouTube, Twitter, and Instagram amounts to over 1.2 million.[43]

---

[41]     https://coinmarketcap.com/currencies/lets-go-brandon/historical-data/   (last   visited Jul. 19, 2022).

[42]     *See* David J. Harris Jr. official online store, https://davidharrisjr.store (last visited Jul. 19, 2022).

[43]     *See* Fletcher's YouTube Channel, https://www.youtube.com/c/FleccasTalks (last visited Mar. 4, 2022); Fletcher's Twitter account, https://twitter.com/fleccas (last visited Mar. 4, 2022); and Fletcher's Instagram Account, https://www.instagram.com/fleccas/ (last visited Mar. 4, 2022).

113.    For example, on December 28, 2021 and December 30, 2021, Fletcher reposted the following solicitations (at least one of which originated from Brendon Leslie) for the Company and LGBCoin on his Twitter account @fleccas:

a.    December 28, 2021:



b.    December 30, 2021:



*         *         *



114.    On December 28, 2021, and December 29, 2021, Founder and Editor in Chief of Florida's *Conservative Voice,* Brendon Leslie, promoted the Company in two video podcasts he posted to his 60,000+ followers on personal Twitter account @brendonleslie and 3,000+ followers the Florida Conservative Twitter account under @FLVoiceNews.

115.    During the December 28, 2021, Patriot Talk Show with Brendon Leslie, which upon information and belief, was recorded at the Seed to Table market in Naples, Florida, an audience member asked Leslie how to purchase LGBCoin.  Leslie coyly responded that, "It's . . . a . . . very easy.  And I recommend doing it ***for no apparent reason of knowledge that I know, I recommend buying it tonight. Just saying***.  You go to LGBCoin.io."[44]   Koutoulas and Norden then laughed at Leslie's response because they understood the value of LGBCoin would rise significantly once Brandon Brown and BMS announced their NASCAR Sponsorship with the Company.  [Emphasis added.]

116.    Leslie continued to encourage his viewers to purchase LGBCoin the following day during his UnBossed Reporting video podcast recording in Florida, stating:

> LGBCoin.io. Head over to there.  It explains what you got to do to be able to get this LGB coin.  ***I've been stressing it for the last 48 hours . . . 24 hours . . . buy now***.  That's all I can say. ***Buy now***. ***Buy now***. Because —

---

[44]    Patriot  Talk  Show,  https://twitter.com/BrendonLeslie/status/1475980992749846529, Minute 24:50-25:10.  (last visited Jul. 19, 2022).

Leslie is then cut off by Norden, who looks at Koutoulas and continues to insinuate the Sponsorship by noting, "And…and the website itself is . . . uh . . . going to go over a little bit of a transformation in the next, uh . . . ."[45]  [Emphasis added.]

117.    On December 30, 2021, the Company, along with Brandon Brown and BMS, announced the NASCAR Sponsorship, which Leslie retweeted on his personal Twitter account and the Florida Conservative Twitter account:



118.    As noted in the *New York Post* article, *NASCAR driver Brandon Brown does complete 180 on 'Let's Go Brandon*,' "The NASCAR driver had done a round of media interviews purporting to distance himself from the political chant,

[45]     Unbossed Reporting with Brendon Leslie, https://twitter.com/BrendonLeslie/status/1476238865245491204, Minute 19:10-19:29 (last visited Mar. 2, 2022).

only to turn around and unveil a vehicle prominently featuring an acronym for the phrase — "LGB" — to promote a new cryptocurrency.[46]

119.    Following LGBCoin's launch, Defendants' promotional activities in November and December 2021, and NASCAR's December 26, 2021, approval of the Sponsorship among Brandon Brown, BMS, and the Company, the trading volume and price of the Company surged.  On January 1, 2022, LGBCoin reached the maximum price of $0.000001734, which represents 510% increase from its initial price of $0.00000034.  CoinMarketCap reflects that there were 5,281 unique account holders of LGBCoin the day before the Sponsorship announcement, which skyrocketed to 10,257 unique account holders of LGBCoin by January 4, 2022.  At its height, LGBCoin reached a market value of more than $570 million[47] with a liquidity pool of $6.5 million.[48]

**The Dump – LGBCoin price plummets**

120.    However, this meteoric rise did not last long, and the Company began to deflate immediately after NASCAR distanced itself from the prior approval of

---

[46]    Ryan Glasspiegel, *NASCAR driver Brandon Brown does complete 180 on 'Let's Go Brandon',* NEW YORK POST, NYP HOLDINGS, INC., Dec. 31, 2021, https://nypost.com/2021/12/31/brandon-brown-does-complete-180-on-lets-go-brandon/.

[47]    Noah Kirsch, *Squabbling 'Let's Go Brandon' Crypto Team Tries to Relaunch*, THE DAILY BEAST, Feb. 23, 2022, https://www.thedailybeast.com/lets-go-brandon-crypto-team-tries-to-relaunch-after-james-koutoulas-threatened-lawsuit.

[48]    Noah Kirsch and Zachary Petrizzo, *'Let's Go Brandon' Crypto Coin Turns Into Total Dumpster Fire*, THE DAILY BEAST, Feb. 11, 2022, https://www.thedailybeast.com/lets-go-brandon-crypto-coin-turns-into-total-dumpster-fire.

the Sponsorship, claiming NASCAR Racing Operations Senior Manager Dale Howell was not authorized to sign off on the relationship.[49]

121.    Between December 30, 2021, when the Company, BMS and Brown announced the sponsorship and January 4, 2022, when NASCAR executives announced that the sponsorship was not approved, the price of LGBCoin fell 63% from a high of $.000001612 with a trading volume of $6.7 million to a low of $.0000005992 with a trading volume of $2.6 million.

122.    Yet, the Executive Defendants, Brandon Brown, and BMS continued to promote LGBCoin to prop up the price of LGBCoin.

123.    On January 1, 2022, BMS tweeted the following from the BMS Twitter account prominently showing the Company name on Brandon Brown's racecar, which Koutoulas then retweeted from his personal Twitter account:



---

49      *See* Liz Clark, *NASCAR Rejects Sponsorship Deal Based on 'Let's Go Brandon' Chant*, THE WASHINGTON POST, Jan. 4, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/.

124. On January 7, 2022, the Company released a press release announcing that it had secured an "exclusive, expanded sponsorship agreement" with Brandon Brown "as part of a two-year, eight-figure, comprehensive crypto/digital exclusive endorsement partnership."[50] An excerpt of this press release included a statement from Brandon Brown supporting the Company and mentioned how he "is now a holder and endorser of the most talked about crypto product in America."



"I'm working to achieve my own American dream," said Brown. "I'm humbled and thankful for LGBcoin.io's reaffirmed support for my professional journey and their commitment to maintain a patriotic message. LGBcoin.io has already demonstrated incredible potential and I'm excited to help build this brand through the 2022 season and beyond."

Brown is now a holder and endorser of the most talked about crypto product in America. The original sponsorship announcement on December 30, 2021 had the highest single-day viewership and media reach of any crypto project in industry history, engaging millions of fans with coverage from nearly every major media brand, spanning sports, news, politics, crypto, racing, and entertainment publications.

Up until NASCAR's surprising comments to the media after the initial announcement, LGBcoin.io reached a market cap of $580 million and added thousands of new coin holders within a 24 hour period. That kind of excitement and interest in the project, in Brandon, and in a pro-America message is the driving

125. The Company continued to tout its connection to NASCAR, stating in the "News and Publications" section of its Company website that "the sponsorship, *if approved by* NASCAR, is for two years and includes a personal endorsement deal. The deal is said to include 'personal participation in publicity events, videos,

---

[50]  *See* Company Instagram, https://www.instagram.com/p/CYeNj4TLneC/ (last visited Jul. 19, 2022).  https://twitter.com/BrendonLeslie/status/ 1476238865245491204

crypto conferences, racing-related events and more, though won't include car decals.'"[51] Likewise, the Company is continuing to promote itself and LGBCoin as the "Official Partner of NASCAR Xfinity Series Driver Brandon Brown and Car No. 68."[52]

126.   NASCAR again did not take any meaningful steps to distance itself from this renewed sponsorship agreement among Brandon Brown, BMS, and the Company, even though this new arrangement still included Brandon Brown's and the Company's participation at NASCAR racing-related events.

127.   In fact, NASCAR has been complicit in the Company's continued promotion of LGBCoin at NASCAR'S racing events, including at the Alsco Uniforms 300 Xfinity Race in Las Vegas, Nevada.[53]

128.   Owens also continued to associate herself with LGBCoin during its decline, as Koutoulas' January 6, 2022, Instagram post shows:

---

[51]      *See* News and Publications: Latest News, https://LGBCoin.io/news-and-publications/ (last visited Mar. 1, 2022).

[52]      *See* Let's Go Brandon, https://LGBCoin.io (last visited Mar. 1, 2022).

[53]      *See* Company Instagram Account @letsgo, https://www.instagram.com/p/CauokR5uiJs/ (last visited Jul. 19, 2022).



129.    On January 27, 2022, in an attempt to keep investors from selling any more LGBCoin, the Company's Twitter account posted the following image with a caption that read "Sometimes you just need to have faith and HODL. Let's Go LGBCoin.io!":[54]



---

[54]    https://twitter.com/LGBCoin_io/status/1486804700657864712?s=20&t=pq5exm4-UHF wkqqiwxZ7qg (last visited Jul. 19, 2022).

130.    But the LGBCoin price continued its precipitous decline to a price of $.00000002228 with a trading value of $0 by the evening of January 28, 2022 — significantly less than its initial capital.

131.    The aforementioned promotional activities by Koutoulas, Mascioli, Brown, and others generated the trading volume needed for the Executive and Corel Defendants to offload their LGBCoin onto unsuspecting investors.  While Plaintiffs and class members were buying the inappropriately promoted LGBCoin, Executive and Corel Defendants were able to, and did, sell their LGBCoin during the Relevant Period for substantial profits.  The Company admits as much when describing the failure of the LGBCoin, stating that "without sales restrictions, large holders were able to sell into the announcements, putting the sustainability of the project at risk."[55]

132.    One of those large holders is Defendant McLaughlin who received 2.2 trillion LGBCoin from Carter Wallet 1 on November 1, 2021 and immediately began selling off.  For example, on November 5, 2021 McLaughlin Main Wallet started swapping and transferring his LGBCoin in exchange for Wrapped Ethereum.  In the first transaction, McLaughlin Main Wallet sold 50 billion LGBCoins for 4.292 Wrapped Ethereum on Uniswap, valued at $19,282.03.  The second swap was for 90 billion LGBCoins for 6.6 Wrapped Ethereum, valued at $29,652.44.  The third

---

[55]    *See* New LetsGoBrandon.com Crypto coin ($LETSGP) Relaunched with 3 Significant Announcements, https://roundtable.io/crypto/letsgo/news/new-letsgobrandon-com-crypto-coin-letsgo-relaunched (last visited Jul. 19, 2022).

transaction on that day was a transfer of 750 billion LGBCoins from McLaughlin Main Wallet to Wallet Address 0xf9c27dd9194c21f2395e8dcf0048cf2a1463a051 ("McLaughlin Pass Through 1").

133. McLaughlin Main Wallet continued to sell off its LGB Coins directly. On November 7, 2021, McLaughlin Main Wallet sold 26 billion LGBCoins for 2.1 Wrapped Ethereum worth $9,849.70. Between November 9 and December 4 of 2021, McLaughlin Main Wallet directly sold approximately 86 billion LGBCoins for 18.3 Wrapped Ethereum worth $81,844.82.

134. In total, McLaughlin Main Wallet directly sold at least $140,628.99 worth of LGBCoins during November and December of 2021.

135. Upon information and belief, McLaughlin Pass Through 1 is also owned and/or controlled by McLaughlin, and it operates as a pass-through wallet to facilitate his sale of LGBCoin. First, there are three deposits of LGBCoin from McLaughlin Main Wallet: (1) 750 billion on November 6, 2021 and two separate deposits of 25 billion LGBCoins from McLaughlin Main Wallet on December 23, 2021, and December 31, 2021, respectively. Second, McLaughlin Main Wallet also transfers other ERC-20 tokens in an out of McLaughlin Pass Through 1.

136. The transaction history of McLaughlin Pass Through 1 shows a pattern of receiving LGBCoin directly from McLaughlin Main Wallet and then immediately selling those LGBCoins. For example, shortly after receiving the 750 billion LGBCoins on November 5, 2021, McLaughlin Pass Through 1 directly sold approximately 375 billion LGBCoins for $186,823.15 worth of Wrapped Ethereum

in November 2021. The remaining 375 billion LGBCoins were transferred to three separate addresses: Wallet 0x9bb86ab2ebe3e6b9b580d557f7adcc4ff746ec8f ("McLaughlin Pass Through 2"), Wallet Address 0x76882d3af63796c 390f8202e019d0815e03a5389 ("McLaughlin Pass Through 3"), and Wallet Address 0x21e783bcf445b515957a10e992ad3c8e9ff51288.[56]

137.   Upon information and belief, McLaughlin Pass Through 2 is also owned and/or controlled by McLaughlin and serves as a second pass-through wallet that allowed McLaughlin to sell LGBCoin he received from Carter and Koutoulas via the Hub Wallet.   McLaughlin Pass Through 2 has similar transactions and trading patterns as McLaughlin Pass Through 1.  For example, on November 10, 2021, McLaughlin Main Wallet sent 53 billion LGBCoins to McLaughlin Pass Through 2.  Eight minutes later, McLaughlin Pass Through 2 began to sell off those LGBCoins in a series of three transactions (each from LGBCoin to Wrapped Ethereum to Tether USDT), netting $51,279.24.

138.   The following day, November 11, 2021, McLaughlin Main Wallet transferred 90 billion LGBCoins to McLaughlin Pass Through 2.  According to the transaction history on the blockchain, McLaughlin Pass Through 2 used four different pass-through wallets to help sell-off those 90 billion LGBCoins.  40 billion of those LGBCoins (worth $32,889.87) were directly sold off by McLaughlin Pass

---

[56]     Wallet 0x21e has only one transaction: receiving the 39 billion LGBCoins on November 10, 2021.  According to the Ethereum blockchain, this wallet continues to hold those LGBCoins as of the filing of this amended complaint.

Through 2 in two transactions from LGBCoin to Wrapped Ethereum to Tether USDT). McLaughlin Pass Through 2 also received 100 billion LGBCoins from McLaughlin Pass Through 1 on November 7, 2021. That same day, McLaughlin Pass Through 2 sold off 34.4 billion of those LGBCoins for Wrapped Ethereum and then $10,017.61 worth of USD coin.

139. McLaughlin Pass Through 2 sent the other 50 billion LGBCoins to four separate wallet addresses, which, upon information and belief, are each also owned and/or controlled by McLaughlin:

- Wallet Address 0x097797f9692b58cfd96991b482ecd1796efb4 390 ("Wallet 0x0977") received 10 billion LGBCoins from McLaughlin Pass Through 2 (worth $9,139.91 in USDT) and immediately sold. Wallet 0x977 also received 120 billion LGBCoins directly from McLaughlin Main Wallet on November 12, 2021. Wallet 0x977 then sold off those LGBCoins in a series of six transactions (from LGBCoin to Wrapped Ethereum to DAI tokens) between November 23, 2021 and November 28, 2021. McLaughlin sold $105,451.89 worth of LGBCoin in these six transactions.

- Wallet Address 0x66b064b5fac00eeb32cd6bce64bbf5fd985 81b08 ("Wallet 0x66b") received 20 billion LGBCoins from McLaughlin Pass Through 2 and cashed out from LGBCoin to Wrapped Ethereum to $16,578.14 worth of Tether USDT on November 11, 2021. That same day Wallet 0x66b received another 80 billion LGBCoins directly from McLaughlin Main Wallet. Six hours later, all of those LGBCoin were sold for $48,058.98 in Tether USDT.

- Wallet Address 0x0f58ded458ffc47421d932aca2e11e694bce 14b4 ("Wallet 0x0f5") received 10 billion LGBCoins from McLaughlin Pass Through 2 and immediately sold. In particular, these LGBCoins were swapped to Wrapped Ethereum and ultimately sold for $9,110.64 worth Tether USDT.

- Wallet Address 0x50a7ac925424aee678b0d3c02f243121d74 fd7c7 ("Wallet 0x50a") received 10 billion LGBCoins from McLaughlin Pass Through 2 and immediately sold. In particular, these LGBCoins were swapped to Wrapped Ethereum and ultimately sold for $9,047.64 worth Tether USDT.

140. Similarly, on November 10, 2021, McLaughlin Pass Through 3 sent 50 billion LGBCoins to McLaughlin Pass Through 2. In a series of four transactions occurring over the following four hours, McLaughlin Pass Through 2 sold those 50 billion LGBCoins for $45,240.59 worth of Tether USDT.

141. In total, McLaughlin used McLaughlin Pass Through 2 and its various subsidiary pass-through wallets to sell approximately $336,814.51 worth of LGBCoin between November 11, 2021 and November 26, 2021.

142. Upon information and belief, McLaughlin Pass Through 3 is also owned and/or controlled by McLaughlin. First, McLaughlin Pass Through 3 received approximately 221.5 billion LGBCoins from McLaughlin Pass Through 1 (which had previously received those LGBCoins from McLaughlin Main Wallet) on November 10, 2021. Second, in addition to the 50 billion LGBCoins that McLaughlin Pass Through 3 sent to McLaughlin Pass Through 2, McLaughlin Pass Through 3 also sent 83.23 billion LGBCoins to Wallet Address

0xa00c368ac856ed94c0705081c58a3088e98c784a ("McLaughlin Pass Through 4"), which, as discussed below also has ties to McLaughlin.

143.   Between November 10, 2021 and November 24, 2021, McLaughlin Pass Through 3 sold approximately 99.3 billion LGBCoins for 18.3 Wrapped Ethereum and 9.4 USD Coin, collectively worth $94,943.05

144.   In addition, McLaughlin Main Wallet sent LGBCoin directly to McLaughlin Pass Through 3 on at least three separate occasions: November 25, 2021 (55.71B); January 2, 2022 (50B); and January 16, 2022 (100B).  On each occasion, McLaughlin Pass Through 3 sold all of LGBCoin it received through a series of several different transactions all taking place within a few hours.  McLaughlin sold $23,020.62,  $22,936.53,  $44,486.77 worth of LGBCoin respectively following the aforementioned deposits from his main wallet.

145.   Upon information and belief McLaughlin Pass Through 4 is also owned and/or controlled by McLaughlin.  In addition to the ties to McLaughlin Pass Through 3[57], McLaughlin Pass Through 4 has also received multiple deposits of LGBCoin directly from McLaughlin Main Wallet.  And the same pattern of receiving the LGBCoins and promptly selling off is present as well.

146.   For example:

---

[57]   Notably, after receiving the 83.23 billion LGBCoins from McLaughlin Pass Through 3, McLaughlin Pass Through 4 sold off those LGBCoins in a series of nine transactions from November 10, 2021 through November 20, 2021.  McLaughlin received $33,301.76 worth of Wrapped Ether and USD coin in these nine transactions.

- November 20, 2021 – McLaughlin Pass Through 4 received 63,111,111,110 LGBCoins from McLaughlin Main Wallet.  Within seven days, all of these LGBCoins were sold via seven transactions for $29,025.15 worth of Wrapped Ethereum and USD Coin.

- December 4, 2021 – McLaughlin Pass Through 4 received 32.5 billion LGBCoins from McLaughlin Main Wallet.  Within six days, all of these LGBCoins were sold via four transactions for $32,241.41 worth of Wrapped Ethereum.

- December 13, 2021 – McLaughlin Pass Through 4 received 103 billion LGBCoins from McLaughlin Main Wallet.  Within seven days, 33.9 billion of these LGBCoins (the remainder were transferred to three presently-unidentified wallet addresses) were sold via four transactions for $31,545.55 worth of Wrapped Ethereum.

- December 23, 2021 – McLaughlin Pass Through 4 received 50 billion from McLaughlin Main Wallet.  Within six days, McLaughlin Pass Through 4 had transferred these LGBCoins to the same three unidentified wallet addresses plus a fourth.

- December 31, 2021 – McLaughlin Pass Through 4 received 25 billion LGBCoins from McLaughlin Main Wallet.  Within seven days, McLaughlin Pass Through 4 sold 10 billion LGBCoins worth $7,655.22 in Wrapped Ethereum and transferred the remainder to two of the same unidentified wallets.

- January 27, 2022 – McLaughlin Pass Through 4 received 275 billion from McLaughlin Main Wallet then promptly cashed out 75 billion of those LGBCoins for $13,819.53 worth of USD Coin twenty minutes later.

147. McLaughlin Pass Through 4 ultimately sold at least $114,286.86 worth of LGB Coins from November 2021 through January 2022.

148. All told, McLaughlin gained almost $1 million from his LGBCoins sales, according to the transaction histories in wallet addresses presently identifiable.

149. McLaughlin was not alone in dumping the LGBCoins he had been given by Carter, Koutoulas, and Michalopoulos from Typhon Capital. For example, Coral DeFi itself (*i.e.*, McLaughlin's company) also received LGBCoin and sold off as unsuspecting investors bought in.

150. Carter Wallet 1 provided 5.28 trillion LGBCoin to the Coral Wallet on November 1, 2021. The transaction history of the Coral Wallet shows a similar pattern as described with the McLaughlin wallets wherein LGBCoin are received from wallet addresses traceable to Carter, Koutoulas, and/or Michalopoulos, and then are promptly sold off. For example, on November 9, 2021, the Coral Wallet sold 30 billion LGBCoins via three separate transactions of 10 billion tokens each for a total of $32,162.09 worth of Wrapped Ethereum.

151. On November 10, 2021 – the Coral Wallet sent unidentified Wallet Address 0x041733d6087c86295e1882bfe88473d6fdf20f7b 170 billion LGBCoins.

In approximately two weeks, that wallet sold approximately 59 billion LGBCoins for $55,213.80 worth of Wrapped Ethereum.

152.  The Coral Wallet continued to sell off the LGBCoin it received from Carter, Koutoulas, and Michalopoulos.  Between November 10 and November 15, the Coral Wallet sold approximating 81 billion LGBCoins worth $50,861.16 in Wrapped Ethereum.

153.  From November 16, 2021 through December 29, 2021, Coral Wallet sold 198.2 billion LGBCoin via twenty transactions for 38.7 Wrapped Ethereum and/or USD Coin worth $167,348.38.

154.  Notably, on November 18, 2021, Coral Wallet transferred 911 billion LGBCoins Coins to Wallet Address 0x663f230b60c16cd1b1290959bfebddb8b9e 89211 ("Coral Pass Through 1").  Upon information and belief, Coral Pass Through 1 is a pass-through wallet used by Coral DeFi to sell off the LGBCoin it received from Carter, Koutoulas, and/or Michalopoulos.  Only 11 minutes after receiving 80 billion LGBCoins from the Coral Wallet, Coral Pass Through 1 began selling off roughly half of the LGBCoins directly to retail investors for about $19,000 in Wrapped Ethereum and USD Coin.  The remaining half was transferred to Wallet Address 0x6c5af25266ee3b2bcfeb0aeb1b3578b38933ce6e ("Coral Pass Through 2").

155.  Notably, Coral Pass Through 2 received several deposits of LGBCoin from McLaughlin Pass Through 4 on December 22, 2021, December 23, 2021, December 30, 2021, and January 1, 2022.  Similarly, Coral Pass Through 2 also

received deposits from McLaughlin Pass Through 1 on December 23, 2021 and December 31, 2021. Upon information and belief, Coral Pass Through 2 is also a pass-through wallet used by Coral DeFi used to sell their portion of the LGBCoin Float.

156. As the chart below of Coral Pass Through 2's transactions from the Ethereum blockchain shows, Coral Pass Through 2 follows the pattern of receiving LGBCoin that originated from Carter, Koutoulas, and Michalopoulos and then promptly selling:

| | | | | | | |
|---|---|---|---|---|---|---|
| 0x5c0f158af6f719b2d7d... | 0x1a441fb7 | 161 days 13 hrs ago | 0x6c5af25266ee3b2bcfe... | OUT | Uniswap V2: LGB | 324,871,336.977274418981270628 |
| 0x5c0f158af6f719b2d7d... | 0x1a441fb7 | 161 days 13 hrs ago | 0x6c5af25266ee3b2bcfe... | OUT | Uniswap V2: LGB | 8,707,974,632.026025581018729372 |
| 0x5c0f158af6f719b2d7d... | 0x1a441fb7 | 161 days 13 hrs ago | 0xa00c368ac856ed94c0... | IN | 0x6c5af25266ee3b2bcfe... | 9,032,845,969.0033 |
| 0x665871c2c0c968debff... | 0x1a441fb7 | 161 days 20 hrs ago | 0x6c5af25266ee3b2bcfe... | OUT | Uniswap V2: LGB | 834,968,031.526387599149184284 |
| 0x665871c2c0c968debff... | 0x1a441fb7 | 161 days 20 hrs ago | 0x6c5af25266ee3b2bcfe... | OUT | Uniswap V2: LGB | 18,265,031,968.473612400850815716 |
| 0x665871c2c0c968debff... | 0x1a441fb7 | 161 days 20 hrs ago | 0xa00c368ac856ed94c0... | IN | 0x6c5af25266ee3b2bcfe... | 19,100,000,000 |

157. The transaction history of Coral Pass Through 1, shows that it frequently transfers LGBCoin to Wallet Address 0x4374f318ea2f8cc50ee 177e3c6344c102fedbd9f ("Wallet 0x437"). For example, on December 3, 2021, Coral Pass Through 1 sent Wallet 0x473 822.1 billion in two transactions. Shortly thereafter, Wallet 0x437 begins making eleven separate transfers to CoralDeFi's pass-through wallet, Coral Pass Through 2, from December 5, 2021 to December 22, 2021.

158. The LGBCoin flow from Carter Wallet 3 and the related transaction history on the Ethereum blockchain indicate that Defendant Mascioli also received LGBCoin from Carter, Koutoulas, and/or Michalopoulos and subsequently sold off before the price collapsed. For example, on November 23, 2021, Carter Wallet 3 transferred 38.1 trillion tokens to Wallet Address 0xe949360d2a2e69a89 ab240e37e45ca1e0c2cd037 ("Mascioli Private Wallet"). Upon information and belief, the Mascioli Private Wallet is owned and/or controlled by Mascioli.

159. According to publicly available information on the NFT exchange Open Sea, Mascioli's public wallet address is Wallet Address 0x5ef6cfb6c7b1a33 bda09e8f9afe18cc6eab56110 ("Mascioli Public Wallet").

160. On November 26, 2021, the Mascioli Public Wallet received approximately 565 billion LGBCoins from the Mascioli Private Wallet, which subsequently transferred the LGBCoins it received to several pass-through wallets that promptly cashed out. Similarly, the Mascioli Public Wallet received 2.03 trillion LGBCoin from the Mascioli Private Wallet on January 28, 2022 and then sold.

161. Specifically, over the course of fifty-nine transactions between November 26, 2021 and January 30, 2021, Mascioli sold and/or transferred to other pass-through wallets (which subsequently sold) at least 2.31 trillion LGBCoins that he had received from Carter, Koutoulas, and Michalopoulos. In exchange, Mascioli received 84.1 Wrapped Ethereum worth $335,936.92.

162.  Mascioli knew or should have known that the transactions in Mascioli's public and private wallets were inappropriate and should not have been executed because of Mascioli's status as an insider.  In 2014, the Securities and Exchange Commission ("SEC") filed a complaint against Mascioli, charging him and his company with making false statements and representations in conjunction with an attempted acquisition.  Mascioli consented to the judgment against him (without admitting guilt) for misleading investors in violation of the Securities Exchange Act of 1934.  Mascioli was ordered to pay a civil penalty of $100,000 and was "permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.P.R. § 240.1 Ob-5]."  In particular, Mascioli is specifically enjoined from employing a "scheme" to defraud investors in connection with the sale of any security and from engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

163.  Likewise, Carter and Koutoulas used the Hub Wallet to sell and/or transfer their LGBCoins to unidentified wallets that also sold off.  In total, Carter Wallet 1 transferred 23 trillion LGBCoin in four separate transactions to the Hub Wallet: November 1, 2021 (1T); November 2, 2021 (5T); November 3, 2021 (15T); and November 9, 2021 (2T).  Shortly after receiving each of those deposits from Carter Wallet 1, the Hub Wallet either sold or transferred those LGBCoins to unidentified wallets, which also sold off.  For example, within two hours of

receiving the 1 trillion LGBCoins from Carter Wallet 1 on November 1, the Hub Wallet sold them for $22,284.27 of Wrapped Ethereum.

164.   On November 2, 2021, the Hub Wallet sold over 1 trillion of the 5 trillion LGBCoins it received from Carter Wallet 1 for $27,589.31 of Wrapped Ethereum.

165.   On November 3, 2021 the Hub Wallet sold about 5 trillion of 19 trillion LGBCoins it held that day for approximately $396,906.06 of Wrapped Ethereum.

166.   On November 4, 2021 – with 14 trillion LGBCoins still held within the Hub Wallet – Carter and Koutoulas sold 1.2 trillion LGBCoins for about $291,881.73 in Wrapped Ethereum.  Then on November 7, 2021 the Hub Wallet sold another 226.6 billion LGBCoins for $60,033.59 in Wrapped Ethereum.

167.   Similarly, on November 11, 2021 (two days after the November 9 deposit from Carter Wallet 1) the Hub Wallet sold approximately 57 billion LGBCoins for 10 Wrapped Ethereum, which was worth $47,478.26 at the time.

168.   On November 13, 2021, the Hub Wallet sold 126.9 billion LGBCoins for $116,394.33 worth of Wrapped Ethereum.  The next day, November 14, the Hub Wallet sold another 54.9 billion LGBCoins for $46,365.37 in Wrapped Ethereum. On November 21, 2021, the Hub Wallet continued to sell off, selling 46.8 billion LGBCoins for $44,452 in Wrapped Ethereum.

169.   On January 3, 2022 – the Hub Wallet sold 119 billion LGBCoins for 37 Wrapped Ethereum worth $139,749.29.  In a similar transaction on January 4, 2022, the Hub wallet 157 billion LGBCoins for 36.6 Wrapped Ethereum worth

$139,352.02. On January 5, 2022, the Hub Wallet sold 53.5 billion LGBCoins for $190,706.56 worth of Wrapped Ethereum in two transactions.[58]

170. In total, the Hub Wallet directly sold over $1.5 million worth of LGBCoins for Wrapped Ethereum between November 2021 and January 2022.

171. As executive officers of a hedge fund, Carter, Koutoulas (who also touts himself as an "investor protection" attorney), and Michalopoulos knew or should have known that their promotional activities were misleading and improperly inducing retail investors like Plaintiffs and the class to purchase LGBCoins.

172. For example, in a recorded zoom interview with Carter and Koutoulas where they were discussing LGBCoin and its origins, Carter recounts how he created LGBCoin and gifted Koutoulas 1 trillion LGBCoins. Koutoulas enthusiastically says "Let's go Brandon. 1 trillion coins. Yeah baby! Rocket to the moon!" while clapping his hands and pumping his fist. A few moments later, Koutoulas composes himself and then disclaims "please note, it has no value. It is a digital collectible only. Don't spend money on it unless you want to light it on fire but [Koutoulas pauses at this point for a moment then says] . . . ***to the moon***."

173. The cliché "this is not financial advice" disclaimer Koutoulas gives in this interview (similar to the "just a meme coin" disclaimer in the Company's pseudo whitepaper) is immediately undercut by the declaration by Koutoulas to

---

[58]     Both of these transactions appear to be taken directly from the LGBCoin liquidity pool.

reassure investors that the price of LGBCoins was nevertheless going to go up "to the moon."

174.    Likewise, the following December 29, 2021 post and comment from Koutoulas and Cawthorn, respectively, from Koutoulas' Instagram account gives the same messaging:



175.    Further to this point, Koutoulas and Norden repeatedly made public statements about how fast the LGBCoin market cap had grown since launch.  For example, during his Roundtable interview on December 14, 2021, Koutoulas bragged that "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap already without even being on a centralized exchange, [with]

only 5,000 holders." [59]  One-week later Koutoulas similarly proclaimed on David J. Harris Jr.'s podcast that "the coin is already about $350 million in market cap." [60] The following week, on December 29, 2021, Defendant Norden gave the same promotional talking point on the UnBossed Reporting podcast that LGBCoins "went from $0 to $330 million." [61]

176.  These promotional pitches, along with the "to the moon" exclamations, speak only to the value of the LGBCoin and how it is poised for continued growth.  As financial advisors themselves, Carter, Koutoulas, Michalopoulos, and Norden were aware, or should have been aware, that their promotional activities undermined any of their boilerplate disclaimers.

177.  Concurrently, the complex web of transactions among the wallets described above strongly suggests that this was purposefully designed to obscure the true owners of significant portions of LGBCoin Float and provide Carter, Koutoulas, Michalopoulos (along with McLaughlin and the Coral entities) plausible deniability to investors when those owners sold.  There are dozens of additional wallet addresses that have received LGBCoins from the Carter Wallets, the Hub Wallet, McLaughlin's Wallets, Mascioli's Wallets, and the Coral Wallets.

---

[59]  Roundtable Crypto, *Let's Go Brandon Meme Coin Gains Traction In Conservative Circles*, ROUNDTABLE CRYPTO, Dec. 14, 2021, https://roundtablecrypto.io/political/lets-go-brandon-new-coin.

[60]  *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 15:51.

[61]  Brendon Leslie*, We're hanging out the Let's Go Brandon Coin guys discussing conservative news in Florida.* UNBOSSED REPORTING, Dec. 29, 2021, https://twitter.com/i/broadcasts/1eaKbNyjrOjKX.

Upon information and belief, several of these wallets are similarly owned and/or controlled by Defendants and have been used to sell off LGBCoins.

178.   Another example of Koutoulas-related insiders receiving coins and selling off at the perfect time (*i.e.*, prior to the announcement that LGB team would officially sponsor NASCAR driver Brown and subsequent LGBCoin price surge) can be seen within the transaction history of Madison Cawthorn's wallet (Wallet Address 0x8a4037f3954E9FD79fF2c18488ab269a7ff095e1 (the "Cawthorn Wallet"). During December 2022, while Koutoulas used his relationship with Congressman Cawthorn to promote LGBCoin as investments with high growth potential, Cawthorn (as well as the Coral Defendants) was able to time his own exit from LGBCoin at its price high.

179.   Initially, Carter Wallet 1 sent 12 trillion LGBCoin to Wallet 0x85e116b86839440c1e162c24a488b61e71d69207 ("Wallet 0x85e") on November 22, 2021.  Then on December 21, 2021, Wallet 0x85e sent the Cawthorn Wallet 180 billion LGBCoins.   10 days later, right after the LGBCoin team announced a sponsorship of NASCAR driver Brandon Brown, the Cawthorn Wallet sells off 65.8 billion LGBCoins worth approximately $105,000 in Wrapped Ethereum.  Cawthorn's December 29, 2021 comment on Instagram to Koutoulas that "Tomorrow we go to the moon!" indicates that Cawthorn knew about the impending announcement directly from Koutoulas and sold off on the run up.

180.   Notably, on May 23, 2022, the Congressional House Committee on Ethics announced it would be investigating the possibility that, among other

things, Cawthorn "improperly promoted a cryptocurrency [*i.e.* LGBCoin] in which he may have had an undisclosed financial interest." Cawthorn partially disclosed his LGBCoin transactions on May 27, 2022. While Cawthorn did not include his specific wallet details, his disclosure nonetheless paints a picture of a crypto trader who cashed out a six-figure profit at just the right time.

181. The promotion by Cawthorn and Cawthorn's purchase increased the available trading volume of LGBCoin and provided exit liquidity for the sales by the Executive Defendants (who also sold all the way up to the price peak).

182. The announcement by NASCAR that LGBCoin would not be allowed to sponsor Brown and the attendant liquidation by investors including the Executive and Coral Defendants reduced LGBCoin's value to zero.

183. The LGBCoin price still has not recovered and trading volume remains down significantly. The *Daily Beast* bluntly noted, LGBCoin amounted to a "dumpster fire" and were "effectively worthless."[62]

### The re-Pump and Dump – the Relaunch of LGBCoin

184. On January 28, 2022, the Executive Defendants took a snapshot of LGBCoin and then drained the remaining liquidity as part of plan to remint and relaunch the LGBCoin into a second meme coin, which caused both the price and transaction volume of LGBCoin to plummet to near $0 by January 30, 2022.

---

[62] *See id.*

185.    The Company posted a video on the Company's Twitter and Instagram accounts on January 28, 2022, from the "Brandon Brown and #68 racing and LGBCoin Team," promoting this "Re-Mint, Re-launch and Airdrop" of LGBCoin as an intent to "improve" what it described as a "down-market moment."



186.    Upon information and belief, this decision to relaunch LGBCoin was part of a February 2022 agreement reached in Miami, Florida, that was "forged in part by the media executive James Heckman, representatives of the NASCAR racer Brandon Brown, and LGB's former de facto leader . . . James Koutoulas."[63]

187.    Koutoulas discussed this agreement during a February 2022 interview with *The Daily Beast* claiming that other key coin holders attempted to have him purged from LGBCoin to launch their own LGB "copycat." "Koutoulas alleged . . . that major coin holders had fueled the decline [of LGBCoin] by rapidly selling large

---

[63]    *See* n.46, *supra*.

volumes of [LGBCoin].”[64]   The article quotes two of the unnamed LGBCoin founders explaining that the rift with Koutoulas stemmed from his political antagonism: “Guys hanging out in Puerto Rico don't want to antagonize the government.  It's the opposite.”[65]

188.   Between February 22, 2022, and February 24, 2022, the Executive Defendants then “relaunched” the LGBCoin into a second version of the LGBCoin. The   Executive   Defendants   created   a   second   Company   website   at https://www.letsgobrandon.com/ (hereafter “Second Company Website”), which — like the earlier Company Website — promotes LGBCoin as the “Official Partner of NASCAR Xfinity Series Driver Brandon Brown and Car No. 68.”

189.   The Company also released a new logo for this LGBCoin substantially resembling the former Company Logo:



190.  On February 24, 2022, the Company issued a Press Release announcing a “new leadership team” and the creation of a “LetsGoBrandon Foundation” that:

---

[64]      *See id.*

[65]      Given the transaction history with Wallets owned by McLaughlin and CoralDefi and their location in Puerto Rico, Plaintiffs believe the unnamed coin holders who Koutoulas blames for draining LGBCoin's liquidly are McLaughlin and CoralDefi.

has committed already several million dollars in cash, to secure assets, fill the liquidity pool, and support marketing. The Foundation has also confirmed and funded the previously announced sponsorship for $5 Million per year, securing a long-term relationship with Brandon Brown and his racing team, in addition to investing in a world-class media, licensing, marketing and crypto-architectural team to ensure stability and longevity of the coin.[66]

191. This Press Release also outlined some of the Company's concepts and expectations for this "new" LGBCoin, including the following excerpts:

**Crypto and Digital Media Leadership Team Additions**
Significant HODLers invested in world-class leadership to recreate, launch and help manage the improved official coin, correct tokenomic deficiencies and ensure reputational excellence. The team is filled with crypto pioneers, senior media executives and licensing experts. . . .

**New Tokenomics**
The initial coin project was architected in such a way that large pre-sale buyer [sic] ***were able to damage the value at their will, and so while the coin was one of the most-covered crypto projects in history, some "Whales" were selling in size on every positive announcement***. This will no longer be technically possible. The new team has dramatically improved the tokenomics, with smart contracts restricting large holders and added marketing allocations for the project's growth. Previous holders of up to 200B coins as of 2/22/2022 will be rewarded for holding for 6 months with a 10% bonus and the liquidity pool has been refilled and supplemented. The team began airdrops a few weeks ago for smaller wallets, and began dropping the remaining coins on 2/24/2022. Whales will be allocated their coins directly, to ensure authenticity and accuracy. . . .

**LetsGoBrandon's Future, Plans and Commitment**
***LetsGoBrandon.com*** is a forever project. All significant holders of the coin have agreed to restrict their selling for at least two years, because the vision of this project is to prioritize the movement for protecting free spreech [sic] and fighting de-platforming.[67]

[Emphasis added.]

---

[66]    *See* Press Release, https://www.letsgobrandon.com/press (last visited Mar. 1, 2022).

[67]    *Id.* (last visited Jul. 19, 2022).

192.    The Executive Defendants also created a second Company Twitter account under the @officialletsgo handle,[68] which uses the Brandon Brown racecar graphics that NASCAR previously rejected as its wallpaper:



193.    In addition, on or about March 4, 2022, the Executive Defendants also created a second Company Instagram account under the @letsgo handle,[69] which uses the new logo for the "new" LGBCoin.

194.    According to data from CoinMarketCap, the "new" LGBCoin had an opening price of $0.00000009744 on March 1, 2022 — 65% lower than the opening price of its previous iteration of LGBCoin.

195.    Despite this, Koutoulas, Harris, Cawthorn, and others still promoted the "new" LGBCoin, including in the following video from the Conservate Political Action Conference in Orlando that Koutoulas posted to his Instagram account on February 27, 2022[70]:

---

[68]    *See* Official $LETSGO, https://twitter.com/officialletsgo (last visited Mar. 1, 2022).

[69]    *See* Official $LETSGO, https://www.instagram.com/letsgo/ (last visited Mar. 9, 2022).

[70]    *See* Feb. 27, 2022, Koutoulas Instagram Post, https://www.instagram.com/p/CafZYEK gnK3/ (last visited Mar. 3, 2022).



| Harris: | I got Let's Go Brandon coin. Do you got Let's Go Brandon coin? |
| Cawthorn: | I got Let's Go Brandon coin. |
| Harris: | You got some Let's Go Brandon coin? |
| Cawthorn: | It's working out very well. Very well. |
| Harris: | So do you have Let's Go Brandon coin? \<laughter\> |
| Cawthorn: | That's the question — That's the question we all want to know. |
| Harris: | Get you some. Get you some. \<laughter\> |
| Cawthorn: | Yes sir! |

196.   Similarly, on March 7, 2022, Harris conducted an interview with former President Donald J. Trump on his podcast, The David J. Harris Jr. Show.[71] In an effort to promote LGBCoin to all of the listeners tuning in for Trump and to lead retail investors into believing that Trump was personally associated with LGBCoin, Harris announced that Koutoulas would be gifting Trump 500 billion LGBCoins.  Trump responded to this promotional gifting by saying, "that sounds good" and that "those groups are the right groups to support" because "they're

---

[71]     The David J. Harris Show, https://www.audacy.com/podcasts/the-david-j-harris-jr-show-39252/exclusive-my-second-interview-with-president-trump-1296066681. Minute 19:45-22:20. (last visited Jul. 19, 2022).

great patriots, great people."  The video of the interview was then posted on Twitter

by both Harris[72] and Koutoulas[73] on March 9, 2022:



197.   As United Kingdom's Financial Conduct Authority director Charles

Randall noted in a recent speech, "social media influencers are routinely paid by

scammers to help them pump and dump new tokens on the back of pure

speculation."[74]

198.   Randall further observed that the hype around speculative digital

assets like the LGBCoin "generates a powerful fear of missing out from some

consumers who may have little understanding of their risks.  There is no shortage

of stories of people who have lost savings by being lured into the crypto bubble

---

[72]      *See* Mar. 9, 2022, Harris Instagram Post, Post, https://twitter.com/DavidJHarrisJr/ status/1501709784793374720?cxt=HHwWgICz5fjFktcpAAAA (last visited Jul. 19, 2022).

[73]      *See* Mar. 9, 2022, Koutoulas Instagram Post, Post, https://twitter.com/jameskoutoulas/ status/1501745962548703234 (last visited Mar. 9, 2022).

[74]      Charles Randell, *Speech to the Cambridge International Symposium on Economic Crime* (June 9, 2021), https://www.fca.org.uk/news/speeches/risks-token-regulation.

with delusions of quick riches, sometimes after listening to their favourite influencers, ready to betray their fans' trust for a fee."[75]

199.    United States President Joseph Biden similarly observed in a cryptocurrency executive order executed on March 9, 2022, that:

> The increased use of digital assets and digital asset exchanges and trading platforms may increase the risks of crimes such as fraud and theft, other statutory and regulatory violations, privacy and data breaches, unfair and abusive acts or practices, and other cyber incidents faced by consumers, investors, and businesses.  The rise in use of digital assets, and differences across communities, may also present disparate financial risk to less informed market participants or exacerbate inequities.[76]

200.    Former U.S. Securities and Exchange Commission Chairman Jay Clayton similarly warned prospective investors about the dangers of cryptocurrency and cautioned:

> market participants against promoting or touting the offer and sale of coins without first determining whether the securities laws apply to those actions.  ***Selling securities generally requires a license, and experience shows that excessive touting in thinly traded and volatile markets can be an indicator of "scalping," "pump and dump" and other manipulations and frauds***.[77]

[Emphasis added.]

---

[75]    *See id.*

[76]    *See* Presidential Actions, *Executive Order on Ensuring Responsible Development of Digital Assets*, Mar. 9, 2022, https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09 /executive-order-on-ensuring-responsible-development-of-digital-assets/.

[77]    *See* U.S. Securities and Exchange Commission, *Statement on Cryptocurrencies and Initial Coin Offerings*, Dec. 11, 2017, https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.  In fact, these emerging cryptocurrency dangers compelled the SEC to create a Crypto Assets and Cyber Unit in 2017, which "has brought more than 80 enforcement actions related to fraudulent and unregistered crypto asset offerings and platforms."  *See* U.S. Securities and Exchange Commission, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit*, May 3, 2022, https://www.sec.gov/news/press-release/2022-78.  The SEC recently expanded its Crypto Assets and Cyber Unit under the leadership of the SEC's current Chairman Gary Gensler.

## CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased the Company's LGBCoin and were subsequently damaged thereby.

202.    The Class Period is defined as the period between November 2, 2021, and March 15, 2022.[78]

203.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

204.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable.   On January 4, 2022, there were more than 10,000 unique account holders of LGBCoin.

205.    **Commonality**: Common questions of law and fact exist as to all members of each Class.  These questions predominate over questions affecting

---

[78]    Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

individual Class members. These common legal and factual questions include, but are not limited to:

        a.      Whether NASCAR represented that it would approve a LGBCoin Sponsorship or whether it informed the Executive Defendants, the Company and BMS in November that it would not approve any variation of "Let's go Brandon!" on a race car;

        b.      Whether the Executive Defendants fraudulently marketed LGBCoin as affiliated with BMS, Brown and NASCAR;

        c.      Whether Executive Defendants conspired to artificially inflate the price to LGBCoin and then sell their LGBCoin to unsuspecting investors;

        d.      Whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

        e.      Whether the proceeds that the Defendants obtained as a result of the sale of LGBCoin rightfully belong to Plaintiffs and class members;

        f.      Whether Defendants should be required to return money they received as a result of the sale of LGBCoin to Plaintiffs and class members; and

        g.      Whether Plaintiffs and class members have suffered damages, and, if so, the nature and extent of those damages.

206. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out

of uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of LGBCoin.

207. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

208. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

209.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### COMMON LAW FRAUD
### (Against NASCAR Concerning the November 5 Approval)

210.  Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-12, 43-47, 65-85, 120-121.

211.  On November 5, 2021, Mascioli, Koutoulas and BMS co-owner Jerry Brown met with NASCAR executives at the NASCAR Xfinity Series Champion Race in Phoenix, Arizona discussing the potential for a partnership.[79]

212.  According to an unnamed NASCAR official, the NASCAR executives told Mascioli, Koutoulas and BMS co-owner Jerry Brown "that it would not allow any variation on the euphemism for a profane insult on a racecar."[80]

213.  According to Koutoulas, however, the parties reached an agreement that should the Company not use the phrase "Let's Go Brandon," and instead just

---

[79]  Liz Clarke, *NASCAR rejects sponsorship deal based on 'Let's go, Brandon' chant*, THE WASHINGTON POST, Jan 5, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/#:~:text=Moreover%2C%20the%20official,on%20a%20racecar.

[80]  *Id.*

use the abbreviated coin name, LGBCoin.io, that NASCAR would approve a sponsorship.[81]

214.   The NASCAR executives either made this representation without knowledge of its truth or falsity or should have known that the representation was false.

215.   On information and belief, the NASCAR executives intended that Mascioli, Koutoulas and BMS co-owner Jerry Brown believe their representation that a LGBCoin sponsorship would be approved should the Company use the abbreviated coin name, LGBCoin.io, and to act in reliance of that representation by consummating a partnership with BMS and promoting BMS racing and NASCAR.

216.   On information and belief, Mascioli, Koutoulas and BMS co-owner Jerry Brown relied on the NASCAR executives' statement that a LGBCoin sponsorship would be approved.

217.   Throughout November and December 2021, as detailed above, the Company, Koutoulas and BMS promoted LGBCoin using race car imagery, and promoted NASCAR and BMS alluding to the impending partnership between the Company and BMS.  This promotion was so extensive that it was "pretty obvious"

---

[81]   Josh Peter, *NASCAR driver Brandon Brown's new paint scheme that references vulgar anti-Biden meme in limbo*, USA TODAY, Dec. 31, 2021, https://www.usatoday.com/story/sports/nascar/2021/12/31/nascar-driver-brandon-browns-new-anti-biden-paint-scheme-limbo/90 59843002/.

for anyone paying attention that there would be a collaboration between LGBCoin and BMS.[82]

218.   Finally, on December 30, 2021, the Company, along with Brandon Brown and BMS, issued press releases touting the sponsorship and disseminating the materially false and misleading statement that LGBCoin was an official sponsor of BMS.

219.   As a result of the dissemination of the materially false information that LGBCoin was an official sponsor of BMS, the market price of LGBCoin was artificially inflated.  Upon the announcement on December 30, 2021, the price of LGBCoin jumped 75% briefly reaching a market capitalization of $570 million.

220.   In ignorance of the fact that the market price of LGBCoin was artificially inflated due to the misrepresentation that LGBCoin was an official sponsor of BMS, Plaintiffs and class members acquired LGBCoin at artificially high prices.

221.   Plaintiff De Ford purchased LGBCoin on December 31, 2021 and LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

222.   Plaintiff Bader purchased LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

---

[82]     Matt Stieb, *Madison Cawthorn's Crypto Guru Goes Bust In the hyperworld of Miami's crypto right, the "Let's Go Brandon" coin sounded as good as gold*, NEW YORK MAGAZINE, May 12, 2022, https://nymag.com/intelligencer/2022/05/lets-go-brandon-coins-james-koutoulas-on-madison-cawthorn.html#:~:text=Koutoulas%20explained%20that,a%20few%20hours.

223.   Had the Plaintiffs and the other members of the Class known the truth, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their LGBCoin, or, if they had acquired LGB during the Class Period, they would not have done so at the artificially inflated prices which they paid.

224.   On January 4, 2022, NASCAR announced that LGBCoin was rejected as a sponsor of BMS.

225.   Following NASCAR's announcement that the sponsorship was rejected, the price of LGBCoin fell 63% from a high of $.000001612 to a low of $.0000005992.

226.   Plaintiff De Ford's purchases of LGBCoins on December 31, 2021 and January 1, 2022 have subsequently lost a significant amount of their original value since the NASCAR announcement.

227.   Plaintiff Bader's purchase of LGBCoin on January 1, 2022 has subsequently lost a significant amount of their original value since the NASCAR announcement.

228.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of LGBCoin.

## SECOND CAUSE OF ACTION

### COMMON LAW FRAUD
### (Against the Company, Koutoulas, and BMS,
### in the alternative to the First Cause of Action)

229.    Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-183.

230.    Plaintiffs allege this Count in the alternative to Count I in accordance with Fed. R. Civ. P. 8(d)(2).

231.    On November 5, 2021, Mascioli, Koutoulas and BMS co-owner Jerry Brown met with NASCAR executives at the NASCAR Xfinity Series Champion Race in Phoenix, Arizona discussing the potential for a partnership.

232.    According to an unnamed NASCAR official, the NASCAR executives told Mascioli, Koutoulas and BMS co-owner Jerry Brown "that it would not allow any variation on the euphemism for a profane insult on a racecar."[83]

233.    Nevertheless, throughout November and December 2021, as detailed above, the Company, Koutoulas and BMS falsely promoted LGBCoin using race car imagery, and promoted NASCAR and BMS alluding to the impending partnership between the Company and BMS.  This promotion was so extensive that it was "pretty obvious" for anyone paying attention that there would be a collaboration between LGBCoin and BMS.

---

[83]    Liz Clarke, *NASCAR rejects sponsorship deal based on 'Let's go, Brandon' chant*, THE WASHINGTON POST, Jan 5, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/#:~:text=Moreover%2C%20the%20official,on%20a%20racecar.

234.   Finally, on December 30, 2021, the Company, along with Brandon Brown and BMS, issued press releases touting the sponsorship and disseminating the materially false and misleading statement that LGBCoin was an official sponsor of BMS.

235.   As a result of the dissemination of the materially false information that LGBCoin was an official sponsor of BMS, the market price of LGBCoin was artificially inflated.  Upon the announcement on December 30, 2021, the price of LGBCoin jumped 75% briefly reaching a market capitalization of $570 million.

236.   In ignorance of the fact that the market price of LGBCoin was artificially inflated due to the misrepresentation that LGBCoin was an official sponsor of BMS, Plaintiffs and class members acquired LGBCoin at artificially high prices.

237.   Plaintiff De Ford purchased LGBCoin on December 31, 2021 and LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

238.   Plaintiff Bader purchased LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

239.   Had the Plaintiffs and the other members of the Class known the truth, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their LGBCoin, or, if they had acquired LGBCoin during the Class Period, they would not have done so at the artificially inflated prices which they paid.

240.   On January 4, 2022, NASCAR announced that LGBCoin was rejected as a sponsor of BMS.

241.   Following NASCAR announcement that the sponsorship was rejected, the price of LGBCoin fell 63% from a high of $.000001612 to a low of $.0000005992.

242.   Plaintiff De Ford's purchases of LGBCoins on December 31, 2021 and January 1, 2022 have subsequently lost a significant amount of their original value since the NASCAR announcement.

243.   Plaintiff Bader's purchase of LGBCoin on January 1, 2022 has subsequently lost a significant amount of their original value since the NASCAR announcement.

244.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of LGBCoin.

### THIRD CAUSE OF ACTION

**COMMON LAW FRAUD**
**(Against NASCAR Concerning the December 26 Approval)**

245.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-12, 43-47, 65-85, 120-121.

246.   On December 26, 2021, Dale Howell, NASCAR Racing Operations Senior Manager, acting in his capacity as an employee of NASCAR, represented to

Mac MacLeod, acting as an agent of the Company, that LGBCoin's sponsorship of Brandon Brown's car was approved.

247.  Dale Howell either made this representation without knowledge of its truth or falsity or should have known that the representation was false.

248.  On information and belief, Dale Howell intended Mac MacLeod to believe his representation that the LGBCoin sponsorship was approved and to edit the decal design to improve its readability at 170 mph.

249.  Dale Howell made this representation to Mac MacLeod by email sent from an official NASCAR email address with a signature that indicated Dale Howell's position in NASCAR Operations.

250.  On information and belief, Mac MacLeod believed that Dale Howell was authorized to approve the sponsorship.

251.  On information and belief, Mac MacLeod, the Company and BMS relied on Dale Howell's statement that the LGBCoin's sponsorship was approved. Mac MacLeod edited the decal design as requested.

252.  On December 30, 2021, the Company, along with Brandon Brown and BMS, issued press releases touting the sponsorship and disseminating the materially false and misleading statement that LGBCoin was an official sponsor of BMS.

253.  As a result of the dissemination of the materially false information that LGBCoin was an official sponsor of BMS, the market price of LGBCoin was artificially inflated.

254. In ignorance of the fact that the market price of LGBCoin was artificially inflated due to the misrepresentation that LGBCoin was an official sponsor of BMS, Plaintiffs and class members acquired LGBCoin at artificially high prices.

255. Plaintiff De Ford purchased LGBCoin on December 31, 2021 and LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

256. Plaintiff Bader purchased LGBCoin on January 1, 2022 in reliance on the statement that LGBCoin was an official sponsor of BMS.

257. Had the Plaintiffs and the other members of the Class known the truth, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their LGBCoin, or, if they had acquired LGBCoin during the Class Period, they would not have done so at the artificially inflated prices which they paid.

258. On January 4, 2022, NASCAR announced that LGBCoin was rejected as a sponsor of BMS and that Dale Howell did not have authority to approve the sponsorship.

259. Following NASCAR announcement that the sponsorship was rejected, the price of LGBCoin fell 63% from a high of $.000001612 with a trading volume of $6.7 million to a low of $.0000005992 with a trading volume of $2.6 million.

260.   Plaintiff De Ford's purchases of LGBCoins on December 31, 2021 and January 1, 2022 have subsequently lost a significant amount of their original value since the NASCAR announcement.

261.   Plaintiff Bader's purchase of LGBCoin on January 1, 2022 has subsequently lost a significant amount of their original value since the NASCAR announcement.

262.   As a direct and proximate result of NASCAR's wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of LGBCoin.

## FOURTH CAUSE OF ACTION

### CIVIL CONSPIRACY
### (Against All Defendants (Except for NASCAR))

263.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-80, 86-183.

264.   Plaintiffs allege this Count in the alternative to Count I in accordance with Fed. R. Civ. P. 8(d)(2).

265.   On information and belief, on or about November 2, 2021, the Executive Defendants agreed to fraudulently promote the LGBCoin as associated with Brown, BMS and NASCAR in an effort to artificially inflate the value and liquidity of the LGBCoin while they worked to liquidate the retained LGBCoin to maximize their joint and individual returns.

266. In furtherance of this conspiracy, Carter created the code for the smart contract and LGBCoin itself. Carter purposefully did not include any "locking" or vesting mechanism within the code to protect investors from insiders immediately selling off the coins they received from Carter pre-launch. The purpose of this overt act was to enable Carter, Koutoulas, Michalopoulos, along with Mascioli, McLaughlin, the Coral entities, and other insiders, to sell as much of their respective portions of the LGBCoin Float as possible.

267. In furtherance of this conspiracy, Carter, Koutoulas, Michalopoulos transferred or caused to be transferred trillions of LGBCoins between October 2021 and March 2022 to various insiders, including Mascioli, McLaughlin, and the Coral entities. The purpose of these overt acts was to provide each of these Defendants with the actual LGBCoins that they would subsequently sell and/or transfer to other wallet addresses that, in turn, sold.

268. In furtherance of this conspiracy, Koutoulas, Norden, and Mascioli falsely promoted LGBCoin and recruited others to falsely promote LGBCoin. In particular, in November and December of 2021, Koutoulas and Norden repeatedly touted the rapid increase in the market capitalization of LGBCoins since launch. Similarly, Koutoulas and the Racing Defendants repeatedly teased an officially sanctioned sponsorship of NASCAR driver Brandon Brown and the LGB team. The purpose of these overt acts was to lead investors to believe that there was massive growth potential for LGBCoins generally and with a NASCAR partnership specifically, and, thus, a financial benefit to investing in LGBCoins.

269.   Defendants' actions falsely promoting LGBCoin enriched themselves to the detriment of Plaintiffs and class members.  As seen in the transaction history publicly available on the Ethereum blockchain, the Carter Wallets, Koutoulas Wallet, Hub Wallet, Mascioli Wallets, McLaughlin Wallets, and Coral Wallets collectively sold trillions of LGBCoins directly to investors.  While the Coral Defendants and Mascioli made millions of dollars, investors were left with LGBCoins that were a worthless "dumpster fire."

270.   As a direct and proximate result of Defendants' actions, Plaintiffs and class members were damaged in the amount of the difference between the fair market price of their LGBCoin but for the Defendants' actions and the price they paid for their LGBCoin.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment/Restitution
### (Florida Common Law, in the Alternative)
### (Against the Executive Defendants, Coral Defendants, and Individual Defendant Mascioli)

271.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-83, 86-196.

272.   Plaintiffs and Class members conferred a monetary benefit on Defendants by raising the price and trading volume of LGBCoin, which allowed Defendants to sell their LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.

273.   Defendants received a financial benefit from the sale of their LGBCoin at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

274.   Plaintiffs and Class members seek restitution in the form of the monetary value of the difference between the purchase price of LGBCoin and the price those LGBCoin sold for.

## SIXTH CAUSE OF ACTION

### Violation of the 1933 Securities Act
### (Against the Company and the Executive Defendants)

275.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶43-64, 120-121, 131-170, 197-200.

276.   Section 12(a)(1) of 15 U.S.C. §§77*l*(a)(1) (the "Securities Act") provides a private cause of action against any person who offers or sells a security in violation of Section 5 of 15 U.S.C. §§77e.

277.   The following elements must be established to prevail on a Section 5 claim: "(1) absence of an effective registration statement covering the securities in question; (2) the offer or sale of the securities; and (3) the use of the mails, or any means or instruments of transportation or communication in interstate commerce in connection with the sale or offer." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1347-48 (S.D. Fla. 2019).

278.  LGBCoins are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1) because they are investment contracts subject to federal securities laws, including the registration requirements promulgated thereunder.  The term "investment contract" "'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"  *Tippens v. Round Island Plantation L.L.C.*, No. 09-CV-14036, 2009 WL 2365347, at *7 (S.D. Fla. July 31, 2009) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)).  "An offering is an investment contract if there is: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others."  *Id.*

279.  Plaintiffs invested money into the common enterprise of LGBCoin with the expectation of profits to come solely from the efforts of others.

280.  The funds Plaintiffs and Class members paid to purchase LGBCoin were pooled by the Company and the Executive Defendants to secure a profit for themselves and the investors.  As a result, the investors, including Plaintiffs and Class members, shared in the risks and benefits of the investment.

281.  Plaintiffs and Class members relied on, and are dependent upon, the expertise and efforts of the Company and the Executive Defendants for their investment returns.

282.  Plaintiffs and Class members expected that they would receive profits from their investments in the Company and the Executive Defendants' efforts.

283.   No Defendant or other person filed with the U.S. Securities and Exchange Commission a registration statement for the offer and sale of LGBCoin through or following the LGBCoin launch, no registration statement was in effect at the time of the LGBCoin launch, and no exemption to the registration statement was available.

284.   By virtue of the foregoing, without registration statement in effect as to the LGBCoin, the Company and the Executive Defendants, directly or indirectly made use of means or instruments of transportation or communication in interstate commerce to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through in interstate commerce for the purpose of sale or for delivery after sale, securities for which no registration statement has been filed and no exemption to the registration statement was available. *See Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019).

285.   The Company and the Executive Defendants are "sellers" within the meaning of the Securities Act because they or their agents solicited Plaintiffs' investments in LGBCoin.

286.   By reason of the foregoing, the Company and the Executive Defendants participated in the offer and sale of unregistered securities in violation of the Securities Act.

287.   As a direct and proximate result of the Company's and the Executive Defendants' unregistered sale of securities, Plaintiffs and Class members suffered damages in connection with his respective purchases of LGBCoin, and the

Company and the Executive Defendants are liable to Plaintiffs and Class members for rescission and/or compensatory damages.

### SEVENTH CAUSE OF ACTION

### FRAUD
### (Against the Company and the Executive Defendants)

288.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-64, 120-121, 184-196.

289.   On January 28, 2022, the Company stated that it was launching a new token and that all owners of LGBCoin would be issued a corresponding number of new tokens.

290.   However, the Company did not deliver on this promise.  All LGBCoin holders were not issued a corresponding number of new tokens.

291.   Plaintiff De Ford never received a corresponding number of new tokens from the Company or Executives despite their representations to the contrary.

292.   As a direct and proximate result of the Company's and the Executive Defendants' fraudulent conduct, Plaintiffs and Class members suffered damages in connection with the compelled exchange of their respective purchases of LGBCoin, and the Company and the Executive Defendants are liable to Plaintiffs and Class members for compensatory damages.

## EIGHTH CAUSE OF ACTION

### CONVERSION
### (Against the Company and the Executive Defendants)

293.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-64, 120-121, 184-196.

294.   As set forth above, Plaintiffs are the rightful owners of the LGBCoins that they respectively purchased during the Relevant Period.  At all relevant times, Plaintiffs maintained a possessory interest in the LGBCoins in their respective wallets, including those old LGBCoins purchased on the day of the "air drop" of new tokens.

295.   On January 28, 2022, the Company suddenly announced that it was launching a new token and that all owners of LGBCoin would be required to swap their old LGBCoins for the new version of the LGBCoin, LETSGO.  The Company and Executive Defendants promised to issue a corresponding number of new tokens via an "air drop" to investors that held the old LGBCoins as of January 28, 2022.

296.   However, these new tokens were worth significantly less than the value of the LGBCoin at the time of the announcement.

297. LGBCoin had an opening price on January 28, 2022 of $0.0000001968. The "new" LGBCoin had an opening price of $0.00000009744 on March 1, 2022 — approximately 50% lower than the price of its previous iteration of LGBCoin on its last trading day.

298.    The Company and the Executive Defendants had no rights, claims, or title to Plaintiffs' LGBCoins, and the forced exchange of Plaintiffs' old LGBCoins for the Company's newer LGBCoins is therefore inconsistent with the Company's alleged right to compel investors to swap their more valuable, old LGBCoins with less valuable new coins.

299.    As a direct and proximate result of the willful, grossly negligent, and/or fraudulent conduct of the Company and Executive Defendants relating to the January 28, 2022 token swap, Plaintiffs have been injured and suffered damages.

300.    Accordingly, Plaintiffs seek compensatory damages, reasonable attorney's fees and costs, and any other relief the Court deems necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.      Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and class members are entitled;

D.    Award post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief;

F.    Award reasonable attorneys' fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED: July 19, 2022          s/ *Aaron M. Zigler*
                              Aaron M. Zigler (*pro hac vice*)
                              Robin Horton Silverman (FL Bar 0027934)
                              **ZIGLER LAW GROUP, LLC**
                              308 S. Jefferson Street | Suite 333
                              Chicago, IL 60661
                              Tel: 312-673-8427
                              aaron@ziglerlawgroup.com
                              robin.horton@ziglerlawgroup.com

                              John T. Jasnoch (*pro hac vice*)
                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                              600 W. Broadway, Suite 3300
                              San Diego, CA 92101
                              Tel.: 619-233-4565
                              jjasnoch@scott-scott.com

                              Sean T. Masson (*pro hac vice*)
                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                              The Helmsley Building
                              230 Park Avenue, 17th Floor
                              New York, NY 10169
                              Tel.: 212-223-6444
                              smasson@scott-scott.com

                              *Counsel for Plaintiffs and the Proposed Class*

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| ERIC DE FORD, SANDRA BADER, SHAWN R. KEY, Individually and on Behalf of All Others Similarly Situated, | Case No. 6:22-cv-652-PGB-DCI |
| Plaintiffs, | CLASS ACTION |
| v. | |
| JAMES KOUTOULAS, LETSGOBRANDON.COM FOUNDATION d/b/a/ LGBCOIN FOUNDATION, LGBCoin, LTD, PATRICK BRIAN HORSMAN, and NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

# TABLE OF CONTENTS

I.    NATURE OF THE CASE..................................................................1

II.    PARTIES .........................................................................................7

    A.    Plaintiffs..................................................................................7

    B.    Defendants ..............................................................................8

    C.    Relevant Non-Parties............................................................15

III.    JURISDICTION AND VENUE ......................................................22

IV.    FACTUAL ALLEGATIONS..........................................................25

    A.    Cryptocurrency and the Blockchain......................................25

    B.    LGBCoin Background............................................................28

        1.    The Creation and Distribution of LGBCoin.................36

        2.    The LGBCoin Founders Seek to Bring the Race Team into the Fold .....44

    C.    The Pump – Executive, and Shill LGBCoin.............................53

        1.    The Individual Defendants Promote *LGBCoin* ...........53

        3.    Koutoulas and Norden's Use of Conservative Influencers to Promote LGBCoin..................................................76

        4.    NASCAR's Approval of the LGBCoin Sponsorship .............108

    D.    Wallet Tracing Proves Ill-Gotten Gains Received by LGBCoin Insiders 115

        1.    Individual Defendants Koutoulas and Horsman ...................115

        1.    The wallet sales and transfers of LGBCoin by the Non-Named Parties ...........................................125

            a.    Erik Norden .......................................................125

            b.    Rick Latona .......................................................128

            c.    Alex Mascioli ....................................................128

            d.    Thomas McLaughlin ...........................................130

        1.    Damage to the Value of LGBCoin and Coinholders Due to NASCAR's Misconduct ....................................136

        5.    The Formation of the LGBCoin Entities in the Cayman Islands ..........141

i

6.    The Re-Pump and Dump – the Relaunch of LGBCoin ..........................145

V.    CLASS ACTION ALLEGATIONS ......................................................................165

## THIRD AMENDED CLASS ACTION COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, bring this action against James Koutoulas ("Koutoulas"), LetsGoBrandon.com Foundation d/b/a LGBCoin Foundation, LGBCoin, LTD, Patrick Horsman ("Horsman"), and National Association for Stock Car Auto Racing, LLC ("NASCAR"). The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, upon public information, and upon information and belief where facts are solely in possession of Defendants.

### I.     NATURE OF THE CASE

1.      This case involves the marketing and sale of the unregistered security, LGBCoin cryptocurrency (defined below), through, among other things, falsely claiming LGBCoin was a sponsor approved by NASCAR and NASCAR's approval of, and then withdrawal of its approval of the sponsorship, damaging Plaintiffs and a Class of purchaser investors.

2.      The scheme had its origins on October 2, 2021, when an NBC reporter incorrectly described attendees at the NASCAR Sparks 300 race at Talladega Superspeedway who were expressing their distaste for President Biden as

chanting "Let's go Brandon!" in support of the race's eventual winner, Brandon Brown.

3.      From there, the phrase "Let's Go Brandon!" and its shorthand "LGB!" has become a nearly universally known euphemistic slogan for those seeking to express their displeasure with President Biden. The phrase's popularity gave rise to its appearance on t-shirts, trucker hats, coffee mugs, wrist bands, and bumper stickers, among other things.

4.      For Koutoulas, CEO of the hedge fund Typhon Capital Management, LLC and a Republican influencer, it was the basis for a Halloween costume.



5.      Alex Giuliani, a/k/a Alexandra Georgaklis, a/k/a Alexandra Koutsogiannopoulos ("Giuliani"), suggested creating a "Let's go Brandon!" cryptocurrency token (a digital currency that's value rises with its demand) ("LGBCoin") and associating it with high-profile conservative influencers and NASCAR.

6.      Koutoulas immediately began reaching out to business acquaintances with experience in cryptocurrencies for help to develop the toekn and in making overtures to Brandon Brown's racing team, Brandonbilt Motorsports ("BMS") to discuss a partnership.  Koutoulas made contact with Alexander H. Mascioli ("Mascioli"), a self-proclaimed cryptocurrency investments expert and co-founder of Trade the Chain, then a current sponsor and co-owner of BMS, through Rick Latona, an acquaintance of Horsman.

7.      NASCAR rules provide that all sponsors must be approved by NASCAR.

8.      A meeting was set between BMS and NASCAR on November 6, 2021 at the NASCAR Xfinity Series Champion Race in Avondale, Arizona, to discuss how to handle the interest of, as Matt Humphrey, NASCAR Director of Racing

3

Communications, described them, "quick-buck cryptocurrency hucksters trying to cash in on Let's Go Brandon."

9.      On Saturday November 6, 2021, at around 11:15 a.m. Pacific Time, the prospect of a Let's Go Brandon inspired sponsorship was discussed between Eric Nyquist ("Nyquist"), NASCAR Senior Vice President and Chief Communications & Social Responsibility Officer, Jennifer Knoeppel ("Knoeppel"), NASCAR Senior Director, Team, Driver & Industry Communications, and Justin Swilling ("Swilling"), NASCAR Senior Manager, Driver & Team Marketing, and BMS driver Brandon Brown, BMS owners Jerry Brown and David Clarke, BMS Director of Marketing Mac MacLeod ("MacLeod"), and Mascioli, Co-founder of Trade the Chain, the current BMS sponsor, in the NASCAR Xfinity hauler garage in Avondale, Arizona.

10.      Witness accounts differ.  According to BMS, Nyquist, stated at that meeting that while he did not recommend it, BMS was free to use "Let's Go Brandon" in any way it wanted off the track, but NASCAR would not approve the use the slogan "Let's Go Brandon" on a race car as they were trying to steer away from political issues.  Moreover, NASCAR was willing to help BMS in any way it could to distance itself from the "Let's Go Brandon" slogan, including holding a

joint press conference. But no one at that meeting stated or inferred that BMS could not have a sponsor that sold "Let's Go Brandon" merchandise.

11. According to NASCAR, Nyquist made it unambiguously clear to BMS at that meeting that "Let's Go Brandon!" or any derivative of that phrase/chant would not be allowed in any type of NASCAR advertising or sponsorship.

12. BMS declined NASCAR's assistance in distancing itself from "Let's Go Brandon." Instead, Koutoulas, BMS, Mascioli, and others spent the next two months promoting LGBCoin to the public using race car imagery and inside access to Brandon Brown and to additional conservative influencers by, among other things, providing them purported insider information, gifting them LGBCoins and benefiting from their further promotion of the coin.

13. Koutoulas's Instagram and Twitter accounts are littered with pictures of himself with Brandon Brown and wearing the LGBCoin's logo alongside prominent Republican public figures such as former President Donald J. Trump, Donald J. Trump, Jr., Peter Thiel, Texas Governor Greg Abbott, Arizona Senate candidate Blake Masters, and City of Miami Mayor Francis Suarez.

14.     All the while, Koutoulas and the other promoters continued to tease an upcoming announcement of a NASCAR partnership.



15.     On December 30, 2021, LGBCoin and BMS announced that LGBCoin was Brandon Brown's full season primary partner for the 2022 NASCAR Xfinity Series season (the "Sponsorship").

16.     On January 1, 2022, LGBCoin reached a price of $0.000001734, a market value of more than $570 million, which represented a 510% increase from its initial price of $0.00000034 just two months earlier.

17.     On January 5, 2022, BMS announced that NASCAR had revoked its sponsorship.  Insiders sold and the value of LGBCoin fell to zero.



18.     Plaintiffs bring this action their own behalf and on behalf of purchasers of LGBCoin between November 2, 2021, to March 15, 2022.

## II.     PARTIES

### A.     Plaintiffs

19.     Plaintiff Eric De Ford ("De Ford") is a resident and citizen of Missouri. During the class period, De Ford purchased LGBCoins in several transactions dating December 31, 2021, January 1, 2022, January 11, 2022, January 26, 2022, January 28, 2022, February 24, 2022, February 26, 2022, and February 27, 2022, via the U.S.-based cryptocurrency exchanges Coinbase and Uniswap.   De Ford suffered investment losses as a result of Defendants' conduct.

20.     Plaintiff Sandra Bader ("Bader") is a resident and citizen of Idaho. During the relevant period, and specifically on January 1, 2022, Bader purchased LGBCoins via the U.S.-based cryptocurrency exchanges Coinbase and Uniswap. Bader suffered investment losses as a result of Defendants' conduct.

21.     Plaintiff Shawn R. Key ("Key") is a resident and citizen of Virginia. During the relevant period, and specifically on December 30, 2021, Key purchased LGBCoins via the U.S.-based cryptocurrency exchanges Coinbase and Uniswap. Key suffered investment losses as a result of Defendants' conduct.

## B.     Defendants

22.     Defendant Koutoulas is a resident and citizen of Florida, living in Miami Beach, Florida.  Koutoulas is the co-founder/creator of LGBCoin, served as a public spokesman for LGBCoin, is a LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

23.     Koutoulas's primary occupation is being the CEO of Typhon Capital Management, LLC ("Typhon"), a commodity trading advisory firm that he founded in 2008.  In 2017, Typhon became a Florida corporation with its principal address in Miami Beach, Florida.  Koutoulas is also a lawyer, who graduated from

Northwestern Law School in 2006, admitted to practice in Illinois in November 2006 and New York in April 2021.

24.     In October 2011, Koutoulas learned that nearly all the funds Typhon was managing ($55 million of Typhon's $70 million under management) had been dragged into the MF Global bankruptcy proceedings.  Koutoulas loudly threw himself into the proceedings by filing an emergency motion arguing for MF Global customers' (Typhon's investors) funds to be unfrozen.  Although his motion was denied, his picture appeared on the cover of *The New York Times* business section the next day and he became the figurehead for the MF Global customers whose funds were frozen.  He and another broker organized fundraising calls with affected customers and hired a securities lawyer to represent their interests in the bankruptcy.[1]  The bankruptcy court eventually released the customers' funds and Koutoulas touted a $6.7 billion victory, *pro bono*.  Koutoulas parlayed that notoriety into a spot on the National Futures Association's Board of Directors.  Critics claimed "a 'toxic' environment [was] created [at the NFA], damaging the interests

---

[1]     Ameet Sachdev, *Hedge-fund manager an impassioned advocate for commodities customers*, CHICAGO TRIBUNE, Mar. 18, 2013, https://www.chicagotribune.com/ business/ct-xpm-2013-03-18-ct-biz-0318-executive-profile-koutoulas-20130318-story.html.

of those [Koutoulas] purports to represent by engaging in the equivalent of spitting vitriol at anyone who opposes {Koutoulas] as [Koutoulas] continues on a self-promotional tour."  An industry writer labeled Koutoulas a "bombastic loose cannon" who was "incapable of being trustworthy."[2]

25.     Koutoulas now frequently promotes his association with notable conservative public figures such as Peter Thiel and Donald Trump, Jr.  In his most recent court experience, he served as one of the plaintiffs' counsel in a securities fraud class action concerning the issuance and promotion of a cryptocurrency, EOS Tokens, which his client alleges was "an unregulated security" that violated several provisions of the Securities Act of 1933 and the Exchange Act of 1934. *Williams v. Block.one*, No. 20-cv-2809 (S.D.N.Y.).  Koutoulas touted that the *Williams* case concerned a multi-billion-dollar fraud.  The parties have proposed to settle prior to a ruling on the motion to dismiss for $22 million.

26.  Defendant   LetsGoBrandon.com   Foundation,   d/b/a   LGBCoin Foundation, is a Cayman Islands foundation company owned by LGBCoin, LTD,

---

[2]     Mark Melin, *MF Global Advocate Koutoulas at Center Of Controversy Again*, VALUEWALK, Dec. 22, 2015.

10

another Cayman Islands Corporation that, on information and belief, is wholly owned by Koutoulas.

27.    In March 2022, LetsGoBrandon.com Foundation entered into a settlement agreement regarding LGBCoin and its successor coin $LETSGO, which Florida law applied and governed in all respects.

28.    Defendant LGBCoin, LTD, d/b/a LGBCoin Foundation, is a Cayman Islands foundation company that is purported to be the sole director of LetsGoBrandon.com Foundation, and on information and belief, is wholly controlled by Koutoulas.

29.    In March 2022, LGBCoin, LTD entered into a settlement agreement regarding LGBCoin and its successor coin $LETSGO, which Florida law applied and governed in all respects.  Koutoulas signed this agreement as an "authorized signer of LGBCoin, LTD."

30.    LetsGoBrandon.com Foundation and LGBCoin, LTD were both created by Koutoulas on January 5, 2022 to be the face of the LGBCoin operations in an effort to shield himself and other founders from personal liability.  Prior to that time, the creation, marketing, and promotional activities of LGBCoin were conducted through a de facto partnership between certain defendants and others.

Although LetsGoBrandon.com Foundation and LGBCoin, LTD maintain a maildrop in San Juan, Puerto Rico, their principal place of business is Koutoulas's home in Miami, Florida.  According to a Florida state court complaint verified by Koutoulas (the "State Court Action"), LetsGoBrandon.com Foundation conducted the majority of its operations during the relevant period in Miami, Florida.[3]

31.     Horsman is the Managing Partner and Co-Founder of Coral DeFi, LP, an investment platform focused on decentralized finance ("DeFi") and cryptocurrency.

32.     In 2002, Horsman co-founded Blue Sand Securities, a placement agent for Alternative Investment funds that has raised over $15 billion from institutional investors.  Horsman was forced to resign from Blue Sands after being accused of misrepresentation and fraud.[4]  In addition, FINRA temporarily suspended and fined him $20,000 based on his concealment of 11 IPO purchases while employed

---

[3]     *LetsGoBrandon.com Foundation v. National Assoc. for Stock Car Auto Racing*, No. 2023-002831-CA-01(11th Cir. Ct. 2023), Verified Compl., ¶32.

[4]     *See* Blue Sands Terminates Stockbroker for Alleged Fraud, https://securitiesarbitrations.com/patrick-horsman/ (last visited Jan. 27, 2023).

at Blue Sands,[5] and he was sanctioned by Massachusetts's Securities Division based upon the FINRA findings.

33.     In 2022, Horsman was accused of fraud in connection with Horsman's involvement in a business called Integrated CBD.  According to the lawsuit, Horsman made material misrepresentations to solicit investments and then funneled those funds to himself.  The suit also alleges that Horsman defrauded the federal Paycheck Protection Program (PPP).[6]

34.     Horsman is a co-founder/creator of LGBCoin, served as a consultant, developer, and spokesman for LGBCoin; is an LGBCoin holder; and exercised control of LGBCoin and directed and/or authorized, directly or indirectly, the initial offering, sale, and/or solicitations of LGBCoin to the public.

35.     Horsman maintains continuous and significant contacts with Florida. Horsman has two condominiums in Bay Harbor Islands, Florida, one in his personal capacity and one through a revocable trust that bears his name, and Horsman is the director of the HOA for those condominiums.  Horsman is the Managing Partner of Horsman Holdings, his family office is based in Miami,

---

[5]     *See* Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 20160488854001.

[6]     *See Gatoff v. Horsman*, 22-cv-21310 (S.D. Fla. Apr. 27, 2022).

Florida.  Horsman is connected to several limited liability companies that operate in Florida; as one example, Horsman is a member and the registered agent for Tathata Holdings LLC, a Florida domestic limited liability company.  Horsman also transacted business in Florida in connection with LGBCoin by, among other things, promoting the sale of LGBCoin.  For example, Horsman promoted LGBCoin at Mar-a-Lago in Palm Beach, Florida, on or about December 6, 2021, when meeting with former U.S. Representative Madison Cawthorn, Koutoulas, major conservative influencer Rogan O'Handley (a/k/a DC Draino) and others. And Horsman used at least one of his Florida based companies, Horsman Holdings, to solicit and recruit others into investing in LGBCoin.

36.      Defendants Koutoulas and Horseman are hereinafter referred to as the "Individual Defendants."

37.      NASCAR is a Florida corporation with its principal place of business in Daytona Beach, Florida, where it controls, oversees, promotes, and markets the NASCAR brand and sanctioned stock car racing events and series and throughout the United States, Canada, Mexico, and Europe.

## C.    Relevant Non-Parties

38.    Non-party Erik Norden is a resident and citizen of Florida, living in Boca Raton, Florida.  Norden served as a consultant, developer, strategist, and spokesman for the LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.  Norden was brought in to the LGBCoin team through his friend Koutoulas, whom Norden affectionately refers to as his "crypto daddy."

39.    Norden is also the founder, president, treasurer, secretary, and director of Norden, Inc., a Florida corporation with its principal place of business in Boca Raton, Florida.

40.    Non-party Alex Giuliani, a/k/a Alexandra Giuliani, a/k/a Alexandra Georgaklis, a/k/a Alexandra Koutsogiannopoulos ("Giuliani") is a former Florida resident and believed to reside in Montreal, Canada.  Giuliani is a co-founder/creator of LGBCoin, served as a consultant, developer, and spokesperson for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

41.    Non-party Thomas McLaughlin, Jr. ("McLaughlin") is a resident and citizen of Puerto Rico, living in San Juan, Puerto Rico.  McLaughlin served as a

consultant, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public. McLaughlin is also the co-founder and Chief Investment Officer of defendant Coral DeFi. McLaughlin visited Florida around the time of LGBCoin's announcement of its sponsorship agreement with BMS.

42. Non-party Coral DeFi LP ("Coral DeFi") is a Delaware Limited Partnership with its principal place of business located in Puerto Rico. Coral DeFi LP operates as an "Alternative Investment Platform" and digital asset manager. Coral DeFi was founded by Horsman, McLaughlin, and David Namdar, and is specifically focused on decentralized financial applications and investment opportunities.

43. Non-party Rick Latona ("Latona") is a resident and citizen of Puerto Rico. Latona is a principle of LGBCoin, served as a consultant, developer, and spokesperson for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

44. Latona has several operating businesses including Site Matrix, LLC a domain name monetization company and asset management firm, Latona's, a

business brokerage firm that specializes in online properties, and Island Liquidity, a company that provides liquidity and services to the Crypto DeFi space.

45. In March 2022, Latona entered into an agreement regarding LGBCoin and its successor coin $LETSGO, which Florida law applied and governed in all respects.

46. Non-party Alex Mascioli ("Mascioli") is a resident and citizen of Puerto Rico, living in San Juan, Puerto Rico. Mascioli served as a consultant and spokesman for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

47. Mascioli was convicted of forgery and criminal impersonation in Connecticut in 2002, and also has an investment history that is consistent with stock price manipulation.

48. In September 2011, Mascioli and his purported hedge fund, North Street Capital, LP agreed to purchase Spyker Cars for $43.5 million and 2.38 million shares of SAAB for $70 million. Although the deals were widely reported, they never closed, with SAAB Chairman and CEO Victor Muller quoted as saying "North Street Capital was not real," "they pretended to make a deal, but in fact they could not at all that. They could not provide credible evidence of assets."

17

49.     In May 2012, Mascioli and North Street Capital again made an offer to purchase a publicly traded company, that was widely reported, for which Mascioli was without the ability to consummate the transaction.  On May 9, 2012, Mascioli sent Winnebago ("WGO") an unsolicited offer letter to acquire all of Winnebago's common stock for $11 per share, or approximately $321 million.  The $11 per share represented a $2.11 (or 23.7%) premium to WGO's closing price on May 8, 2012.

50.     On May 17, 2012, Mascioli sent a copy of that offer letter to Bloomberg which reported the offer.  Winnebago Industries stock, which closed at $8.51 on May 17, 2012, the day before news of the latest offer broke, reached a high of $10 per share on May 18, 2012.  In pre-market trading on May 18, 2012, almost 700,000 WGO shares were traded.  By contrast, in the four trading days prior to May 18, 2012, WGO had little to no volume in pre-market trading.

51.     In March 2014, the SEC filed a securities fraud complaint against Mascioli and North Street Capital for their actions in connection with the Winnebago offer.  *See U.S. Securities and Exchange Commission v. Alexander H.G. Mascioli*, No. 3:14-cv-325 (D. Conn. Mar. 12, 2014).  Mascioli and North Street Capitol agreed to a consent judgment accessing a civil penalty of $100,000 and

permanently enjoining Mascioli from acting as an officer or director of any issuer of securities. *Securities and Exchange Commission v. Alexander H.G. Mascioli*, No. 3:14-cv-325, ECF No. 9 (D. Conn. Mar. 20, 2014).

52.     In 2017, Mascioli shifted his attention to cryptocurrencies, as head of institutional services for Bequant, a crypto prime broker, overseeing the trading, execution, margin financing and lending for institutional players in crypto.  In 2020, Mascioli co-founded Trade the Chain, a Florida Limited Liability Company with a principal office address in Jupiter, Florida, that offers an alerts-based dashboard of crypto markets.  Mascioli now markets himself as a crypto fund and institutional digital assets educator, speaker, and entrepreneur.  At some point prior to December 30, 2021, Mascioli became co-owner of BMS.  Mascioli used his Trade the Chain resources, including but not limited to his Trade the Chain email address, to conduct LGBCoin business.

53.     Mascioli regularly travels to Florida and makes use of its resources, including during the Class Period when significant events related to LGBCoin occurred.

54.     Non-Party Trade the Chain, LLC ("Trade the Chain") is a Florida corporation with its principal place of business in Jupiter, Florida, that offers an

alerts-based dashboard of crypto markets. Trade the Chain's registered agent is Douglas DeRosa, a citizen of Florida. Trade the Chain, through its employee Mascioli, served as a consultant and spokesman for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

55.     Non-party Scott Walker ("Walker") is a resident and citizen of Puerto Rico, living in San Juan, Puerto Rico, and served as a consultant, developer, and spokesperson for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public.

56.     Non-party James Heckman ("Heckman") is a resident and citizen of Washington State, and served as a consultant, developer, and spokesperson for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public. On information and belief, Heckman is responsible for soliciting more than $10 million in LGBCoin sales.

57.     Non-party Dave Gillels a/k/a Pyro Brain ("Pyro Brain") is a resident and citizen of New Jersey, and served as a consultant and spokesperson for LGBCoin, is an LGBCoin holder, and directed and/or authorized, directly or

indirectly, the sale and/or solicitations of LGBCoin to the public. Gillels was responsible for, among other things, moderating LGBCoin chatrooms.

58.     Non-party XBTO includes any of the entities of XBTO Ventures, LLC, XBTO Ventures 2955, LLC, XBTO Capital GP, LLC, XBTO Capital, LP, XBTO Capital Advisors, Ltd., XBTO Crypto Index Fund, LLC, XBTO Crypto Opportunities Fund SAC Ltd., XBTO International Ltd., and XBTO Global Ltd. XBTO Ventures, LLC, and XBTO Ventures 2955, LLC are Delaware corporations with their principal place of business in Miami, Florida. XBTO was founded by Walton Comer and Philippe Bekhazi and advertises itself as the "liquidity provider of choice to the digital asset market."

59.     Non-Party Jeffrey R. Carter ("Carter") is a resident and citizen of Florida, living in Miami Beach, Florida. Carter served as consultant, and spokesman for the Company, is an LGBCoin holder, and directed the sale and/or solicitations of LGBCoin to the public.

60.     Carter is the managing partner of West Loop Ventures, a venture capital fund. Carter also serves as a board member of Koutoulas's Typhon Capital Management.

61.     Non-party George Michalopoulos ("Michalopoulos") is a resident and citizen of Florida, living in Miami Beach, Florida.  Michalopoulos served as consultant for Koutoulas with regard to LGBCoin and is an LGBCoin holder receiving 10% of the total coin minted in exchange for his consulting.  Michalopoulos is the founder and CEO of Empeopled, a social networking website that has been inactive since 2017, and the chief investment officer of Leonidas Cryptocurrency Fund at Koutoulas's Typhon Capital Management.

62.     Non-Party Brandon Brown ("Brown") is a resident and citizen of Virginia living in Stafford County, Virginia.  Brandon Brown is a NASCAR driver and an LGBCoin holder and acted as a promotor of LGBCoin.

63.     Non-Party Brandonbilt Motorsports, LLC ("BMS"), is a Virginia Limited Liability Corporation with its principal place of business in Mooresville, North Carolina, that operates a professional stock car racing team with Brown.  BMS is managed by Jerry Brown and David Clark, both citizens of Virginia.  BMS acted as a promotor of LGBCoin.

## III.     JURISDICTION AND VENUE

61.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Plaintiffs bring this civil action seeking to represent a Class of

more than 100 plaintiffs pursuant to Fed. R. Civ. P. 23.  Plaintiff De Ford is a citizen of the State of Missouri.  Plaintiff Bader is a citizen of the State of Idaho.  Plaintiff Key is a resident of Virginia.  None of the Defendants are citizens of Missouri or Idaho or Virginia.  Plaintiffs seek an award exceeding $5,000,000, exclusive of interest and costs, on behalf of themselves and the putative Class.

62.    The Court has personal jurisdiction over Koutoulas because he is a resident of the State of Florida and thus "at home" in the forum.  The Court also has personal jurisdiction over Koutoulas because Koutoulas operates, conducts, engages, and carries on business and business ventures in Florida, committed a tortious act within Florida, and entered into a March 2022 contract related to this action that complies with Fla. Stat. §685.102.  *See* Fla. Stat. §48.193(1)(a).

63.  The    Court    has    personal    jurisdiction    over    Defendant LetsGoBrandon.com  Foundation  because  LetsGoBrandon.com  Foundation's principal place of business is Florida, and it operated and conducted the majority of its business in Florida, committed a tortious act within Florida, and availed itself to Florida through the filing of the State Court Action.  *See* Fla. Stat. §48.193(1)(a). The Court also has personal jurisdiction over LetsGoBrandon.com Foundation because LetsGoBrandon.com Foundation entered into a March 2022 contract

related to this action that complies with Fla. Stat. §685.102. *See* Fla. Stat. §48.193(1)(a).

64.     The Court has personal jurisdiction over LGBCoin, LTD because LGBCoin, LTD's principal place of business is Florida, and it operated and conducted the majority of its operations in Florida, represents itself as the sole director of LetsGoBrandon.com Foundation, which operated and conducted the majority of its operations in Florida, and committed a tortious act within Florida. *See* Fla. Stat. §48.193(1)(a).  The Court also has personal jurisdiction over LGBCoin, LTD because LGBCoin, LTD entered into a March 2022 contract related to this action that complies with Fla. Stat. §685.102.  *See* Fla. Stat. §48.193(1)(a).

65.     The Court has personal jurisdiction over Horsman because Horsman operates, conducts, engages, and carries on business and business ventures in Florida, owns real property in Florida, and committed tortious acts in Florida.  *See* Fla. Stat. §48.193(1)(a).  As part of this tortious conduct, Horsman made electronic communications into Florida – including to Koutoulas – and physically met Koutoulas and others in Florida to discuss the funding, sale, and promotion of LGBCoin.  Plaintiffs' claims against Horsman arise out these communications and meetings, along with Horsman's extensive LGBCoin transactions.  Horsman also

has extensive contacts and business operations in Florida and should reasonably anticipate being hauled into court here.

66.     The Court has personal jurisdiction over NASCAR because it is a resident of the State of Florida and thus "at home" in the forum.  The Court also has personal jurisdiction over NASCAR because NASCAR operates, conducts, engages, and carries on business and business ventures in Florida.  *See* Fla. Stat. §48.193(1)(a).

67.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because Defendants live and/or conduct business in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Cryptocurrency and the Blockchain

68.     "Cryptocurrency," or "crypto," is a form of currency that exists digitally or virtually and uses cryptography to secure transactions. Cryptocurrencies use a decentralized system to record transactions and issue new units.  The first cryptocurrency was Bitcoin, which was founded in 2009.  By March

2022, there were 18,465 cryptocurrencies in existence.[7]  Some of the largest include: Ethereum, XRP, Dogecoin, and Shiba Inu.

69.    Anyone can create a new cryptocurrency.  An internet search will provide you step-by-step instructions with video for creating a new cryptocurrency in less than an hour.  Once created, the new cryptocurrency can be traded on cryptocurrency exchanges.  Exchanges can be centralized such as Coinbase, Crypto.com, Gemini, BitMart and others, or decentralized (Dex) such as Uniswap, Pancake Swap, and others.

70.    Cryptocurrency is stored in crypto wallets, which are physical devices or online software used to store the private keys to the owner's cryptocurrencies securely.  Wallets have unique identifiers called Wallet IDs.  There is no limit on the number of wallets a person can control.

71.    Transactions of cryptocurrencies are recorded in a "blockchain" which serves as a distributed public ledger.  Each transaction is recorded in a "block," which is cryptographically secured and linked to the previous block, forming a chain of blocks (hence the name "blockchain").  Each block in the

---

[7]    Josh Howarth, *How Many Cryptocurrencies are There in 2022?*  Jul. 19, 2022, https://explodingtopics.com/blog/number-of-cryptocurrencies (last visited Jul. 19, 2022).

blockchain contains a unique digital signature, called a hash, that is created using advanced cryptographic techniques.  This hash is a fixed-length string of characters that represents the contents of the block.  Even a small change to the contents of the block will result in a completely different hash.  Furthermore, each block in the blockchain also contains a reference (or "pointer") to the previous block in the chain.  This means that changing the contents of one block would require changing the hash of that block as well as the hashes of all subsequent blocks in the chain.

72.    The amount of cryptocurrency transacted, the sender's wallet address, the recipient's wallet address and the date and time of the transfer for every transfer of cryptocurrency between digital wallets can be publicly viewed on the blockchain by using any number of websites like www.blockchain.com/explorer or www.etherscan.io.

73.    The owner of a particular wallet is generally not publicly available from the blockchain.  However, since users usually have to reveal their identity in order to receive services or goods, many times the owner of a wallet can be deduced from a wallet's transactions or matching wallet data with other identifiable data points such as a user's IP address.

27

**B.      LGBCoin Background**

74.      LGBCoin is a cryptocurrency token created by certain defendants, and others.  Specifically, LGBCoins are blockchain-based digital assets known as "ERC-20 tokens" that are created using the Ethereum blockchain.  After an ERC-20 token is created, it can be traded, spent, or otherwise transacted with.  LGBCoin were primarily traded against Ether, ("ETH") the native currency of the Ethereum blockchain network on Binance, Coinbase, Uniswap, and other decentralized exchanges that allow anyone to list a token.

75.      The idea for LGBCoin arose after a political phrase "Let's Go Brandon" arose after Brandon Brown's NASCAR Xfinity Series win at the Talladega Speedway on October 2, 2021 (the "Talladega NASCAR Race").  The phrase stemmed from a misunderstanding that occurred during Brown's post-win interview with NBC Sports reporter, Kelli Stavast, but later caught on as a euphemistic expression of displeasure with President Biden.

76.      The idea of selling the cryptocurrency LGBCoin came about when Koutoulas's friend, Alex Giuliani, a/k/a Alexandra Georgaklis, a/k/a Alexandra Koutsogiannopoulos ("Giuliani"), suggested that Koutoulas's Let's Go Brandon themed Halloween costume should be the theme of a cryptocurrency marketed to

conservatives and NASCAR enthusiasts.  From there, Koutoulas sought out friends, colleagues, and business contacts for assistance in the creation and marketing of a new cryptocurrency associated with the Let's Go Brandon slogan. He started with Giuliani and Norden to assist with the marketing of the token and Typhon employee George Michalopoulos as someone he could trust to review the technical code.

77.     Koutoulas then enlisted his business associate and mutual friend of Norden, Horsman, who runs a cryptocurrency hedge fund to assist with the creation, marketing, and solicitation of LGBCoins.  Koutoulas also recruited two others with direct connections to NASCAR driver Brandon Brown – Latona and Mascioli – to bring Brandon Brown and his racing team into their get rich quick crypto scheme.[8]

---

[8]     Latona and Mascioli currently reside in Puerto Rico. While they both are alleged to have been active participants in the alleged misconduct, Latona and Mascioli are currently believed to be outside the jurisdiction of the Middle District of Florida and, thus, not named as Defendants in this action.  Plaintiffs are evaluating bringing claims against the Coral corporate entities and Thomas McLaughlin within the District of Puerto Rico.  Plaintiffs are also mindful of the Court's reminder that including Norden as a named defendant in an amended complaint requires a motion for reconsideration (*see* ECF No. 244).  As detailed herein, Norden is alleged to have directly and actively participated in the sale and promotion of LGBCoins.

78.     Some of this discussion is reflected in the transcript of a Telegram group chat thread between Koutoulas, Horsman, Latona, and Mascioli that occurred between October 30, 2021 and November 18, 2021 titled LGBCoin Racing Team ("Founding Telegram Chat") that demonstrates their agreement to promote the sale of LGBCoin.  03102023PRODQ260014

79.     The chat was created by Latona and/or Mascioli so that they could discuss the launch and promotion of LGBCoins.[9]  Horsman invited Koutoulas to this Telegram Chat, stating Koutoulas was "my buddy who is behind the project." Latona then introduced Mascioli as the "owner of Brandon's team and car."  The group went on to make plans to have a conference call to further discuss their plan for LGBCoins, and Horsman posted a picture of the LGBCoin logo.

80.     On November 1, 2021, Horsman, Koutoulas, Latona, and Mascioli discussed specific details surrounding the LGBCoin launch on the Telegram Chat thread.  Latona inquired if the team behind LGBCoin (namely, the four individuals on the group thread: Koutoulas, Horsman, Latona, and Mascioli) would remain anonymous and whether there would be a formal corporate structure behind the token.  Upon information and belief, Koutoulas and Horsman confirmed that the

---

[9]     03102023PRODQ26014.

founders' identities would be hidden and that there would be no corporate entity behind the token's launch. Latona responded, "Ok great, it needs to be that way for Alex's side."

81.     Latona then discussed the percentage of the Float that would be "used for liquidity on Uniswap" and whether Koutoulas and Horsman intended to lock that liquidity. Koutoulas stated that he and Horsman were "open to locking liquidity" but did not confirm that this was actually done. Latona offered the following concerning the importance of the liquidity pool:

> The more liquidity the better. If we want this to turn into a 9-digit coin, we'll need pretty deep liquidity. We can certainly add to it as it goes but if a founder pulls the liquidity it could kill the project. The ultimate example of this is dogelonmar.com. They locked 5M in ETH and half the tokens and because of that they have been they have been able to grow a 1.2 billion market cap and you can trade in and out of it with low slippage at up to $1m at a time. I'm not saying to go that deep but you get my point. I'm just recommending that a lot of the funds raised go towards liquidity.

82.     In response, Horsman assured Latona that "Everything [we are] raising right now is going into liquidity and building the project. Think we brought in $100k and plus today." Koutoulas confirmed, "yeah 115k and have another 20k coming tomorrow at least. Am also meeting with two main guys at XBTO tomorrow to get behind it, one of them is very tight with me (had MF Global exposure)." Koutoulas further stated that the developers he enlisted to write the

31

LGBCoin smart contract were "super class acts" who would not "rug pull" the members of the group.

83. On November 3, 2021, Koutoulas and Horsman continued planning the LGBCoin launch with Mascioli and Latona within the Telegram Chat thread. Koutoulas informed the group that he and Horsman were able to recruit several "meme lords" and social media influencers to promote LGBCoin. Latona then stated "After the call with Brandon, can the 4 of us hop back on and hammer out the deal?" Koutoulas, Horsman, and Mascioli agreed to have a google meet discussion between the four of them, and Latona circulated a link for the group to use.

84. On November 4, 2021, Horsman wrote to confirm the terms of their agreement to promote and sell LGBCoins (the "Agreement"):

> ok guys here is the plan to move forward. There is 10% not going to either side its market making and future influencers.
> 22% - Sold OTC ($500k more added to liquidity pool last night another $300k coming this afternoon)
> 5% - GSR they are starting on boarding process, and both founders who we know are excited about it
> 5% - Treasury for future influencers (we can mutually agree on who these people will be) - I'm talking to Peter Thiel's team today
> **_68% Left Over- Split 50:50 for 34% each party_**

85.     In response to Horsman and the terms of the Agreement that Horsman recounted, Latona stressed "No more OTC please!"  He then confirmed "We think everyone is being reasonable.  We agree to the deal.  But, please no more changes [to the terms, particularly the percentage of permitted OTC sales]."  Horsman replied:

> Great we do too and we're excited to partner with you guys and make this a huge success!
> We're about to trademark Let's Go Brandon for crypto use. And LGB Coin and LGB Token
> What entity should we put on the trademark ownership?

86.     Later in the Telegram chat thread from November 4, 2021, Latona posted a picture of himself and Jon Najarian, stating "Got a CNBC anchor ready to shill us."  Koutoulas quickly replied "don't use the s word haha" and "I know [N]ajarian too haha tell him whats up."  Horsman chimed in "Me too he's a board member of my company Innovation sh[]ares."  Notably, Horsman explicitly said to Latona "Don't tell [Najarian] our names.  Want to keep quiet."

87.     The next day, on November 5, 2021, Koutoulas offered himself up, stating in the group text threat that he was "happy to use my name as a major recipient of coin."  Notably, Koutoulas already was working on a way to publicly associate himself with LGBCoin (while also obscuring his role as a founder and his significant allocation of the total LGBCoin Float).  On October 29, 2021,

33

Koutoulas contacted Jeffrey Carter ("Carter"), the managing partner of West Loop Ventures, a venture capital fund and a board member of Koutoulas's Typhon, by text message to propose that Koutoulas transfer one trillion LGBCoin tokens to Carter in exchange for Carter publicly taking credit for the coin and announcing that Carter is giving 500 billion LGBCoin to Koutoulas to commemorate the tenth anniversary of the MF Global bankruptcy. Thirteen minutes later, at Koutoulas's direction, LGBCoin Wallet #1 0x373 transfers two trillion LGBCoin to Carter's Ethereum wallet address: 0x70305bcbf231e96bbc0a80f6e892a401ad7e83e2. Carter and Koutoulas then begin collaborating by email on the content of a post for Carter's blog *Points and Figures*.

88. As their plans to launch the LGBCoin were being discussed, Koutoulas and Horsman also recruited others for assistance in promoting LGBCoin. For example, in addition to Carter, Koutoulas recruited George Michalopoulos ("Michalopoulos") who worked as the portfolio manager of the Leonidas Cryptocurrency Fund at Koutoulas's hedge fund. Michalopoulos received 10% of all LGBCoin tokens minted (33 trillion tokens) and indemnification in exchange for "early technical assistance" in creating LGBCoin

(*i.e.*, making sure the developer Koutoulas hired to code the smart contract did not program a back door to allow the developer unauthorized access).

89.     Koutoulas also retained Social Ally Media, a digital marketing agency run by Natalie Speers, in November 2021 to handle the social media presence necessary to promote LGBCoin. Koutoulas promised it 256 billion LGBCoin tokens for a six-month term.

90.     Heckman was given one trillion LGBCoins to promote LGBCoin and 7.5% of the USD value of the OTC transactions that were made the result of Heckman's efforts.

91.     Koutoulas also connected with Walton Comer at XBTO and XBTO associate Phil Potter on November 3, 2021 through a private Telegram chat.  Potter is the former chief strategy officer at cryptocurrency exchange Bitfinex as well as the co-founder of stablecoin company Tether.[10]   Potter offered to use his connections to help Koutoulas get LGBCoin listed on CoinGecko, CoinMarketCap, and Etherscan.

---

[10]     In April 2019, New York Attorney General Letitia James launched an investigation accusing Bitfinex of using the reserves of Tether, an affiliated company, to cover up a loss of $850 million to a Panamanian payment processor.

92.     By November 17, 2021, Koutoulas claimed to have 80 people on staff promoting LGBCoin.

93.     Eventually the principles of scheme came to include Koutoulas, Horsman, Mascioli, Latona, Norden, Scott Walker, and James Heckman.

### 1. The Creation and Distribution of LGBCoin

94.     On October 28, 2021, at Koutoulas's direction, 330 trillion LGBCoin tokens were minted under the creator smart contract 0x21E783bcf445B515957A10E992aD3c8E9FF51288 ("LGBCoin Contract") by Wallet address 0x00e17962016c74876580dc9d925a5849b50eaadc ("Contract Wallet"). Earlier that day, Wallet Address 0xcD39Fd52d7998D30A77903FF31229B4cDbc7805B owned by Michalopoulos[11] sent .51 ETH[12] to the Contract Wallet.

95.     On November 10, 2021, the Contract Wallet transfers 33 trillion LGBCoins (10% of the total number of tokens), and .2 ETH to by Michalopoulos at

---

[11]     This wallet owns the domain name "empeopled.eth" – Michalopoulos' social networking business is called "empeopled."

[12]     The minting and transfer of cryptocurrencies incur fees called Gas Fees that are paid in ETH.

Wallet Address 0xc9150014a3cab1ff3ffcb031b5bc2570b07d4a53 (Michalopoulos Wallet "0xc9").

96.     It is best practice for tokens to be sold as part of time-locked smart contracts with controls to prevent fraud. And although Koutoulas claimed to be working with "super class act" developers who were experienced in crypto, they did not implement any fraud prevention controls. Moreover, despite being put on notice of importance of implementing a time-lock mechanism for the liquidity pool during the group text thread with Latona, both Koutoulas and Horsman purposefully chose to not instruct the LGBCoin developers to include a time lock in the LGBCoin Contract.

97.     Additionally, Koutoulas and Horsman took steps to obfuscate the source of their tokens and conceal their true roles within the scheme.

98.     First, the Contract Wallet, transferred 165 trillion LGBCoins, 50% of the total number of tokens, in two transfers on October 29, 2021 to Wallet Address 0x37364ca1fd526ed06c6e0a36b8d471919b0e273f (LGBCoin Wallet #1"0x373").

99.     Later that day, Koutoulas contacts Carter regarding the MF Global commemoration cover story. Thirteen minutes later, at Koutoulas's direction LGBCoin Wallet #1 0x373 transfers two trillion LGBCoin to Carter's wallet

0x70305bcbf231e96bbc0a80f6e892a401ad7e83e2. On November 1, 2021, at Koutoulas's direction, Carter transfers one trillion LGBCoin tokens back to Koutoulas at Wallet address 0x65ad6f29bec4b298f83c8b75ce7a6687522419de ("Koutoulas Wallet #1"). About 12 hours later, Carter's blog post *Congratulations to an unsung American Hero*, https://jeffreycarter.substack.com/p/congratulations-to-an-unsung-american goes live where Carter misleadingly writes that Carter is giving Koutoulas one trillion LGBCoin and promotes the token.

100. Koutoulas further spreads this false origin story by sharing Carter's LinkedIn link to Carter's blog post and thanking Carter for making Koutoulas a LGBCoin.io trillionaire.



101.    At Koutoulas's direction, the LGBCoin.io website is launched linking back to Carter's misleading blog post *Congratulations to an unsung American Hero* as the LGBCoin.io "Origin Story."

102.    Norden also shared Carter's blog post to his Instagram account @realeriknorden so people could learn about "all the hype behind LGBCoin.io":



103.    Meanwhile, LGBCoin tokens are being distributed to founders and others in exchange for promotion of the coin or washed through other wallets obscuring their origin.

104.    On October 29, 2021, LGBCoin Wallet #1 0x373 transfers 20.05 trillion LGBCoin                tokens                to                wallet                address 0x74a97a1D5a268498d67F91f14008B1c673DF0258, which belongs to Horsman (the

"Horsman Wallet #1). On November 1, 2021, LGBCoin Wallet #1 0x373 transfers 5.28 trillion LGBCoin tokens to another wallet owned and controlled by Horsman – wallet address 0x9725BDd039FCFE6DEE3de5398C3ba06113390aEc (the "Horsman Wallet #2"). In the following days and weeks, Horsman used these two wallets and at least three other pass-through wallets owned and/or controlled by Horsman to sell his portion of the LGBCoin allocation.

105. On October 29, 2021, LGBCoin Wallet #1 0x373 transfers 100 billion LGBCoin tokens to wallet address 0xed33bf53db3349db27f9bF54d29460Ad10567206, which belongs to Koutoulas' friend Alex Giuliani (the "Giuliani Wallet").

106. On October 30, 2021, LGBCoin Wallet #1 0x373 transfers 50 billion LGBCoin tokens to Norden's wallet 0xfee7cd8f1891941abd6604a87c79f22a3b284858 (the "Norden Wallet").

107. Wallet Address 0x619e91cf4bbd4a78f8207192d6fb5c347bee1a1d ("0x619") received 132 trillion LGBCoins on November 11, 2021. Upon

40

information and belief, this wallet is owned and/or controlled by Mascioli and Latona.[13]

108.    Other LGBCoin tokens are washed through other wallets.

109.    On November 1, 2021, LGBCoin Wallet #1 sends one trillion LGBCoin tokens to another wallet controlled by Koutoulas, Wallet Address 0x2986534b03b87d358224daee9e1585c32b7725db ("Koutoulas Wallet 2").[14]

110.    That same day, an additional wallet is set up to act as a pass-through, Wallet Address: 0x40ecf54ad6339e0b346a48f4907661bde67dd4d0 (the "Hub Wallet"), enabling Koutoulas and Horsman to further obscure the transfer and sale of LGBCoins.  To begin, Koutoulas provided $4,292.06 worth of eth for gas fees to

---

[13]    This wallet interacts with the Mascioli Private Wallet discussed further herein.  For example, on November 23, 2021 this wallet sends 38.1 trillion LGBCoin tokens to the Mascioli Private Wallet – about 30% of the entire amount transferred to Wallet 0x619.

[14]    Further demonstrating that this wallet is under Koutoulas' control is its February 23, 2022 transaction sending 500 billion LGBCoins to a newly created wallet.  This new wallet only holds these 500 billion LGBCoins and it appears to be the same one Koutoulas set aside for, and gave to, former President Trump (discussed further below). Additionally, during an interview with the Daily Beast, Koutoulas recounted a story about how he had personally attempted to stabilize the price of the LGBCoin during a sell-off period by purchasing roughly $70,000 worth of LGBCoin while he was in the bathroom at Peter Thiel's home.  The following transaction on the Ethereum blockchain shows the Koutoulas Wallet making a purchase for similar amount around the same timeframe:    https://etherscan.io/tx/0x661d7df5433f25cbc98a883b1fa5ef0f6a038fe16f9aa 2bfca307d3136c0fde5.

41

the Hub Wallet. Shortly thereafter, two additional wallet addresses, one owned by McLaughlin and the other by Horsman's firm Coral DeFi, sent eth to cover gas fees to the Hub Wallet.[15] Koutoulas's Typhon works with McLaughlin and Horsman's Coral DeFi. Around two and a half hours later, LGBCoin Wallet #1 made the first of transfer of several trillion LGBCoin tokens to the Hub Wallet. Within an hour, the Hub Wallet sold one trillion LGBCoin tokens.

111. On November 2, 2021, LGBCoin became available to the public with a transaction volume of $100 million and an opening price of $0.000000034.

112. On November 3, 2021, the Hub Wallet transfers two trillion LGBCoin tokens to Norden.

113. On November 3, 2021, LGBCoin Wallet #1 transfers one billion LGBCoin tokens to Norden.

---

[15] Wallet Address 0x9725bdd039fcfe6dee3de5398c3ba06113390aec provides $40,000 in USDC for initial gas fees to the Hub Wallet. Wallet 0x97 owns the domain name "CoralDefi." It is owned by Coral DeFi. (the "Coral Wallet"). *See* https://etherscan.io/tx/0xdc0328b07ae47542a185311ee4ae36da4e49ae305b595e50b6ccfe25 ef5ac86 Wallet Address. 0xaa130e5a43cadbe2eaa4e58ede61e39874e3ead7 provides $10,000 in USDC for gas fees to the Hub Wallet. Wallet 0xaa owns the domains of thomasmclaughlin.eth, tmcg.eth, and tmclaughlin.eth, and owns the same penguin NFT as Thomas McLaughlin displays as his twitter avatar. It is owned by Thomas McLaughlin. *See* https://etherscan.io/tx/0x702bd76e51bd858277367c237b9312932db4a1d4cc7e2863d 611c967e5768763; https://opensea.io/fhsunvds ("McLaughlin Main Wallet").

114.   On November 3, 2021, LGBCoin Wallet #1 transfers 13.2 trillion to wallet address 0xdbc13e67f678cc00591920cece4dca6322a79ac7, which, upon information and belief, is owned and/or controlled by Horsman (the "Horsman Wallet #3").  This wallet interacts frequently with Horsman's other wallets and pass-through wallets, including but not limited to:

- 0x663f230b60c16cd1b1290959bfebddb8b9e89211 (Horsman Pass #1)

- 0x4374F318eA2f8Cc50EE177E3c6344c102FedBd9F ("Horsman Pass #2)

- 0x4D43Da00e8B1Ee55C75Ae4A0981766679CCF180c (Horsman Pass #3)

- 0x77B319A5CB9c17C48ab3C600D2ee4ff6BAC1F568 ("Horsman Pass #4")

115.   On November 4, 2021, LGBCoin Wallet #1 transfers one trillion LGBCoin tokens to Norden.

116.   On November 8, 2021, Horsman Wallet #1 sends 20 billion LGBCoin to Horsman Pass #4.

43

117.    On November 9, 2021, LGB Hub Wallet 0xe2 transfers 10 billion LGBCoin tokens to Alex Giuliani's wallet 0xed33bf53db3349db27f9bF54d29460Ad10567206 (Giuliani Wallet).

### 2. The LGBCoin Founders Seek to Bring the Race Team into the Fold

118.    On November 6, 2021, the same day NASCAR executives held a meeting with BMS representatives, Koutoulas, Horsman, and Latona were also in attendance at the NASCAR race at the Phoenix Raceway, as VIP guests of Mascioli. Although Koutoulas, Horsman, and Latona did not directly participate in the November 6 meeting with NASCAR officials, they nevertheless went to the race together to forge an agreement between the parties to combine their personal efforts and business resources toward promoting LGBCoin for their own profit.

119.    Some of this discussion is reflected in the transcript of a Telegram group chat thread between Koutoulas, Horsman, Latona and Mascioli that occurred between October 30, 2021 and November 18, 2021 titled LGBCoin Racing Team ("Founding Telegram Chat") that demonstrates their agreement to promote the sale of LGBCoin.  03102023PRODQ260014-03102023PRODQ260040.

120.    Over the course of the Founding Telegram Chat, several calls between the parties are scheduled.  On November 1, 2021, the parties discuss technical aspects of the development of LGBCoin such as the amount of money that will be

44

reserved to provide liquidity for trades.  Horsman states that "[e]verything were [sic] raising right now is going into liquidity and building the project.  Think [sic] we brought in $100k and [sic] plus today."  Just past midnight, Koutoulas confirms raising $115,000 that day with more coming tomorrow and informing the others of his plan to meet with "the main guys" at XBTO tomorrow to get behind LGBCoin.

On November 4, 2021, in the Founding Telegram Chat the parties discuss purchasing the domain letsgobrandon.com.  Horsman writes: "Let's give him coins for it."  On November 6, 2021, Koutoulas publicly posted an Instagram video entitled "LGBcoin.io at the Phoenix NASCAR Championship."[16]  The video shows Koutoulas walking to Brown's pit box with Horsman, Coral DeFi's Managing Partner and Co-Founder.[17]  Both Koutoulas and Horsman are shown wearing Coral DeFi baseball caps with the "Coral Capital" displayed on the side.[18]

---

[16]     *See* https://www.instagram.com/tv/CV8yyA2AviD/ (last visited Jan. 23, 2023).

[17]     *See* Our Team, https://www.coralcapital.io/team (last visited Nov. 1, 2022).

[18]     A closeup picture of the Coral DeFi baseball cap featuring the Coral DeFi logo can be found at https://twitter.com/nikhilgour_/status/151472197019314995, last visited Jan. 26, 2023:




121.    Koutoulas narrates the video:

Koutoulas: What's up?  We're here at Phoenix Raceway.  Last NASCAR race of the season.  A little behind the scenes action.  Cars warming up in the background.  Making our way to Brandon [Brown]'s area.  Patrick [Horsman] what's up?

[Horsman looks up and waves his hand at Koutoulas]

---

…footnote continued on following page.



                \*       \*       \*

> Got to thank Team Brandon for hooking us up. Got the LGBCoin [shirt]. Let's Go Brandon.

> A little love for DeFi [displays Coral DeFi baseball cap]. Definite crypto racing over here . . . . Getting closer to the track here. Can't wait to cheer on our boy Brandon.

122.    Then, Koutoulas posted a picture on Twitter in which he is wearing the Coral DeFi hat and an LGBCoin shirt while standing next to Brandon Brown:



123.    Norden posted the same picture to Instagram:

47



124.    These pictures are also circulated in the Founding Telegram chat. Latona is also in the video with Koutoulas and Horsman walking towards Brandon Brown's pit box.[19]

_____



125.    On November 8, 2021, in the Founding Telegram Chat, Latona comments about the scope of social media presence necessary to scale LGBCoin interest and asks Koutoulas for the plan.  Koutoulas responds that he is hiring teams to handle the marketing and is "on with [S]cott [W]alker['s] guy [J]ames Heckman as we speak."

126.    The chat participants then discuss offshore holding companies to serve as the physical mailing address for the LBGCoin website.  Latona provides a Lagos, Nigeria number where those who answer the phone are trained to answer, "Domain Administration" and only take messages. Koutoulas responses "Love it."  Horsman asks Mascioli to make an introduction to offshore lawyers.

127.    Koutoulas and other LGBCoin insiders' intent was clear: give LGBCoin the appearance of a legitimate investment vehicle with the potential for huge returns through constant marketing and promotional activities associated with the "Let's Go Brandon" phrase, often from "trusted" celebrities and political pundits, to increase demand of LGBCoin by convincing potential retail investors that its price would appreciate as a result of an official association with NASCAR, but be sure to get their own profit before the truth came out.  This is all but admitted in a chat string between Koutoulas and Alex Giuliani on or around November 5, 2021, where Giuliani expresses concern that Koutoulas get out "before the dump" and Koutoulas explains that his reputation is clean so they are doing it like a "real project" and they don't want to give off a "pump and dump vibe[,]" but they should be sure to take profits along the way:



03102023PRODQ261610.

128.  And again, a month later, in a text conversation with Michalopoulos where Koutoulas admits he does not believe the NASCAR sponsorship will succeed:



Michalopoulos 006.

### C.    The Pump – Executive, and Shill LGBCoin

#### 1.    The Individual Defendants Promote *LGBCoin*

129.    Defendants Koutoulas and Horsman, along with Norden, Latona and Mascioli, conspired together to promote sales of LGBCoins through a misleading association with NASCAR and via other celebrity influencers.    Latona and Mascioli acted as the gateway to NASCAR driver Brandon Brown, whom they coerced into going along with the LGBCoin sponsorship agreement.    Horsman and Koutoulas, for their part, would use their experience with financial products and cryptocurrency to handle all aspects of the LGBCoin's creation, promotion, and sale.    Koutoulas recruited several individuals within his personal circle to assist with the promotion (Norden) and the technical aspects of the LGBCoin mint and wallet set up to transfer the tokens to insiders (Michalopoulos).    The two camps had one common purpose: selling unregistered LGBCoins for their personal gain.

130.    Koutoulas and Norden directly oversaw the promotional activity of LGBCoin, both through their own personal social media accounts and via the LGBCoin.io accounts.    Koutoulas and Norden also managed the recruitment of celebrity influencers to promote LGBCoin.    In addition to personally creating a host of LGBCoin promotions, Norden worked behind the scenes as an operations manager for the LGBCoin social media accounts.    For example, on or around

January 6, 2022, Norden created a group chat thread titled "LGB coin ban" to troubleshoot a ban of the official @lgbcoin.io account on Instagram. Norden retained a social media consultant who was able to get the ban reversed the following day. During that same conversation, Norden also negotiated with the consultant on the terms for a 24-hour promotion related to LGBCoin and handled the payment for the marketing service.

131. Koutoulas, Horsman, Latona, Mascioli, Norden, and others under the aforementioned participants' control directed the scheme through text messages, WhatsApp, Signal and Telegram chat messages.

132. For example, marketing decisions about LGBCoin were coordinated through the "LGB Marketing Team" group chat that included as participants Koutoulas, Horsman, Norden, Giuliani, Latona, James Heckman, Natalie Speers and Kristin Evje Knudson of Social Ally, Dave Gillels (a/k/a Pyro Brain), Jasmina Midzic at Typhon, and others. 03102023PRODQ261501-261545.









133.  The Individual Defendants worked to maintain an artificially high price for LGBCoin by also limiting the ability of holders to sell into the market.

134.  These efforts were coordinated in Signal chats between Koutoulas, Norden, Gillels, Horsman, and others, as evidenced in the following excerpt from the Signal chat tread:



**Pyro Brain**
Where do you see that
11:08 PM
Wallet never held LGB

On geckoterm
Weird
11:09 PM geckoterminal.com/eth/pools/0x1de76481f8881ed323ede2388095a59fda09be9b?page=2&items=20

**Pyro Brain**
hehehe
11:09 PM That's a front running bot, he sandwiched a transaction and made .8 eth

How do you know lol

**Pyro Brain**

You can see them here with the angry red bag. Purely due to a too high slippage

Ah
That slippage makes chart lit tho

**Pyro Brain**
11:11 PM

11:11 PM Lmao

**Erik Norden**
Shipper

**Pyro Brain**
it hurts it overall, increases volume but if our price point were high enough, people would start to fomo
only makes sense if we needed to pump volume for an exchange or other stat, which can be made by just
transfering funds between wallets by buying and selling, you only lose gas fees that way

But that huge green upward candle says upside fomo
I mean we didn't do it on purpose
Think Tom freaked when I called him out lol

**Pyro Brain**
i guess you're intimidating haha

**Erik Norden**
Fucked up corzine, Holder, Freeh, and dimon. James gives no fucks
legend

**Pyro Brain**

03102023PROD26S0199.

135.   The Individual Defendants repeatedly relied upon and marketed their relationships with both Brandon Brown and NASCAR to promote the LGBCoin launch in November 2021 and the subsequent rise in value in December 2021.

136.   For example, on November 6, 2021, the Individual Defendants used, or directed others to use (*e.g.*, Norden), the Twitter account, handle @LGBCoin_io, to associate LGBCoin with NASCAR, Brandon Brown and BMS by repeatedly tweeting and retweeting to its thousands of followers about Brandon Brown and his appearance in the NASCAR Xfinity Series Champion Race in Phoenix, Arizona (the "Phoenix NASCAR Race"), including the following pictures and video:



*       *       *



\*      \*      \*



137.     The Individual Defendants posted, or directed others to post,[20] the same Brandon Brown and Phoenix NASCAR Race photos and videos to thousands of followers on LGBCoin's Instagram account @LGBCoin.io.[21]

138.     Mascioli also posted a picture of Koutoulas (wearing an LGBCoin promotional shirt) on the racetrack with Brown standing together for the national anthem at the Phoenix NASCAR Race.[22]

139.     Likewise, that same day, Koutoulas repeatedly tweeted about LGBCoin, Brandon Brown, and NASCAR from his personal Twitter account @jameskoutoulas (the "Koutoulas Twitter account"), which was then retweeted on the LGBCoin Twitter account:

---

[20]     *See* November 6, 2021, LGBCoin Instagram Post https://www.instagram.com/p/CV9Xg5Zru2F/ (last visited Feb. 25, 2022); November 6, 2021, LGBCoin Instagram Post, https://www.instagram.com/p/CV9L5cRDEAf/ (last visited Feb. 25, 2022); November 6, 2021 LGBCoin Instagram Post, https://www.instagram.com/p/CV9FZkXvb6L/ (last visited Feb. 25, 2022); November 6, 2021 LGBCoin Instagram Post, https://www.instagram.com/p/CV8712SPW8l/ (last visited Feb. 25, 2022).

[21]     On or about March 4, 2022, LGBCoin changed its Instagram account handle from @LGBCoin.io to the new @LetsGo handle. *See* Official $LETSGO, https://www.instagram.com/letsgo/ (last visited Jul. 19, 2022).

[22]     https://www.instagram.com/p/CV9VzQODXBl/ (last visited Jul. 19, 2022).



*   *   *



140.    After the Phoenix Xfinity Race, the Individual Defendants made clear in a November 11, 2021 tweet of their intent to hire professional promoters to increase the popularity and value of LGBCoin as well as implementing safeguards that would prevent insiders from draining the LGBCoin's liquidity and claimed that several national sponsorships and national partnerships were forthcoming:



141.    The enlarged, emphasized, and complete statement is as follows:

Hi everyone want to give a few project updates – we have about 60 people working on it already on our 10th day in existence, including some serious

crypto OGs. *We are working on implementing a smart contract vesting and locking mechanism to reduce peoples' concerns regarding the genesis wallets*. We are also working on decentralizing those tokens and you'll see some movements of the genesis tokens in preparing them for the smart wallet locks *and a major national sponsorship deal. Also, we have several major national media partnerships in the works as well as 10 influencers engaged*. Again, please remember this project is a digital collectible and a digital way to express your support for the Let's Go Brandon movement, so please spend only what your budget allows (for some that's a t shirt, for others maybe it's a plane that says LGB on the tail), *but do rest assured there's a ton of experienced, honest, and talented people working around the clock to make this the best damn collectible out there* with goals of showing America how much we love her.[23]

[Emphasis added.]

142. The Individual Defendants then continued to promote to the public that it was working to promote LGBCoin and that a NASCAR sponsorship was

---

[23] *See* LGBCoin Twitter Account, https://twitter.com/LGBCoin_io/status/ 1458925209369595913/photo/1 (last visited Feb. 23, 2022).

imminent through posts made on LGBCoin's Twitter account on November 10, 2021, November 21, 2021, November 23, 2021, December 2, 2021, and December 3, 2021:

       a.     November 10, 2021:



b.    November 21, 2021:



c.    November 23, 2021:



d.      December 2, 2021, and December 3, 2021:



143.   The same November 23, 2021 and December 2, 2021 posts were posted

on the LGBCoin Instagram account by or at the individual defendants' direction.

68

144.    On November 15, 2021, Koutoulas entered into separate agreements with Mascioli and BMS, as Trustee for "LGB Coin Foundation" that provided that in exchange for LGBCoin tokens to Mascioli and BMS that BMS would promote LGBCoin and allow the use of BMS's trademarks to promote LGBCoin.  However, if LGBCoin's sponsorship was not approved by NASCAR, two-thirds of the tokens to be paid would be forfeited.

145.    On November 23, 2021, Wallet 0x619 transfers 38 trillion LGBCoin tokens to Mascioli at Wallet address 0xE949360D2a2e69A89ab240e37e45ca1e0c2CD037.  That same day, Mascioli transfers 5.7 trillion LGBCoin tokens to Latona at Wallet address 0xdf8Ef854071d6bA03Ca1d618f402be2ce62CCfbe.  Mascioli transfers 5.3 trillion LGBCoin tokens to Jerry Brown and Wallet address 0x7364059cF7E4569F0fC0b47Cb699CBe906Ff2Bb2.  Mascioli transfers 5.3 trillion LGBCoin tokens to Brandon Brown at Wallet address 0x157Eaf9e6144b91925f73C3287e49EFd0464bCc5.

146.    On November 30, 2021, BMS, in accordance with its obligations under its agreement with Koutoulas, contracted with Levick Strategic Communications ("Levick") to provide public relations and marketing support for LGBCoin.

147.    On December 23, 2021, Mascioli posted a picture of Brown's racecar with only a prime coating of gray paint with the following caption: "Pumped for the 2022 NASCAR Xfinity season.  What will be the new paint scheme for the season on the @brandonbrown_68 #68 @BMSRaceTeam car?  You'll know soon enough."[24]

148.    However, NASCAR rules require the approval of all sponsorships and provide that NASCAR may refuse to permit a team to participate if NASCAR determines that its advertising or sponsor is detrimental to the sport.

149.    On December 29, 2021, BMS tweeted from its company Twitter account @BMSRaceTeam (the "BMS Twitter account") that a big announcement was imminent:



---

[24]      https://twitter.com/AlexMascioli/status/1474045240650706946 (last visited Jul. 19, 2022).

150.    Brandon Brown posted a similar message about "big news" to his 33k+ followers on his Twitter account @brandonbrown_68 (the "Brown Twitter account"):



151.    This big announcement was what LGBCoin had been alluding to for weeks — that LGBCoin was to be Brandon Brown's full season primary partner for the 2022 NASCAR Xfinity Series season (the "Sponsorship").

152.    The LGBCoin.io website was relaunched predominantly featuring LGBCoin's affiliation with NASCAR.



153. The website also detailed future development and promotional plans

for LGBCoin:





154. BMS, Brandon Brown, and the individual defendants through LGBCoin announced this Sponsorship across their social media platforms and through a December 30, 2021, press release issued by BMS. The BMS Twitter account, Brown Twitter account, and the LGBCoin Twitter account, at the individual defendants direction, each posted a video with Brandon Brown, his BMS racing team, and his Number 68 Chevrolet Camaro (also referred to herein as "Brandon Brown's racecar") showing the red-white-and-blue paint scheme with the LGBCoin name and Logo:



**Brandonbilt Motorsports**
@BMSRaceTeam

NEWS: @LGBcoin_io joins @brandonbrown_68 and Brandonbilt Motorsports as full season primary partner for the 2022 @NASCAR_Xfinity Series season!

Press release: bmsraceteam.com/teamupdates

10:02 AM · Dec 30, 2021 · Twitter for iPhone



**Let's Go Brandon Coin ($LETSGO)**
@LGBcoin_io

𝔻ℝ𝕌𝕄 ℝ𝕆𝕃𝕃 please 🥁: Number 68 @NASCAR driver @brandonbrown_68 endorses @LGBcoin_io , America's Coin!
#letsgobrandon #letsgoamerica

10:48 AM · Dec 30, 2021 · Twitter for iPhone

74



155.    Koutoulas also posted a picture on his personal Twitter account of Brandon Brown standing next to his racecar with the LGBCoin logo prominently displayed on the hood:



156.    Koutoulas told *USA Today* that he and LGBCoin had "put together proposed car designs a month or so ago before any of this happened because we thought (Brown) was obviously the best guy to naturally do a national sponsorship with.  So we had it ready to go[.]"[25]

157.  In the 24 hours leading up to BMS's, Brandon Brown's, and LGBCoin's Sponsorship announcement and the 24 hours following, the value of a single LGBCoin increased 64% from $0.00000098 on December 29, 2021, to $0.000001646 the morning of December 31, 2021.[26]

### 3.    Koutoulas and Norden's Use of Conservative Influencers to Promote LGBCoin

158.    In addition to promoting LGBCoin's relationship to Brandon Brown, BMS, and NASCAR, Koutoulas, and Norden used their Instagram and Twitter accounts to promote LGBCoin and/or post pictures of themselves wearing the

---

[25]    Josh Peter, *NASCAR driver Brandon Brown's new paint scheme that references vulgar anti-Biden meme in limbo*, USA TODAY, Dec. 31, 2021, https://www.usatoday.com/story/sports/nascar/2021/12/31/nascar-driver-brandon-browns-new-anti-biden-paint-scheme-limbo/9059843002/.

[26]    Daniel Villareal, *'Let's Go Brandon' Coin Rallies as NASCAR Grapples With Insult to President Joe Biden*, NEWSWEEK, Dec. 31, 2021, https://www.newsweek.com/lets-go-brandon-coin-rallies-nascar-grapples-insult-president-joe-biden-1664789.

LGBCoin logo alongside prominent Republican public figures such as former President Donald J. Trump, Donald J. Trump, Jr., Peter Thiel, Texas Governor Greg Abbott, Arizona Senate candidate Blake Masters, and City of Miami Mayor Francis Suarez.

159.   For example, on or around November 11, 2021, Gillels raised the possibility of recruiting Cawthorn to promote LGBCoin.  Norden enthusiastically endorsed this idea, saying Cawthorn was a "legend" and that they could get in contact with Cawthorn through "Alex B."  Gillels added his own contact to Cawthorn – upon information and belief, influencer Hugie Johnston – informed him that "its something best discussed on a secure call or better yet face to face. Koutoulas confirmed that he was "down for either."

160.   On November 13, 2021, Gillels reported on Signal that a competitor token project was rumored to have conservative influencer David Harris onboard. Norden responded that "we have someone talking w him I believe."  Koutoulas confirmed "ya he gonna be at our trump table I think."

161.   Around the same time Koutoulas worked to get LGBCoin listed on various cryptocurrency exchanges.  In particular, on November 20, 2021, Koutoulas wrote an email to the Bittrex exchange, indicating that Bill Shihara had instructed

him to reach out about listing LGBCoin on Bittrex. Koutoulas stated he was "a major HODLer of LGB as well as an existing Bittrex fund customer via Leonidas Cryptocurrency Fund." Koutoulas claimed the "LGB team is finalizing a sponsorship deal with NASCAR to make Brandon's car the LGBCoin.io car." Koutoulas went on to brag about the naivety of the investors in LGBCoin could be used to boost new user growth at the exchange: "hundreds of people with no crypto experience have been jumping through all the hoops to buy via uniswap and coinbase wallet. The team thinks this coin will catalyze a huge in flow. Of new crypto users to whatever exchange lists it first."

162. Throughout December 2021, Koutoulas also promoted LGBCoin at several prominent cryptocurrency and conservative events, including at Puerto Rico Blockchain Week, Turning Point USA's AmericaFest in Phoenix, Arizona, a dinner party at Mar-a-Lago, and former President Donald J. Trump's Christmas party in Naples, Florida.

163. Koutoulas and Norden also promoted LGBCoin on several conservative podcasts, including UnBossed Reporting with Brendon Leslie at

Florida's Conservative Voice on or about December 29, 2021,[27] and the Patriot Talk Show with Brendon Leslie at Florida's Conservative Voice on or about December 28, 2021.[28]

164. Koutoulas also promoted LGBCoin through interviews on The David J. Harris Jr. Show podcast, which was recorded on or about December 13, 2021, and aired on or about December 22, 2021,[29] and Roundtable, which aired on or about December 14, 2021.[30] Koutoulas boasted during his Roundtable interview that "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap already without even being on a centralized exchange, [with] only 5,000 holders."[31]

---

[27] Brendon Leslie, *We're hanging out the Let's Go Brandon Coin guys discussing conservative news in Florida*, UNBOSSED REPORTING, Dec. 29, 2021, https://twitter.com/i/broadcasts/1eaKbNyjrOjKX.

[28] Brendon Leslie, *We're Live at Seed to Table with our guests the major HODLers of Let's Go Brandon Coin!* PATRIOT TALK SHOW, Dec. 28, 2021, https://twitter.com/BrendonLeslie/status/1475980992749846529.

[29] *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 15:51.

[30] Roundtable Crypto, *Let's Go Brandon Meme Coin Gains Traction In Conservative Circles*, ROUNDTABLE CRYPTO, Dec. 14, 2021, https://roundtablecrypto.io/political/lets-go-brandon-new-coin.

[31] *See id.*

Koutoulas similarly proclaimed on David J. Harris Jr.'s podcast that "the coin is already about $350 million in market cap."[32]

165.   In addition to his repeated posts and statements encouraging the public as a means of supporting the conservative movement, Koutoulas, a public figure himself, actively recruited and retained conservative influencers to serve as the promotors following the launch of the LGBCoin in November 2021.

166.   Upon information and belief, these influencers received LGBCoins and/or other forms of consideration as part or all of their compensation for promoting LGBCoin.

167.   On November 24, 2021, conservative personality Candace Owens posted the following solicitation for LGBCoin on her Twitter account @Real CandaceO, which has over three million followers:



---

[32]   *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 15:51.

168.     Defendant Horsman endorsed Owens' promotional post in a now deleted post from Horsman's official Twitter account.[33]

169.     Owens' promotional post generated a lot of media attention.[34]

170.     On or about December 6, 2021, at a Republican political event at Mar-a-Lago, Koutoulas promoted LGBCoin by wearing an LGB button throughout the event and appearing alongside political figures like Congressman Madison Cawthorn.[35]     A picture shared by Koutoulas's official Instagram account shows Koutoulas (right) with Cawthorn (left) during the event:

---

[33]     *See*     https://web.archive.org/web/20211125210529/https://twitter.com/horsmanp/status/1463714935481929728.

[34]     https://twitter.com/RealCandaceO/status/1463702086684749826; Ewan Palmer, *Lets Go Brandon' Crypto Coins Are Being Pushed by Conservative Figures*, NEWSWEEK, Nov. 25, 2021,     https://www.newsweek.com/lets-go-brandon-crypto-coin-launch-conservatives-1653334.

[35]     Koutoulas, James [@jameskoutoulas], (Dec. 4, 2021), *About last night. . .* [Photograph] Instagram. https://www.instagram.com/p/CXFqJI6LQOf

81



171.   Upon information and belief, this was also the event that Norden and Koutoulas had previously discussed with Gillels as an opportunity to solidify David Harris Jr.'s exclusive promotion of LGBCoin, through gifting Harris Jr. a significant portion of LGBCoins.  Norden and Koutoulas followed through on their plan as evidenced by the following post from Koutoulas – a picture of Koutoulas with Harris and Norden from the event – with the comment that Harris was a "boss @lgbcoin.io HODLer":



jameskoutoulas Nothing finer than watching boss @lgbcoin.io HODLer @davidjharrisjr get a shoutout from @realdonaldtru...

172.    Koutoulas and Norden also used Cawthorn to promote the sale of LGBCoin at the Mar-a-Lago event and to investors following the event through social media.  In particular, the LGBCoin social media account – which is directly controlled by Koutoulas and Norden - promoted a picture of Cawthorn alongside Alex Giuliani (left) and Lauren Norden, Erik Norden's wife (right), with the caption "@LGBCoin.io babes":[36]

---

[36]     An image of this promotion was captured and posted on Twitter, *see* https://twitter.com/patriottakes/status/1467924649501765639?s=20&t=M4G9G6ezbWKdZ 79SYUm2EA.



173. Similarly, the LGBCoin social media account posted a picture of Cawthorn (sitting on the right) having an "LGB Meeting" with Horsman (standing on the left), Koutoulas (standing on the right), and major conservative influencer Rogan O'Handley, a/k/a DC Draino (standing center), at the Mar-a-Lago event to its social media platforms in an effort to promote LGBCoin as being backed by powerful political interests:[37]

---

[37] https://twitter.com/patriottakes/status/1467937685130170375 (last visited Jul. 19, 2022).



174. As one commentator following the Mar-a-Lago event noted on December 6, 2021, during this event, "people . . . were posting online that LGB coin was doing well and others were falling."[38]

175. Koutoulas, on behalf of the "LGB Foundation" also publicly gifted conversative activist Charlie Kirk $100,000 worth of LGBCoin to further promote LGBCoin during the Mar-a-Lago event.[39]

---

[38] https://twitter.com/patriottakes/status/1467943522074513417 (last visited Jul. 19, 2022).

[39] https://twitter.com/patriottakes/status/1467945291567575041 (last visited Jul. 19, 2022).

176.   After the Mar-a-Lago event, Koutoulas gave an interview with conservative public speaker and author, David J. Harris, Jr. on December 14, 2021. During the podcast interview with Koutoulas, Harris made the following statement:

> And if it does, uh, take off like I think it's going to, then maybe it will grow and make a nice little bonus for you.  ***But, uh, I know you have some other things in the works that we cannot get into.  Some very exciting things that should make national headlines, without a doubt, uh, and some very interesting people that are also aligning with this that I know my audience will absolutely love.***  But. . . uh . . .I know we can't get into that yet, so [Koutoulas], I'd love to have you back on in the very near future.  And again, friends, if you're going to get some coin, I'd say get some as soon as you can 'cause once some of this stuff breaks, it's just, ***it's gonna increase, it's what they do***. . . .

> Friends, get over to, uh, L—LGB . . . LGBCoin.io, LGBCoin.io. Read the story.  Read more about [Koutoulas], what he's done, uh, you can verify everything that I've said that we've shared.  Do your own research.  But I'm telling you, I'm only bringing you the stuff that I believe in and that I think will be a powerful blessing for those people who are watching or listening.  So share this with as many people as possible . . . .

> ***I have some of this coin.***  I know Candace Owens has promoted this coin.  ***There's going to be some other very big*** names***, very soon.*** They're going to be talking about it and uh, this is your chance to get in early. . . . ***Please share this with as many people as you can — 10,***

*25 friends, 50 friends.*  Share it, let's get the word out, we need to — we need to bless [Koutoulas].[40]

[Emphasis added.]

177.   On December 19, 2021, LGBCoin's Twitter account posted a link to a *New York Times* article "Brandon Just Wants to Drive His Racecar," which came out on the same day.  Mascioli posted this article as well the following day.[41]

178.   On December 20, 2021, *Newsweek* magazine published an article prepared by Levick Communications on behalf of Brown entitled "My name is Brandon," designed to further the LGBCoin partnership.  In the article, Brown claimed that he was not a political person despite being thrust into the political spotlight due to the "Let's Go Brandon" chant.[42]  Brown stated that he had "no interest in leading some political fight," but rather, would focus on "problems we face together as Americans."  Brown elaborated on this point:

> I understand that millions of people are struggling right now
> and are frustrated.  Struggling to get by and struggling to build a solid

---

[40]   *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 29:58-30:39, 31:53-32:58.

[41]   https://twitter.com/AlexMascioli/status/1472886572123103237 (last visited Jul. 19, 2022).

[42]   Brandon Brown, *My Name Is Brandon | Opinion*, NEWSWEEK.COM, Dec. 20, 2021, https://www.newsweek.com/my-name-brandon-opinion-1660525.

life for themselves and their families, and wondering why their government only seems to make it worse.

<p style="text-align:center">*    *    *</p>

Listen, I buy more gas than most.  I don't like that $4 per gallon has become the norm.  I know the cost of everything is rising and I know first-hand that making ends meet can be a struggle for middle-class folks like me.

<p style="text-align:center">*    *    *</p>

I will use what free time I have to highlight the struggle we all feel and share, as Americans.

179.  LGBCoin's Twitter account, at the individual defendants' direction, Mascioli, and Koutoulas reposted the Brandon Brown *Newsweek* article that same day.[43]

180.  Also on December 20, 2021, Koutoulas gave a speech at an event sponsored by non-profit organization Turning Point USA, called AmericaFest 2021 ("Amfest 2021").[44]  Amfest 2021 featured many notable conservative politicians and speakers, and Koutoulas used his proximity to these public figures to promote LGBCoin as being tacitly approved and/or endorsed by these figures.

---

[43]     https://twitter.com/jameskoutoulas/status/1472941662229852163; https://twitter.com/AlexMascioli (last visited Jul. 19, 2022).

[44]     https://www.instagram.com/tv/CXtuLKsDVQL/ (last visited Jul. 19, 2022).

<p style="text-align:center">88</p>

181.   As Harris' promotional efforts were taking place between December 12, 2021 and December 20, 2021, the trading volume correspondingly rose approximately 534%.

182.   Harris continued to promote LGBCoin and a big forthcoming announcement with the following Instagram post on or about December 22, 2021, which both LGBCoin, at the individual defendants' direction, and Congressman Madison Cawthorn shared from their social media accounts:



183.   On December 23, 2021, Harris posted the following endorsement video[45] for LGBCoin on his Instagram account @davidjharrisjr, which has over 1.5 million followers:

_____

[45]     The video is footage from Harris' podcast interview with Koutoulas, which was recorded on or about December 13, 2021, and aired on or about December 22, 2021.



184.    In his December 23rd Instagram post, Harris, wearing a Let's Go Brandon t-shirt, plainly endorses the coin to his followers and proclaims that the LGBCoin is "going to be huge!!!"

185.    Trading volume for LGBCoin rose over 31% the day of Harris' promotions, going from $2,653,477 on December 22, 2021 to $3,478,490 on December 23, 2021.[46]

---

[46]    https://coinmarketcap.com/currencies/lets-go-brandon/historical-data/ (last visited Jul. 19, 2022).

186.    Harris continues to support LGBCoin by posting numerous photos and videos on his Instagram account wearing Let's Go Brandon apparel and even sells Let's Go Brandon apparel on the David J. Harris Jr. official online store.[47]

187.    Similarly, Austen Fletcher a/k/a Fleccas, host of the conservative podcast show "Fleccas Talks," is an LGBCoin holder and acted as an avid promotor for LGBCoin on numerous social media platforms, including but not limited to, his podcast show Fleccas Talks; his YouTube channel Fleccas Talks; his Twitter account @fleccas; and his Instagram account @fleccas.

188.    Fletcher's combined social media following from YouTube, Twitter, and Instagram amounts to over 1.2 million.[48]

189.    In an email dated December 27, 2021, Koutoulas sent Fletcher his bio and headshot in advance of a scheduled appearance by Koutoulas on Fletcher's podcast.  In the body of the email, Koutoulas told Fletcher to obscure the nature of his involvement and financial interest in LGBCoin, stating: "Just please don't

---

[47]    *See* David J. Harris Jr. official online store, https://davidharrisjr.store (last visited Jul. 19, 2022).

[48]    *See* Fletcher's YouTube Channel, https://www.youtube.com/c/FleccasTalks (last visited Mar. 4, 2022); Fletcher's Twitter account, https://twitter.com/fleccas (last visited Mar. 4, 2022); and Fletcher's Instagram Account, https://www.instagram.com/fleccas/ (last visited Mar. 4, 2022).

mention typhon at all. Our big institutional clients made me agree to that in order to do coin thing. We call me a HODLer of LGB as opposed to involved in management."

190. On December 28, 2021, Leslie obliged Koutoulas' request to hide the true nature of his involvement with LGBCoin. Leslie promoted Koutoulas' appearance on the Patriot Talk Show, referring to Koutoulas only as one of the "Major HODLer's of Let's Go Brandon Coin" instead of one of the founders and executives behind LGBCoin.

191. On December 28, 2021 and December 30, 2021, Fletcher reposted the following solicitations (including the aforementioned post from Leslie) for LGBCoin on his Twitter account @fleccas:

    a. December 28, 2021:



b. December 30, 2021:









192. On December 28, 2021, and December 29, 2021, Founder and Editor in Chief of Florida's *Conservative Voice*, Brendon Leslie, promoted LGBCoin in two video podcasts he posted to his 60,000+ followers on personal Twitter account @brendonleslie and 3,000+ followers the Florida Conservative Twitter account under @FLVoiceNews.

193.    During the December 28, 2021, Patriot Talk Show with Brendon Leslie, which upon information and belief, was recorded at the Seed to Table market in Naples, Florida, an audience member asked Leslie how to purchase LGBCoin. Leslie coyly responded that, "It's . . . a . . . very easy.  And I recommend doing it *for no apparent reason of knowledge that I know, I recommend buying it tonight.  Just saying*.  You go to LGBCoin.io."[49]  Koutoulas and Norden then laughed at Leslie's response because they understood the value of LGBCoin would rise significantly once Brandon Brown and BMS announced their NASCAR Sponsorship with LGBCoin.

194.    Leslie continued to encourage his viewers to purchase LGBCoin the following day during his UnBossed Reporting video podcast recording in Florida, stating:

> LGBCoin.io.  Head over to there.  It explains what you got to do to be able to get this LGB coin.  *I've been stressing it for the last 48 hours . . . 24 hours . . . buy now*.  That's all I can say.  *Buy now*.  *Buy now.* Because —

---

[49]    Patriot Talk Show, https://twitter.com/BrendonLeslie/status/1475980992749846529, Minute 24:50-25:10. (last visited Jul. 19, 2022).

Leslie is then cut off by Norden, who looks at Koutoulas and insinuates the imminent LGBCoin sponsorship announcement by noting the impending change to LGBCoin's website.[50]

195.   On December 30, 2021, LGBCoin, along with Brandon Brown and BMS, announced the NASCAR Sponsorship, which Leslie retweeted on his personal Twitter account and the Florida Conservative Twitter account:



196.   Norden also repeatedly promoted LGBCoin on Leslie's podcasts and identified himself as someone "wrapped in this LGB every day, 24/7"[51] and a self-proclaimed, "avid" meme creator for LGBCoin.  During the December 28, 2021, Patriot Talk Show with Brendon Leslie, Norden emphasized how important it was

---

[50] *Id.* at 19:10-19:29.

[51]      *Id.* at 9:27-9:31.

for him to make memes to promote and inflate LGBCoin's value, stating "***memes move markets***.  They really do.  You know, you have one good meme, and it gets reposted by the right person, and you have a slew of buys and you do it the wrong way and you get a slew of sales.  ***And they're really big market movers.***"[52]

197.    Norden reiterated during the December 29, 2021 UnBossed Reporting with Brendon Leslie podcast that the misleading origin story that Koutoulas "was gifted a trillion tokens as a thank you for . . . the ten-year anniversary of MF Global" and added ". . . six weeks later you know, we . . . you know, ***I kept making memes and had the right accounts pick them up***, . . .   And yeah, it just became . . . ***it just went from . . . zero dollars to $330 million in market cap***."[53]

198.    Norden also posted and re-shared several of these market-moving memes on his social media accounts directing investors to lgbcoin.io's website and social media pages and encouraging them to purchase LGBCoin:

---

[52]     *Id.* at 9:50-10:09.

[53]     *Id.* at 12:17-12:45.
















199.   As an executive officer of a hedge fund, Koutoulas (who also touts himself as an "investor protection" attorney) knew or should have known that his promotional activities with Norden were misleading and improperly inducing retail investors like Plaintiffs and the class to purchase the unregistered security LGBCoin.

200.   For example, in a recorded zoom interview with Carter and Koutoulas where they were discussing LGBCoin and its origins, Carter recounts the false origin story of how he created LGBCoin and gifted Koutoulas one trillion LGBCoins.  Koutoulas enthusiastically says "Let's go Brandon.  1 trillion coins. Yeah baby!  Rocket to the moon!" while clapping his hands and pumping his fist. A few moments later, Koutoulas composes himself and then disclaims "please note,

it has no value.  It is a digital collectible only.  Don't spend money on it unless you want to light it on fire but [Koutoulas pauses at this point for a moment then says] . . . *to the moon*."

201.    The cliché "this is not financial advice" disclaimer Koutoulas gives in this interview (similar to the "just a meme coin" disclaimer in LGBCoin's pseudo whitepaper) is immediately undercut by the declaration by Koutoulas to reassure investors that the price of LGBCoins was nevertheless going to go up "to the moon."

202.    Likewise, the following December 29, 2021 post – a picture of Koutoulas and Norden both wearing LGBCoin buttons and posing with Cawthorn – and comment exchange with Koutoulas and Cawthorn, respectively, from Koutoulas' Instagram account gives the same messaging:



203.    On December 21, 2021, Koutoulas transfers from Wallet 0x85e 180 billion LGBCoins to Cawthorn.  Ten days later, right after LGBCoin announced a sponsorship of NASCAR driver Brandon Brown, the Cawthorn Wallet sells off 65.8 billion LGBCoins worth approximately $105,000 in Wrapped Ethereum. Cawthorn's December 29, 2021 comment on Instagram to Koutoulas that "Tomorrow we go to the moon!" indicates that Cawthorn knew about the impending announcement directly from Koutoulas and sold off on the run up.

204.    Notably, the Congressional House Committee on Ethics launched an investigation of Cawthorn's activities.  The subcommittee's report found that in

December 2021 Cawthorn provided a $150,000 check made out to Koutoulas for 180 billion LGB Coin. But the actual value of the amount of LGB Coin at the time he received it was more than what he had paid, according to the report, which called it an improper gift.

205. The Committee also sought testimony from Koutoulas, who it referred to as Witness 1 in its report. The Committee found Koutoulas's testimony to not be credible, noting that his testimony contradicted other testimony and that Koutoulas claimed to not know the basis for Cawthorn's written statement that was written solely by Koutoulas.

206. The Committee did not find sufficient evidence of insider trading or fraud writing that there "is not clear evidence on the record showing [Koutoulas] gave Representative nonpublic, material information or that Representative Cawthorn purposefully sold his LGB Coin in order to gain a maximum return on his investment."

207. However, LGBCoin insiders knew differently. As Koutoulas's Typhon's Director of Investor Relations and LGBCoin insider Jasmina Midzic notes in the LGB Marketing Team group chat, Madison Cawthon sold LGBCoin immediately after the NASCAR announcement at Koutoulas's direction.



208.   The promotion by Cawthorn and Cawthorn's purchase increased the available trading volume of LGBCoin and provided exit liquidity for the sales by the Individual Defendants and other LGBCoin insider (who, as discussed in the wallet tracing section below, also sold all the way up to the price peak).

209.   Koutoulas and Norden repeatedly promoted LGBCoin through public statements about how fast the LGBCoin market cap had grown since launch. For example, during his Roundtable interview on December 14, 2021, Koutoulas bragged that "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap already without even being on a centralized exchange, [with]

only 5,000 holders."[54]  One week later Koutoulas similarly proclaimed on David J.

Harris Jr.'s podcast that "the coin is already about $350 million in market cap."[55]

The following week, on December 29, 2021, Norden gave the same promotional

talking point on the UnBossed Reporting podcast that LGBCoins "went from $0 to

$330 million."[56]

210.    These promotional pitches, along with the "to the moon"

exclamations, speak only to the value of the LGBCoin and how it is poised for

continued growth.  As financial advisors themselves, Koutoulas and Horsman

were aware, or should have been aware, that their promotional activities

undermined any of their boilerplate disclaimers.

211.    Koutoulas continued to use his association with celebrity influencer

Candace Owens as a way to promote LGBCoin and prop up investor interest

---

[54]    Roundtable Crypto, *Let's Go Brandon Meme Coin Gains Traction In Conservative Circles*, ROUNDTABLE CRYPTO, Dec. 14, 2021, https://roundtablecrypto.io/political/lets-go-brandon-new-coin.

[55]    *See* The David J. Harris Jr. Show, DJHJ MEDIA INC., Dec. 22, 2021, https://podcasts.apple.com/us/podcast/the-david-j-harris-jr-show/id1485932439, 15:51.

[56]    Brendon Leslie, *We're hanging out the Let's Go Brandon Coin guys discussing conservative news in Florida.* UNBOSSED REPORTING, Dec. 29, 2021, https://twitter.com/i/broadcasts/1eaKbNyjrOjKX.

following January 6, 2021, as Koutoulas' January 6, 2022, Instagram post with

Giuliani shows:



212. The aforementioned promotional activities by Koutoulas, Horsman,

Norden, and others generated the trading volume needed for the Individual

Defendants and their co-conspirators to offload their LGBCoin allocations onto

unsuspecting investors. While Plaintiffs and class members were buying the

inappropriately promoted LGBCoin, Individual Defendants and their cohorts were

able to, and did, sell their LGBCoin during the Relevant Period for substantial

profits. LGBCoin admits as much when describing the failure of the LGBCoin, stating that "without sales restrictions, large holders were able to sell into the announcements, putting the sustainability of the project at risk."[57]

213. Further, Defendants conspired together to accomplish these sales. An example is found in a spreadsheet accounting for a $1 million sale of LGBCoin made in December 2021 where the LGBCoin principles allocate the proceeds between themselves.



| LGBcoin.io Block Trade Allocation Form | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Buyer: | Jeff Hanson | | | | Consortium Parties: | % of trade | Opt-In? | Adjusted Allocation % | ERC20 Wallet |
| Seller(s): | LGBcoin.io DAO + Supporter Consortium | | | | LGBCoin.io DAO | 40.00% | X | 40.15% | |
| Introducer: | James Heckman | | | | JK | 19.70% | X | 19.77% | 0xe8804f0b2c67d93639SBAb9b372351cf7398fA047 |
| USD On-Ramp Provider: | Scott Valtier | | | | PH | 12.92% | X | 12.96% | |
| | | | | | AM | 22.00% | X | 22.08% | |
| Purchase Price: | $ 1,000,000.00 | | | | XB | 4.45% | | 4.47% | |
| Purchase Currency: | USD | | | | DR | 2.00% | X | 2.01% | |
| LGB Valuation at time of fill: | 260,363,753.00 | | | | RL | 1.70% | X | 1.71% | |
| Discount applied: | 25% | | | | SV | 1.00% | X | 1.00% | |
| Net Valuation for Quantity Calculati | $ 195,272,364.75 | | | | JH | 0.30% | X | 0.30% | |
| Percent of Diluted Float Purchased | 0.512% | | | | Total opted-in: | 99.62% | | | |
| LGB Quantity to be Delivered: | 1,889,947,271,456 | | | | | | | | |
| On-Ramp Commission Rate: | 2% | | | | | | | | |
| On-Ramp Commission paid to Scott | $ 20,000.00 | | | | | | | | |
| Introducer Commission Rate: | 5% | | | | | | | | |
| Introducer Commission paid to Jam | $ 50,000.00 | | | | | | | | |
| Net Proceeds for Consortium: | $ 920,000.00 | | | | | | | | |
| | USD in | LGB out | Wallet | | | | | | |
| Allocation to LGBCoin.io DAO | $ 369,366.66 | 678,489,319,062.89 | 0 | | | | | | |
| Allocation to JK | $ 181,913.08 | 334,155,969,636.47 | 0xe8804f0b2c67d93639SBAb9b372351cf7398fA047 | | | | | | |
| Allocation to PH | $ 119,397.77 | 219,326,672,397.00 | 0 | | | | | | |
| Allocation to AM | $ 203,151.66 | 372,169,125,494.59 | 0 | | | | | | |
| Allocation to XB | $ - | 75,401,936,745.75 | 0 | | | | | | |
| Allocation to DR | $ 18,468.33 | 33,924,465,953.14 | 0 | | | | | | |
| Allocation to RL | $ 15,698.08 | 28,835,796,060.17 | 0 | | | | | | |
| Allocation to SV | $ 9,234.17 | 16,962,232,976.57 | 0 | | | | | | |
| Allocation to JH | $ 2,770.25 | 5,088,669,892.97 | 0 | | | | | | |

03102023PRODQ450406.

---

[57] *See* New LetsGoBrandon.com Crypto coin ($LETSGP) Relaunched with 3 Significant Announcements, https://roundtable.io/crypto/letsgo/news/new-letsgobrandon-com-crypto-coin-letsgo-relaunched (last visited Jul. 19, 2022).

214.    As the spreadsheet indicates, proceeds of this sale, which is to be filled from one of Koutoulas's wallets, are allocated to Koutoulas, Horsman, Mascioli, Latona, Walker, Heckman, and others, providing all of them substantial profit through the sale of the unregistered security, LGBCoin.

### 4.  NASCAR's Approval of the LGBCoin Sponsorship

215.    NASCAR sponsorship by its sponsors is intended to increase the sales of the sponsors' products.  When sponsors increase their sales and revenues through a NASCAR sponsorship, those increased sales serve to attract more sponsors to NASCAR.  Thus, NASCAR has an incentive to foster and approve successful sponsorship relationships, including the LGBCoin sponsorship.

216.    NASCAR generates revenue through broadcasting rights, sponsorship agreements, ticket sales, and licensing agreements, among other things.  It is to NASCAR's benefit if its sponsorships facilitate and induce purchases of and brand loyalty to the sponsors' goods or services.  When a NASCAR sponsorship increases revenue for its sponsor, it attracts and holds sponsors to NASCAR.  Thus, in this case, NASCAR had a strong interest in inducing the sale and success of LGBCoin.

217.    In furtherance of its own financial interests, on December 26, 2022, NASCAR gave its approval of the sponsorship to Brandon Brown, BMS, and LGBCoin.  NASCAR also knew approval provides exposure and marketing

advantages and thus was essential to the promotion and the value of the LGB cryptocurrency. To achieve the financial benefits NASCAR received from the sponsorship, NASCAR intended to induce purchases of LGBCoin by approving the sponsorship.

218. The value and sale of LGBCoins increased following the announcement of the approval of the LGBCoin sponsorship; the value sank to zero when it was disclosed that NASCAR had revoked its approval.

219. As far back as early November, 2021, NASCAR entertained a sponsorship with LGBCoin and was well aware of LGBCoin's desire to promote and associate Brandon Brown and the LGBCoins with NASCAR. On November 2, 2021, Matt Humphreys with Track Communications at NASCAR emailed Nyquist asking him to meet with MacLeod to discuss BMS' business development with LGBCoin:

| | |
|---|---|
| From: | Humphrey, Matt </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b206a88a24594090808c7d37dac4a7b6-mhumphrey@n> |
| To: | Nyquist, Eric |
| Sent: | 11/2/2021 1:04:38 AM |
| Subject: | Brandon Brown - Counsel |

Eric,

I just had a lengthy conversation with Mac McLeod, who handles comms for Michael McDowell and Brandon Brown. With Brandon, he's also involved with that team's business development and they are being approached by quick-buck cryptocurrency hucksters trying to cash in on Let's Go Brandon.

Meanwhile, they are contemplating a campaign for the NXS Most Popular Driver Award that would include a social media video that spoofs a political campaign.

As you can see, this team needs some advice. Would you have a few moments on Saturday to spend some time with Mac and perhaps even Brandon to walk them through strategies on how to address this?

They are continually being hounded for comment on Let's Go Brandon and they want to find a way to address this without jeopardizing their political neutrality.

Please advise and I can connect you with Mac.

All the best,
Matt

Matt Humphrey | Track Communications | NASCAR
Auto Club Speedway | Iowa Speedway | Kansas Speedway | Phoenix Raceway
(386) 453-8693 | mhumphrey@nascar.com



220.    NASCAR executives then met with Brown, BMS owner Jerry Brown, and LGBCoin's representative, Mascioli, and others on November 6, 2021, to discuss the possibility of a sponsorship with LGBCoin.[58]

221.    Present at the meeting were Eric Nyquist ("Nyquist"), NASCAR Senior Vice President and Chief Communications & Social Responsibility Officer, Jennifer Knoeppel ("Knoeppel"), NASCAR Senior Director, Team, Driver & Industry Communications, and Justin Swilling ("Swilling"), NASCAR Senior Manager, Driver & Team Marketing, and BMS driver Brandon Brown, BMS owners

---

[58]    See Liz Clark, *NASCAR Rejects Sponsorship Deal Based on 'Let's Go Brandon' Chant*, THE WASHINGTON POST, Jan. 4, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/.

Jerry Brown and David Clarke, BMS Director of Marketing Mac MacLeod ("MacLeod"), and Mascioli, Co-founder of Trade the Chain, the current BMS sponsor.  At the meeting, Nyquist advised that while NASCAR management was in discussions with regards to their future policies moving forward on politics, political candidates, and political issues being displayed on race cars, there was no new rule at that time.  Nyquist also said that while LGBCoin and BMS were free to use the meme "Let's Go Brandon" in any way they wanted off the track, NASCAR would not approve us to use the meme "Let's Go Brandon" on the race car as they were trying to steer away from political issues.  However, LGBCoin and BMS were never told that they could not use the phrase LGBCoin. They also discussed the possibility of a joint press conference on the issue.

222.   While NASCAR claimed it rejected the idea at this November 2021 meeting after the fact, NASCAR did absolutely nothing to distance itself from a prospective sponsorship with Brandon Brown and LGBCoins and the publicity connecting NASCAR to LGBCoin.

223.   For example, two days after the Talladega Race and leading up to the championship weekend at Phoenix Raceway, NASCAR president Steve Phelps commented on the Let's Go Brandon chant and its political connotations.  Notably,

the issue that most displeased Phelps was that some of the Let's Go Brandon apparel being sold featured NASCAR's trademarked color bars and added that NASCAR would be pursuing legal action against those who are profiting off the phrase using said bars: "We will pursue whoever (is using logos) and get that stuff. That's not OK.  It's not OK that you're using our trademarks illegally."[59]  While NASCAR was willing to pursue legal action against those merchants who did not cut NASCAR in on the merchandise sales for Let's Go Brandon apparel, NASCAR has not pursued any legal action (copyright, trademark infringement, or otherwise) against LGBCoin, the Individual Defendants, Brown, or BMS.

224.    NASCAR approved LGBCoin and TradetheChain.com to be Brandon Brown's sponsors for the upcoming Daytona 500 race no later than December 26, 2021.

225.    BMS's MacLeod submitted all necessary information concerning LGBCoin.io's potential sponsorship to Defendant NASCAR's Director of Operations, Dale Howell.  Howell approved the sponsorship on December 26, 2021, by email writing "The sponsors are approved."

---

[59]    Asher Fair, *NASCAR is going after some let's go Brandon' users*, FANSIDED – MINUTE MEDIA,  Nov.  14,  2021,  https://beyondtheflag.com/2021/11/14/nascar-going-lets-go-brandon-users/.

226.   The email exchange between MacLeod and NASCAR's Howell confirmed LGBCoin's sponsorship details: specifically referenced the LGBCoin name, LGBCoin.io, prominently featured the LGBCoin logo:

| | |
|---|---|
| **From:** | Howell, Dale </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8FD112E6A8DE40279900EBF8FC727973-HOWELL, DAL> |
| **To:** | Mac MacLeod |
| **Sent:** | 12/26/2021 1:48:09 PM |
| **Subject:** | Re: Brandonbilt Motorsports Paint Scheme Submission - Daytona |
| **Attachments:** | Brandon Brown Daytona 1 Submission.jpg |

Good morning Mac,

The sponsors are approved however please clean up the markings around the number especially the white stars touching the white number.

2022 we are really going to hone in on keeping the numbers clean per the rule book nothing within 2" should be touching the numbers we understand some step and repeats, however in this case white and white makes it blob.

My rule of thumb is step back from the computer screen and see how it looks. In the shop or up close it looks fine but think about the tower or safety vehicles seeing it go 170mph

Dale Howell
NASCAR Racing Operations
386-235-1465

On Dec 25, 2021, at 1:20 PM, Mac MacLeod <mac.macleod@fastlanemediainc.com> wrote:

**WARNING: This email originated outside of NASCAR Enterprises, LLC.**
**DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe**

Dale, good afternoon and Merry Christmas!

I'm sure that you won't see this until sometime next week, but I just received this from the team and wanted to get it in front of you for a hopeful approval next week. I tried submitting via the paint scheme portal, however there are no race events listed to select from.

The attached paint scheme is being submitted for Daytona.

**General**
**Driver:** Brandon Brown
**Owner:** Jerry Brown
**Entry List:** LGBCoin.io Chevrolet Camaro

**Events**
Daytona

**Sponsor:** *They are a Cryptocurrency*
**Hood:** LGBCoin.io
**Decklid:** LGBCoin.io
**TV Panel:** LGBCoin.io
**Rear Quarter Panel:** LGBCoin.io
**Lower Front Quarter Panel:** None
**Lower Rear Quarter Panel:** TradeTheChain.com
**B Post:** None
**C Post:** TradeTheChain.com
**Spoiler:** None
**Roof:** LGBCoin.io
**Side Skirt:** None
**Door Panel:** None

**Paint Scheme:** *Attached to email*

Please let me know if you have any questions. Looking forward to hearing from you next week.

Thanks!

Mac MacLeod
<Brandon Brown Daytona 1 Submission.jpg>

227.   The sponsorship approval was unambiguous.

228.    Based upon this written approval, Mascioli and BMS subsequently issued a press release announcing the LGBCoin sponsorship approval on December 30, 2021.

229.    Brown filmed a promotion unveiling his car and LGBcoin as his official sponsor, and BMS incurred costs in wrapping the racecar and hauler and purchasing fire suits in reliance on the approval.

230.    NASCAR did not deny it had given its approval or publicly issue a withdrawal of that approval until seven days later on January 5, 2023.

231.    During this seven-day period, LGBCoin soared to new all-time-highs and record volume of over 5 million on December 31, 2021, as the announcement generated millions of media views globally and thousands of new buyers purchased LGBCoin in reliance on NASCAR's approval of the LGBCoin sponsorship of Brandon's car.

232.    Following LGBCoin's launch, the Individual Defendants' promotional activities in November and December 2021, and NASCAR's December 26, 2021, approval of the Sponsorship among Brandon Brown, BMS, and LGBCoin, the trading volume and price of LGBCoin surged.  On January 1, 2022, LGBCoin reached the maximum price of $0.000001734, which represents 510% increase from

its initial price of $0.00000034. CoinMarketCap reflects that there were 5,281 unique account holders of LGBCoin the day before the Sponsorship announcement, which skyrocketed to 10,257 unique account holders of LGBCoin by January 5, 2022. At its height, LGBCoin reached a market value of more than $570 million[60] with a liquidity pool of $6.5 million.[61]

### D. Wallet Tracing Proves Ill-Gotten Gains Received by LGBCoin Insiders

#### 1. Individual Defendants Koutoulas and Horsman

##### a. Koutoulas

233. Koutoulas used the following wallet addresses to sell and/or transfer his LGBCoins to other wallets under his ownership and/or control that also sold off:

- 0x40ecf54ad6339e0b346a48f4907661bde67dd4d0 (the "Hub Wallet")

- 0x37364ca1fd526ed06c6e0a36b8d471919b0e273f ("Koutoulas Wallet #1")

---

[60] Noah Kirsch, *Squabbling 'Let's Go Brandon' Crypto Team Tries to Relaunch*, THE DAILY BEAST, Feb. 23, 2022, https://www.thedailybeast.com/lets-go-brandon-crypto-team-tries-to-relaunch-after-james-koutoulas-threatened-lawsuit.

[61] Noah Kirsch and Zachary Petrizzo, *'Let's Go Brandon' Crypto Coin Turns Into Total Dumpster Fire*, THE DAILY BEAST, Feb. 11, 2022, https://www.thedailybeast.com/lets-go-brandon-crypto-coin-turns-into-total-dumpster-fire.

- 0x65ad6f29bec4b298f83c8b75ce7a6687522419de ("Koutoulas Wallet #2")

- 0xe7007f52283CF10B38AE191FE0b1385907016D4c ("Koutoulas Wallet #3")

- 0x0B443D64B3D2CFe30865129c5d113aC86dc5229B ("Koutoulas Wallet #4")

- 0x85e116b86839440c1e162c24a488b61e71d69207 ("Koutoulas Wallet #5")

- 0x2986534b03b87d358224daee9e1585c32b7725db ("Koutoulas Wallet #6")

234.    In total, Koutoulas Wallet #1 transferred 23 trillion LGBCoin in four separate transactions to the Hub Wallet: November 1, 2021 (1T); November 2, 2021 (5T); November 3, 2021 (15T); and November 9, 2021 (2T).  Shortly after receiving each of those deposits from Koutoulas Wallet #1, the Hub Wallet either sold or transferred those LGBCoins to other wallets, which also sold off.  For example, within two hours of receiving the one trillion LGBCoins from Koutoulas Wallet #1 on November 1, the Hub Wallet sold them for $22,284.27 of Wrapped Ethereum.

235.    On November 2, 2021, the Hub Wallet sold over one trillion of the five trillion LGBCoins it received from Koutoulas Wallet #1 for $27,589.31 of Wrapped Ethereum.

236.    On November 3, 2021 the Hub Wallet sold about five trillion of 19 trillion LGBCoins it held that day for approximately $396,906.06 of Wrapped Ethereum.

237.    On November 4, 2021 – with 14 trillion LGBCoins still held within the Hub Wallet – Koutoulas sold 1.2 trillion LGBCoins for about $291,881.73 in Wrapped Ethereum.  Then on November 7, 2021, the Hub Wallet sold another 226.6 billion LGBCoins for $60,033.59 in Wrapped Ethereum.

238.    Similarly, on November 11, 2021 (two days after the November 9 deposit from Koutoulas Wallet #1) the Hub Wallet sold approximately 57 billion LGBCoins for 10 Wrapped Ethereum, which was worth $47,478.26 at the time.

239.    On November 13, 2021, the Hub Wallet sold 126.9 billion LGBCoins for $116,394.33 worth of Wrapped Ethereum.  The next day, November 14, the Hub Wallet sold another 54.9 billion LGBCoins for $46,365.37 in Wrapped Ethereum. On November 21, 2021, the Hub Wallet continued to sell off, selling 46.8 billion LGBCoins for $44,452 in Wrapped Ethereum.

240.   On January 3, 2022, the Hub Wallet sold 119 billion LGBCoins for 37 Wrapped Ethereum worth $139,749.29.  In a similar transaction on January 4, 2022, the Hub wallet 157 billion LGBCoins for 36.6 Wrapped Ethereum worth $139,352.02.  On January 5, 2022, the Hub Wallet sold 53.5 billion LGBCoins for $190,706.56 worth of Wrapped Ethereum in two transactions.

241.   Similarly, Koutoulas Wallet #2 – the wallet address used to facilitate Koutoulas and Carter's MF Global commemoration ruse – was also used by Koutoulas to sell off his LGBCoins.  For example, Koutoulas Wallet #2 made three sales on November 21, 2021: 23.5 billion LGBCoin ($22,181.84), 25.4 billion ($23,586.26), and 16.5 billion ($15,760.95).  The next day, Koutoulas Wallet #2 sold another 31.2 billion LGBCoins for $28,510.52.

242.   Ultimately, transactions from the Hub Wallet and Koutoulas Wallet #2 demonstrate that Koutoulas received over $1.6 million for his LGBCoin sales between November 2021 and January 2022.

**E.**   **Horsman**

243.   Between October 29, 2021 and November 2, 2021, Koutoulas, via Koutoulas Wallet #1, made four transfers totaling 20.05 trillion LGBCoin to Horsman Wallet #1.

244.    On November 1, 2021, Koutoulas Wallet #1 also sent 5.28 trillion LGBCoin to Horsman Wallet #2.

245.    On November 3, 2021, Koutoulas Wallet #1 sent 13.2 trillion LGBCoin sent to Horsman Wallet #3.

246.    On November 8, 2021, Horsman Wallet #1 sends 20 billion LGBCoin to Horsman Pass #4.

247.    On November 9, 2021, Horsman actively sold and transferred LGBCoins through several of his wallet addresses.  For example, Horsman Wallet #1 sold 25 billion LGBCoin for $20,837.54 in Wrapped Ethereum.  Similarly, Horsman Wallet #2 sold 10 billion LGBCoin for $10,815.47 in WETH.  Horsman Wallet #2 also sent 80 billion LGB to Horsman Pass #1, which turned around and made three sales totaling 27 billion LGBCoin.  Horsman netted $20,854.36 total from these three particular sales transactions.

248.    The next day, November 11, 2021, Horsman Wallet #1 made two more sell transactions:

- 25 billion LGB for $24,267.80 in WETH

- 25 billion LGB for $29,435.80 in WETH

249.    On November 11, 2021, Horsman Pass #1 sold 9 billion LGBCoins for $6,109.40 in USDC.

250.    On November 14, 2021, Horsman Wallet #1 sold 60 billion LGBCoins (in two separate transactions) for a total of $54,423.88 in WETH.

251.    Over the course of a week from November 18, 2021 to November 25, 2021, Horsman Pass #1 made numerous sales of LGBCoins totaling $57,138.76.  In particular, Horsman Pass #1 make the following seven transactions:

- November 18, 2021 – 7.6 billion LGBCoin for $6,045.14 in WETH

- November 19, 2021 – 7.7 billion LGBCoin for $6,644.42 in WETH

- November 20, 2021 – 6.8 billion LGBCoin for $7,627.53 in WETH

- November 21, 2021 – 11.1 billion LGBCoin for $10,417.86 in WETH

- November 23, 2021 – 9.7 billion LGBCoin for $8,706.84 in WETH

- November 24, 2021 – 9.8 billion LGBCoin for $8,335.91 in WETH

- November 25, 2021 – 8.9 billion LGB for $9,361.06 in WETH

252.    In December 2021, Horsman continued to use his various wallet addresses to both sell his LGBCoins and hide the fact it was him that was selling. For example, on December 2, 2021, Horsman Pass #1 sold 9.35 billion LGBCoins for $7,272.32 in WETH.

120

253. On December 3, 2021, Horsman Pass #1 sends 822 billion LGB to Horsman Pass #2.

254. On December 4, 2021, Horsman Pass #2 sold around 9.8 billion LGBCoin for $8,398.59.

255. On December 5, 2021, Horsman Pass #2 sent 10 billion LGBCoin to Horsman Pass #4, which immediately sold for $9,815.69 in WETH.

256. On December 8, 2021, Horsman Pass #2 sold approximately 21.4 billion LGB for $10,435.16 in WETH.

257. On December 13, 2021, Horsman Pass #2 sent 10 billion LGBCoin to Horsman Pass #4, which turned around and sold for $9,235.81 in WETH. Later that day, Horsman Pass #2 sent another 10 billion LGBCoin to Horsman Pass #4, which again immediately sold for $9,503.67 in Wrapped Ethereum.

258. On December 17, 2021, Horsman Wallet #2 sends 154.3 billion LGB to Horsman Pass #1.

259. On December 18, 2021, Horsman Pass #2 sent 20 billion LGBCoin to Horsman Pass #4, which turned around and sold for $18,059.35 in WETH.

260. On December 21, 2021, Horsman Pass #2 sold around 8.8 billion LGB for $8,191.53 in WETH. That same day, Horsman Pass #2 sent 20 billion LGBCoin

to Horsman Pass #4, which turned around and sold for $18,236.76 in WETH. Later, on December 21, 2021, Horsman Pass #2 sent another 20 billion LGBCoin to Horsman Pass #4, which promptly sold for $18,498.77 in WETH.

261. On December 22, 2021, Horsman Pass #2 sold around 14.6 billion LGB for $13,327.11 in WETH. That same day, Horsman Pass #2 sent 20 billion LGBCoin to Horsman Pass #4, which then sold for $18,787.16 in WETH. Later that same day, Horsman Pass #2 sent another 20 billion LGBCoin to Horsman Pass #4, which turned around and sold for $20,317.67 in WETH. Finally, Horsman Pass #4 sold an additional 19.1 billion LGBCoin for $20,534.20.

262. On December 23, 2021, Horsman Pass #2 sold about 13.4 billion LGBCoin in three transactions for $17,132.14 in WETH, USDC, and Tether. Later that same day, Horsman Pass #2 sent 20 billion LGBCoin to Horsman Pass #4, which promptly sold for $26,813.86. Horsman Pass #4 sold around 30.7 billion more LGBCoin in three separate transactions that day for another $40,423.23.

263. December 28, 2021, Horsman Pass #2 sold approximately 15 billion LGBCoin for $14,340.44.

264. On December 30, 2021, Horsman Wallet #2 sent 691 billion LGBCoin to Horsman Pass #2, while Horsman Wallet #1 sent 1.7 billion LGBCoin to Horsman

Wallet #3. That same day, Horsman used his pass-through wallet addresses to make multiple LGBCoin sales. For example, Horsman Pass #2 sold approximately 59.7 billion LGBCoin over six transactions for $112,312.05 total in WETH, USDC, and Tether. Additionally, Horsman Pass #3 sold around 16 billion LGBCoin in two transactions for $16,806.62 in total. And Horsman Pass #4 sold approximately 5.8 billion LGBCoin for $7,554.28.

265. On December 31, 2021, Horsman Pass #3 sold approximately 11 billion LGBCoin for $16,059.08 in Wrapped Ethereum. Similarly, Horsman Pass #2 sold approximately 22.6 billion LGBCoin that day in three transactions for $48,041.30 total in WETH and USDC. Additionally, Horsman Pass #2 sent 20 billion LGBCoin to Horsman Pass #4, which turned around and sold for $28,035.28. Later that same day, Horsman Pass #2 sent another 20 billion LGBCoin to Horsman Pass #4, which turned around and sold for $31,360.34. Horsman Pass #4 then sold another 6.8 billion LGBCoin for $10,834.22.

266. On January 1, 2022, Horsman Pass #4 sold about 14.6 billion LGBCoin for $24,343.62 in WETH.

267.  On January 6, 2021, Horsman used his Horsman Pass #1 wallet to make three sell transactions for a total of 18.1 billion LGBCoin. Horsman made $10,251.68 for these transactions.

268.  On January 10, 2022, Horsman Pass #1 sent 20 billion LGBCoin to Horsman Pass #3, which immediately sold for $10,694.05.

269.  The next day, January 11, 2021, Horsman Pass #1 sold another 18 billion LGBCoin for $20,641.99 in WETH.

270.  Similarly, on January 19, 2022, Horsman Pass #1 sent about 45.7 billion LGBCoin to Horsman Pass #3, which immediately sold for $20,482.54 in WETH.

271.  On January 28, 2021, at the same time that Plaintiff De Ford was purchasing LGBCoins, Horsman was dumping his remaining LGBCoin holdings. In particular, Horsman Wallet #1 makes five sell transactions of 1.2 trillion LGBCoin in total for $34,113.09 in Wrapped Ethereum.  Finally, Horsman cashed out his Horsman Wallet #3, selling 2.28 trillion LGBCoin over four separate transactions.  Horsman made $225,119.91 off of these final four transactions.

272.  In total, Horsman received at least $1.14 million from his LGBCoin sales between November 2021 and January 2022.

### 1. The wallet sales and transfers of LGBCoin by the Non-Named Parties

#### a. Erik Norden

273.    On October 30, 2021, the Koutoulas Wallet #1 sent 50 billion LGBCoin to wallet address 0xfee7Cd8f1891941aBd6604a87C79f22A3b284858 (the "Norden Wallet").

274.    On November 3, Koutoulas Wallet #1 transferred two trillion LGBCoin to Norden Wallet. The Koutoulas Wallet #1 sent another billion LGBCoin to Norden Wallet. The following day, Koutoulas Wallet #1 sent one trillion more LGBCoin to Norden Wallet.

275.    On November 5, 2021, Norden started selling those LGBCoins. For example, Norden Wallet sold 22.7 billion LGB for $8,984.92 in WETH on that day. Then on November 7, 2021, Norden Wallet sold 10.5 billion LGB for $4,617.97 in WETH. Two days later, on November 9, 2021, Norden Wallet made another two sales totaling 40.2 billion LGBCoin (valued at $27,633.31).

276.    On November 10, 2021, Norden made two sell transactions. In the first transaction, Norden sold 13 billion LGBCoin for $14,312.29 in WETH. In the second, Norden sold another 17.8 billion LGBCoin for $20,571.22 in WETH.

277.    From November 11, 2021 to November 13, 2021, Norden made six sales (two per day) for a total of 112.3 billion LGBCoin worth $88,684.97.

278.    On November 15, 2021, Norden continued the pattern, making two sales from the Norden Wallet for 21.9 billion LGBCoin ($19,258.97) and 13.2 billion LGBCoin ($11,005.13), respectively.  The next day, he did the same thing.  Norden Wallet sold 15.1 billion LGBCoin for $10,276.52 and then another 13.2 billion LGBCoin for $8,991.96.

279.    On November 17, 2021, Norden Wallet sold 13 billion LGBCoin for $9,446.77 in WETH.  Norden used this wallet to sell an additional 15 billion LGBCoin on November 18, 2021 for $11,734.18 in WETH and then 10 billion more LGBCoins for $8,667.68 in WETH on November 19, 2021.

280.    On November 22, 2021, Norden Wallet started interacting with a pass-through wallet that was used to sell off tokens received from the Norden Wallet. In particular, on November 22, 2021, Norden Wallet sent 100 billion LGB to wallet address (0x3b5F7Cb8D3bC0c1D38e2f44857ccF448ba8E5b23) (Norden Pass #1).  The following day, Norden Pass #1 sold 14.2 billion LGB for $12,976.92 in WETH.

281.    On November 24, 2021, Norden Pass #1 both sold and transferred LGBCoins to a second pass-through wallet that sold.  In particular, Norden Pass #1

126

sold 14.9 billion LGBCoins for $12,687.38 in WETH, and it sent 60 billion LGBCoin to wallet address 0x139a90ae0933e44a93cbdbeae90348cdf0ef9eac ("Norden Pass #2"), which turn around and sold over 92% (13.8 billion LGBCoins) for $11,708.16 in WETH.

282. The next day, November 25, 2021, Norden Wallet sent 100 billion LGB to Norden Pass #2. On November 28, 2021, Norden Pass #2 began selling off the additional LGBCoins Norden received for his participation in the alleged scheme. Specifically, Norden Pass #2 sold 23.8 billion LGB for $21,358.33 in WETH on November 28, 2021. The following day, Norden Pass #2 sold another 14.3 billion LGB for $12,598.48 in WETH.

283. In December 2021, Norden sold off more LGBCoin. For example, on December 1, 2021, Norden Pass #2 sold 16 billion LGB for $13,736.83 in WETH. On December 6, 2021, Norden Pass # sold 13.8 billion LGBCoin for $13,724.62. The next day, December 7, 2021, Norden Pass #2 made two more sales: 13.7 billion LGB for $13,485.01 and 14 billion LGBCoin $14,187.20.

284. In total, Norden received at least $370,000 from his LGBCoin sales from November through December 2021.

### b.    Rick Latona

285.    Latona began selling off his portion of the LGBCoin Float by no later than November 24, 2021.  In particular, after receiving 43.8 trillion LGBCoin from Koutoulas and Michalopoulos to his wallet address 0xdf8Ef854071d6bA03Ca1d618f402be2ce62CCfbe, Latona sold at least $3.3 million worth of LGBCoin over the course of 38 transactions between November 24, 2021 and January 28, 2022.

### c.    Alex Mascioli

286.    The LGBCoin flow from the Contract Wallet and the related transaction history on the Ethereum blockchain indicate that Mascioli also received LGBCoin and subsequently sold off before the price collapsed.  For example, on November 23, 2021, Mascioli received 38.1 trillion tokens to Wallet Address 0xe949360d2a2e69a89ab240e37e45ca1e0c2cd037 ("Mascioli Private Wallet").  Upon information and belief, the Mascioli Private Wallet is owned and/or controlled by Mascioli.

287.    According to publicly available information on the NFT exchange Open Sea, Mascioli's public wallet address is Wallet Address 0x5ef6cfb6c7b1a33 bda09e8f9afe18cc6eab56110 ("Mascioli Public Wallet").

288.    On  November  26,  2021,  the  Mascioli  Public  Wallet  received approximately 565 billion LGBCoins from the Mascioli Private Wallet, which subsequently transferred the LGBCoins it received to several pass-through wallets that  promptly  cashed  out.    Similarly,  the  Mascioli  Public  Wallet  received  2.03 trillion LGBCoin from the Mascioli Private Wallet on January 28, 2022 and then sold.

289.    Specifically, over the course of 59 transactions between November 26, 2021 and January 30, 2021, Mascioli sold and/or transferred to other pass-through wallets (which subsequently sold) at least 2.31 trillion LGBCoins.  In exchange, Mascioli received 84.1 Wrapped Ethereum worth $335,936.92.

290.    Mascioli  knew  or  should  have  known  that  the  transactions  in Mascioli's public and private wallets were inappropriate and should not have been executed because of Mascioli's status as an insider.  In 2014, the Securities and Exchange Commission ("SEC") filed a complaint against Mascioli, charging him and his company with making false statements and representations in conjunction with an attempted acquisition.  Mascioli consented to the judgment against him (without admitting guilt) for misleading investors in violation of the Securities Exchange Act of 1934.  Mascioli was ordered to pay a civil penalty of $100,000 and

was "permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.P.R. §240.1 Ob-5]." In particular, Mascioli is specifically enjoined from employing a "scheme" to defraud investors in connection with the sale of any security and from engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

### d. Thomas McLaughlin

291. McLaughlin received 2.2 trillion LGBCoin from Koutoulas on November 1, 2021, and immediately began selling off. For example, on November 5, 2021, McLaughlin Main Wallet started swapping and transferring his LGBCoin in exchange for Wrapped Ethereum. In the first transaction, McLaughlin Main Wallet sold 50 billion LGBCoins for 4.292 Wrapped Ethereum on Uniswap, valued at $19,282.03. The second swap was for 90 billion LGBCoins for 6.6 Wrapped Ethereum, valued at $29,652.44. The third transaction on that day was a transfer of 750 billion LGBCoins from McLaughlin Main Wallet to a pass-through wallet that is, upon information and belief, owned and or controlled by McLaughlin.

292. McLaughlin Main Wallet continued to sell off its LGB Coins directly. On November 7, 2021, McLaughlin Main Wallet sold 26 billion LGBCoins for 2.1

130

Wrapped Ethereum worth $9,849.70. Between November 9 and December 4 of 2021, McLaughlin Main Wallet directly sold approximately 86 billion LGBCoins for 18.3 Wrapped Ethereum worth $81,844.82.

293. Upon information and belief, McLaughlin used at least four different pass-through wallets to obscure and facilitate sales of the LGBCoins he received from Koutoulas and/or Horsman.

294. All told, McLaughlin gained almost $1 million from his LGBCoins sales, according to the transaction histories in wallet addresses presently identifiable.

**D.** The Dump – LGBCoin Price Plummets

295. However, this meteoric rise did not last long. Following public announcement by BMS, Brandon Brown, and LBGCoin about their partnership, NASCAR reneged on the sponsorship agreement and the bubble burst.

296. The significance of NASCAR's public approval was noted by the news media. On the morning of December 30, 2021, after announcement of the approval, a journalist, Robert Pockrass, a NASCAR reporter at FOX Sports, emailed Mike Forde, Managing Director, Racing Communications at NASCAR, writing "This is embargoed until 10am so please don't share except with those who need to know

131

but wanted to check. The Brandon Brown team says NASCAR has OK'd this paint scheme with LGBCoin on the side. No reason to doubt them but just didn't want it to be a surprise. Thanks." Forde immediately contacted NASCAR's Jason Simmons in Team & Driver Marketing asking him if Brandon Brown's sponsor is approved. Simmons responded that he would ask Howell to "doublecheck for us," clearly indicating that Howell was the one knowledgeable and responsible for approving the sponsorship.

297. Howell responded directly to Forde confirming the approval and that it was appropriate, stating "Mac [McLeod] emailed me Christmas day on this scheme. I quickly just assumed it was crypto, **which it is,** but didn't realize it was let's go Brandon behind it, **however it's not political nor a PAC, so I don't see how we can reject it."**

298. Also on December 30, 2021, Howell again confirmed the approval and essentially advised against its withdrawal, when he sent an email to "All" and reiterated that although LGB stands for Let's Go Brandon, it is a crypto coin and thus approved, stating, in pertinent part, "as we have approved such as Voyager Digital, Doge and Mini doge . . . . With the sponsor being crypto I do recommend we approve."

299.   Nyquist did not respond back to Howell that NASCAR had not approved the sponsorship nor that Howell did not have the authority to do so. Instead, he said, in sum and substance, that they were concerned about media coverage and would be meeting the next week to review their overall position.

300.   NASCAR had given Howell the authority to approve the sponsorship, and Howell continues to have authority to approve and does approve NASCAR sponsorships.

301.   On or about December 30, 2021, Howell had a telephone conversation with MacLeod, who was acting as an agent of BMS.  MacLeod expressed concern that NASCAR was saying there was no approval and that it was causing potential financial impact on the Team and LGBCoin and requested that the situation be addressed.  In that conversation, Howell confirmed that NASCAR has provided written authorization of the sponsorship agreement between BMS and LGBCoin. Further, Howell expressed that only after the public sponsorship agreement did NASCAR claim that it had internal miscommunications on the issue of the sponsorship approval.

302.   In an email and phone conversations, MacLeod pleaded with NASCAR to correct the misleading narrative that NASCAR had leaked to the

media: that BMS and LGBCoin had not followed proper procedures to secure approval of their sponsorship agreement. MacLeod pointed out that, in fact, BMS used the same procedure it had previously used for gaining approval of other sponsorship agreements. The public and BMS were also aware of this prior approval.

303. It was reasonable for BMS and the public to rely on written approval of the LGBCoin sponsorship based on NASCAR's prior practice of approving sponsorships linked to cryptocurrency and even political messages. For example, in June 2021, NASCAR approved a sponsorship of Voyager Digital which operated a cryptocurrency trading platform. Corey LaJoie's car carried a scheme touting the re-election bid of President Donald Trump in a NASCAR race. The Patriots of America PAC spent $350,000 for the political advertisement. Bubba Wallace, the only Black driver in the NASCAR Cup Series, helped persuade NASCAR to ban Confederate flags from its events less than two months ago. He also ran Petty's famed No. 43 car in a Black Lives Matter paint scheme that did not have a sponsor. He also wore a T-shirt with the words "I can't breathe," the last words spoken by Floyd as he died with his neck pinned to the ground by the knee of a police officer. Mike Harmon Racing added the phrase #BackTheBlue, a reference to supporting

police officers, to one of his Xfinity Series cars after running the message Blue Lives Matter. On January 5, 2022, the same day that NASCAR revoked its approval of LGBCoin's sponsorship, NASCAR announced that Carolinas LGBT+ Chamber of Commerce, one of the largest LGBT Chambers within the region pushing for equitable change within the workplace and marketplace, would become NASCAR's Diversity, Equity & Inclusion partner for the 2022 term.

304.    Nevertheless, NASCAR silently determined to backtrack and figure out how to get out of the written agreement. Meanwhile, NASCAR publicly stayed mum on the sponsorship. On January 3, 2022, having heard nothing further from NASCAR, Jerry Brown contacted NASCAR and again reiterated that withdrawal of the approval would cause significant damage to BMS and LGBCoin.

305.    On January 4, 2022, NASCAR had a phone call with BMS, whereby Swindell, Nyquist and Steve O'Donnell informed BMS that NASCAR would not be approving the LGB sponsorship before they went public. Executive Swindell also emailed Jerry Brown that, "upon further review," the sponsorship agreement was "not approved." The email stated: "Thank you for your time today. Per our conversation, upon further review of LGBCoin.io, the sponsor is not approved. The NASCAR rule book states, "NASCAR may refuse to permit a Competitor to

participate in an Event if NASCAR determines that any advertising, sponsorship, or similar agreement to which the Competitor is or will be a party, is detrimental to the sport, to NASCAR, Series Sponsor, or to the Promoter for any reason, including without limitation, the public image of the sport. We appreciate your participation as a team owner and longtime NASCAR supporter and wish you the best of luck in the 2022 season."

306. On January 5, 2022, BMS issued a press release advising the public that NASCAR had rescinded its approval of the sponsorship.

**E.** The Aftermath

      **1.** **Damage to the Value of LGBCoin and Coinholders Due to NASCAR's Misconduct**

307. The price of LGBCoin began to deflate immediately after NASCAR cancelled its official affiliation between LGBCoin and NASCAR, claiming NASCAR Racing Operations Senior Manager Dale Howell was not authorized to sign off on the relationship.[62]

308. Between December 30, 2021, when LGBCoin, BMS and Brown announced the sponsorship and January 5, 2022, when BMS announced that

---

[62] *See* Liz Clarke, *NASCAR Rejects Sponsorship Deal Based on 'Let's Go Brandon' Chant*, THE WASHINGTON POST, Jan. 4, 2022, https://www.washingtonpost.com/sports/2022/01/04/LGBCoin-lets-go-brandon-nascar-rejected/.

NASCAR'S sponsorship had been revoked, the price of LGBCoin fell 63% from a high of $.000001612 with a trading volume of $6.7 million to a low of $.0000005992 with a trading volume of $2.6 million.

309.   Yet, Koutoulas, Brandon Brown, and BMS continued to promote LGBCoin to prop up the price of LGBCoin.

310.   On January 1, 2022, BMS tweeted the following from the BMS Twitter account prominently showing LGBCoin name on Brandon Brown's racecar, which Koutoulas then retweeted from his personal Twitter account:



311.   On January 7, 2022, LGBCoin released a press release announcing that it had secured an "exclusive, expanded sponsorship agreement" with Brandon Brown "as part of a two-year, eight-figure, comprehensive crypto/digital exclusive

endorsement partnership."[63]  An excerpt of this press release included a statement from Brandon Brown supporting LGBCoin and mentioned how he "is now a holder and endorser of the most talked about crypto product in America."



"I'm working to achieve my own American dream," said Brown. "I'm humbled and thankful for LGBcoin.io's reaffirmed support for my professional journey and their commitment to maintain a patriotic message. LGBcoin.io has already demonstrated incredible potential and I'm excited to help build this brand through the 2022 season and beyond."

Brown is now a holder and endorser of the most talked about crypto product in America. The original sponsorship announcement on December 30, 2021 had the highest single-day viewership and media reach of any crypto project in industry history, engaging millions of fans with coverage from nearly every major media brand, spanning sports, news, politics, crypto, racing, and entertainment publications.

Up until NASCAR's surprising comments to the media after the initial announcement, LGBcoin.io reached a market cap of $580 million and added thousands of new coin holders within a 24 hour period. That kind of excitement and interest in the project, in Brandon, and in a pro-America message is the driving

312.   At the direction of the individual defendants, LGBCoin continued to tout its connection to NASCAR, stating in the "News and Publications" section of its website that "the sponsorship, if approved by NASCAR, is for two years and includes a personal endorsement deal.  The deal is said to include 'personal participation in publicity events, videos, crypto conferences, racing-related events

---

[63]    *See* LGBCoin Instagram, https://www.instagram.com/p/CYeNj4TLneC/ (last visited Jul. 19, 2022), https://twitter.com/BrendonLeslie/status/ 1476238865245491204.

and more, though won't include car decals.'"[64]  Likewise, at the direction of the individual defendants, LGBCoin continued to promote itself the "Official Partner of NASCAR Xfinity Series Driver Brandon Brown and Car No. 68."[65]

313.   NASCAR again did not take any meaningful steps to distance itself from this renewed sponsorship agreement among Brandon Brown, BMS, and LGBCoin, even though this new arrangement still included Brandon Brown's and LGBCoin's participation at NASCAR racing-related events.

314.   Moreover, NASCAR knew that the LGBCoin team – which included Defendants Koutoulas and Horsman – intended to relay the information that LGBCoin's sponsorship of Brown had been approved by NASCAR to investors, who in turn would rely on that information when purchasing LGBCoins.  Thus, NASCAR has been complicit in LGBCoin's continued promotion at NASCAR'S racing events, including at the Alsco Uniforms 300 Xfinity Race in Las Vegas, Nevada.[66]

---

[64]   *See* News and Publications: Latest News, https://LGBCoin.io/news-and-publications/ (last visited Mar. 1, 2022).

[65]   *See* Let's Go Brandon, https://www.letsgobrandon.com/ (last visited Jan. 20, 2023).

[66]   *See*         LGBCoin         Instagram         Account         @letsgo, https://www.instagram.com/p/CauokR5uiJs/ (last visited Jul. 19, 2022).

315.    On January 27, 2022, in an attempt to keep investors from selling any more LGBCoin, LGBCoin's Twitter account posted the following image with a caption that read "Sometimes you just need to have faith and HODL.  [Hold On for Dear Life]  Let's Go LGBCoin.io!":[67]



316.    But the LGBCoin price continued its precipitous decline to a price of $.00000002228 with a trading value of $0 by the evening of January 28, 2022 — significantly less than its initial capital.

317.    The announcement that LGBCoin would not be allowed to sponsor Brown and the attendant liquidation by investors including Koutoulas and Horsman reduced LGBCoin's value to zero.

_____

[67]    https://twitter.com/LGBCoin_io/status/1486804700657864712?s=20&t=pq5exm4-UHF wkqqiwxZ7qg (last visited Jul. 19, 2022).

318.    The LGBCoin price still has not recovered and trading volume remains down significantly.    The Daily Beast bluntly noted, LGBCoin amounted to a "dumpster fire" and the tokens were "effectively worthless."[68]

### 5.  The Formation of the LGBCoin Entities in the Cayman Islands

319.    Koutoulas represents himself to be the attorney and trustee of an entity called "LGBCoin Foundation," and executed several LGBCoin contracts in this capacity including:

a.    a November 2021 Sponsorship Agreement with BMS:



b.    a November 2021 LGBCoin Agreement with Mascioli:

---

[68]    *See id.*

MISCELLANEOUS

This contract is not assignable by Alex Mascioli without written consent of all interested parties.

Any notice required to be given under this agreement shall be sent via email and deemed given at the time it is received by either party, provided such notice is addressed as follows:

| Alex Mascioli: | The Sponsor: |
| --- | --- |
|  | LGB Coin Foundation |
| Attn: Alex Mascioli | Attn: James L. Koutoulas, Esq. |
| 1315 Avenida Ashford | Trustee |
| Suite 304 | james@koutoulaslaw.com |
| San Juan, Puerto Rico 00907 |  |
| alex@alexmascioli.com |  |

320.     Yet, upon information and belief, no such entity named the "LGBCoin Foundation" exists, or ever existed, in any formalized capacity or was registered with any state, federal, or foreign agency.

321.     On January 5, 2022, an entity called "LGBcoin, LTD" was registered in the Cayman Islands as a Virtual Asset Service Provider (VASP) or Fintech pursuant to the Cayman Islands Virtual Asset (Service Providers) Act, 2020:

# Search Report

| | |
|---|---|
| **Entity Name :** | LGBcoin, LTD. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 385375 |
| **Registration Date :** | 05th January 2022 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | HARNEYS FIDUCIARY (CAYMAN) LIMITED |
| | P. O. Box 10240 |
| | 4th Floor, Harbour Place, |
| | 103 South Church Street, |
| | George Town, |
| | Grand Cayman KY1-1002 |
| | Cayman Islands |
| **Initial Subscriber:** | Harneys Fiduciary (Cayman) Limited |
| **Authorised Share Capital:** | CI$41,000.00 |
| **Nature of Business:** | Other VASP or Fintech |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 05th January 2022 |

322. On January 5, 2022, an entity called "LetsGoBrandon.com Foundation" was registered in the Cayman Islands as a grantee foundation pursuant to the Cayman Islands Foundation Companies Law, 2017:

143

## Search Report

| | |
|---|---|
| **Entity Name :** | LetsGoBrandon.com Foundation |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 385418 |
| **Registration Date :** | 05th January 2022 |
| **Entity Type :** | EX-LTD GRNTEE FOUNDATION |
| **Registered Office :** | HARNEYS FIDUCIARY (CAYMAN) LIMITED |
| | P. O. Box 10240 |
| | 4th Floor, Harbour Place, |
| | 103 South Church Street, |
| | George Town, |
| | Grand Cayman  KY1-1002 |
| | Cayman Islands |
| **Initial Subscriber:** | Harneys Fiduciary (Cayman) Limited |
| **Authorised Share Capital:** | CIS |
| **Nature of Business:** | Other Information and Communication Related Activities |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 05th January 2022 |

323.    According to the State Court Action, LetsGoBrandon.com Foundation is "charged with performing operational functions to support LGBcoin" and "conducted the majority of its operations in Miami, Florida."[69]

324.    In turn, LGBCoin, LTD represented in this action that it is "the sole director of LetsGoBrandon.com Foundation."  *See* ECF No. 204.

---

[69]    *LetsGoBrandon.com Foundation v. National Assoc. for Stock Car Auto Racing*, No. 2023-002831-CA-01(11th Cir. Ct. 2023), Verified Compl., ¶¶ 31, 32.

### 6.  The Re-Pump and Dump – the Relaunch of LGBCoin

325.    Despite LGBCoin's precipitous fall, Koutoulas and Norden continued

to tout cryptocurrency and promote it in the media.  On or about January 20, 2022,

Stephanie Hamill from One America News Network ("OANN") interviewed

Norden and Koutoulas to discuss LGBCoin's future and NASCAR's sponsorship

decision.[70]



---

[70]    *See* IN FOCUS – Stephanie Hamill with James Koutoulas and Erik Norden, Jan. 20, 2022,    https://rumble.com/vsz7o2-in-focus-stephanie-hamill-with-james-koutoulas-and-erik-norden.html.  Norden admitted this interview appearance in response to number 5 of Plaintiffs' request for admissions.

326.  Norden, pictured on the left wearing an LGBCoin shirt, and Individual Defendant Koutoulas, pictured on the right, used the publicity to tout LGBCoin's leadership and promotional teams:

> You know, there are a couple of hundred million dollars in damages that we're going to be bringing in suit to NASCAR. That being said, you know, the coin has an incredible team – it has, like 90 people working on it, and that's like, day-in, day-out.  And they're working on exchange listings . . . and I think they signed, like 800 influencers on who are going to be talking about the coin and, you know, doing media around it. . . .[71]

327.  About a week before the OANN interview, Norden circulated a draft Litepaper to Koutoulas listing some of these "90+ full time [people] working on $LGB," which included "James Koutoulas; investor advocate attorney" "Scott Walker; first ever ICO," "James Heckman; Rupert Murdoch's chief strategist," "Rick Latona; Site Matrix," "David Namdar; Coral DeFi," "Patrick Horsman; Serial Entrepreneur," and "Erik Norden; Consultant and Marketer."

328.  Norden continued to actively direct the promotional activities at this time.  For example, on January 24, 2022, Norden reported to Koutoulas and others in the LGB Marketing Team group chat that Norden was in the process of recruiting

---

[71]     *Id.* at 7:05-7:20.

<mark>promoters and that</mark> the New York Times had reached out to him for an interview.

329.   On January 26, 2022, Norden instructed the LGB Marketing Team via the group chat to recruit country singer Kid Rock to promote LGBCoin after seeing that Kid Rock released a song called "Let's Go Brandon."  Norden explained that he believed the celebrity promotion of Rock specifically "would be good when we drop CEX listing."

330.   That same day, January 26, 2022, Norden personally paid $10,049.19 to Aerial Messages of Daytona & Sales, Inc. to have a plane with LGBCoin promotions fly for four hours over Daytona during the 2022 NASCAR Xfinity Series opening race on February 19, 2022.  The following image of the promotion[72] was taken that day:

---

[72]    https://twitter.com/A_S12/status/1495145667215474688



**Adam Stern** ✔
@A_S12

A plane is carrying a "Let's Go Brandon" @LGBcoin_io banner over @Daytona.

4:18 PM · Feb 19, 2022

**58** Retweets   **52** Quotes   **750** Likes   **5** Bookmarks

331.   On January 28, 2022, a snapshot of LGBCoin was taken and then the remaining liquidity was drained as part of plan to remint and relaunch the

148

LGBCoin into a second meme coin, which caused both the price and transaction volume of LGBCoin to plummet to near $0 by January 30, 2022.

332.  LGBCoin posted a video on its Twitter and Instagram accounts on January 28, 2022, from the "Brandon Brown and #68 racing and LGBCoin Team," promoting this "Re-Mint, Re-launch and Airdrop" of LGBCoin as an intent to "improve" what it described as a "down-market moment."



333.  Upon information and belief, this decision to relaunch LGBCoin was part of a February 2022 agreement reached in Miami, Florida, that was "forged in

part by the media executive James Heckman, representatives of the NASCAR racer

Brandon Brown, and LGB's former de facto leader . . . James Koutoulas." [73]

334.   On February 8, 2022, the tenuous alliance between co-conspirators

Koutoulas, Horsman, Latona, and Mascioli fell apart.

335.   Koutoulas drafted the following statement meant for LGBCoin

investors giving his side of what occurred, which states, in relevant part:

> Today's fork is unauthorized by the LGBcoin Foundation and
> was orchestrated by BMS owner and convicted felon; Alex
> Mascioli, and supported by Scott Walker, James Heckman, and
> Rick Latona.  This takeover attempt was done in an attempt to
> remove the founders and James Koutoulas from the project, and
> the Coup Crew named above have stolen our trade dress,
> branding, and reneged on their promises to air drop all holders
> 1:1 to their balances as of the time of their January 26th dump of
> LGB in violation of their contract with the Foundation.  Our
> team stayed silent after their announcement in hopes they
> would honor their promise to restore holders the value they
> destroyed by their breach of contract. Sadly, these scumbags are
> consistently dishonest and set out to harm our community . . . .

336.   In response to seeing a draft of the statement, which Koutoulas sent

via Signal chat to Norden, Giuliani and Gillels on February 8, 2022, both Giuliani

and Gillels suggested that Koutoulas tone down the "scumbag" rhetoric in the

---

[73]   *See* n.46, *supra*.

statement.  Notably, Norden countered that a "lot of [LGBCoin investors] are morons so we have to spell it out for them."

337.  In that same Signal chat, Norden, Koutoulas, and Giuliani also discussed Horsman's efforts to distance himself from LGBCoin and hide his involvement.  Notably, Norden observed that Walker and Heckman were "***trying to make it seem like Patrick [was] not involved. . .  But he def is . . . He caused literally all of this***."  Norden urged Koutoulas to "name Patrick" in Koutoulas' threatened lawsuit, but Koutoulas admitted that the "[p]roblem with naming [P]atrick is that fucks Natalie hard . . .  Basically her husband[']s business goes under."  Giuliani candidly acknowledged that the "[w]hole this is a shit show. Poorly run, thought, and executed."  Koutoulas replied:

> So Patrick told me from beginning he was just trying to prevent a war because he viewed it as catastrophic to both sides and he was suicidal for 6 months from what he went through when he got frivolously sued (tho he insanely hired his crazy ex gf who's a mediocre lawyer over me to defend him because I wanted a contingency fee on any counter claim) and that they offered him 0 coins.  He renounced his claim to 40% of our original liquidity pool for which he raised all the capital for and said he'll kick in a few hundred k for our launch if we don't let them know he's involved since he and [S]cott own a boat together and [S]cott has 25M invested in Patrick's defi fund.  Also Natalie's [Spears] husband's company is fucked if I sue [P]atrick and he basically begged me not to name him.

338.    Koutoulas and Giuliani also discussed Mascioli's conduct following the breakup of the co-conspirators.  In particular, Giuliani sent a screenshot of a social media post from Mascioli of a yacht with the comment "Just another day on the boat in the Caribbean @tradethechain #caribbeanlife #yacht #ownit #cryptotrading."  Guilian asked "Isn't it paid in whole with stolen money??" and noted that Mascioli had blocked her on Instagram.

339.    Koutoulas discussed the rift between himself and the other founders, as well as the February 2022 agreement, during a February 2022 interview with The Daily Beast, claiming that other key coin holders attempted to have him purged from LGBCoin to launch their own LGB "copycat."  "Koutoulas alleged . . . that major coin holders had fueled the decline [of LGBCoin] by rapidly selling large volumes of [LGBCoin]."[74]  The article quotes two of the unnamed LGBCoin founders explaining that the rift with Koutoulas stemmed from his political antagonism: "Guys hanging out in Puerto Rico don't want to antagonize the government.  It's the opposite." [75]

---

[74]    *See id.*

[75]    Given the transaction history with Wallets owned by McLaughlin and CoralDefi and their location in Puerto Rico, Plaintiffs believe the unnamed coin holders who Koutoulas blames for draining LGBCoin's liquidly was Latona and/or Mascioli.

340.    On February 14, 2022, Norden sent another screenshot to the Signal group chat with Koutoulas, Giuliani, and Gillels, showing a text exchange between Norden and Heckman.  Norden informed the group that he was trying to trick Heckman into believing that Norden was on the other camp's side of the breakup in order to gain information about their activities and strategy.  Norden's text message to Heckman stated: "[Koutoulas is] an irrelevant nut job how are we frozen?  He's just one man whose claims to fame was suing MF Global like 10 years ago . . . we have a whole team of crypto entrepreneurs and moguls . . . ."  Norden told the Signal chat group "its all a cruel ploy, to instill trust" and that he "really should win an Oscar for this performance" as a spy.

341.    Koutoulas, Norden, and Gillels then discussed Koutoulas' threatened lawsuit, with Koutoulas declaring: "I can't wait to read 'I just bout 70k while taking a piss' in court."  Norden chimed in: "*I hope my memes get used a[s] exhibits as market movers*."  Koutoulas even advised that Norden's "Smithsonian exhibit worth meme gallery" could be used in the threatened lawsuit to "show [the other camp's] incompetence" and "0 meme launch strategy."  Koutoulas later asked Gillels about the amount of Ethereum and LGB posted to the liquidity pool and how to frame it favorably for the threatened lawsuit.  When Gillels complained

about the effort to calculate the specific transactions, Koutoulas relented and said Gillels "can leave it out" since the "*judge isnt gonna know lol*."

342.    Koutoulas also remarked that he had been thinking about "stoking demand" for the future LGBCoin and offered the following "order of operations" going forward: "lawsuit filed > DHJ drop > social media outing of the villains > twitch streamed AMA > air drop to everyone other than the criminals (getting signed docs with vesting for OG presale guys) > wait few days > open liquidity pool at relatively low valuation to encourage buying rather than dumping. . . ." Koutoulas went on to contrast what his group's strategy would be going forward with what had occurred prior to the breakup of the conspiracy, admitting that they should "*treat it like an egalitarian ICO rather than trying to be inflated* to pump up insecure egos have faq's transparency and communication ahead of launch, i.e. do the exact opposite" of what had transpired with LGBCoin.

343.    On February 20, 2022, Norden appeared with Koutoulas on an "Ask Me Anything Session with James Koutoulas" that they simultaneously

livestreamed on LGBCoin's Instagram and Twitter channels[76] to discuss LGBCoin's future as $LETSGO.

344.    As Koutoulas explained, the "Foundation team" – consisting of himself, Scott Walker, and James Heckman – unilaterally decided to pull – and then indefinitely hold – the remaining liquidity from LGBCoin's investors on January 28 while they relaunched the cryptocurrency into $LETSGO.  Specifically, Koutoulas stated that:

> [S]ome insiders did decide to sell which triggered more additional selling, which triggered the Foundation team *from pulling the liquidity pool* not in a rug pull, but to preserve that liquidity so that we could relaunch with a more modern token that has the functionality that is needed to prevent events like that with having large insider sales be a detriment to the product as a whole. . . .
>
> I believe in Telegram they did announce that we were pulling the liquidity pool shortly after it was done on January 28.  So, you know, I do hate to break it to you, but people who, you know, bought trillions of tokens for a few pennies after liquidity pool pull.  You know, that's an arbitrage trade *that is not going to receive the successor coin*. . . .
>
> *So the LGB Coin Foundation still has the remaining liquidity pool that was pulled from the original LGB one coin on the 28th*. As we saw a cascade of insider sales.  The pool was pulled to

---

[76]    Norden admitted this appearance in response to Plaintiffs request for admission number 5.

preserve it not to like steal it or do anything nefarious with it.
. . .

345.    On February 22, 2022, Norden executed an LGBCoin agreement as founder of Norden, Inc., wherein he agreed for Norden, Inc. to use its best efforts to spread awareness of the LetsGoBrandon movement in exchange for 12,000,000,000,000 $LETSGO tokens.  Norden also agreed for disputes arising out of that agreement to be resolved in Miami, Florida.

346.    Between February 22, 2022, and February 24, 2022, Koutoulas and Norden then "relaunched" the LGBCoin into a second version of the LGBCoin known as "$LETSGO."    Koutoulas then created a second website at https://www.letsgobrandon.com/ (hereafter "Second Website"), which — like the earlier Website — promotes $LETSGO as the "Official Partner of NASCAR Xfinity Series Driver Brandon Brown and Car No. 68."

347.    However, people like Plaintiff Eric De Ford, who purchased some LGBCoin after this liquidity pull, would completely lose their investments.

348.    A new logo was released for this $LETSGO Coin substantially resembling the former LGBCoin Logo:



349.    On February 24, 2022, $LETSGO issued a Press Release announcing a "new leadership team" and the creation of a "LetsGoBrandon Foundation"[77] that: has committed already several million dollars in cash, to secure assets, fill the liquidity pool, and support marketing.  The Foundation has also confirmed and funded the previously announced sponsorship for $5 million per year, securing a long-term relationship with Brandon Brown and his racing team, in addition to investing in a world-class media, licensing, marketing and crypto-architectural team to ensure stability and longevity of the coin.[78]

350.    This Press Release also outlined some of the concepts and expectations for this "new" LGBCoin, including the following excerpts:

**Crypto and Digital Media Leadership Team Additions**

---

[77]    A "LetsGoBrandon.com Foundation" was formed in the Cayman Islands on January 5, 2022 – *after* the original LGBCoin pump and dump.  Despite engaging in discovery, none of the Defendants provided anything establishing any state, national or internationally registered "LGBCoin Foundation."

[78]    *See* Press Release, https://www.letsgobrandon.com/press (last visited Mar. 1, 2022).

Significant HODLers invested in world-class leadership to recreate, launch and help manage the improved official coin, correct tokenomic deficiencies and ensure reputational excellence. The team is filled with crypto pioneers, senior media executives and licensing experts. . . .

### New Tokenomics

The initial coin project was architected in such a way that large pre-sale buyer [sic] *were able to damage the value at their will, and so while the coin was one of the most-covered crypto projects in history, some "Whales" were selling in size on every positive announcement*. This will no longer be technically possible. The new team has dramatically improved the tokenomics, with smart contracts restricting large holders and added marketing allocations for the project's growth. Previous holders of up to 200B coins as of 2/22/2022 will be rewarded for holding for 6 months with a 10% bonus and the liquidity pool has been refilled and supplemented. The team began airdrops a few weeks ago for smaller wallets, and began dropping the remaining coins on 2/24/2022. Whales will be allocated their coins directly, to ensure authenticity and accuracy. . . .

### LetsGoBrandon's Future, Plans and Commitment

*LetsGoBrandon.com* is a forever project. All significant holders of the coin have agreed to restrict their selling for at least two years, because the vision of this project is to prioritize the movement for protecting free spreech [sic] and fighting de-platforming.[79]

[Emphasis added.]

---

[79]     *Id.* (last visited Jul. 19, 2022).

351.   A new LGBCoin Twitter account was then created under the @officialletsgo handle,[80] which uses the Brandon Brown racecar graphics that NASCAR previously rejected as its wallpaper:



352.   In addition, on or about March 4, 2022, another LGBCoin Instagram account was created under the @letsgo handle,[81] which uses the new logo for the "new" LGBCoin.

353.   According to data from CoinMarketCap, the "new" LGBCoin had an opening price of $0.00000009744 on March 1, 2022 — 65% lower than the opening price of its previous iteration of LGBCoin.

---

[80]   *See* Official $LETSGO, https://twitter.com/officialletsgo (last visited Mar. 1, 2022).

[81]   *See* Official $LETSGO, https://www.instagram.com/letsgo/ (last visited Mar. 9, 2022).

329.   Despite this, Koutoulas, Harris, Cawthorn, and others still promoted the "new" LGBCoin, including in the following video from the Conservative Political Action Conference in Orlando that Koutoulas posted to his Instagram account on February 27, 2022.[82]



Harris:        I got Let's Go Brandon coin. Do you got Let's Go
               Brandon coin?

---

[82]       *See* Feb. 27, 2022, Koutoulas Instagram Post, https://www.instagram.com/p/CafZYEK gnK3/ (last visited Mar. 3, 2022).

> Cawthorn:   I got Let's Go Brandon coin.
>
> Harris:       You got some Let's Go Brandon coin?
>
> Cawthorn:   It's working out very well. Very well.
>
> Harris:       So do you have Let's Go Brandon coin? <laughter>
>
> Cawthorn:   That's the question — That's the question we all want to know.
>
> Harris:       Get you some. Get you some. <laughter>
>
> Cawthorn:   Yes sir!

354.   Similarly, on March 7, 2022, Harris conducted an interview with former President Donald J. Trump on his podcast, The David J. Harris Jr. Show.[83] In an effort to promote LGBCoin to all the listeners tuning in for Trump and to lead retail investors into believing that Trump was personally associated with LGBCoin, Harris announced that Koutoulas would be gifting Trump 500 billion LGBCoins. Trump responded to this promotional gifting by saying, "that sounds good" and that "those groups are the right groups to support" because "they're great patriots,

---

[83]   The David J. Harris Show, https://www.audacy.com/podcasts/the-david-j-harris-jr-show-39252/exclusive-my-second-interview-with-president-trump-1296066681.   Minute 19:45-22:20. (last visited Jul. 19, 2022).

great people." The video of the interview was then posted on Twitter by both

Harris[84] and Koutoulas[85] on March 9, 2022:



[84]    *See* Mar. 9, 2022, Harris Instagram Post, Post, https://twitter.com/DavidJHarrisJr/
status/1501709784793374720 (last visited Jul. 19, 2022).

[85]    *See*    Mar.    9,    2022,    Koutoulas    Instagram    Post,    Post,
https://twitter.com/jameskoutoulas/status/1501745962548703234   (last   visited   Mar.   9,
2022).

355.   As United Kingdom's Financial Conduct Authority director Charles Randall noted in a recent speech, "social media influencers are routinely paid by scammers to help them pump and dump new tokens on the back of pure speculation."[86]

356.   Randall further observed that the hype around speculative digital assets like the LGBCoin "generates a powerful fear of missing out from some consumers who may have little understanding of their risks.  There is no shortage of stories of people who have lost savings by being lured into the crypto bubble with delusions of quick riches, sometimes after listening to their favourite influencers, ready to betray their fans' trust for a fee."[87]

357.   United States President Joseph Biden similarly observed in a cryptocurrency executive order executed on March 9, 2022, that:

> The increased use of digital assets and digital asset exchanges and trading platforms may increase the risks of crimes such as fraud and theft, other statutory and regulatory violations, privacy and data breaches, unfair and abusive acts or practices, and other cyber incidents faced by consumers, investors, and businesses.  The rise in use of digital assets, and differences

---

[86]   Charles Randell, *Speech to the Cambridge International Symposium on Economic Crime* (June 9, 2021), https://www.fca.org.uk/news/speeches/risks-token-regulation.

[87]   *See id.*

across communities, may also present disparate financial risk to less informed market participants or exacerbate inequities.[88]

358.    Former U.S. Securities and Exchange Commission Chairman Jay Clayton similarly warned prospective investors about the dangers of cryptocurrency and cautioned:

> market participants against promoting or touting the offer and sale of coins without first determining whether the securities laws apply to those actions. ***Selling securities generally requires a license, and experience shows that excessive touting in thinly traded and volatile markets can be an indicator of "scalping," "pump and dump" and other manipulations and frauds***.[89]

[Emphasis added.]

---

[88]    *See* Presidential Actions, *Executive Order on Ensuring Responsible Development of Digital Assets*, Mar. 9, 2022, https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.

[89]    *See* U.S. Securities and Exchange Commission, *Statement on Cryptocurrencies and Initial Coin Offerings*, Dec. 11, 2017, https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.  In fact, these emerging cryptocurrency dangers compelled the SEC to create a Crypto Assets and Cyber Unit in 2017, which "has brought more than 80 enforcement actions related to fraudulent and unregistered crypto asset offerings and platforms."  *See* U.S. Securities and Exchange Commission, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit*, May 3, 2022, https://www.sec.gov/news/press-release/2022-78.  The SEC recently expanded its Crypto Assets and Cyber Unit under the leadership of the SEC's current Chairman Gary Gensler.

# V.    CLASS ACTION ALLEGATIONS

359.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased LGBCoin and were subsequently damaged thereby.

360.    The Class Period as to all Counts except for Counts VIII and IX is defined as the period between November 2, 2021, and March 15, 2022.[90]

361.    The Class Period as to Counts VIII and IX is defined as the period between December 30, 2021 and January 5, 2022.[91]

362.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

---

[90]    Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

[91]    Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

363. **Numerosity**: The Class is so numerous that joinder of all members is impracticable.  On January 5, 2022, there were more than 10,000 unique account holders of LGBCoin.

364. **Commonality**: Common questions of law and fact exist as to all members of each Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

      a.      whether NASCAR negligently misrepresented that it approved the LGBCoin Sponsorship and then withdrew its approval

      b.      whether NASCAR is promissorily estopped from rescinding its approval of the LGBCoin Sponsorship;

      c.      whether LGBCoin is an unregistered security;

      d.      whether Defendants promoted LGBCoin;

      e.      whether the Defendants fraudulently marketed LGBCoin as affiliated with BMS, Brown and NASCAR;

      f.      whether the Defendants (except NASCAR) conspired to artificially inflate the price to LGBCoin and then sell their LGBCoin to unsuspecting investors;

g.      whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

h.      whether the proceeds that the Defendants obtained as a result of the sale of LGBCoin rightfully belong to Plaintiffs and class members;

i.      whether Defendants should be required to return money they received as a result of the sale of LGBCoin to Plaintiffs and class members; and

j.      whether Plaintiffs and class members have suffered damages, and, if so, the nature and extent of those damages.

365.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out of uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of LGBCoin.

366.   **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action

litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

367. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

368. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF SECTION 12(a)(1) OF THE SECURITIES ACT
## [15 U.S.C. §77e]
## (Against Defendant Koutoulas)

369. Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶43-64, 120-121, 131-170, 197-200.

370. Section 12(a)(1) of 15 U.S.C. §§77l(a)(1) (the "Securities Act") provides a private cause of action against any person who offers or sells a security in violation of Section 5 of 15 U.S.C. §§77e.

371. The following elements must be established to prevail on a Section 5 claim: "(1) absence of an effective registration statement covering the securities in question; (2) the offer or sale of the securities; and (3) the use of the mails, or any means or instruments of transportation or communication in interstate commerce in connection with the sale or offer." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1347-48 (S.D. Fla. 2019).

372. LGBCoins are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1) because they are investment contracts subject to federal securities laws, including the registration requirements promulgated thereunder. The term "investment contract" "'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable

169

schemes devised by those who seek the use of the money of others on the promise of profits.'" *Tippens v. Round Island Plantation L.L.C.*, No. 09-CV-14036, 2009 WL 2365347, at *7 (S.D. Fla. July 31, 2009) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)). "An offering is an investment contract if there is: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others." *Id*.

373. Plaintiffs invested money into the common enterprise of LGBCoin with the expectation of profits coming solely from the efforts of others.

374. The funds Plaintiffs and Class members paid to purchase LGBCoin were pooled by Koutoulas and others to secure a profit for themselves and the investors. As a result, the investors, including Plaintiffs and Class members, shared in the risks and benefits of the investment.

375. Plaintiffs and Class members relied on, and are dependent upon, the expertise and efforts of Koutoulas and others for their investment returns.

376. Plaintiffs and Class members expected that they would receive profits from their investments in Koutoulas's efforts.

377. Neither Koutoulas nor anyone else filed with the U.S. Securities and Exchange Commission a registration statement for the offer and sale of LGBCoin

through or following the LGBCoin launch, no registration statement was in effect at the time of the LGBCoin launch, and no exemption to the registration statement was available.

378. By virtue of the foregoing, without a registration statement in effect as to the LGBCoin, Koutoulas directly or indirectly made use of means or instruments of transportation or communication in interstate commerce to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through in interstate commerce for the purpose of sale or for delivery after sale, securities for which no registration statement has been filed and no exemption to the registration statement was available. *See Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019).

379. Koutoulas is a "seller" within the meaning of the Securities Act because he or his agents solicited Plaintiffs' investments in LGBCoin, including on social media.

380. By reason of the foregoing, Koutoulas participated in the offer and sale of unregistered securities in violation of the Securities Act.

381. As a direct and proximate result of Koutoulas's unregistered sale of securities, Plaintiffs and Class members suffered damages in connection with his

respective purchases of LGBCoin, and Koutoulas is liable to Plaintiffs and Class

members for rescission and/or compensatory damages.

## SECOND CAUSE OF ACTION
## UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF THE FLORIDA SECURITIES AND INVESTMENT PROTECTION ACT
### [Fla. Stat. §517.07]

(Against Defendants Koutoulas, Horsman
LetsGoBrandon.com Foundation, and LGBCoin, LTD)

382.    Plaintiffs repeat and reallege the allegations of **** as if fully set forth

herein.

383.    Section 517.07, Florida Statutes, of the Florida Securities and Investor

Protection Act ("FSIPA") says that it is unlawful for any person to sell or offer to

sell a security from within Florida unless the security is registered pursuant to

Chapter 517, Florida Statutes.

384.    Defendants and others called for an investment of money or assets by

Plaintiffs – specifically ERC-20 tokens created through the Ethereum blockchain –

in exchange for non-functional LGBCoin.

385.    The funds paid by Plaintiffs were pooled by Defendants and others in

the process of securing a profit for themselves and Plaintiffs.

386.   As a result, Plaintiffs were investors who shared in the risks and benefits of the LGBCoin investment scheme.

387.   The proposed transactions at issue constitute investment contracts and are therefore securities subject to Florida blue-sky laws and the FSIPA.

388.   LGBCoin is not registered with the Florida Office of Financial Regulation as required by the FSIPA.

389.   LGBCoin is not exempt from registration under section 517.051, Florida Statutes.

390.   LGBCoin is not a federal covered security as described by the FSIPA.

391.   LGBCoin was not sold in a transaction exempt under section 517.061, Florida Statutes.

392.   Section 517.07 is a binding provision that obligates Defendants to register LGBCoin as a security with the Florida Office of Financial Regulation.

393.   Because LGBCoin was never registered as required under the FSIPA, Defendants violated section 517.07 and are subject to liability because they solicited and participated in or aided the making of an offer of LGBCoin tokens for sale.

394.   As a result of Koutoulas's unregistered sales of securities, Plaintiffs have suffered damages in connection with their respective purchases of LGBCoin.

## THIRD CAUSE OF ACTION
## CIVIL CONSPIRACY TO VIOLATE FEDERAL AND STATE SECURITIES LAWS
### (Against All Defendants (Except for NASCAR))

395.    Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-80, 86-183.

396.    Plaintiffs allege this Count in the alternative to Count I in accordance with Fed. R. Civ. P. 8(d)(2).

397.    On information and belief, on or about November 6, 2021, the Executive Defendants agreed to fraudulently promote the LGBCoin as associated with Brown, BMS and NASCAR in an effort to artificially inflate the value and liquidity of the LGBCoin while they worked to liquidate the retained LGBCoin to maximize their joint and individual returns.

398.    On information and belief, on or about November 6, 2021, the Executive Defendants agreed to promote the unregistered security LGBCoin while they worked to liquidate the retained LGBCoin to maximize their joint and individual returns.

399.    In furtherance of this conspiracy, the founders directed the LGBCoin developer to create the code for the smart contract and LGBCoin itself.  Individual Defendants purposefully did not include any direction to create a "locking" or

vesting mechanism within the code to protect investors from insiders immediately selling off the LGBCoin allocations the insiders received pre-launch. The purpose of this overt act was to enable Individual Defendants Koutoulas and Horsman, along with Latona, Mascioli, Norden, Michalopoulos, McLaughlin, Horman's Coral DeFi, and other insiders, to sell as much of their respective portions of the LGBCoin Float as possible.

400. In furtherance of this conspiracy, Koutoulas and Horsman transferred trillions of LGBCoins between October 2021 and March 2022 to various insiders, including Mascioli, McLaughlin, and the Individual Defendants themselves. The purpose of these overt acts was to provide each of these Defendants with the actual LGBCoins that they would subsequently sell and/or transfer to other wallet addresses that, in turn, sold.

401. In furtherance of this conspiracy, Koutoulas, Horsman, Norden, and Mascioli falsely promoted LGBCoin and recruited others to falsely promote LGBCoin. In particular, in November and December of 2021, Koutoulas and Norden repeatedly touted the rapid increase in the market capitalization of LGBCoins since launch. Similarly, Koutoulas, personally and through the LGBCoin.io social media accounts, repeatedly teased an officially sanctioned

sponsorship of NASCAR driver Brandon Brown and the LGB team. The purpose of these overt acts was to lead investors to believe that there was massive growth potential for LGBCoins generally and with a NASCAR partnership specifically, and, thus, a financial benefit to investing in LGBCoins.

402. Defendants' actions falsely promoting LGBCoin enriched themselves to the detriment of Plaintiffs and class members. As seen in the transaction history publicly available on the Ethereum blockchain, the wallets owned and controlled by Koutoulas and Horsman collectively sold trillions of LGBCoins directly to investors. While these Defendants and their co-conspirators made millions of dollars, investors were left with LGBCoins that were a worthless "dumpster fire."

403. As a direct and proximate result of Defendants' actions, Plaintiffs and class members were damaged in the amount of the difference between the fair market price of their LGBCoin but for the Defendants' actions and the price they paid for their LGBCoin.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment/Restitution
### (Florida Common Law)
### (Against Defendant Koutoulas)

404. Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-83, 86-196.

405.    Plaintiffs and Class members conferred a monetary benefit on Koutoulas by raising the price and trading volume of LGBCoin, which allowed Koutoulas to sell LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.

406.    Koutoulas received a financial benefit from the sale of LGBCoin at inflated prices and is in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

407.    Plaintiffs and Class members seek restitution in the form of the monetary value of the difference between the purchase price of LGBCoin and the price those LGBCoin sold for.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment/Restitution**
**(Florida Common Law)**
**(Against Defendant Horsman)**

408.    Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-83, 86-196.

409.    Plaintiffs and Class members conferred a monetary benefit on Horsman by raising the price and trading volume of LGBCoin, which allowed

177

Horsman to sell LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.

410.    Horsman received a financial benefit from the sale of LGBCoin at inflated prices and is in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

411.    Plaintiffs and Class members seek restitution in the form of the monetary value of the difference between the purchase price of LGBCoin and the price those LGBCoin sold for.

<div align="center">

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment/Restitution**
**(Florida Common Law)**
**(Against Defendant LetsGoBrandon.com Foundation)**

</div>

412.    Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-83, 86-196.

413.    Plaintiffs and Class members conferred a monetary benefit on LetsGoBrandon.com Foundation by raising the price and trading volume of LGBCoin, which allowed LetsGoBrandon.com Foundation to sell LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.

414.   Horsman received a financial benefit from the sale of LGBCoin at inflated prices and is in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

415.   Plaintiffs and Class members seek restitution in the form of the monetary value of the difference between the purchase price of LGBCoin and the price those LGBCoin sold for.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment/Restitution
### (Florida Common Law)
### (Against Defendant LGBCoin, LTD)

416.   Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-38, 43-83, 86-196.

417.   Plaintiffs and Class members conferred a monetary benefit on LGBCoin, LTD by raising the price and trading volume of LGBCoin, which allowed LGBCoin, LTD to sell LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.

418.   LGBCoin, LTD received a financial benefit from the sale of LGBCoin at inflated prices and are in possession of this monetary value that was intended to

be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

419. Plaintiffs and Class members seek restitution in the form of the monetary value of the difference between the purchase price of LGBCoin and the price those LGBCoin sold for.

### EIGHTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against NASCAR)

420. Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-232.

421. This is a count for damages for negligent misrepresentation against NASCAR.

422. The following elements must be alleged to prevail on a negligent misrepresentation claim: (1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the

misrepresentation. *Doria v. Royal Caribbean Cruises, Ltd.*, 393 F. Supp 3d 1141, 1145 (S.D. Fla. 2019).

423.    NASCAR approved the sponsorship by LGBCoin on December 26, 2022 and on December 30, 2022, the approval became public.  Plaintiffs were aware of this disclosure of the approval and relied upon the approval in deciding to purchase LGB Coin.  On January 5, 2022, NASCAR abruptly withdrew its approval by stating that NASCAR would not permit BMS/Brandon Brown to participate in a race sponsored by LGBCoin.

424.    Prior to and as a result of the December 26, 2021 approval, NASCAR was aware that LGBCoin.io was a cryptocurrency coin whose value was directly related to the coin's notoriety, and therefore NASCAR knew or should have known that Plaintiffs and the proposed Class would make their purchasing decision based on their approval and the coin's notoriety.  Further, NASCAR knew or should have known that featuring LGBCoin on BMS/Brandon Brown's racecar at an official NASCAR race would significantly increase exposure of the coin to potential investors, which in turn would cause Plaintiffs and the proposed Class to decide to purchase the coin.  Finally, upon information and belief, NASCAR's silence and refusal to correct the NASCAR associations being made in the LGBCoin

promotions, which NASCAR was directly aware of at the time, was done so that NASCAR could benefit from increased viewership due to the controversy and, in turn, the associated increase in advertising revenue.

425.   Under the Restatement (Second) of Torts 552 (1977), which was adopted by the Supreme Court of Florida in 1997, it provides that a party who, in the course of its business or in any other transaction in which it has a pecuniary interest, supplies false information negligently, is liable to a party harmed by that false information.  As comment h. to § 552(2) explains: "It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.  **It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or grou**p . . . ."

426.   Here, NASCAR knew that the LGBCoin.io team intended to transmit the information from the December 26, 2021 email regarding NASCAR's approval of the LGBCoin.io sponsorship of Brown to Plaintiffs and the other members of the class of LGBCoin investors.

427.    To continue to boost its own revenue, NASCAR needs to show value to current and future sponsors.  It keeps track of the sales and revenue garnered by NASCAR sponsors.  NASCAR seeks to hold and gain more sponsorships by inducing the successful marketing and sales of sponsor products, including LGBCoin and purchases by Plaintiffs and the proposed Class.  NASCAR intended to induce Plaintiffs and the proposed Class to rely on the approval in deciding to purchase LGBCoins.

428.    NASCAR was negligent in making the material misrepresentation of approval of the LGBCoin sponsorship because the representation was made without knowledge of its truth or falsity and/or NASCAR should have known or ascertained that the misrepresentation was false.

429.    On December 26, 2021, it was reasonably foreseeable to NASCAR that Plaintiffs and the Class would rely and did rely upon its approval to purchase LGBCoin when those same individuals and entities would otherwise have not purchased LGBCoin without the increased notoriety of the coin stemming from approval of the sponsorship.

430.    From December 26, 2021 through January 5, 2022, NASCAR was aware or should have been aware that its statements had induced others to act to promote

the coin with the aim of increasing the coin's notoriety and causing Plaintiffs and the proposed Class, to purchase the coin. Before January 5, 2022, NASCAR never made any statement to contradict its approval. Rather, NASCAR permitted others to continue to act in reliance on its approval.

431. Plaintiffs and the proposed Class justifiably relied on the representation of approval of NASCAR in deciding to purchase LGBCoin.

432. If NASCAR had not given its approval, then Plaintiffs and the proposed Class would not have acted in reliance to decide to purchase the LGBCoin.

433. Plaintiffs and the proposed Class justifiably relied on the material misrepresentation of approval of NASCAR by deciding to purchase LGBCoin.

434. Plaintiffs and the proposed Class suffered damages in an amount to be proven at trial by acting in justifiable reliance on the material misrepresentation by NASCAR.

435. Plaintiffs and the proposed Class justifiably relied on the material misrepresentation of approval of NASCAR by deciding to purchase LGBCoin.

**NINTH CAUSE OF ACTION**
**Promissory Estoppel Under Florida Common Law**
**(Against NASCAR)**

436.    Plaintiffs restate and reallege the following allegations as if fully set forth herein: ¶¶1-232.

437.    The following elements must be alleged to prevail on a promissory estoppel claim: that the plaintiff detrimentally relied on the defendant's promise, that the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance by the plaintiff, and that injustice can only be avoided by enforcement of the promise. *Conseal International Inc. V. Neogen Corp.*, 2020 WL 4736203 at *8 (S.D. Fla. 08/14/2020)

438.    NASCAR made a promise of approval of the sponsorship by LGBCoin on December 26, 2022 and on December 30, 2022, BMS publicly disclosed that it had received approval of the sponsorship stated.  Plaintiffs read and/or were aware of this disclosure of the approval and relied upon the approval in deciding to purchase LGBCoin.

439.    Prior to and as a result of the December 26, 2021 approval, NASCAR was aware that LGBCoin.io was a cryptocurrency coin whose value was directly related to the coin's notoriety, and therefore NASCAR knew or should have known

that Plaintiffs and the proposed Class would make their purchasing decision based on their approval and the coin's notoriety. Further, NASCAR knew or should have known that featuring LGBCoin on BMS/Brandon Brown's racecar at an official NASCAR race would significantly increase the notoriety of the coin, which in turn would cause Plaintiffs and the proposed Class to decide to purchase the coin.

440.   To continue to boost its own revenue, NASCAR needs to show value to current and future sponsors. It keeps track of the sales and revenue garnered by NASCAR sponsors. NASCAR seeks to hold and gain more sponsorships by inducing the successful marketing and sales of sponsor products, including LGBCoin and purchases by Plaintiffs and the proposed Class. NASCAR intended to induce Plaintiffs and the proposed Class to rely on the approval in deciding to purchase LGBCoins.

441.   NASCAR hoped to hold and gain more sponsorships by inducing the successful marketing of LGBCoin and purchases by Plaintiffs and the Class. NASCAR intended to induce Plaintiffs and the proposed Class to rely on the approval in deciding to purchase LGBCoins.

442.   On December 26, 2021, it was reasonably foreseeable to NASCAR that Plaintiffs and the Class would rely and did rely upon its approval to purchase

LGBCoin when those same individuals and entities would otherwise have not purchased LGBCoin without the increased notoriety of the coin stemming from approval of the sponsorship.

443.   If NASCAR had not given its approval, then Plaintiffs and the proposed Class would not have acted in reliance to decide to purchase the LGBCoin.

444.   Plaintiffs and the proposed Class justifiably relied on the promise of approval of NASCAR by deciding to purchase LGBCoin.

445.   Injustice can be avoided only by holding NASCAR to its promise. From December 26, 2021 through January 5, 2022, NASCAR was aware or should have been aware that its statements had induced others to act to promote the coin with the aim of increasing the coin's notoriety and causing Plaintiffs and the proposed Class, to purchase the coin.  Before January 5, 2022, NASCAR never made any statement to contradict its approval.  Rather, NASCAR permitted others to continue to act in reliance on its approval.

446.   On January 5, 2022, NASCAR abruptly withdrew its promise made on December 26, 2021 by stating that NASCAR would not permit BMS/Brandon Brown to participate in a race sponsored by LGBCoin.

447.   On January 5, 2022, NASCAR knew or should have known that its breach of its December 26, 2021 promise would gain widespread, national media attention and harm the reputation of the LGBCoin. As a consequence of NASCAR's withdrawal of its promise to permit sponsorship by LGBCoin, the LGBCoin lost substantially all its value, and Plaintiffs and Class Members who had acted in reliance on NASCAR's promise thus lost substantially all the value of their purchase-price investments in LGBCoin. NASCAR should be estopped from revoking its approval.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.   Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.   Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and class members are entitled;

D.      Award post-judgment interest on such monetary relief;

E.      Grant appropriate injunctive and/or declaratory relief;

F.      Award reasonable attorneys' fees and costs; and

G.      Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED: April 14, 2023

s/ *Sean T. Masson*

Sean T. Masson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: 212-223-6444
smasson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**
John T. Jasnoch (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
jjasnoch@scott-scott.com

**ZIGLER LAW GROUP, LLC**
Aaron M. Zigler (*pro hac vice*)
Robin Horton Silverman (FL Bar 0027934)
Mary Jane Fait (*pro hac vice* forthcoming)
Michael Krzywicki (FL Bar 1002304)
Nidya Gutierrez (*pro hac vice*)
308 S. Jefferson Street | Suite 333
Chicago, IL 60661
Tel: 312-673-8427
aaron@ziglerlawgroup.com
robin@ziglerlawgroup.com
maryjane@ziglerlawgroup.com
michael@ziglerlawgroup.com
nidya@ziglerlawgroup.com

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DISTRICT

|  |  |  |
|---|---|---|
| PATRICK HORSMAN, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24-cv-00342-AW-MAF |
| | § | |
| BRETT JEFFERSON, | § | |
| RYAN ANDREWS, and | § | |
| ANDREWS LAW FIRM, P.A., | § | |
| | § | |
| Defendants. | § | |

## <u>DECLARATION OF BRETT JEFFERSON</u>

Brett Jefferson, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2.      I am a current resident of the state of North Carolina. My address is 108 Edward Booth Lane, Durham, NC, 27713.

3.      On October 9, 2023, I filed a lawsuit in Florida's Second Judicial Circuit. In bringing suit in Florida's Second Judicial Circuit, the complaint alleged that venue was proper in Gadsen County, Florida. The parties subsequently

stipulated to transfer the case to Florida's Fifteenth Judicial Circuit, where it is currently pending.

4.    When I initiated the lawsuit, I alleged that I was a Florida resident because I own real property in Florida and that venue was proper in Florida because the underlying contracts at issue in that lawsuit were negotiated in Florida at times when I was within the state.

5.    While I have owned this property in Florida since 2018, I spent less than two months at this property in 2024 and have never exercised or applied for the Florida homestead exemption. My permanent residence as of today is in North Carolina, where Plaintiff served the summons on me.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October __15__, 2024.

_____
Brett Jefferson